**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **SHANNON KING,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 2:21-cv-02049-KHV-KGG |
| vs. ) | |
| ) | |
| **BOARD OF COUNTY** ) | |
| **COMMISSIONERS OF** ) | |
| **JOHNSON COUNTY, KANSAS,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

In this case, Plaintiff asserts that Defendant, Board of County Commissioners of Johnson County, Kansas ("Defendant," "Johnson County," or "the County") discriminated and/or retaliated against her when it did not select her to fill five different positions. Specifically, Plaintiff asserts that the County discriminated against her on the basis of her sex, age, and/or alleged disability, and retaliated against her for using FMLA when it did not hire her for two positions within Johnson County's Department of Corrections. She asserts those same claims in regards to three positions within the County's Mental Health Department and, for those three positions, adds claims of retaliation for reporting her belief that the County discriminated against her with respect to the Department of Corrections positions.

As discussed in detail, below, none of the decision makers for the Mental Health positions knew Plaintiff. They did not know her sex, sexual orientation, gender presentation, or age. They also were unaware she had any kind of impairment, did not know she had used FMLA, and did not know she had made any complaints of discrimination. Because they were not even aware of

Plaintiff's protected statuses, the decision makers could not possibly have engaged in discrimination or retaliation. Rather, Plaintiff submitted a resume for these positions that did not reflect experience that had anything to do with the positions.

The hiring managers for the Department of Corrections positions were also unaware that Plaintiff had any kind of impairment or had taken any FMLA leave, thus negating any possible suggestion of discrimination or retaliation on those bases (even if Plaintiff could establish that she has a disability). The hiring managers for the Department of Corrections positions were aware of Plaintiff's gender and gender presentation. They were also aware that Plaintiff was older than one of the candidates selected. But even viewing the evidence in the light most favorable to Plaintiff, she cannot establish that her sex (broadly defined) or age had anything to do with the reasons she was not selected for those positions. Rather, the County based its decisions on the candidates' skills, qualifications, experiences, and interviews. Not only is the record devoid of any evidence that the decisions were discriminatory, it establishes that the County hired the most qualified candidates for each position.

For these reasons, as more fully discussed below, Plaintiff cannot establish the essential elements of her claims nor can she establish pretext, and the County is entitled to judgment as a matter of law on all of Plaintiff's claims.

## II.    STATEMENT OF UNCONTROVERTED[1] FACTS

### Relevant Johnson County Policies

1.      County policies prohibit discrimination on the basis of sex, age, and disability (among other protected characteristics). Ex. 1, Pltf's depo. 84:5-8; Ex. 2, pre-2021 EEO Policy

---

[1] For purposes of this Motion, Defendant has assumed the truth of Plaintiff's testimony and outlined the facts in the light most favorable to Plaintiff. In actuality, Defendant disputes many of the facts included herein but assumes their truth for purposes of this Motion.

and Procedure; Ex. 3, 2021 EEO Policy and Procedure; *See also* Ex. 4, Positive Employee Relations Policy; Ex. 5, Productive Work Environment Policy and Procedure.

2.      In 2021, the County updated its policies and explicitly listed sexual orientation, gender identity, and gender presentation among the protected categories, but the County prohibited discrimination on those bases for many years before that. Ex. 6, Hentschel Decl. ¶ 4.

3.      All supervisors and managers receive regular training on the County's anti-discrimination and anti-harassment policies. Supervisors also receive training on recruitment, selection, and interviewing, which includes reference to the EEO policies. Ex. 6, Hentschel Decl. ¶ 5; Ex. 7, House depo. 56:5-59:24.

4.      Since at least 2017, the County has specifically trained its employees to understand that the prohibition on sex discrimination extends to discrimination based on sexual orientation, gender identity, and gender presentation. Ex. 6, Hentschel Decl. ¶ 6; Ex. 8, 2017 STI Training at JoCo 3224, 3237; Ex. 9, May 2019 STI Training at JoCo 3268; Ex. 10, September 2019 STI Training at JoCo 3298; Ex. 11, portion of 2016 Harassment Training at JoCo 7662-7663.

5.      On June 19, 2020, Johnson County issued an announcement to its employees to highlight the Supreme Court holding that Title VII prohibits discrimination on the basis of sexual orientation and gender identity. The announcement notes that Johnson County "has considered such discrimination and inconsistent with our policies, values and expectations for decades." Ex. 12 (Depo. Ex. 6) Inside JoCo Announcement.

6.      Plaintiff claims the training she attended did not include mention of those protected categories, but Plaintiff admits she took the training outlined in Exhibits 10 and 11. Ex. 1, Pltf's depo. 85:25-87:1; Ex. 13 (Depo. Ex. 7), Plaintiff's Training Transcript; Ex. 1, Pltf's depo. 91:2-8.

7.     Plaintiff is aware of the County's policy against discrimination. She has received hard copies over the years and is aware it is located online. Ex. 1, Pltf's depo. 83:20-85:6.

8.     The policies also contain information about how to report discrimination and harassment. Ex. 1, Pltf's depo. 85:4-6.

9.     Plaintiff has received training on the policies against discrimination and harassment, as well as training regarding how to report discrimination and harassment, on numerous occasions throughout her employment with the County. Ex. 1, Pltf's depo. 83:19-25; Ex. 14 (Depo. Ex. 2) Training Acknowledgements.

10.     County policies also prohibit retaliation based on reports of discrimination or harassment and based on the use of FMLA leave. Ex. 6, Hentschel Decl. ¶ 7; Ex. 15 (FMLA policy); s*ee e.g.* Ex. 2 at JoCo 111; Ex. 5 at JoCo 116. The training the County provides also includes training on retaliation. Ex. 6, Hentschel Decl. ¶ 7; *see e.g.* Ex. 8 at JoCo 3225; Ex. 7, House depo. 102:3-103:2.

**Johnson County Department of Corrections**

11.     Johnson County's Department of Corrections (JDOC) is headed by a Director of Corrections. From April 2007 until September 29, 2017, Betsy Gillespie held that position. Ex. 6, Hentschel Decl. ¶ 8.

12.     Robert Sullivan became the interim Director of Corrections in October 2017 and officially took over the position inn 2018. Ex. 18, Sullivan depo. 119:6-120:3. Mr. Sullivan is 49 years old. *Id.* at 119:4-5.

13.     JDOC has four division directors, all of whom report to the Director of Corrections. Those include the Administrative Division, the Director of Juvenile Services, the Director of Field Services, and the Director of the Adult Residential Center (ARC). Ex. 19, Sullivan Decl., ¶ 2.

14.     In addition, the Director of Corrections and/or Assistant Director of Corrections oversee financial functions, administrative functions, and project management functions. Ex. 20, Dougan depo. 14:5-23:24.

15.     When Mr. Sullivan became the Director of Corrections, the Assistant Director was Susan Dougan. Ex. 20, Dougan depo. 16:3-17:7.

16.     Ms. Dougan (YOB 1963) had a great working relationship with Mr. Sullivan. Ex. 20, Dougan depo. 45:22-24; Ex. 6, Hentschel Decl. ¶ 15.

17.     Each department in Johnson County is supported by a Human Resources Partner, Senior Partner or Principal Partner. Shala Bloomberg has supported the JDOC since February 2017. Ex. 17, Bloomberg depo. 15:5-9, 21:18-19.

**The Recruitment Process**

**Reviewing Candidates and Determining Who to Interview**

18.     Each department within the County handles the recruitment process differently. Ex. 7, House depo. 33:3-7.

19.     In the Department of Corrections, the Human Resources Partner supporting the department typically posts open positions and screens applicants for minimum qualifications. Ex. 17, Bloomberg depo. 111:4-112:2.

20.     If an applicant meets minimum qualifications, the HR Partner moves the applicant to "candidate status" in the applicant tracking system. Ex. 17, Bloomberg depo. 112:25-113:6.

21.     The hiring manager then decides who to interview. Ex. 17, Bloomberg depo. 118:20-119:3.

22.    By contrast, in the Mental Health department, the HR Partner (currently Samantha Veronda) posts open positions but is not involved in reviewing applicants for minimum qualifications before interviews. Ex. 22, Veronda depo. 16:18-21:17.

23.    The hiring managers review applications, select candidates to interview, complete interviews, select those candidates to hire and send the list of candidates they want to hire to Ms. Veronda. Ex. 22, Veronda depo. 16:18-21:17.

24.    After the hiring managers select candidates, Ms. Veronda reviews the materials to ensure the selected candidates meet minimum qualifications and begins the hiring process. Ex. 22, Veronda depo. 18:22-19:10. The hiring managers review the candidates for minimum qualifications first. Ms. Veronda just double-checks them at the background check phase. *Id.* at 19:5-10.[2]

25.    Ms. Veronda sometimes enters information into the applicant tracking system to show which candidates were interviewed and the outcome, but she does not choose who to interview, does not review the candidates selected for interviews before the interviews, and is not involved in determining who will be on the interview panel. Ex. 22, Veronda depo. 18:16-18, 21:13-24, 25:23-26:2, 28:5-9.

26.    Ms. Veronda never makes hiring recommendations and never makes hiring decisions. Ex. 22, Veronda depo. 35:14-18.

27.    After the hiring manager selects a person to hire, Ms. Veronda reviews that person's information, but she does not review information on anyone else who applied for the position. Ex. 22, Veronda depo. 25:23-26:12.

---

[2] The Library uses a similar process. Ex. 7, House depo. 32:13-42:9.

28.     The County's Recruitment and Selection Policy states that the County "prefers to promote from within and may first consider current employees with the necessary qualifications and skills to fill vacancies, unless outside recruitment is considered to be in the County's best interest." Ex. 23, Policy 202; Ex. 17, Bloomberg depo. 114:25-115:12.

**Conducting Interviews**

29.     JDOC generally conducts panel interviews to fill positions, and the hiring manager determines who will be on the panel. Ex. 1, Pltf's depo. 63:1-8; Ex. 17, Bloomberg depo. 119:16-19.

30.     Members of the interview panel provide input, but the decision is ultimately made by the hiring manager for the position. Ex. 1, Pltf's depo. 63:1-8; Ex. 24, Bloomberg Decl. ¶ 6.

31.     Historically, each panel member scored each interviewed candidate on their answers to interview questions. Ex. 1, Pltf's depo. 63:4-17.

32.     Using this process, there were occasions when the candidate with the highest score was not the person the hiring manager wanted to hire. Ex. 6, Hentschel Decl. ¶ 12; Ex. 7, House depo. 52:20-53:11; Ex. 25, Brown depo. 49:20-50:10.

33.     For this reason, Human Resources has recommended against using scoring matrixes. Ex. 6, Hentschel Decl. ¶ 13.

34.     After Mr. Sullivan became the Director of JDOC, he agreed to stop using scoring rubrics in the interview process. Ex. 18, Sullivan depo. 20:5-25:15.

**<u>Background on Plaintiff and her Employment with the County</u>**

35.     Plaintiff is a masculine-presenting, homosexual female. Doc. __, Pretrial Order, Plaintiff's Contentions.[3] Plaintiff's 's date of birth is June 27, 1969. Ex. 1, Pltf's depo. 15:22-24.

---

[3] Consistent with the Court's instructions, citations to the Pretrial Order are left blank and will be supplemented upon entry of the final Order.

36.     Plaintiff began her college career at LaBette Community College and then transferred to the University of Central Florida ("UCF"). Plaintiff's original major at UCF was computer science and mathematics, but she graduated with a criminal justice degree in 1991. Ex. 1, Pltf's depo. 22:14-24:10.

37.     Plaintiff started graduate school in 1992 at UMKC in the Administration of Justice Program and received a Master's degree from there in 1994. *Id.* at 22:22-25. In that program, she had several statistical classes in quantitative and qualitative data analysis. *Id.* at 23:11-12.

38.     Plaintiff first began with Johnson County in 1992 as a House Arrest Officer in the Department of Corrections and held that position until she resigned in 1996. Ex. 1, Pltf's depo. 99:20-100:10.

39.     Plaintiff then worked for the State of Kansas in Court Services for approximately one year. In 1997, Plaintiff applied to return to the County and was hired as an Adult Intensive Supervision Officer (ISO) (a probation officer) position within the JDOC. Ex. 1, Pltf's depo. 100:22-103:8.

40.     In March 1999, Plaintiff became an ISO II, which was later retitled a Senior Case Manager (SCM). Ex. 1, Pltf's depo. 106:9-12.

41.     The SCM position is a supervisory position overseeing ISOs. Plaintiff oversaw ISOs on the Adult side of the criminal justice system. *Id*. at 105:18-22; Ex. 26, Pltf's Resume; Ex. 19, Sullivan Decl. ¶ 5.

42.     In her position, Plaintiff typically supervised a team of eight or nine ISOs. She also supervised a secretary at times. Ex. 19, Sullivan Decl. ¶ 6.

43.     Sharon Brown became the Director of Field Services in 2007. Ex. 25, Brown depo. 5:24-6:1. Plaintiff reported to Ms. Brown from that time until Ms. Brown retired in March 2019.

Ex. 25, Brown depo. 5:24-6:9.

44.    Ms. Brown describes Plaintiff as very smart. Plaintiff took a lot of pride in her work. She did a good job. She was able to interact with clients and staff. She understood the mission and the Department's vision. She showed maturity and did a very good job in her SCM role. Ex. 25, Brown depo. 7:5-14.

45.    Ms. Brown viewed Plaintiff's areas for improvement as learning to fight appropriate battles and to be sure to gather all the information before jumping to conclusions. Ms. Brown also coached Plaintiff to be open to different ideas and ways of approaching situations. Ms. Brown did not necessarily believe Plaintiff could not be innovative, but observed that sometimes if she did not agree with something, it became a point of contention. Ex. 25, Brown depo. 10:12-11:18.

46.    During much of her tenure as an SCM in Adult Supervision, Plaintiff handled side projects related to data. For example, Plaintiff took over a report that Brian Seidler[4] had previously handled that required her to engage in a detailed data collection process each month. Ex. 1, Pltf's depo. 204:13-205:9.

47.    This report gathered revocation data to try to ascertain whether there was a pattern regarding why clients had their probations revoked. They looked at a variety of data such as the charge, reason for revocation, officer involved, age, race, gender, etc. Ex. 28, Seidler depo. 58:8-59:1.

48.    At some point, Mr. Seidler turned that report over to the Adult Field Services department, and Plaintiff worked on it. Ex. 28, Seidler depo. 58:8-59:9.

49.    Mr. Seidler did not view this work as data analysis, but Plaintiff inputted

---

[4] As discussed in more detail, below, Brian Seidler worked as a Project Manager/BI Analyst, a position that Plaintiff later sought and which involves significant data analysis. *See* SOF 157-167.

information about, for example, the reason an officer revoked someone's probation and likely looked at trends related to that. Ex. 28, Seidler depo. 59:10-60:18; *see also* Ex. 25, Brown depo. 101:15-102:18 (Plaintiff's work on the revocation report was basic).

50.     During her tenure, Ms. Brown gave Plaintiff positive performance reviews on an annual basis. Ex. 29, Pltf's Performance Reviews for performance years 2011 through 2018.[5] The reviews consistently rate Plaintiff very highly and include many favorable comments. *Id*.

51.     In 2013, Plaintiff received a letter of expectation because Ms. Brown received a report that Plaintiff engaged in a heated verbal exchange with another supervisor, which was inappropriate and did not display the department's values. Ex. 30 (Depo. Ex. 20) Pltf's 2013 Review; Ex. 1, Pltf's depo. 206:10-207:1.

52.     In June 2016, SCM Nanette Rosas reported to Ms. Brown that she had heard Plaintiff go into the office of SCM Robert Johnson and scream at him that he better fucking do what she told him to do. Ex. 32, Rosas Decl. ¶ 4.

53.     In September 2018, the County received an anonymous hotline complaint about all of the SCMs in Adult supervision. The caller reported that Plaintiff was rude to her staff and that Plaintiff had indicated she was going to wear a t-shirt that says "STFU" (Shut the Fuck Up) so staff would stop asking her to help with the caseload. Ex. 33 (Depo. Ex. 24).

54.     Mr. Sullivan forwarded the complaint to Ms. Brown for investigation. Ms. Brown then reported her findings to Ms. Bloomberg and Mr. Sullivan. Among other things, Ms. Brown reported that Plaintiff admitted to making the comment about the shirt but said she was joking. Ex.

---

[5] Starting in 2019, the County stopped conducting formal performance reviews and began using a system called Pillars of Performance Development (PPD), which is a forward-thinking system where supervisors check in with their employees on a regular basis. Ex. 6, Hentschel Decl. ¶ 10.

34 (Emails related to hotline complaint).[6]

**Alleged Discrimination Outside of Hiring Decisions**

Following is the discrimination Plaintiff alleges, other than hiring decisions.

55.     In 1992, Beverly Marshbank, the ARC Director at the time, told Plaintiff she should wear a dress twice a week with makeup and panty hose. Ex. 1, Pltf's depo. 75:18-76:5, 77:19-3.

56.     Ms. Marshbank was actually employed by the state but stopped working at the ARC in the 1990s. She was never employed by Johnson County. Ex. 6, Hentschel Decl. ¶ 14.

57.     When Plaintiff was in House Arrest (a position she left in 1996), a director named Bruce Rider told her she should not give a gay client preferential treatment. Ex. 1, Pltf's depo. 76:6-14

58.     A former Division Director named Doug Gertsema told Plaintiff to wear a dress when a County Commissioner was going to visit the facility and periodically had conversations with her about dressing less masculine. Ex. 1, Pltf's depo. 76:15-22, 80:2-8

59.     Mr. Gertsema's employment was terminated in 2006. Ex. 6, Hentschel Dec. ¶ 9.

60.     Bill Keith, Plaintiff's supervisor when she was first promoted to ISO (in 1997), told her he wanted to make the expectations regarding her dress clear. Plaintiff told him she was familiar with the dress code and would follow it. Ex. 1, Pltf's depo. 76:23-77:11.

61.     Mr. Keith left the County in 1999. Ex. 6, Hentschel Decl. ¶ 16.

62.     Plaintiff believes she was also passed over for promotion to ISO (which would have occurred before 1997). Ex. 1, Pltf's depo. 78:20-80:1.

63.     After a discipline hearing with Sheri Almer, an employee Plaintiff supervised, Ms. Almer and Ms. Gillespie told Plaintiff she should think about smiling more. Ex. 80:10-25. Plaintiff

---

[6] Plaintiff testified that she did not remember suggesting that she wear a shirt saying STFU. Ex. 1, Pltf's depo. 141:20-23.

believes that statement is sexist. *Id*. at 81:8-20.

64.     When Ms. Gillespie became the Director of JDOC in 2007, she indicated that she wanted the employees in the department to dress more professionally. Ex. 25, Brown depo. 19:4-16, 108:4-17.

65.     Ms. Gillespie never told or implied to Ms. Brown that she wanted Plaintiff to dress in a more feminine way or anything to that effect. Ex. 25, Brown depo. 18:1-16.

66.     Ms. Brown subsequently spoke with others, including Plaintiff, and informed them they needed to dress more professionally. Ex. 25, Brown depo. 18:23-19:25, 108:4-109:9.

67.     Plaintiff believes Ms. Gillespie's intent was discriminatory but admits Ms. Brown never made any discriminatory statement and never claimed Ms. Gillespie indicated the conversation had anything to do with Plaintiff's sex, sexual orientation, or gender presentation. Ex. 1, Pltf's depo. 81:21-82:12.

68.     Plaintiff received cards from Commissioners congratulating her on 20 years of service that were directed to "Mr. King." Ex. 1, Pltf's depo. 82:21-83:2.

69.     Ms. King had never met the Commissioners who sent those cards. Ex. 1, Pltf's depo. 111:25-112:7.

70.     Other than the hiring decisions discussed below, Plaintiff cannot recall any other discriminatory treatment. 83:3-15; 278:6-19; 292:23-293:4.[7]

**Department of Corrections Positions At Issue**

**Director of Field Services**

71.     After Sharon Brown retired, Plaintiff applied to fill her position as the Director of

---

[7] Plaintiff also claims that County employees have told her to get out of the restroom or asked what she is doing in the restroom, but Plaintiff does not know who they were. They were people who did not know her. Ex. 1, Pltf's depo. 278:23-280:8. Plaintiff never reported any of this behavior until June 2019. *See* SOF ¶ 327.

Field Services. Ex. 35 (Depo. Ex. 31).

72.     By that time, Mr. Sullivan had been the Director of Corrections for approximately 15 months and was familiar with Plaintiff as one of the SCMs in Adult Field Services. Ex. 19, Sullivan Decl. ¶ 7.

73.     The job posting for this position can be found at Exhibit 36. Mr. Sullivan was the hiring manager. Ex. 24, Bloomberg Decl. ¶ 7; Ex. 36.

74.     The Director of Field Services oversees both Adult and Juvenile Intensive Supervision (supervised probation). The position also oversees Adult and Juvenile House Arrest, Juvenile Case Management, Juvenile Programming, Probation Intake, and Bond Assessment. Ex. 21, Clark depo. 72:16-21.

75.     The Director of Field Services maintains strong familiarity with department policies, as well as Kansas Department of Corrections (KDOC) adult and juvenile offender contact standards. The Director maintains a working knowledge of current trends and actions with both Adult and Juvenile Field Services. Ex. 36.

76.     This Director maintains continued awareness of the status of the Department's budget and adjusts operations accordingly. This Director authorizes purchases according to budget status and need, and oversees compliance with state and local statutes. Ex. 36.

77.     This Director participates in the development of the agency's comprehensive plan, serves as the Administrative Contact to the KDOC Juvenile Services, and ensures the district complies with KDOC juvenile policies and regulations. Ex. 36. This Director must also develop positive working relationships with the KDOC, the Adult and Juvenile Community Corrections Advisory Boards, and serves on the Statewide Community Advisory Committee. Ex. 36.

78.     A total of 44 people applied for this position. Ex. 24, Bloomberg Decl. ¶ 8.

79.     Mr. Sullivan determined who to interview, and he selected eight candidates, including Plaintiff, for interviews. Ex. 18, Sullivan depo. 87:21-88:15; Ex. 19, Sullivan Decl. ¶ 9; Ex. 24, Bloomberg Decl. ¶ 10; Ex. 37, List of Interviewees.

80.     Resumes for these eight candidates can be found at Exhibit 16. Ex. 24, Bloomberg Decl. ¶ 10.

81.     There were 12 candidates who met the minimum qualifications for the position but whom Mr. Sullivan decided not to interview: Jennifer Douglas, Shawn Fletcher, Randy Focken, Andrew Harold, Alexander Kump, Claude Maye, Momodou Nije, Adam Patterson, Nanette Rosas, Richard Skaggs, Jesse Williams, and Julie Wright. Ex. 38, Information from the County's Applicant Tracking System; Ex. 24, Bloomberg Decl. ¶ 11.

82.     In addition to Mr. Sullivan, the following people were on the interview panel: Sharon Brown, Susan Dougan (Deputy Director of Corrections), Tedd Jester (Director of Juvenile Services), Shelly Williams (Director of Community Corrections for Riley County, Kansas), and Shala Bloomberg. Ex. 1, Pltf's depo. 162:22-163:6; Ex. 18, Sullivan depo. 83:13-16, 88:16-89:5.

83.     At times, hiring managers within Johnson County ask people outside the organization to sit on interview panels for high level positions in order to obtain an outside perspective. Other governmental organizations also do this. Ex. 18, Sullivan depo. 89:6-15; Ex. 21, Clark depo. 138:10-139:8; Ex. 22, Veronda depo. 95:24-96:6.

84.     For example, the Kansas Department of Corrections (KDOC) has asked Mr. Sullivan to participate in interview panels for them, and when Mr. Sullivan left Emporia, the chief judge asked another director to help him pick Mr. Sullivan's replacement. Ex. 18, Sullivan depo. 89:6-15.

85.     Mr. Sullivan asked the Director from Sedgwick County to be on the panel for the Director of the ARC position. Ex. 18, Sullivan depo. 89:23-90:7; Ex. 21, Clark depo. 139:5-8.[8] And Earl Taylor asked the Deputy Director from Sedgwick County to be on the panel for the Deputy Director of the ARC position. Ex. 18, Sullivan depo. 94:13-19.

86.     Plaintiff completed an application for the position and listed Sharon Brown (who was on the interview panel) as a reference. Ex. 39 at JoCo 3448.

87.     Exhibit 35 (Depo. Ex. 31) contains the other materials Plaintiff submitted in connection with her application for this position.[9] Ex. 1, Pltf's depo. 161:18-20.

88.     As shown on her resume, Plaintiff had one year of experience with juveniles, which occurred in 1992-1993. Ex. 35 (Depo. Ex. 31); Ex. 1, Pltf's depo. 168:14-17.

89.     Plaintiff had limited experience with budgets. She understood and read budgets but had never created them. Ex. 1, Pltf's depo. 168:18-22.

90.     Plaintiff's experience with writing grants was limited to helping another employee write one grant in 2007. Ex. 1, Pltf's depo. 169:14-24.

91.     The writing sample Plaintiff submitted was a letter she had written to a judge in 2008. *Id*.

92.     Exhibits 40, 41 and 42 contain the submissions Keith Clark provided for this position. Ex. 24, Bloomberg Decl. ¶ 9.

93.     Like Plaintiff, Mr. Clark was born in 1969. Ex. 43, Clark Decl. ¶ 3.

94.     Mr. Clark had been working in corrections since 1994. Ex. 40.

---

[8] Notably, Mr. Clark also applied for the ARC Director position but was not selected for an interview. Ex. 21, Clark depo. 139:9-22.
[9] Plaintiff's cover letter is dated January 28, 2018, but there is no dispute she submitted them in 2019. Ex. 1, Pltf's depo. 167:18-168:10.

95.     From 2003 until 2016, Mr. Clark was the Director of Community Corrections for the Fourth Judicial District, meaning he held a Director position similar to the position held by Mr. Sullivan but in a much smaller District. Ex. 40; Ex. 21, Clark depo. 28:10-15, 34:18-35:1; Ex. 43, Clark Decl. ¶ 4.

96.     In that position, Mr. Clark was directly responsible for community-based supervision in a four-county area. This included Adult Intensive Supervision, Juvenile Intensive Supervision, Community Case Management, Behavior Health Services, and various programming to meet the needs of the populations being served. Ex. 40; Ex. 41 (Depo. Ex. 32), Clark Cover Letter and Resume; Ex. 1, Pltf's depo. 170:3-11.

97.     Mr. Clark developed and monitored six budgets totaling $1.1 million, and he wrote and executed multiple grant applications that support the continuation of evidence-based practices in community supervision. Ex. 41, Depo. Ex. 32, p. 2.

98.     Mr. Clark supervised 10 to 12 employees in that role. He also wrote the adult comprehensive plan, the behavioral health plan, submitted quarterly reports for the Kansas Department of Corrections, and worked on data and outcomes. Ex. 21, Clark depo. 30:14-20; Ex. 43, Clark Decl. ¶ 5.

99.     An adult comprehensive plan is an annual report required by the Kansas Department of Corrections which details the services. It discusses the District's population, the District's Advisory Board, the programming available in the District, Quality Assurance programs, and outcomes. It also includes budget and funding considerations. Ex. 21, Clark depo. 32:25-33:13.

100.    The quarterly reports are also required by the KDOC to provide documentation of the District's progress related to the outcomes in the comprehensive plan. Ex. 21, Clark depo. 35:2-10.

101.    During part of the time Mr. Clark was the Director in the 4th Judicial District, Mr. Sullivan was the Director in the 5th Judicial District, a neighboring jurisdiction, and they had some interaction in those roles. For example, they had transfer cases between them, attended all of the same meetings, consulted to complete plans or budgets, and consulted about new initiatives. Ex. 21, Clark depo. 23:13-24:4, 28:25-29:2.

102.    Beginning in February 2016, Mr. Clark held a Project Manager position at the Johnson County Department of Corrections. Ex. 21, Clark depo. 20:19-24; Ex. 43, Clark Decl. ¶ 6.

103.    When Mr. Clark was in that position and Mr. Sullivan was Johnson County's Criminal Justice Coordinator (the position he held before became the Director of JDOC), Mr. Clark and Mr. Sullivan interacted on various projects. Ex. 18, Sullivan depo. 149:3-152:21.

104.    Mr. Sullivan had familiarity with Mr. Clark's experience based on his interactions with him when they were Directors of Community Corrections in neighboring jurisdictions and based on his interactions with him in their roles at Johnson County. Ex. 19, Sullivan Decl. ¶ 8.

105.    The writing sample Mr. Clark provided was a 43-page Community Corrections Comprehensive Plan he had drafted in April 2016. Ex. 40 at JoCo 3401-3444.

106.    Of the bullet points listed on the job posting, which describe the duties of the Director of Field Services (*See* Ex. 36 at JoCo 911), the only duty Mr. Clark did not already have experience with was service delivery associated with house arrest. Ex. 21, Clark depo. 202:2-204:8.

107.    Mr. Clark also submitted an application, which can be found at Exhibit 42. Ex. 24, Bloomberg Decl. ¶ 9. Mr. Clark listed Shelly Williams as one of his references on his application. Ex. 42.

108.    Mr. Clark has known Ms. Williams for 25 years and considers her a friend. Ms. Williams was a Director of Community Corrections for the 21st Judicial District when Mr. Clark was the Director of Community Corrections for the 4th Judicial District.  Ex. 21, Clark depo. 137:4-23, 138:5-6.

109.    At the time he listed Ms. Williams as a reference, Mr. Clark did not know Ms. Williams would be on the interview panel. Ex. 21, Clark depo. 199:2-7.

110.    Similarly, when Mr. Sullivan asked Ms. Williams to be on the panel, he had not noticed that Mr. Clark had listed Ms. Williams as a reference. Ex. 18, Sullivan depo. 91:7-9.

111.    Mr. Sullivan agrees that the optics of that look bad, but he is not concerned about asking Ms. Williams to serve. Ex. 18, Sullivan depo. 91:7-18.

112.    Megan Milner also applied for the Director of Field Services position. Ex. 37.

113.    At the time, Ms. Milner was the Director of Community Based Juvenile Services for the KDOC. In that role, she oversaw the daily operations of the Juvenile Services division at the KDOC central office. She also created and administered the $5 million Reinvestment and Regional Collaboration for grants and provided oversight for the federal Title II funds and Comprehensive Plan Grant funds for judicial districts. Ex. 44, Milner Resume. Before that, she spent five years as the Deputy Superintendent of the Kansas Juvenile Correctional Complex. Before that, she had spent five years as a Program Consultant for the Kansas Juvenile Justice Authority. She also had Case Management experience. Ex. 44.

114.    Rachel Mestad also applied for the position. At the time, Ms. Mestad was the Training Coordinator for JDOC. Previously, she had been a SCM in Adult Intensive Supervision for six years. Before that, she had experiences with the Jackson County Family Court, Safer

Foundation (an Adult Transition Center in Chicago), and the National Institute of Corrections. Ex. 16 at JoCo 3470-3471.

<u>The Interviews</u>

115.    The interviews were conducted on March 15, 2019. Ex. 37.

116.    After completing the interviews, the panel had a debrief session. Ex. 17, Bloomberg depo. 125:21-126:2; Ex. 25, Brown depo. 22:25-23:3.

117.    The interview panelists generally recall that Keith Clark, Rachel Mestad, and Megan Milner were the top three candidates. Ex. 18, Sullivan depo. 216:4-22; Ex. 20, Dougan depo. 53:17-55:11, 74:6-16, 77:19-22; Ex. 17, Bloomberg depo. 129:11-131:10, 137:5-138:5, 180:4-25, 182:16-25; Ex. 25, Brown depo. 22:24-25:2, 40:10-22.

118.    The only panel member who may have had Plaintiff in her top three is Shelly Williams. Ex. 18, Sullivan depo. 217:3-8; Ex. 20, Dougan depo. 53:17-55:11; Ex. 25, Brown depo. 23:14-25:14, 37:7-22, 40:10-22; Ex. 17, Bloomberg depo. 133:1-16.

119.    Plaintiff reported to Sharon Brown for 12 years. According to Plaintiff, the only person who may have had more familiarity with her performance than Ms. Brown was Tony Booker.[10] Ex. 1, Pltf's depo. 172:21-173:4

120.    Plaintiff had a very trusting relationship with Ms. Brown. Ex. 1, Pltf's depo. 138:9-17; Ex. 25, Brown depo. 5:24-6:9.

121.    In addition, Ms. Brown had actually held the Director of Field Services position for 12 years. Ex. 25, Brown depo. 5:24-6:1.

---

[10] Mr. Booker was the Director of the ARC for many years. Ex. 19, Sullivan Decl. ¶ 3.

122.    In Ms. Brown's view, Mr. Clark and Ms. Milner were clearly the top candidates, based on their experiences at the state level and in local jurisdictions. Ex. 25, Brown depo. 22:25-24:8.

123.    Ms. Brown remembers discussing which of those two candidates was a better fit, meaning they looked at the maturity, the experience, understanding the system, understanding the numbers, understanding both the adult and the juvenile world, ability to interact with staff, open to feedback, and the totality of how they will do on the leaderships team and overseeing the division. Ex. 25, Brown depo. 23:14-24.

124.    Mr. Clark had an advantage because he was an internal candidate. He had worked for the department for a few years as a project manager, so he understood the work they were doing, the numbers, and he knew the staff. He also had lots of experience on the state level because he had been a director in a smaller jurisdiction. He was also a good grant writer. Ex. 25, Brown depo. 24:9-25:2.

125.    Ms. Brown had worked with Ms. Milner extensively on the juvenile side and really appreciated her maturity. Ms. Milner did not have the experience on the adult side, but Ms. Brown felt she could do the job because she had watched Ms. Milner on the state level. Ex. 25, Brown depo. 25:3-14.

126.    In Ms. Brown's experience, the juvenile system was more complicated because there are more moving parts. Ex. 25, Brown depo. 25:15-26:8.

127.    Ms. Brown did not believe Plaintiff was the best fit for the position based on an analysis of who could navigate both the adult and juvenile systems, who had the most administrative experience, and who knew how to do the work not only on a local level, but on a state level. Ex. 25, Brown depo. 40:10-22.

128.    In Ms. Brown's view, Mr. Clark and Ms. Milner had the best experience in those areas. Ex. 25, Brown depo. 40:10-22.

129.    Ms. Brown believed Plaintiff could have the maturity necessary for the job with growth, but it takes patience to move the needle and bring people along, and Ms. Brown observed that Plaintiff sometimes lacked patience. Ex. 25, Brown depo. 41:25-43:20.[11]

130.    Mr. Clark was Mr. Sullivan's top pick. For Mr. Sullivan, it was an easy decision. In his opinion, none of the other candidates came close. Ex. 18, Sullivan depo. 219:5-25.

131.    Mr. Sullivan knew that Mr. Clark had been a director in multiple jurisdictions, had years of experience as a community corrections director, and was very aware of Kansas law and KDOC policies. Mr. Sullivan also knew that Mr. Clark had years of experience writing strategic comprehensive plans required by the KDOC, fully understood the method of allocation the KDOC requires, and was used to working with diverse funding. Ex. 18, Sullivan depo. 219:5-25.

132.    Mr. Sullivan was also aware that Mr. Clark understood the financial guidelines for the various pots of money in a way that would help position them for audits. Ex. 18, Sullivan depo. 220:1-12.

133.    Ms. Bloomberg remembers Mr. Clark standing out as a top candidate. He had great experience and good answers. Ex. 17, Bloomberg depo. 137:5-138:5.

134.    Ms. Dougan remembers that Mr. Clark had significant experience and gave many good examples. Ex. 20, Dougan depo. 77:19-22. She recalls a consensus to hire Mr. Clark. Ex. 20, Dougan depo. 55:17-56:9, 87:3-12.

---

[11] Ms. Brown had discussions with Plaintiff about being more patient and learning how to tactfully bring people along because Plaintiff was not always willing to do that. Ex. 25, Brown depo. 43:24-45:7.

135.    Ms. Brown wanted Ms. Milner for the position and was disappointed Ms. Milner did not get the position, but she understood why Mr. Clark got it. He had the most experience, and he was an internal candidate. Ex. 25, Brown depo. 56:9-21.

Meet and Greets

136.    On the same day the candidates interviewed with the hiring panel, they also met with members of Field Services for "meet and greets." This process allowed Field Services employees to meet the candidates and provide feedback on them. Ex. 25, Bloomberg depo. 125:1-126:19.

137.    Plaintiff scored highly on some of those forms and poorly on others. The same is true of Keith Clark. Ex. 45, Meet and Greet Feedback Forms.

138.    One anonymous ISO indicated that Plaintiff favors certain ISOs over others, constantly made rude comments about staff, such as calling them "jackwads." Ex. 45 at JoCo 4195.

139.    Another employee indicated Plaintiff had been reluctant to change, shows favoritism toward staff and is degrading to staff who does not share her beliefs. Ex. 45 at JoCo 4197.

140.    Another employee indicated that Plaintiff says the right thing but does not practice it. She has favorites who are not held accountable. Ex. 45 at JoCo 4199.

141.    Another employee noted that Plaintiff has an exceptional grasp on relationships with other agencies and is a global thinker but has historically been reluctant to change. Ex. 45 at JoCo 4203.

Timing of the Decision

142.    Going into the interviews, Mr. Sullivan believed Mr. Clark would be the best candidate, and Mr. Clark's interview solidified that for him. Ex. 18, Sullivan depo. 220:13-19.

143.    Mr. Sullivan does not recall when he made the final decision, but in his mind, Mr. Clark was the clear front runner after the interviews. Ex. 18, Sullivan depo. 220:20-222:9.

144.    On March 23, 2019, Ms. Brown sent an email to Mr. Sullivan regarding the meet and greet feedback forms. At the end of the email, she asked if Mr. Sullivan had decided who will offer the Field Services Director position to yet. Ex. 45 (Depo. Ex. 35).

145.    As of that day, Ms. Brown did not know who Mr. Sullivan had chosen. Ex. 25, Brown depo. 30:24-31:3; *See also* Ex. 17, Bloomberg depo. 126:3-19 (noting Mr. Sullivan did not indicate what his decision was on the day of the interviews).[12]

146.    After the decision was made, Plaintiff asked Ms. Brown how Plaintiff performed in the interview. Ms. Brown told Plaintiff she did excellent. Ms. Brown also told Plaintiff she (Ms. Brown) was upset that she missed a retirement party for a colleague to participate in the interviews for the position when it was already a done deal. Ex. 1, Pltf's depo. 188:18-189:12, 200:12-201:2.

147.    Plaintiff understood Ms. Brown to be saying Mr. Sullivan made up his mind about Mr. Clark before the interviews, but Plaintiff does not recall if Ms. Brown stated that. Ex. 1, Pltf's depo. 189:12-190:13.

148.    Ms. Brown did not know who Mr. Sullivan was going to select until sometime after she sent her email on March 23, 2019. Ex. 25, Brown depo. 30:24-31:3; Ex. 45.

Basis of Plaintiff's Claim

149.    Plaintiff believes she was more qualified for the position than Mr. Clark because, in her opinion, she had a unique perspective regarding the way the various aspects of Field Services run together. She also believes she had the people skills to be able to explain issues to stakeholders,

---

[12] Susan Dougan initially testified she remembered a decision being made on the evening after the interviews, but later admitted she really does not recall. Ex. 20, Dougan depo. 51:20-53:3.

and she believes she had a high level of trust with the supervisors in Field Services. Ex. 1, Pltf's depo. 170:20-171:24.

150.    Plaintiff also believes she was more qualified than all of the other candidates but admits she does not know all of them and is not familiar with their qualifications. Ex. 1, Pltf's depo. 171:25-172:8.

151.    Plaintiff believes the decision was discriminatory based on direction she says she was given regarding the way she dressed from Bev Marshbank, Doug Gertsema, Bill Keith, and Betsy Gillespie. Ex. 1, Pltf's depo. 173:5-175:6.

152.    None of these individuals was involved in the hiring process, and none of them worked for the County in 2019. Indeed, Ms. Marshbank never worked for the County and left her post at the ARC in the 1990s. Mr. Keith left the County in the 1990s, Mr. Gertsema had left the County more than twelve years before this hiring decision, and Ms. Gillespie had retired more than a year earlier. Ex. 6, Hentschel Decl. ¶¶ 8, 9, 14, 16.

153.    Plaintiff does not believe anyone on the panel has any bias against females, older people, or gay people but believes Robert Sullivan and Susan Dougan have a bias against masculine-presenting females. Ex. 1, Pltf's depo. 163:18-164:9.

154.    As to Mr. Sullivan, she bases her opinion on the fact that she has not seen Mr. Sullivan promote masculine-presenting females, and she saw in documents that Mr. Sullivan referred to male candidates being sharp or polished. Ex. 1, Pltf's depo. 164:7-166:7.

155.    Plaintiff is not aware of any other masculine-presenting females who have applied for positions where Mr. Sullivan has been on the hiring panel. Ex. 1, Pltf's depo. 199:12-16.

156.    As to Ms. Dougan, she bases her opinion on the fact that Ms. Dougan and the previous JDOC Director, Betsy Gillespie, gave a PowerPoint presentation on the dress code, and

all of the women's clothing shown as examples were feminine-presenting. Ex. 1, Pltf's depo. 166:8-167:2.

**BIA Position**

157.    After Mr. Clark took the Director of Field Services position, Plaintiff applied for the position Mr. Clark vacated, which would have been a lateral move for Plaintiff. Doc. __, Pretrial Order; Ex. 18, Sullivan depo. 231:21-232:4.

158.    The position was originally known as a "Project Manager" position, but at some point, the County changed the title to Business Intelligence Analyst (BIA) to better match the duties the individuals in those positions were actually performing. Ex. 28, Seidler depo. 15:16-16:10.

159.    At the time Plaintiff applied, there were only two BIA positions – the one previously occupied by Mr. Clark and one held by Brian Seidler. Ex. 28, Seidler depo. 34:8-24.

160.    The Project Manager role evolved over time. Ex. 28, Seidler depo. 15:16-16:10, 33:23-34:7. The job description for the position at the time Plaintiff applied for it can be found in Exhibit 46 (Depo. Ex. 111) and includes:

      a.   Acting as the domain expert understanding existing systems as well as the culture and business objectives.

      b.   Cleaning, reviewing, manipulating and conducting high level data analysis.

      c.   Designing and developing higher data solutions, reviewing and analyzing data from multiple internal and external sources, proactively analyzing data to answer key questions from stakeholders or out of self-initiated curiosity with an eye for what drives business performance.

      d.   Through higher level analysis of data identifies areas or ways to increase success of the department, tracks performance, optimizes operations, predicts the success of new programs, identifies trends and business issues, and compares data with other entities.

      e.   Creates advanced data visualization for presentations.

      f.   Writes and submits grant applications to pursue funding, and related duties.

Ex. 46.

161.    The posting sought to fill either a BIA role or a Senior BIA role. The job requirements for the BIA role were a Bachelor's degree in Computer Science, Information Technology, Economics, Information Systems, Statistics, Applied Math, Business Administration, or a department specific degree. Ex. 46.

162.    One year of Corrections knowledge was preferred. Ex. 46.

163.    Susan Dougan was the hiring manager for the position, but Ms. Dougan relied heavily on Mr. Sullivan in making this decision because Mr. Sullivan worked much more closely with the BIAs. Ex. 20, Dougan depo. 95:3-13; Ex. 28, Seidler depo. 40:16-19, 44:7-45:15; Ex. 18, Sullivan depo. 240:2-8.

164.    On May 24, 2019, Mr. Sullivan sent an email outlining the characteristics of what he saw as a great candidate, as follows:

(1) loves working with data and can teach us a thing or two;

(2) is innovative;

(3) has people skills and is willing to shadow operations to gain domain experience;

(4) can present information in a manner that is understandable; and

(5) is humble (bonus points for humor).

Ex. 47 (Depo. Ex. 39).[13]

165.    BIAs give presentations on a regular basis. Ex. 52, Allen depo. 127:7-128:11; Ex. 21, Clark depo. 53:1-54:21; Ex. 20, Dougan depo. 119:16-120:6.

---

[13] Mr. Sullivan sent this email before Plaintiff applied. *See* SOF ¶¶ 188-189.

166.    They present to advisory boards and must be able to present data and explain it to people who know nothing about corrections. Ex. 20, Dougan depo. 119:16-120:7.

167.    They also present to other people, such as judges and District Attorneys. Ex. 20, Dougan depo. 152:17-153:16.

The Two Portfolios – Juvenile and Adult

168.    At the time Mr. Clark left the BIA/Project Manager role, he was handling the adult portfolio, and Brian Seidler was handling the juvenile portfolio. Ex. 21, Clark depo. 48:11-16.

169.    Some of the duties are similar, but some are different. There were some portions of the juvenile portfolio Mr. Clark could have taken over instantly, but others would have presented a learning curve. Ex. 21, Clark depo. 48:11-50:4.

170.    In the weeks leading to posting the BIA position, Mr. Seidler decided he wanted to take over the adult portfolio, so Ms. Dougan and Mr. Sullivan were looking for someone to handle the juvenile portfolio. Ex. 18, Sullivan depo. 241:12-24; Ex. 28, Seidler depo. 36:2-37:13.

171.    The juvenile portfolio has some fairly specific nuances that are different from the adult portfolio such that having juvenile experience would be beneficial to the person taking on the juvenile portfolio. Ex. 28, Seidler depo. 38:6-39:6.

172.    In 2016, the Kansas legislature passed Senate Bill 367, which was one of the biggest paradigm shifts in juvenile justice since 1997, and there were many changes associated with the juvenile portfolio as a result. Ex. 18, Sullivan depo. 58:12-23.

173.    Conversely, the adult portfolio has not changed much in a number of years. Ex. 18, Sullivan depo. 58:24-59:8.

Data Visualization Software

174.    Originally, Project Managers used Excel because that was the only tool available.

Ex. 28, Seidler depo. 23:15-19; Ex. 21, Clark depo. 37:16-38:24.

175.    Sometime before the title changed to BIA, they began using a data visualization tool called Tableau. Ex. 28, Seidler depo. 23:15-25; Ex. 21, Clark depo. 37:16-38:24.

176.    Tableau allows you to take a data source, manipulate the data to create charts and graphs to visualize the information in a way that is simple for people to understand. Ex. 28, Seidler depo. 25:6-17.

177.    Once they started using Tableau, the data still generally came over in Excel, but they no longer used Excel to do the data analysis. Ex. 28, Seidler depo. 25:18-26:12.

178.    Mr. Seidler believes it was necessary for the person hired into the BIA position to have enough experience with Excel that they could clean the data in order to connect it to Tableau, but by the time they were filling this position, they used Tableau most of the time, so Excel formulas were not as important. Ex. 28, Seidler depo. 39:7-10, 90:16-91:20.

179.    When Mr. Sullivan became the Director of JDOC, he was able to negotiate for two Tableau creator licenses. Ex. 18, Sullivan depo. 153:3-155:7.

180.    Many employees within JDOC, including Plaintiff, had Tableau reader licenses, meaning they had the ability to view the dashboards created by others, but only the BIAs had creator licenses. Ex. 18, Sullivan depo. 153:7-154:18, 243:19-245:1.

181.    In order to create dashboards through Tableau, a creator license is required. Ex. 18, Sullivan depo. 153:7-154:18.

182.    Based on his experience as a Project Manager/BIA, Mr. Clark indicated that having end user experience with Tableau would be helpful in learning to create in a limited way. End users can see a dashboard and use filters, but being an end user would not help you to know how

to create worksheets or format dashboards. An end user can see the way the dashboard looks, but that will not help much on the creation side. Ex. 21, Clark depo. 54:24-55:25.[14]

183.    Tableau offers a free version of its software, but any data you input onto the free version is publicly available. Ex. 28, Seidler depo. 115:16-23. Much of the data the County analyzes is confidential and should not be available to the public. Ex. 19, Sullivan Decl. ¶ 10.

184.    Plaintiff obtained the free version of the Tableau software, but not until February 2021 (more than a year after this BIA position was filled). Ex. 58, Email correspondence.

185.    Before the BIA interviews, Plaintiff had experience creating data visualizations in a program called Google Data Studios. Ex. 1, Pltf's depo. 194:7-15.

186.    According to Plaintiff, the program is similar to Tableau. Ex. 1, Pltf's depo. 29:21-30:6. Plaintiff also had experience cleaning data and developing reports and dashboards to convey data. She also had knowledge of the relational databases SQL and MySQL. Ex. 72.

Selecting Candidates to Interview

187.    The posting for this position was open until May 29, 2019. Ex. 46.

188.    On May 24, 2019 at 6:01 a.m., Mr. Sullivan sent an email to Ms. Dougan and Mr. Seidler indicating that Ms. Bloomberg had reviewed the original 13 applicants and screened out one. Mr. Sullivan screened three more. Mr. Sullivan asked Ms. Dougan to decide who she wanted to interview, indicating he was comfortable with any of the applicants whose applications he attached. Ex. 47 (Depo. Ex. 39).

---

[14] Mr. Seidler likened the benefit that being a Tableau end user would have in creating Tableau dashboards to the benefit a person might receive by using the Chipotle website in creating the website. Ex. 28, Seidler depo. 127:23-128:12.

189.     Plaintiff submitted her application at 9:39 a.m. on May 24, 2019 (after Mr. Sullivan reviewed the original 13 applications). Ex. 48 at JoCo 6460, Applicant Tracking Information; Ex. 24, Bloomberg Decl. ¶ 13.

190.     At 10:15 a.m. on May 24, 2019, Ms. Dougan sent an email to Ms. Bloomberg indicating she had seen that Plaintiff had applied for the BIA position and asking if Plaintiff met the minimum requirements. Ex. 49 (Depo. Ex. 125).

191.     Ms. Bloomberg responded that Plaintiff met the minimum requirements for the lower level position (meaning the BIA position, as opposed to the Senior BIA position) and that she had moved Plaintiff into "candidate status." Ex. 49.

192.     Olivia Allen submitted her application on May 29, 2019. Ex. 50, Applicant Tracking Information; Ex. 24, Bloomberg Decl. ¶ 14.

193.     By the time the position closed, the County had received 25 applications for the BIA position. Ex. 24, Bloomberg Decl. ¶ 15.

194.     Ms. Dougan selected to interview Plaintiff and Ms. Allen,[15] along with six of the nine individuals Mr. Sullivan had included in his email and three others, for a total of 11. Ex. 20, Dougan depo. 102:24-103:6; Ex. 47; Ex. 51 (Depo. Ex. 126).

Olivia Allen

195.     Ms. Allen has both a Bachelor of Arts in Criminal Justice and Criminology and a Masters of Science in Criminal Justice and Criminology from UMKC. She graduated with her Masters in 2016. Ex. 53, Allen Resume.

---

[15] Olivia Allen's current name is Olivia Parks. Defendant refers to her as Olivia Allen throughout this brief because that was her name at the time of the interviews.

196.     Ms. Allen wrote her thesis on Teens in Transition, a program held at the ArtsTech in Kansas City, Missouri, where they were offering a summer arts program to youth that were identified as gang affiliated. Ex. 52, Allen depo. 56:22-58:3.

197.     This spanned throughout the time she was getting her masters. She read articles on how the criminal justice system works for youth, specifically disadvantaged black youth. She worked with them all summer, interviewed them, and observed them. Ex. 52, Allen depo. 56:22-58:3.

198.     Ms. Allen worked on the project with Dr. Andrew Fox and prepared it for a presentation. Dr. Fox did not attend the conference, so Ms. Allen spearheaded the presentation herself. Ex. 52, Allen depo. 71:10-23.

199.     Ms. Allen also worked as a research assistant during her schooling. Ex. 53.

200.     As a research assistant, Ms. Allen had helped with a Byrne grant and a KC No Violence Alliance grant. Most of her work on the grants was literature review, but Dr. Fox also had her scrub and clean all of the data for the evidence they were using to show the need for the grant. She started work on a third grant but then transitioned to working with another professor. For that grant, she was pulling census tract data. Ex. 52, Allen depo. 135:4-25.

201.     Ms. Allen wrote the entire literature review and conclusion for the Byrne grant. Ex. 52, Allen depo. 136:12-20. She also presented the portions of the grant she wrote. Ex. 52, Allen depo. 70:21-72:12.

202.     Ms. Allen also completed a social network analysis, which is a way of mapping human relationships and interactions, to try to understand how close youth were to key gang members. Ex. 52, Allen depo. 61:15-19.

203.   Ms. Allen's work as a research assistant prepared her to work with youth data because she was well versed and able to talk about youth issues and present on those topics. Although most of her experience was on the Missouri side, she was confident her experience would allow her to flow into understanding the Kansas side of the juvenile system with time and experience. Ex. 52, Allen depo. 61:25-62:14.

204.   Before coming to Johnson County, Ms. Allen also worked as a research clerk at the Jackson County Family court for approximately two years, where she consistently entered  and scrubbed data related to juvenile side of family court. Ex. 52, Allen depo. 56:22-58:3, 60:11-19.

205.   This work involved huge Excel spreadsheets with massive amounts of data. Often, another person would input the data, and Ms. Allen would clean it because she was able to see patterns and able to make corrections. Ex. 52, Allen depo. 59:24-60:19.

206.   In addition, she was an intern at the evening reporting center at Johnson County where she worked with adjudicated youth on cognitive thinking programs. Ex. 52, Allen depo. 56:22-58:3. She did that for about three months, ten hours per week. Ex. 52, Allen depo. 58:4-19.

207.   Ms. Allen began working for Johnson County in January 2016 as a Pretrial Officer in Court services. Ex. 52, Allen depo. 123:6-20

208.   In that role she supervised a caseload of more than 100 adults who were out on bond in Johnson County for criminal charges, met with them to assess compliance with their bond conditions, created Pretrial Supervision orders, non-compliance and status reports, and various motions, among other duties. Ex. 54, Allen Application.

209.   As a pretrial officer, Ms. Allen handled adult clients, but many of them were in the age range of 18-24. Ms. Allen knew the Senate bills were changing the way they did business on

the juvenile side, and she was able to pick up on the jargon quickly because it was not very different from the jargon in Missouri. Ex. 52, Allen depo. 63:2-24.

210.    During the time she was a pretrial officer, Ms. Allen also helped Dr. Alex Holsinger. Ex. 52, Allen depo. 72:21-74:23.

211.    Dr. Holsinger was a professor at UMKC, and he is known nationally in criminal justice circles. Ex. 28, Seidler depo. 74:24-75:20.

212.    Dr. Holsinger, a data scientist, had previously held the Criminal Justice Coordinator role at Johnson County, and his recommendation was significant to the interview panel. Ex. 17, Bloomberg depo. 156:5-12; Ex. 18, Sullivan depo. 241:25-242:16; Ex. 28, Seidler depo. 75:15-20, 89:16-90:6.

213.    Dr. Holsinger's niche is community assessments and how those assessments affect the criminal justice system. Ms. Allen helped Dr. Holsinger with a project that analyzed how their program affected adults. Ex. 52, Allen depo. 72:21-74:23.

214.    Ms. Allen and Dr. Holsinger planned to present the results of their research at the National Association of Pretrial Services, but they did not end up presenting because Ms. Allen was inundated with her new role as a BIA. Ex. 52, Allen depo. 72:21-74:23.

215.    While working as a pretrial officer, Ms. Allen also worked with Tim Mulcahy on trying to understand pretrial data to support her supervisor in those efforts. Ex. 52, Allen depo. 68:10-69:1.

216.    Mr. Mulcahy was the Director of JIMS, Justice Information Management System, Ex. 18, Sullivan Depo. 171:11-17; Ex. 52, Allen depo. 71:24-72:1.

217.    Ms. Allen was working with JIMS to create a report so they could analyze at the ins and outs of pretrial clients. At the time, the JIMS supervisor was very supportive of these

efforts, but that supervisor left, and the new supervisor was not supportive of it, so that project fell by the wayside. Ex. 52, Allen depo. 141:7-23.

218.    After that, Ms. Allen began work to revalidate the pretrial assessment tool and creating a report for that. Ex. 52, Allen depo. 141:7-23.

219.    Ms. Allen did all of this on her own. It was not related to her pretrial officer position, and no other pretrial officers did that kind of work. Ex. 52, Allen depo. 141:7-142:10.

220.    Ms. Allen had significant experience cleaning data in Excel from her work in Jackson County and also in connection with her work with Dr. Fox. Ms. Allen learned how to scrub data at the family court, but Dr. Fox kicked it up another level because she understood the rationale behind it. Ex. 52, Allen depo. 77:4-14.

221.    Ms. Allen also had experience cleaning her own data, including arrest data for her thesis and data for the social network analysis. Ex. 52, Allen depo. 77:15-19.

222.    Ms. Allen used Excel as the platform to get data ready for software analysis. She did not use formulas in Excel because she did all her analysis in SPSS (Statistical Package for the Social Sciences). Ex. 52, Allen depo. 79:5-21.

223.    When Ms. Allen worked with Mr. Mulcahy, he talked about Cognos, a data visualization program, so Ms. Allen took a one-day training on Cognos. Ex. 52, Allen depo. 68:10-69:1.

224.    Ms. Allen also saw tables created in Cognos because they were used to present pretrial data to judges, but she had not been involved on the creator side. Ex. 52, Allen depo. 69:2-11.

225.    At the time of the interviews, Ms. Allen had not used any other data analytics software besides Excel and SPSS. Ex. 52, Allen depo. 67:15-17.

226.    Ms. Allen was 26 years old at the time of the interview. Ex. 52, Allen depo. 117:17-20.

The Interviews

227.    The interviews took place on May 31, 2019. Ex. 1, Pltf's depo. 192:4-7. The interview panel included Ms. Dougan, Mr. Sullivan and Mr. Seidler. Ex. 20, Dougan depo. 97:15-19; Ex. 45.

228.    Ms. Allen knew Mr. Sullivan before her interview because she attended meetings where Mr. Sullivan presented pretrial data. Ms. Allen's supervisor had her go to most of those meetings to support him because of her statistical background. Ex. 52, Allen depo. 85:16-86:6; Ex. 19, Sullivan Decl. ¶ 11.

229.    Ms. Allen had also contacted Mr. Sullivan about revalidating the pretrial risk assessment tool, and he referred her to Mr. Seidler. They had a meeting about that topic, which Ms. Allen believes Mr. Sullivan attended. Ex. 52, Allen depo. 86:7-23, 87:9-12; Ex. 19, Sullivan Decl. ¶ 11.

230.    Mr. Sullivan had been working closely with Dr. Holsinger and Tim Mulcahy on pretrial risk assessment data. In that context, they both told Mr. Sullivan how impressed they were with Ms. Allen's work in that space. Ex. 19, Sullivan Decl. ¶ 12.

231.    Before the interviews, Mr. Seidler understood that Ms. Allen was a pretrial services officer and worked with data at court services. Ex. 28, Seidler depo. 53:22-54:2. Mr. Seidler had also attended a Cognos[16] training Ms. Allen. Ex. 28, Seidler depo. 49:2- 51:12.

232.    Ms. Allen believes Mr. Seidler emailed the BIA job posting to her. Ex. 52, Allen depo. 86:23-25.

---

[16] As noted above, Cognos is a data visualization tool. Ex. 28, Seidler depo. 49:2-51:12.

233.    Mr. Seidler knew Plaintiff from the 20-plus years they had both worked for the Department. He rarely worked directly with her, but found her to be competent and talked to her when he needed information from Adult Services. Ex. 28, Seidler depo. 56:3-57:2.

234.    As discussed above, Mr. Seidler was aware that Ms. King started working on a revocation report that Mr. Seidler had previously handled. Ex. 28, Seidler depo. 57:3-60:18.

235.    After Mr. Seidler stopped doing the report, he does not recall it getting done to the degree he had done it in the past. He does not know if that was because of Plaintiff or if the other supervisors should have or could have helped her with it. Ex. 28, Seidler depo. 60:24-61:19.

<u>Ms. Allen's Interview</u>

236.    Ms. Allen remembers feeling good about her interview for the BIA position. Ex. 52, Allen depo. 66:7-11.

237.    She remembers being asked about data analytics software, and she was able to share that she had been trained in SPSS. Ex. 52, Allen depo. 67:3-14.

238.    Ms. Allen shared that she was well versed in PowerPoint because that is how she created all her presentations. She used that for classes, her thesis, and presented at a couple conferences in California while she was getting her Master's. Ex. 52, Allen depo. 70:3-20.

239.    Ms. Allen recalls that Mr. Sullivan's ears perked up when she started discussing the social network analysis and indicated that corrections would be interested in doing that at some point or maybe were already gearing towards that. Ex. 52, Allen depo. 139:24-140:10.

240.    Ms. Allen remembers discussing her experience with the juvenile side of corrections. She remembers talking about her thesis, which was specifically on teens, and she talked about the evaluation study she did for the Center for Conflict Resolution, which was a youth-in-schools program. Ex. 52, Allen depo. 63:25-64:15.

241.    Ms. Allen was interested in juveniles and ready to use those skills to see what programs they could evaluate and whether you could introduce random controlled trials. She was excited to work with good data. Ex. 52, Allen depo. 64:22-65:12.

242.    In her interview, Ms. Allen also discussed work she as doing with Dr. Lori Sexton. They interviewed prisoners to understand, on a qualitative level, how their prison experience affected them. She then coded the interviews for themes, and then looked at those on a macro level. Ex. 52, Allen depo. 78:2-79:4.

243.    The interview questions, along with each panel member's notes of Ms. Allen's responses, can be found in Exhibit 55. Ex. 24, Bloomberg Decl. ¶ 16.

244.    When asked to provide a time when she was able to identify a complex problem, evaluate the options, and implement a solution as well as explaining how the solution benefited her organization (Question 4), Ms. Allen referenced a situation where she talked directly to a prosecutor, and her supervisor was not happy she had done that. Ex. 55 at JoCo 1303.

245.    Neither Mr. Sullivan nor Mr. Seidler was impressed with Ms. Allen's answer. Ex. 18, Sullivan depo. 177:5-18; Ex. 28, Seidler depo. 98:20-99:15.

246.    In response to Question 8, Ms. Allen stated she wished she had more experience writing grants. She did a lot of the groundwork for grants and was behind writing three grants, including the Byrne Grant, and she is confident in her writing skills. Ex. 55.

247.    She also discussed the presentation she gave related to the Byrne grant, which analyzed whether sprucing up the area around the Prospect Corridor changed the crime data and also looking at the social network analysis. Ex. 52, Allen depo. 70:21-71:9; Ex. 55.

248.    As noted above, Ms. Allen wrote the literature and conclusion portions of that grant and presented the portions she wrote. Ex. 52, Allen depo. 70:21-72:12.

249.     Ms. Dougan had experience with the Byrne grant and knew that collecting the data for the grants is the biggest part of the process. Ex. 20, Dougan depo. 108:12-19, 114:18-115:21.

250.     In response to Question No. 9, Ms. Allen discussed her education, SPSS, and her work with Dr. Holsinger. Ex. 55 at JoCo 1300, 1304; Ex. 28, Seidler depo. 99:24-101:19.

251.     Mr. Seidler assumed Ms. Allen had significant data analysis experience through her work with Dr. Holsinger. Ms. Allen also discussed regression and Chi-square testing, which was something they were just getting into with corrections. That was more advanced than what they had been doing in corrections. Ex. 55 at JoCo 1304; Ex. 28, Seidler depo. 99:24-101:19.

252.     Mr. Sullivan also liked Ms. Allen's answer to question No. 11, where she discussed qualitative work with Dr. Sexton to understand prison experiences and how that impacted inmates, learning to code qualitative data, and collecting data by listening to stories. Ex. 18, Sullivan depo. 173:16-19; Ex. 55, JoCo 1301.

253.     Brian Seidler created a three-part exercise for the candidates to complete during the interview process. One had an Excel formula, and then there were two charts where they were asked to interpret the information. Ex. 28, Seidler depo. 69:3-15.

254.     Mr. Seidler created the exercise based on his experience and to get a sense of the candidates' experience, knowledge, and ability to interpret data, their Excel abilities, and statistics. Ex. 28, Seidler depo. 69:16-24.

255.     According to Mr. Seidler's interview notes, when asked to complete his exercise, Ms. Allen did not try to answer the first question, saying she has not used excel formulas. Ex. 55 (Depo. Ex. 112) at JoCo at 1305.

256.    That raised concern for Mr. Seidler. He thought with her education and experience, she would have had some familiarity with Excel and would have performed better on that part of the exercise. Ex. 28, Seidler depo. 92:16-93:22.

257.    Ms. Allen answered the second two questions correctly. Ex. 55 (Depo. Ex. 112) at JoCo 1305.

Plaintiff's Interview

258.    The interview questions, and all three panel members' notes of Plaintiff's responses can be found at Exhibit 56. Ex. 24, Bloomberg Decl. ¶ 16.

259.    Mr. Sullivan really liked Plaintiff's answer to Question No. 1 because she had 28 years of corrections experience, a strong educational background, and had dabbled in computer science for two years. Ex. 18, Sullivan depo. 174:22-175:7, Ex. 56 (Depo. Ex. 40) at JoCo 1368.

260.    During the interview, when asked what motivated her to apply for the position (Question 2), the first thing Plaintiff said was that she was ready for a change. She then said she saw the position as a key role to push the department forward and likes the idea of basing policy decisions on data, which keeps her thinking and problem solving. She indicated she has a natural curiosity, it would be a personal challenge, and saw the position having a huge role in the department. Ex. 56 (Depo Ex. 40) at JoCo 1364; Ex. 1, Pltf's depo. 191:23-192:24.

261.    When asked to share an experience where she presented in a group (Question 3), Plaintiff said most of her experience was in a training capacity related to Trauma Informed Care. She presented with another person and made it interactive. She stated she was not afraid to speak in front of groups and had the ability to connect to audiences. She has also presented at a CCAB meeting. Ex. 56 (Depo. Ex. 40); Ex. 1, Pltf's depo. 193:13-15.

262.    Mr. Sullivan liked that Plaintiff had presented on trauma-informed care and was comfortable presenting. Ex. 18, Sullivan depo. 175:8-15.

263.    When asked to provide a time when she was able to identify a complex problem, evaluate the options, and implement a solution as well as explaining how the solution benefited her organization (Question 4), Plaintiff referenced a sexual misconduct issue that had occurred approximately 15 years earlier. Ex. 56 (Depo. Ex. 40) at JoCo 1369; Ex. 1, Pltf's depo. 193:16-18; Ex. 18, Sullivan depo. 175:17-176:2.

264.    Mr. Sullivan and Ms. Dougan both believed Plaintiff should have been able to come up with something more related to her current duties as a supervisor where she was able to identify a complex problem and talk through how she evaluated options and implemented a solution. In addition, they did not view a sexual misconduct issue as a complex problem. Ex. 18, Sullivan depo. 175:17-176:2; Ex. 20, Dougan depo. 133:12-134:7.

265.    Mr. Sullivan does not recall if they asked Plaintiff for a more recent example but noted that this is the time for the candidates to impress them, so he would have thought Plaintiff would have chosen a different and more recent example.[17] Ex. 18, Sullivan depo. 175:17-177:4; *see also* Ex. 22, Veronda depo. 82:14-83:7.

266.    When asked about a time she developed her own way of doing things (Question 5), Plaintiff indicated she had used data visualization tools, specifically Google Data Studios, to look at officer revocation rates and recommendations made in court. Ex. 56 (Depo. Ex. 40) at JoCo 1365; Ex. 1, Pltf's depo. 193:19-21.

---

[17] Ms. Dougan testified they did not ask Plaintiff to provide a more recent example because they try to ask the panel the same questions Ex. 20, Dougan depo. 134:10-16.

267.    Mr. Sullivan was not impressed with that answer because it did not illustrate how Plaintiff had her own way of doing things, and the data sets she referenced were very basic.[18] Ex. 18, Sullivan depo. 177:25-178:6.

268.    When asked to provide an example of how she had used data to answer a question (Question 6), Plaintiff stated that when evidence-based practices were first implemented, the staff did not believe the judges were on board. Plaintiff tracked the data and demonstrated that their perceptions were incorrect. Ex. 56 (Depo. Ex. 40) at JoCo 1369. Mr. Sullivan liked that answer. Ex. 18, Sullivan depo. 181:2-5; Ex. 1, Pltf's depo. 193:22-24.

269.    When asked to describe a time where she came up with and implemented a solution "that was bold – perhaps even risky, creative, maybe even unconventional," (Question 7) Plaintiff responded by saying she is not real risky. Her solutions tend to be more grounded. She thinks grounded solutions will help transition staff and not scare them off. Ex. 56 (Depo. Ex. 40) at JoCo 1365; Ex. 1, Pltf's depo. 193:25-194:2.

270.    Plaintiff's answer to this question caused Mr. Sullivan to question whether Plaintiff would be innovative enough to successfully handle the ever-changing juvenile portfolio. Ex. 18, Sullivan depo. 189:20-192:20.

271.    When asked about grant experience (Question 8), Plaintiff stated she had helped Tom Dugan with a grant. Ex. 56 (Depo. Ex. 40); Ex. 1, Pltf's depo. 194:3-5. Mr. Dugan worked for Ms. Dougan, so she was aware that Plaintiff's involvement in the grant was minimal. In addition, it had occurred 14 years earlier. Ex. 20, Dougan depo. 135:17-137:25.

---

[18] Mr. Sullivan noted that Plaintiff also described the visualization as basic. Ex. 18, Sullivan depo. 177:25-178:6; Ex. 56 at JoCo 1369. That is something Mr. Sullivan would have expected a Senior Case Manager to be doing. Ex. 18, Sullivan depo. 178:7-20.

272.   When asked to describe her experience with data processing/analysis software (Question 9), Plaintiff identified Google Sheets, Google Data Studios, SPSS, and Excel. She indicated she has some knowledge about Google analytics and website traffic. She explained she had learned data visualization tools through online classes and self-teaching and had created dashboards. Ex. 56 (Depo. Ex. 40) at JoCo 1365; Ex. 1, Pltf's depo. 191:23-194:21.

273.   Mr. Sullivan liked that answer as well. Ex. 18, Sullivan depo. 181:11.

274.   Question 10 states: "Have you ever used Tableau or other data visualization software? Were you the end user or the creator? Ex. 56, Depo. Ex. 40.

275.   Ms. Dougan's notes of Plaintiff's response state:

A. Yes – and others both end user and creator – would love to have license and be able to play with it. Google isn't as user friendly as Tableau. Not in Tableau. Like end user feature in Tableau.

Ex. 56, Depo. Ex. 40 at JoCo 1363, Q. 10.

276.   Mr. Seidler's notes of Plaintiff's response state:

Has used Tableau and Google Data Studios. Has created dashboards and been end user with Tableau dashboards. Visualizations help people consume data better.

Ex. 56 (Depo. Ex. 40) at JoCo.1367, Q. 10.

277.   Mr. Sullivan's notes of Plaintiff's response state, "Tableau end user and creator of Google Data Studies." Ex. 56 (Depo. Ex. 40) at JoCo 1371, Q. 10.

278.   Mr. Sullivan and Mr. Seidler understood Plaintiff to say she had end-user experience with Tableau and creator experience with Google Data Studios. Ex. 18, Sullivan depo. 155:13-157:25, 182:1-14; Ex. 28, Seidler depo. 114:13-115:12.

279.   Ms. Dougan testified that her notes say Plaintiff told them she had both end-user and creator experience with Tableau. Ex. 20, Dougan depo. 129:20-130:6.

280.    Regardless, Ms. Dougan knew Plaintiff did not have a license, so she understood Plaintiff's response to mean she had end-user experience. Ex. 20, Dougan depo. 147:13-148:15.

281.    Neither Mr. Seidler nor Mr. Sullivan viewed Plaintiff's experience with Google Data Studios as helpful for the BIA position. Ex. 28, Seidler depo. 116:17-117:2; Ex. 18, Sullivan depo. 182:1-14.

282.    Plaintiff did surprisingly well on Mr. Seidler's exercise. Ex. 28, Seidler depo. 81:15-19, 117:8-118:15.

Impressions of the Panelists

283.    In Ms. Dougan's view, Ms. Allen knocked it out of the park. Ms. Dougan was in awe of Ms. Allen's speaking knowledge, her presentation skills, and her confidence. Ex. 20, Dougan depo. 109:2-11. Something about Ms. Allen's presentation skills stood out, not just compared to Plaintiff, but in comparison to all of the candidates they interviewed. Ex. 20, Dougan depo. 123:9-11.

284.    Ms. Allen came across as very positive and knowledgeable during her interview. She had great presentation skills, had done a lot in analytics. She had worked with the County's Criminal Justice Coordinator, and she had co-authored a textbook, which indicated an ability to write. Ex. 20, Dougan depo. 107:5-21.

285.    Mr. Sullivan was impressed that Ms. Allen had co-authored a textbook chapter on homicides, and he was aware of the work she had done with Dr. Holsinger on pretrial assessment data, which he found impressive. Ex. 18, Sullivan depo. 170:4-171:3.

286.    Mr. Sullivan was also impressed with the work Ms. Allen had done reevaluating the pretrial assessment tool in order to share information to be presented at a national conference. Ex. 18, Sullivan depo. 171:11-17.

287.    Mr. Sullivan found this particularly impressive because, at the time, Ms. Allen was a pretrial supervision officer, and analyzing data was not part of her job duties. Ex. 18, Sullivan depo. 205:12-206:1.

288.    Mr. Sullivan liked the fact that Ms. Allen had been exposed to writing code, which was getting much closer to the direction Mr. Sullivan had been trying to take the BIA position. Ex. 18, Sullivan depo. 171:19-24.

289.    Mr. Sullivan also recalls Ms. Allen discussing a social networking study and recalls that she was excited to work on a project that would track massive amounts of GPS data to analyze where clients spent their time and with whom and leverage that information. Ex. 18, Sullivan depo. 171:25-172:25.

290.    Mr. Sullivan also liked the fact that Ms. Allen had spent significant time cleaning data because the data they use often needs to be cleaned for analysis, and Ms. Allen had significant experience with that. Ex. 18, Sullivan depo. 173:5-21.[19]

291.    Ms. Dougan thought Plaintiff did a very good job in her interview. She was disappointed that some of the examples Plaintiff gave in her interview were from years earlier and thought she could have gone into more depth on some of her answers. She also thought her presentation skills were somewhat lacking, but overall, she had a good interview. Ex. 20, Dougan depo. 132:9-25.

292.    In terms of presentation skills, Ms. Dougan indicated that Plaintiff turned bright red in the interview, and she had some concern about whether Plaintiff would be able to present to

---

[19] Mr. Sullivan put an asterisk by that information in his interview notes. Ex. 55 at JoCo 1300.

advisory boards with confidence in what she was presenting.[20] Ex. 20, Dougan depo. 121:13-122:6.

293.    By contrast, Mr. Seidler does not recall Plaintiff being nervous. Ex. 28, Seidler depo. 135:20-25.

294.    Mr. Seidler remembers he learned more about some of Plaintiff's education and experience, and he was surprised at how well she did on the exercise. In Mr. Seidler's observation, Plaintiff was not super dynamic, and there were areas where he thought she would have better answers, so overall, her interview was okay. She was not his top candidate, but she was in the top three. Ex. 28, Seidler depo. 117:8-119:7.

Deliberation Process

295.    After the interviews, Mr. Sullivan wrote each panelists' top three candidates on a white board and took a picture. Ex. 28, Seidler depo. 72:4-10.[21]

296.    Both Susan Dougan and Robert Sullivan had Olivia Allen as their top candidate. Ex. 20, Dougan depo. 140:3-20; Ex. 28, Seidler depo. 72:21-25.

297.    They also had Plaintiff in their top two. Ex. 18, Sullivan depo. 184:12-185:2; Ex. 20, Dougan depo. 140:3-20.

298.    Mr. Sullivan believed Ms. Allen was the top choice since the position was taking over the juvenile portfolio. As discussed above, Senate Bill 367 fundamentally changed the way juvenile justice happens in the state of Kansas, and not all of the provisions for that statute were going to be fully implemented until July of 2019. As a result there were lots of changes occurring. Ex. 18, Sullivan depo. 188:2-189:19.

---

[20] Sometime before the BIA interview, Ms. Dougan had talked to Plaintiff about why she turns red during interviews. Plaintiff told Ms. Dougan she gets very nervous. Ex. 20, Dougan depo. 124:22-125:17.

[21] Mr. Sullivan searched for this picture when Plaintiff filed her charge, but was not able to find it. Ex. 18, Sullivan depo. 67:12-22; Ex. 19, Sullivan Decl. ¶¶ 13-14.

299.    Based on the interviews he had with Plaintiff and her answer to Question No. 7 (Ex. 56 (Depo. Ex. 40) at JoCo 1362, 1366, 1370), Mr. Sullivan was concerned about Plaintiff's ability to think outside the box and handle programs that had yet to be created. Ex. 18, Sullivan depo. 189:20-192:20.

300.    Mr. Sullivan was not impressed with Ms. Allen's answer to Question No. 7 either, but it also did not scare him or indicate a reluctance to come up with bold, risky, or creative solutions. Ex. 18, Sullivan depo. 192:23-193:9; Ex. 55 at JoCo 1296, 1300, 1304.

301.    By contrast, Plaintiff specifically stated she did not like to take risks. Ex. 56 (Depo. Ex. 40) at JoCo 1362, 1366, 1370; Ex. 1, Pltf's depo. 192:4-194:15

302.    If the selected candidate were going to take over the adult portfolio, Mr. Sullivan would have had Plaintiff as his top candidate due to her extensive experience with adult services. Ex. 18, Sullivan depo. 191:19-192:10, 242:17-243:1.

303.    Mr. Seidler's top choice was an external candidate named Casey Johnson. Ex. 28, Seidler depo. 67:1-19. Plaintiff and Olivia Allen were in Mr. Seidler's top three, but he does not remember in which order. Ex. 28, Seidler depo. 72:21-73:6, 82:21-83:1.

304.    Casey Johnson was Mr. Seidler's top choice because, although he had no corrections experience, Mr. Johnson had much more experience with Tableau and other statistical analysis programs than Mr. Seidler did. Mr. Seidler thought that would complement Mr. Seidler's skills and abilities. In other words, Mr. Seidler could help Mr. Johnson learn corrections, and Mr. Johnson could help Mr. Seidler take Mr. Seidler's knowledge in statistics and analysis to the next level. Ex. 28, Seidler depo. 73:16-74:8.[22]

---

[22] Mr. Johnson's resume and the notes of his interview can be found at Exhibit 57.

305.    Mr. Sullivan and Ms. Dougan, however, were not in favor of Mr. Johnson because he had no Corrections experience. Ex. 28, Seidler depo. 74:11-22.

306.    After the panel decided against Mr. Johnson, Mr. Seidler raised Plaintiff as a possibility. Ex. 28, Seidler 81:20-82:20.

307.    Mr. Seidler remembers Mr. Sullivan saying , in response, that Plaintiff had been in a position for a long time where she could have been innovative and made changes, and she had largely not done that. Mr. Sullivan indicated he did not have reason to believe that would be different by switching positions. Ex. 28, Seidler depo. 76:5-19.

308.    Mr. Seidler does not recall any discussion about the importance of experience in the juvenile sector when they were discussing the candidates. Ex. 28, Seidler depo. 85:5-9.

309.    After Mr. Johnson was eliminated as a candidate, Mr. Seidler was pretty indifferent. He knew he would work with whoever they chose, and he was not invested once his top candidate was eliminated. Ex. 28, Seidler depo. 85:21-87:23.

310.    Mr. Seidler had opportunities to speak up if he felt strongly after that. He just did not feel strongly. *Id*. at 87:6-23.

311.    Mr. Seidler recalls that Ms. Allen had come highly recommended from Alex Holsinger and Tim Mulcahy, and that Mr. Sullivan and Ms. Dougan put a lot of weight on that. Ex. 28, Seidler depo. 75:2-14. They also felt like Ms. Allen was very passionate about coming in and being able to make changes based on her prior experience with Dr. Holsinger. Ex. 28, Seidler depo. 89:2-13.

312.    Mr. Seidler agrees that parts of Ms. Allen's interview were very good. She presented herself very well. Her education, experience, and some of the opportunities she had in

school were very good. She came across as very positive, very genuine in her desire to make changes. Ex. 28, Seidler 95:21-96:19.

313.    On the other hand, he did not think she did well on the practical exercise, which worried him, but based on the fact that she had a master's degree and had worked with Dr. Holsinger, he assumed she would be able to do the job. Ex. 28, Seidler depo. 89:16-90:6.

314.    Mr. Seidler agrees that the ability to present was critical because they present often. At that point, he had not seen Ms. Allen present. He had seen Plaintiff present and did not think she was particularly dynamic, but she was competent and knowledgeable about the material she was presenting. Ex. 28, Seidler depo. 96:20-98:2.

315.    After discussion, the panel decided to sleep on it over the weekend and come on Monday to make a final decision. Ex. 18, Sullivan depo. 186:8-13; Ex. 28, Seidler depo. 67:1-14.

316.    Ultimately, Ms. Dougan and Mr. Sullivan decided to hire Olivia Allen. Mr. Sullivan was really impressed with the enthusiasm Ms. Allen brought to the interview. She was excited to be there and grateful for the opportunity. Ms. Allen brought energy and excitement about the position and her ability to contribute to making the criminal justice system better. Ex. 18, Sullivan depo. 168:14-169:2.[23]

317.    Mr. Sullivan noted that Tableau experience obviously was not the determining factor behind the decision. They passed on someone with extensive Tableau experience (Casey Johnson). Had they put a premium on that, the decision would have been different. Ex. 18, Sullivan depo. 167:16-168:8, 182:15-183:10.

---

[23] Plaintiff's counsel has suggested that the words excited and enthusiastic refer to young people. Mr. Sullivan disagrees, as he is 49 years old (approximately two years younger than Plaintiff). People describe Mr. Sullivan as excited and enthusiastic. He really likes the profession. Ex. 18, Sullivan depo. 169:12-25.

318.    Mr. Sullivan was looking for someone with domain experience as well as data analytics experience or working with data. He also wanted to find someone with a desire to be innovative. In Mr. Sullivan's view, Tableau was a "nice to have" characteristic, but not a requirement. Ex. 18, Sullivan depo. 195:17-25; Ex. 47, Sullivan email outlining traits of a great candidate.

319.    The energy, enthusiasm, and curiosity to think outside the box and not try to solve problems using the same methods they had been using for a long time and expecting different outcomes. Those things, along with the factors discussed above, are what drove Mr. Sullivan's decision/recommendation. Ex. 18, Sullivan depo. 183:11-23.

Post-Hire Information

320.    Ms. Dougan contacted the candidates they did not select to inform them of the decision. Ex. 20, Dougan depo. 143:2-8. She told Plaintiff they went with someone with more data analysis experience. Ex. 1, Pltf's depo. 210:19-211:1.

321.    On June 7, 2019, Ms. Dougan sent an email announcing that they had hired Olivia Allen for the position. The email had Ms. Allen's picture and bio, which is a customary practice. Ex. 59 (Depo. Ex. 122); Ex. 20, Dougan depo. 169:6-11.

322.    After taking the BIA position, Ms. Allen took a couple Excel classes because she wanted to be able to do more with Excel, but she did not really need them because Tableau did not require much Excel besides building the databases to transfer to Tableau. Ex. 52, Allen depo. 80:5-81:1.

323.    In other words, she used Excel as a platform for getting the data ready for analysis in Tableau, which is something she knew how to do before she was a BIA. Ex. 52, Allen depo. 146:11-147:6.

324.    Shortly after Ms. Allen was hired, Mr. Seidler told her she should be humble because there were people in the department who had applied for the position and did not get it. Ex. 52, Allen depo. 88:1-89:10.

Basis of Plaintiff's Claims

325.    Plaintiff believes she was more qualified than Ms. Allen because they were looking for domain experience (i.e. experience in corrections) and Tableau data visualization experience. They also wanted presentation experience. And Plaintiff had all of this experience. Ex. 1, Pltf's depo. 196:23-197:19.

326.    Plaintiff believes the decision was discriminatory because Ms. Allen is significantly younger than Plaintiff and is feminine presenting. In addition, based on the same comments discussed in SOF 55-70, above, from supervisors in the past (none of whom was involved in the decision, or even working for the County at the time), Plaintiff believes it is not desirable for a masculine presenting female to present to advisory boards or commissioners. Ex. 1, Pltf's depo. 197:20-198:10.

**Plaintiff's Complaint to Human Resources**

327.    Plaintiff first made a complaint of discrimination in June 2019. Ex. 1, Pltf's depo. 31:11-14, 203:12-19.

328.    Specifically, on June 11, 2019, Plaintiff sent an email to Shala Bloomberg indicating that she had concerns about the hiring decisions and had contacted the EEOC. Ex. 60 (Depo. Ex. 42).

329.    In response, Ms. Bloomberg and another HR Partner, Sam Veronda, met with Plaintiff on June 13, 2019. Ex. 61 (Depo. Ex. 44); Ex. 1, Pltf's depo. 207:5-15.

330.    In that meeting, Plaintiff raised concerns about the hiring decisions referenced above.[24] Plaintiff stated she did not believe anyone had any malicious intent but suggested the decisions may have been related to her gender presentation, and the BIA decision may have been related to her age. Ex. 61 (Depo. Ex. 44); Ex. 1, Pltf's depo. 207:5-212:10.

331.    Plaintiff also stated that prior supervisors had talked to her about the way she dressed, but she specifically noted that she had not experienced anything like that with Mr. Sullivan or Mr. Clark. Ex. 61 (Depo. Ex. 44) at JoCo 476; Ex. 24, Bloomberg Decl. ¶ 17.

**The Investigation**

332.    After speaking with Plaintiff, Ms. Bloomberg and Ms. Veronda interviewed all of the hiring managers for the positions Plaintiff identified as concerning. The notes of those interviews can be found at Exhibits 62 through 64. Ex. 24, Bloomberg Decl. ¶ 18.

333.    As to the Director of Field Services position, Mr. Sullivan informed Ms. Bloomberg and Ms. Veronda that it was a split decision between Mr. Clark and Ms. Mestad. Mr. Sullivan stated he has known Mr. Clark for a long time. There had been a lack of trust with the prior Director, and he needed to restore that trust. Ex. 62 (Depo. Ex. 102); Ex. 24, Bloomberg Decl. ¶ 18.[25]

334.    Mr. Sullivan stated he was the tie breaker for that decision and opted to go with Mr. Clark. Mr. Sullivan stated he knew Mr. Clark when Mr. Clark was the Director in the 4th judicial district, and he knows Mr. Clark was a contender for the Deputy Secretary of Corrections position. He stated Mr. Clark is one of the best grant writers in the state. The state has reached out to Mr.

---

[24] Plaintiff also raised concerns about the hiring decision for the Deputy Director of the ARC, but she is not pursuing a claim based on that position. *See* Doc. __, Pretrial Order, §6.

[25] Mr. Sullivan believes Ms. Brown stopped trusting him after they had to deal with a personnel issue unrelated to Plaintiff or the claims in this case. Ex. 18, Sullivan depo. 125:3-127:1. Ms. Brown testified she felt Mr. Sullivan did back her in that situation. Ex. 25, Brown depo. 88:6-90:25.

Clark for Evidence Based Practices and Quality Assurance, which is one of Johnson County's biggest challenges. *Id.*

335.    Mr. Sullivan stated it was an easy decision for him. Mr. Clark had been a Director previously and knows Kansas law. Ex. 62 (Depo. Ex. 102).

336.    As to the BIA position, Ms. Bloomberg and Ms. Veronda interviewed both Robert Sullivan and Susan Dougan. They did not interview Brian Seidler because they did not feel they needed more information, and Mr. Seidler was not the hiring manager. Ex. 17, Bloomberg depo. 261:18-263:25.

337.    Ms. Dougan indicated that Mr. Sullivan worked with the BIA position more than she did, so she was leaning more toward what Mr. Sullivan wanted. Ex. 63 (Depo. Ex. 100).

338.    When Ms. Dougan was interviewed, she stated that they were looking for Tableau and data experience and domain experience (Corrections experience), and that did not come to fruition as much as they thought. Ex. 63 (Depo. Ex. 100).

339.    Ms. Dougan and Mr. Sullivan explained to Ms. Bloomberg that they were looking for creator experience with Tableau, which neither Plaintiff nor Ms. Allen had. Ex. 17, Bloomberg depo. 241:10-16, 295:5-24; Ex. 62 (Depo. Ex. 102) at JoCo 492.

340.    Ms. Bloomberg understood from her interviews with Mr. Sullivan and Ms. Dougan, and from her review of the panel's notes of their interview with Plaintiff, that Plaintiff had end user experience with Tableau, but not creator experience with Tableau. Ex. 17, Bloomberg depo. 241:10-16; 295:5-24.

341.    Ms. Dougan stated that Ms. Allen had domain experience with the juvenile justice system and noted that the position was going to take over the juvenile portfolio. Ex. 63 (Depo. Ex. 100).

342.     Ms. Dougan also explained that Ms. Allen had worked with Dr. Alex Holsinger and planned to present at a conference with Mr. Holsinger in September. She stated that Ms. Allen also had extensive experience with another professor doing data analytics. *Id.*

343.      Ms. Dougan stated they put their top three candidates on a white board and Mr. Sullivan took a picture. She initially said everyone had Ms. Allen as number 1 but later clarified that Mr. Seidler leaned toward the Tableau and presentation side of things. She stated Mr. Seidler struggled with Ms. Allen but then Ms. Allen was his top when they returned on Monday. *Id.* Ms. Dougan stated she did not think Mr. Seidler had Plaintiff in his top three. *Id.*

344.     Ms. Dougan said Ms. Allen was her top pick, and Plaintiff was her second. Mr. Johnson was her third pick. Mr. Johnson had Tableau knowledge, but they thought he was overqualified and would not want to stay. *Id*.

345.     Ms. Dougan stated that Plaintiff did not have strong data experience. She kept saying all she had used was Google Analytics, and the examples she gave were from "like 15 years ago." *Id.*

346.     In addition, Plaintiff could not come up with recent innovative things she had done. *Id.*

347.     Ms. Dougan stated that Ms. Allen was the first interview and took the full hour. She stated she was "awe struck with her." Ms. Dougan explained that the person in this position does a lot of presentations, and Ms. Allen was a good presenter *Id.*

348.     By contrast, Ms. Dougan stated that Plaintiff gets nervous and that she turned red during interviews and was nervous. *Id.*

349.    Ms. Dougan stated when they asked her what motivated her to apply, Plaintiff stated she was just ready for a change. She also indicated her only presentation skills were doing training on Trauma Informed Care to staff. *Id.*

350.    Ms. Dougan stated that Ms. Allen had co-authored a textbook with a professor on data concerning street gangs and had been doing a qualitative and quantitative analysis to evaluate the pre-trial tools. *Id.*

351.    Mr. Sullivan stated that Plaintiff did a really good job. It was probably the best interview she had with him yet. She did very well on Mr. Seidler's exercise, and she was one of their two finalists. Ex. 62 (Depo. Ex. 102).

352.    Mr. Sullivan noted that Mr. Seidler had decided he wanted to take over the adult portfolio, which influenced their decision. He indicated that none of the candidates knew Tableau, between Ms. Allen and Plaintiff.[26] He noted that he was impressed with Ms. Allen and that she was going to be presenting on research she did with Alex Holsinger. *Id.*

353.    Mr. Sullivan said he could picture Ms. Allen doing the job. He further stated, that in fairness, he could also picture Plaintiff doing the job. He had seen her present on Trauma Informed Care, and she does well. *Id.*

354.    Mr. Sullivan liked the way Ms. Allen answered the questions. He liked her enthusiasm. *Id.*

355.    Mr. Sullivan stated that Plaintiff seemed very tired to him, and he did not know how she would do taking over the juvenile portfolio. *Id.*

356.    Earl Taylor gave similar feedback about Plaintiff when Ms. Bloomberg and Ms.

---

[26] The notes actually read that none of the candidates knew tableau, but the context makes it clear it references Ms. Allen and Plaintiff. It is undisputed that a different candidate (Casey Johnson) had extensive creator experience with Tableau. *See also*, Ex. 18, Sullivan depo. 243:2-244:1.

Veronda interviewed him about the Deputy Director of ARC position. He stated that Plaintiff does not always seem plugged in and engaged. Ex. 64 (Depo. Ex. 101); Ex. 24, Bloomberg Decl. ¶ 18.

357.    Mr. Sullivan also noted that Plaintiff used the same dated examples in all of her interviews and lacks innovation. Ex. 62 (Depo. Ex. 102).

358.    Mr. Sullivan indicated he and Ms. Dougan wanted to hire Ms. Allen. Mr. Seidler was more ambivalent. He really wanted the external candidate from Topeka (Casey Johnson), but Mr. Sullivan did not believe Mr. Johnson would be a good fit. He stated he did not think Mr. Seidler was excited about either Plaintiff or Ms. Allen. *Id.*

359.    After interviewing the decision makers and reviewing relevant documents, Ms. Bloomberg and Ms. Veronda determined that the department hired the most qualified candidate in each recruitment. Ex. 17, Bloomberg depo. 280:4-12.

360.    Ms. Bloomberg and Ms. Veronda then met with Plaintiff on July 16, 2019 to discuss their findings. In that meeting, Ms. Bloomberg also told Plaintiff they could offer interview assistance if she was interested in that. Ex. 65 (Depo. Ex. 203); Ex. 24, Bloomberg Decl. ¶ 19; Ex. 22, Veronda depo. 105:8-107:14, 109:3-5.

361.    Plaintiff stated she was certain the decisions were discriminatory. She said she did not want interview assistance but appreciated the offer. Ex. 65 (Depo. Ex. 203), Ex. 22, Veronda depo. 107:15-25

362.    Plaintiff also represented to Ms. Bloomberg and Ms. Veronda that she had heard from hiring managers and others in the interviews that Plaintiff was their top candidate. Ex. 65 (Depo. Ex. 203); Ex. 1, Pltf's depo. 218:9-14.

363.    When asked to identify the people who allegedly told her this, the only person Plaintiff identified was Brian Seidler's wife. She did not identify any hiring manager, or even anyone who was in any of the interviews. Ex. 1, Pltf's depo. 218:9-21.[27]

364.    Ms. Bloomberg then sent Plaintiff a letter further explaining the findings and providing feedback for Plaintiff's use in the future. Ex. 66 (Depo. Ex. 143); Ex. 17, Bloomberg depo. 279:6-280:1.

365.    After the investigation concluded, Ms. Bloomberg and Ms. Veronda brainstormed about ways they could assist Plaintiff with her desire to move forward in the organization and decided to offer Plaintiff the opportunity to meet with an executive coach. Ex. 22, Veronda depo. 125:4-14.

366.    They wanted to give her assistance in getting her where she wanted to be. Ex. 22, Veronda depo. 128:1-20.

367.    Ms. Bloomberg got approval to hire a coach, and then Ms. Bloomberg and Ms. Veronda met with Plaintiff on August 2, 2019 to talk to her about the possibility. Ex. 67 (Depo. Ex. 165) at JoCo 484-485; Ex. 24, Bloomberg Decl. ¶ 19.

368.    They informed Plaintiff they had received approval for Plaintiff to work with an external consultant on growth and development in her current role, and they had received favorable feedback about the coach from other employees. They informed Plaintiff the coach could help her with whatever Plaintiff wanted. Ms. Bloomberg gave examples of things the coach could address, such as items on Plaintiff's PPD or leadership. Ex. 67 (Depo. Ex. 165) at JoCo 484.

369.    Plaintiff stated she would have to give it some thought and also asked what prompted this. Ms. Bloomberg responded that they were brainstorming different options they

---

[27] Plaintiff claims Brian Seidler's wife told Plaintiff that Mr. Seidler was "pissed" Plaintiff did not get the position. This is inadmissible hearsay that Mr. Seidler denies. Ex. 28, Seidler depo. 86:7-18, 135:7-19.

could offer Plaintiff in her current role, and they have done this with others in the past who have a desire to do something different. Ex. 67 (Depo. Ex. 165) at JoCo 485.

370.    On August 7, 2019, Plaintiff informed Ms. Bloomberg that she was interested in meeting with the consultant. She also stated she found it concerning that she was being offered the training now since she had not received feedback that she  needed leadership training in the past. She said it was concerning that no one offered the training to her until she made a complaint of discrimination. Ex. 68 (Depo. Ex. 169).

371.    Plaintiff attended sessions with the consultant but did not find them helpful. Ex. 1, Pltf's depo. 220:25-221:7.

**Plaintiff's Mental Health Applications**

372.    The Mental Health Department's clients typically are not in the criminal justice system, and the Mental Health Department takes a different approach to working with clients than the Department of Corrections does. Ex. 71, Worth Decl. ¶ 3.

373.    Leadership in Mental Health has observed that Corrections employees are often tasked with holding clients/offenders accountable for their actions and ensuring they meet certain requirements, while the Mental Health Department treats clients like patients, providing support and resources to help them improve their mental health. Ex. 71, Worth Decl. ¶ 4.

374.    Unlike in Corrections, the Mental Health Department does not impose punitive measures. Mental Health takes a less regimented approach. Ex. 71, Worth Decl. ¶ 5.

375.    The leadership team in the Mental Health Department has observed that case managers who come from the Corrections space often struggle to adapt to the differing approaches. That is not to say that applicants with Corrections experience cannot succeed in the position, but when hiring for those positions, Mental Health leadership looks for indicators that applicants

coming from Corrections desire a change in order to help treat clients from a mental health perspective, rather than holding clients accountable to certain requirements. Ex. 71, Worth Decl. ¶ 6.

376.    Case Managers deal directly with clients and do not have any supervisory responsibilities, so supervisory experience is not necessarily relevant to the job. Ex. 71, Worth Decl. ¶ 7; *see also* Ex. 69 (Depo. Ex. 74) at JoCo 2806-2812 (job description).

377.    In September 2020, Plaintiff applied for a position as a Case Manager in the Mental Health Department. Ex. 69 (Depo. Ex. 74), Ex. 1, Pltf's depo. 254-256:2.

378.    The resume Plaintiff submitted for this position can be found in Exhibit 72 (Depo. Ex. 75). The first section of the resume, titled "Professional Summary," states:

> Skilled manager with over 20 years of experience in corrections and probation management and over 27 years working in the criminal justice system. Over 5 years of experience in Data Analysis including collection, cleaning data sets, and developing reports and dashboards to communicate findings. Knowledge of relational data bases and SQL and MySQL. 2 years of experience with data visualization tools including Tableau and Google Data Studio.

Ex. 72 (Depo. Ex. 75); Ex. 1, Pltf's depo. 255:24-256:2.

379.    The second section of the resume, titled "Skills," focuses on skills related to management, evaluating complex data, and public speaking. It also includes more generic skills such as verbal and written communications and a willingness to learn, but has no focus on mental health or even case management skills. Ex. 72.

380.    The third section, titled "Employment History," focuses on Plaintiff's experience in the criminal justice arena with no information about her experience in dealing with mental health issues. Ex. 72.

381.     Jason Waldmeier was the hiring manager for this position and made the decisions about who to interview based on his review of resumes. Ex. 70 (Depo. Ex. 233); Ex. 71, Worth Decl. ¶ 8; Ex. 73, Waldmeier Decl. ¶¶ 2-3.

382.     Mr. Waldmeier did not choose to interview Plaintiff. Ex. 1, Pltf's depo. 291:16-292:4.

383.     Mr. Waldmeier did not know Plaintiff. He did not know Plaintiff's gender, sexual orientation, gender presentation, or age. He also did not know that Plaintiff had any kind of medical condition, did not know she had taken FMLA, and did not know she had made any complaints of discrimination (either internally or externally). Ex. 73, Waldmeier Decl. ¶¶ 4-6.

384.     Mr. Waldmeier hired Kyle Dolph and Courtney Shaffer for these positions. Ex. 88, Veronda Decl. ¶¶ 5-6. The materials they submitted can be found at Exhibit 91; Ex. 88, Veronda Decl. ¶ 6.

385.     In October 2020, Plaintiff Applied for an Access Team Manager position in the Mental Health Department. Ex. 74 (Depo. Ex. 76); Ex. 1, Pltf's depo. 256:21-257:4. The hiring manager for the position was Renee Van Meter. Ex. 75, Van Meter Decl. ¶ 3.

386.     The people who work in this position meet with and triage prospective new and returning clients to Johnson County Mental Health Center as well as respond to emergency calls and walk-ins. They regularly interact with individuals in mental health crisis, work to de-escalate the crisis, and make determinations about how to best coordinate the client's care. They also provide follow-up phone calls to outreach and encourage clients to engage with recommended services. Ex. 75, Van Meter Decl. ¶ 4; Ex. 74 (Depo. Ex. 76).

387.    The resume Plaintiff submitted for this position can be found at Exhibit 76 (Depo. Ex. 77) and is the same as the one she submitted for the Mental Health Case Manager position. Ex. 1, Pltf's depo. 256:21-257:4; Ex. 76 (Depo. Ex. 77), compared to Ex. 72 (Depo Ex. 75).

388.    The position was initially posted only internally, but Ms. Van Meter later asked to post the position externally as well because in the first round of applicants, she only received applicants from Corrections who did not appear to have mental health experience. Ex. 92, Emails; Ex. 75, Van Meter Decl. ¶ 5.

389.    Ms. Van Meter made the decisions about who to interview for this position based on her review of resumes and application materials and did not choose to interview Plaintiff. Ex. 75, Van Meter Decl. ¶ 6; Ex. 1, Pltf's depo. 291:16-292:4.

390.    Ms. Van Meter did not know Plaintiff. She did not know Plaintiff's gender, sexual orientation, gender presentation, or age. She also did not know that Plaintiff had any kind of medical condition, did not know she had taken FMLA, and did not know she had made any complaints of discrimination (either internally or externally). Ex. 75, Van Meter Decl. ¶¶ 9-10

391.    Ms. Van Meter hired Dylan Hurt to fill this position. Ex. 88, Veronda Decl. ¶ 10. Mr. Hurt's submissions can be found at Exhibit 93.[28] Ex. 88, Veronda Decl. ¶ 10.

392.    In November 2020, Plaintiff applied for another Case Manager position in Mental Health. Ex. 77 (Depo. Ex. 82); Ex. 1, Pltf's depo. 263:1-10.

393.    The resume Plaintiff submitted for this position can be found at Exhibit 80 (Depo. Ex. 83) and is the same as the one she submitted for the first Mental Health Case Manager position. Ex. 1, Pltf's depo. 263:1-10; Ex. 80 (Depo. Ex. 83), compared to Ex. 72 (Depo Ex. 75).

---

[28] Defendant notes this Exhibit also contains a cover letter for another position, which is because the application tracking system includes submissions for other positions as well.

394.    Ms. Spieker was the hiring manager for this position. She made the decisions about who to interview for this position based on her review of resumes and application materials and did not choose to interview Plaintiff. Ex. 79, Spieker Decl. ¶¶ 3-4; Ex. 1, Pltf's depo. 291:16-292:4.

395.    Ms. Spieker did not know Plaintiff. She did not know Plaintiff's gender, sexual orientation, gender presentation, or age. She also did not know that Plaintiff had any kind of medical condition, did not know she had taken FMLA, and did not know she had made any complaints of discrimination (either internally or externally). Ex. 79, Spieker Decl. ¶ 5.

396.    Ms. Spieker hired four individuals based on this posting: Daijah Porchia, Jessica Banes, Thomas Lynch (YOB 1965), and Stacey Stinson. Ex. 88, Veronda Decl. ¶ 14. Their submissions can be found at Exhibit 94. *Id.*

397.    Samantha Veronda was involved in posting the two Case Manager positions and the Access Manager position discussed above, but she had no involvement in determining who should be interviewed or who should be hired for those positions. Ex. 22, Veronda depo. 139:12-142:12; Ex. 88, Veronda Decl. ¶¶ 5, 9, 13; Ex. 79, Spieker Decl. ¶ 4; Ex. 75, Van Meter Decl. ¶ 6.

398.    Ms. Veronda did not speak to any of the hiring managers about Plaintiff's application for those positions. Ex. 22, Veronda depo. 142:7-12, 154:1-156:5.

399.    In fact, Ms. Veronda did not know Plaintiff had applied for those positions until she was asked to pull documents related to Plaintiff's second charge of discrimination which was after all of the selected candidates had been interviewed. Ex. 22, Veronda depo. 140:6-25; Ex. 88, Veronda Decl. ¶¶ 16-18.

400.    Four of the people hired for these positions were hired before Plaintiff even filed her charge. Ex. 88, Veronda Decl. ¶ 18; Ex. 95.

401.     On January 29, 2021, the County responded to Plaintiff's charge of discrimination and pointed out that the resume Plaintiff submitted for the Mental Health positions did not reflect relevant experience. Ex. 84.

402.     On February 26, 2021, Plaintiff again applied for a Case Manager position in Mental Health. Ex. 82, Depo. Ex. 88; Ex. 1, Pltf's depo. 271:12-18; Ex. 88, Veronda Decl. ¶ 19.

403.     Kevin McGuire was the hiring manager. Ex. 22, Veronda depo. 163:19-21; Ex. 1, Pltf's depo. 271:13-18.

404.     This time, Plaintiff submitted a different resume, which can be found at Exhibit 83 (Depo. Ex. 89). Ex. 1, Pltf's depo. 271:12-272:4.

405.     In this version of Plaintiff's resume, the first section, titled "Summary," states:

> Proficient Senior Case Manager prepared to bring experience and professional knowledge to new role with room for growth and advancement. Specializing in resource advocacy, case planning and team communication. Excellent communicator and problem solver with a focus and results-oriented approach.

Ex. 83 (Depo. Ex. 89).

406.     Plaintiff also completely revamped the "Skills" section of her resume to focus on resource coordination, needs evaluations, case planning, care advocacy, treatment plans, and emotional awareness.  Ex. 83.

407.     The section of Plaintiff's resume summarizing her prior employment experience also changed drastically and focused on case management and client-centered work. *Compare* Ex. 72 (Depo. Ex. 75), to Ex. 83 (Depo Ex. 89).

408.     Kevin McGuire made the decisions about who to interview for this position and chose to interview Plaintiff. Ex. 85, McGuire Decl. ¶ 2.

409.     After the interviews, Mr. McGuire contacted Keith Clark to obtain a reference about Plaintiff. Ex. 21, Clark depo. 78:22-79:10.

410.    Mr. Clark gave Plaintiff a positive reference, as reflected in Exhibit 86 (Depo. Ex. 215). Ex. 21, Clark depo. 79:15-23.

411.    Mr. McGuire then offered Plaintiff the position, which she verbally accepted. Ex. 85, McGuire Decl. ¶ 3.

412.    At the time Mr. McGuire offered Plaintiff the position, he had no knowledge of Plaintiff's prior complaints, charges of discrimination, or lawsuit. Ex. 85, McGuire Decl. ¶ 5.

413.    On April 12, 2021, Plaintiff informed Mr. Clark that she was accepting the position in Mental Health, and her last day would be April 30, 2021. Ex. 87, Depo. Ex. 90, Ex. 1, Pltf's depo. 272:15-20.

**Plaintiff's Alleged Disability**

414.    Plaintiff was diagnosed with major depressive disorder with generalized anxiety in approximately 2010. Ex. 1, Pltf's depo. 31:23-32:11, 36:14-16.

415.    On a day-to-day basis, Plaintiff's condition is controlled by medication, but she has panic attacks on occasion, which can be somewhat debilitating. Ex. 1, Pltf's depo. 36:5-21.

416.    Plaintiff claims that between June 2019 and April 2021, she had panic attacks on a weekly or monthly basis, which she claims related to ongoing retaliation. Ex. 1, Pltf's depo. 37:2-38:5.

417.    Between April 2021, when Plaintiff moved to the Case Manager position, and September 2021, Plaintiff only had one panic attack. Ex. 1, Pltf's depo. 37:2-19.

418.    The only medical provider Plaintiff has seen for her condition is Dr. Foos. Ex. 1, Pltf's depo. 72:9-11.

419.    Dr. Foos is a general practice family doctor. Ex. 1, Pltf's depo. 98:7-9.

420.    Plaintiff has not seen a counselor or therapist in the last ten years. 98:10-17.

421.    Plaintiff has never been hospitalized for panic attacks or depression and has never had to go to the ER or an urgent care because of a panic attack. Ex. 1, Pltf's depo. 98: 1-6.

422.    In both August 2019 and August 2020, Plaintiff reported to Dr. Foos that she had no depression or anxiety. Ex. 89 (Depo. Ex. 12 plus additional records so that all of the records produced by Plaintiff are included).

**Plaintiff's FMLA Leave**

423.    Plaintiff first requested intermittent FMLA in September 2018. Ex. 1, Pltf's depo. 33:8-11; Ex. 24, Bloomberg Decl. ¶ 20.

424.    Plaintiff went through Human Resources to request FMLA and informed her supervisor when she needed to take FMLA leave but otherwise did not have any conversations with anyone at the County about her condition. Ex. 1, Pltf's depo. 32:19-33:25.

425.    Plaintiff has never had any trouble with the process of getting her FMLA leave approved and has never had any trouble taking the time she needed to take. Ex. 1, Pltf's depo. 34:8-16.

426.    Plaintiff's peer SCMs have informed Plaintiff that employees in the department feel like Plaintiff is not available when they need her, but Plaintiff does not recall whether those statements related to when Plaintiff called in for FMLA. Ex. 1, Pltf's depo. 34:17-36:4.

427.    Regardless, Plaintiff's peer SCMs were not aware Plaintiff was taking FMLA leave. Ex. 1, Pltf's depo. 35:17-36:1.

**Misc.**

428.    Plaintiff filed her first charge of discrimination on August 26, 2019. Ex. 90 (Depo. Ex. 52); Ex. 1, Pltf's depo. 1-7.

429.    Plaintiff filed her second charge of discrimination on December 4, 2020. Ex. 81

(Depo. Ex. 85).

430.    The only comment Plaintiff recalls related to age is her subordinate, Amy Bond, stating that some people needed to retire and move on. Ex. 1, Pltf's depo. 288:23-289:8.

431.    No one has ever made offensive comments about Plaintiff's FMLA leave. Ex. 1, Pltf's depo. 289:9-15.

432.    At the time of the interviews for the Director of Field Services, Ms. Bloomberg was aware Plaintiff had intermittent FMLA, but she did not know the reason for the FMLA. Ex. 17, Bloomberg depo. 133:17-134:12.

433.    At the time of the hiring decisions for the Director of Field Services and the BI Analyst positions, Ms. Dougan was not aware that Plaintiff had been diagnosed with anxiety or depression and did not know she took FMLA for those reasons. Ex. 20, Dougan depo. 129:6-16.

434.    Mr. Sullivan did not become aware that Plaintiff had been diagnosed with depression and anxiety and did not know Plaintiff had taken FMLA leave until he read it in her charge of discrimination. Ex. 18, Sullivan depo. 81:14-82:16. [29]

435.    Sharon Brown could not recall whether Plaintiff took FMLA leave, but that was no issue for Ms. Brown. She preferred people not come to work sick and to take off when they needed to do that. Ex. 25, Brown depo. 16:14-17:1.

436.    Ms. Brown was aware Plaintiff got counseling from time to time to address anxiety, but she had no conversation with anyone else about that. Ex. 25, Brown depo. 16:14-17:23.

437.    Ms. Brown never heard anyone express any concern about Plaintiff taking time off. Ex. 25, Brown depo. 17:2-9.

---

[29] There is also no evidence that Shelly Williams or Ted Jester was aware of Plaintiff's FMLA leave or alleged disability.

438.    Mr. Clark never received any complaints that Plaintiff was not present enough because she was out of the office. Ex. 21, Clark depo. 121:16-19.

439.    At the time of hiring for the BIA position, Mr. Seidler was not aware that Ms. King took FMLA leave, that she had any kind of diagnosed disability, or that she had depression or anxiety. Ex. 28, Seidler depo. 125:10-18.

## III.    ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotations omitted). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538-39 (10th Cir. 1993). "A genuine issue of material fact exists when 'the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" *Zwygart v. Bd. of Comm'rs of Jefferson Cnty., Kan.*, 483 F.3d 1086, 1090 (10th Cir. 2007) (quoting *Liberty Lobby*, 477 U.S. at 242).

Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Liberty Lobby*, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.

### B.      FRAMEWORK FOR THE ANALYSIS.

Plaintiff claims the County discriminated and/or retaliated against her by failing to hire/promote her into five positions: (1) the Director of Field Services in JDOC, (2) a Business Intelligence Analyst in JDOC, (3) two Adult Services Case Manager positions in Mental Health, and (4) an Access Team Manager position in Mental Health. Doc. __, Pretrial Order.

More specifically, as to the JDOC positions, Plaintiff claims the County violated Title VII, the Age Discrimination in Employment Act (ADEA), and the Americans with Disabilities Act (ADA) by engaging in gender, age, and/or disability discrimination. She also claims the County retaliated against her in violation of the Family Medical Leave Act (FMLA). As to the Mental Health positions, Plaintiff asserts claims of both discrimination and retaliation under Title VII, the ADEA, and the ADA, as well as a claim of FMLA retaliation. Doc. __, Pretrial Order.

Because Plaintiff has no direct evidence of discrimination, all of her claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Laul v. Los Alamos National Laboratories*, 765 Fed. Appx. 434, 440-41 (10th Cir. 2019) (holding that the burden-shifting framework applies to claims of discrimination brought under both Title VII and the ADEA); *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (same); *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018) (holding that the burden-shifting framework applies to discrimination claims brought under the ADA).

In order to establish a claim under the ADA, Plaintiff must first show that she has a disability as defined by the law. Beyond that, the *prima facie* elements for each of her discrimination claims is the same. Specifically, Plaintiff must show that: (1) she applied for the position in question; (2) she was qualified for the position in question; and (3) she was rejected

under circumstances which give rise to an inference of unlawful discrimination. *Anaeme v. Diagnostek, Inc.,* 164 F.3d 1275, 1278 (10th Cir. 1999) (stating the elements for a Title VII failure to hire claim); *Laul*, 765 Fed. Appx. at 440 (stating the elements for a failure to hire claim asserted under Title VII and the ADEA); *Lincoln*, 900 F.3d at 1192 (stating the elements for an ADA failure to hire claim).

Similarly, the *prima facie* elements for each of her retaliation claims are the same. Specifically, Plaintiff must show: (1) that she engaged in protected activity; (2) that she suffered an adverse action; and (3) a causal relationship. *See Laul,* 765 Fed. Appx. at 441 (10th Cir. 2019) (outlining the elements of a retaliation claim brought under Title VII); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122-23 (10th Cir. 2007) (outlining the elements of retaliation claims brought under Title VII and the ADEA); *Foster v. Mountain Coal Company, LLC* 830 F.3d 1178, 1187, 1193-94 (10th Cir. 2016) (outlining the elements of retaliation claims brought under the ADA); ; *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir. 2014) (outlining the elements of a retaliation claim brought under the FMLA).[30]

The County does not dispute the first two elements of Plaintiff's *prima facie* case for any of the positions at issue. However, even viewing the evidence in the light most favorable to Plaintiff, she cannot establish the third element of her *prima facie* case as to any her claims. Importantly, Plaintiff must do more than simply point to the fact that someone outside the protected class was hired for the job. *See e.g. Lincoln*, 900 F.3d at 1193 ("The mere fact that … the employer selected another qualified individual who was not a member of plaintiff's protected class is insufficient to establish an inference of discrimination."); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1223 (10th Cir. 1997) ("The final prong of the [*prima facie*] test requires the plaintiff to present

---

[30] These cases also establish that the *McDonnell Douglas* burden-shifting framework applies equally to the relevant retaliation claims.

some affirmative evidence that [the protected characteristic] was a determining factor in the employer's decision."); *Bowers v. Netsmart*, 2021 WL 2104985, at *9 (D. Kan., May 25, 2021) ("In order to demonstrate 'discrimination,' a plaintiff generally must show that he has suffered an 'adverse employment action because of the [protected characteristic].'") (citations omitted); *Olson v. Philco-Ford*, 531 F.2d 474, 478 (10th Cir. 1976) (in Title VII case, "something more is needed than proof that a qualified male was chosen over a qualified female. If nothing more is needed, we have indeed opened Pandora's box.").

Moreover, the County has articulated non-discriminatory/non-retaliatory reasons for its hiring decisions, and Plaintiff cannot establish that those decisions were somehow a pretext for discrimination or retaliation. Both courts in this District and the Tenth Circuit have repeatedly stressed that it is a plaintiff's burden to prove intentional discrimination. *See e.g. Bowers*, 2021 WL 2104985, at *11 (burden is on plaintiff to demonstrate pretext for intentional discrimination on ADA discrimination claim); *Bennett*, 792 F.3d at 1267 (burden is on plaintiff to prove intentional discrimination on Title VII and ADEA claims); *Laul*, 765 Fed. Appx. at 441 (on age discrimination claim, "It is not enough for [plaintiff] to assert his belief that he was better qualified than the other applicants … [to establish pretext], a plaintiff must come forward with an overwhelming disparity in qualifications." (internal quotations omitted)); *Miller v. Maddox*, 51 F.Supp.2d 1176, 1191 (D. Kan. 1999) (in the Tenth Circuit, "a plaintiff must prove that the defendant's action was intentionally retaliatory."); *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1263 (10th Cir. 1998) ("A plaintiff asserting a retaliation claim has the ultimate burden of persuasion to demonstrate that the challenged employment decision was the result of intentional retaliation.") (internal quotations omitted). There is simply no evidence of that in this case.

On summary judgment, "[t]he court may not act as a super personnel department that second guesses employers' business judgments." *See Thomas v. Farmers Insurance Exchange*, 448 F.Supp.3d 1174, 1192 (D. Kan. 2020) (quoting *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1308 (10th Cir. 2005)). This is particularly true in failure-to-hire cases, where employers are in a unique position to understand the needs of the position and the importance of particular objective and subjective considerations. *See Salemi v. Colo. Pub. Employees' Retirement Assoc.*, 747 Fed. Appx. 675, 690 (10th Cir. 2018) ("We have long respected employers' wide latitude in setting job standards and requirements and in deciding whether applicants meet those standards."); *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[O]ur role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."); *Tran v. Sonic Industries Services, Inc.*, 490 Fed. Appx. 115, 119 (10th Cir. 2012) (employer made good faith business decision in hiring even where it relied on some subjective considerations); *Brown v. Unified School Dist. No. 501*, 2019 WL 3318183, at *7 (D. Kan. July 24, 2019) ("Mere conjecture that the defendant's explanation is pretext is not enough to justify denial of summary judgment.")

## C.    PLAINTIFF DOES NOT HAVE A DISABILITY

To establish that she has a disability, Plaintiff must show that she has an impairment substantially limits one or more of her major life activities, that she had a record of such impairment, or that she was regarded as having such an impairment. *Smothers*, 740 F.3d at 544; *see also O'Neal v. Centene Management Company, LLC*, No. 2:17-cv-02172-JAR-KGS, 2018 WL 4637270, at *15 (D. Kan. Sept. 27, 2018).

Where, as here, a plaintiff alleges depression and anxiety as disabling conditions, expert testimony is required to meet this burden. *Clancy v. Esper*, No. 18-4106-SAC-JPO, 2020 WL 618584, at *6 (D. Kan. Feb. 10, 2020) (analyzing a claim of disability discrimination based on

PTSD, depression, and anxiety under the Rehabilitation Act, but acknowledging the Act "is interpreted as incorporating the standards of the Americans with Disabilities Act" and applying the same analysis). A medical diagnosis, without more, is insufficient to establish a disability. *See generally id.* In addition, Plaintiff may not rely on her own testimony to establish a substantial limitation. *See O'Neal*, 2018 WL 4637270, at \*15 (analyzing a claim of disability discrimination based on generalized anxiety disorder and GERD, and granting summary judgment where the plaintiff had not provided evidence of a substantial limitation beyond her own testimony).

Here, Plaintiff has only seen a general practice family doctor for her condition. She has not seen a counselor or therapist in the last ten years. SOF ¶¶ 418-420. Plaintiff testified that her impairments are typically controlled by medication but that she has debilitating panic attacks on occasion. SOF ¶ 415. Plaintiff has never been hospitalized, gone to an urgent care, or gone to the ER for these attacks. SOF ¶ 421.

Plaintiff has identified Dr. Foos as a non-retained expert, but Dr. Foos' records contain no mention of panic attacks or other indication that Plaintiff is substantially limited in any major life activity. *See* Ex. 89. In fact, Dr. Foos' records demonstrate that between June 2019 and April 2021 (a period when Plaintiff claims to have been suffering from frequent debilitating panic attacks), Plaintiff reported to her physician, at least twice, that she had no depression or anxiety. SOF ¶¶ 416, 422.

Thus, even viewing the facts in the light most favorable to her, Plaintiff has failed to show that she is substantially limited in any major life activity. Plaintiff cannot use her own testimony to meet this burden, and the medical records are insufficient to satisfy her burden. *See Felkins v. City of Lakewood*, 774 F.3d 647, 652 (10th Cir. 2014) (a plaintiff's "declarations are admissible insofar as they describe her injuries and symptoms … [t]hey are inadmissible, however, insofar as

they diagnose her condition … or state how that condition causes limitations on major life activities."); *see also O'Neal*, 2018 WL 4637270, at *15 (finding plaintiff's testimony on limitations of major life activities inadmissible for that purpose and therefore holding that the plaintiff had not satisfied her burden to establish a disability under the ADA).[31]

All of Plaintiff's ADA claims fail for this reason alone. As described below, they also fail because Plaintiff cannot establish the "because of" element of her claim nor can she establish pretext.

### D.  DIRECTOR OF FIELD SERVICES POSITION

#### 1.  The Undisputed Evidence.

The Director of Field Services (DFS) oversees both Adult and Juvenile Intensive Supervision. The position also oversees Adult and Juvenile House Arrest, Juvenile Case Management, Juvenile Programming, Probation Intake, and Bond Assessment. SOF ¶ 74. The DFS monitors the budget and makes decisions accordingly. SOF ¶ 76. The DFS maintains strong familiarity with department policies, as well as KDOC (state-level) adult and juvenile offender contact standards. SOF ¶ 75. The DFS maintains a working knowledge of current trends and actions with both Adult and Juvenile Field Services. *Id*.

The DFS participates in the development of the agency's comprehensive plan, serves as the Administrative Contact to the KDOC Juvenile Services, and ensures the district complies with KDOC juvenile policies and regulations. SOF ¶ 77. The DFS must also develop positive working relationships with the KDOC, the Adult and Juvenile Community Corrections Advisory Boards, and serves on the Statewide Community Advisory Committee. *Id.*

---

[31] Plaintiff also has no evidence that any of the decision makers perceived her as disabled. Indeed, none of the decision makers was even aware that Plaintiff suffered from depression or anxiety when the respective decisions were made. *See* SOF ¶¶ 383, 390, 395, 433, 434. Similarly, Plaintiff's medical records do not establish that she had a disability nor is there any evidence that any of the decision makers even knew about those records, much less reviewed them.

At the time she applied for this position, Plaintiff had significant experience in Adult Intensive Supervision, but no experience in Juvenile Intensive Supervision, Juvenile Programming, Probation Intake, or Bond Assessment. SOF ¶ 87; Ex. 35.  Plaintiff had limited experience with budgets and with writing grants. SOF ¶ 90. The writing sample Plaintiff submitted was a two-page letter she had written to a judge more than ten years earlier. SOF ¶ 91.

By contrast, Keith Clark (who was chosen for the position) had experience in all of the listed areas except the delivery of house arrest services. SOF ¶ 106.  Mr. Clark had also held a Director of Community Corrections position for 13 years. SOF ¶ 95. It is true that the District Mr. Clark led was significantly smaller than the Tenth Judicial District (Johnson County), but Mr. Clark was directly responsible for Adult and Juvenile Intensive Supervision, as well as Community Case Management and Behavior Health Services. SOF ¶ 96. He had developed and monitored budgets totaling more than $1 million. SOF ¶ 97. He had executed multiple grant applications and wrote adult comprehensive plans and behavioral health plans. SOF ¶ 97. He had also submitted quarterly reports for the Kansas Department of Corrections (KDOC). SOF ¶ 98. The writing example Mr. Clark provided was a 43-page Community Corrections Comprehensive Plan he had drafted in 2016. SOF ¶ 105.

In short, both the breadth and depth of Mr. Clark's experience far exceeded Plaintiff's.

### 2.  Plaintiff cannot establish a *prima facie* case of disability discrimination.

In order to establish her *prima facie* case, Plaintiff show a nexus, or "at least a logical connection" between her disability and the decision not to promote her. *Dewitt v. Sw. Bell Tel. Co.*, 41 F.Supp.3d 1012, 1017 (D. Kan. 2014). Here, there is no evidence that the hiring manager (Robert Sullivan) had any knowledge that Plaintiff had any kind of impairment at all, let alone an impairment that substantially limited a life activity. Indeed, only one panel member (Sharon

Brown) had any awareness that Plaintiff had any kind of potential impairment. Ms. Brown knew Plaintiff got counseling from time to time to address anxiety, but did not share that information with anyone on the panel. SOF ¶ 436.

The record is completely devoid of any indication that this awareness impacted Ms. Brown's decision-making, let alone that it impacted Mr. Sullivan's ultimate decision. *See Scherer v. GE Corp.*, 59 F.Supp.2d 1132, 1136 (D. Kan. 1999) (granting summary judgment to defendant on ADA claim in part based on plaintiff's failure to demonstrate defendant knew of his alleged disability and resulting limitations).[32]

These facts do not give rise to any inference that Plaintiff's alleged disability had anything at all to do with the decision to hire Mr. Clark. As such, she cannot establish a *prima facie* case of disability discrimination.

### 3.  Plaintiff Cannot Establish a *Prima Facie* Case of Gender Discrimination.

As noted above, to state a claim for sex discrimination, Plaintiff must show that the circumstances surrounding the decision not to hire her for this position give rise to an inference of discrimination. *Bennett*, 792 F.3d at 1266; *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). The evidence does not support this.

The record establishes that Mr. Sullivan was familiar with Plaintiff long before the Director of Field Services position was posted. SOF ¶ 72. The record further establishes that 44 people applied for this position, and twenty of them met the minimum qualifications for the position. SOF ¶ 78. Mr. Sullivan is the person who determined who to interview. SOF ¶ 79. Of the 20 qualified candidates, Mr. Sullivan selected eight candidates to interview, four of whom were women. Ex.

---

[32] At that time, Ms. Bloomberg was aware that Plaintiff took intermittent FMLA, but she did not know the reason. SOF ¶ 432.

37. In addition, based on the names of the other candidates Mr. Sullivan decided *not* to interview at least seven men who met the minimum qualifications. SOF ¶ 81.

Plaintiff believes Mr. Sullivan has a bias against masculine-presenting females, but the only basis for this belief is that Mr. Sullivan has not promoted any masculine-presenting females. SOF ¶¶ 153-154. Plaintiff admits, however, that she is not aware of other masculine-presenting females who have applied for positions where Mr. Sullivan was the hiring manager. SOF ¶ 155. Moreover, Mr. Sullivan was aware of Plaintiff's presentation long before he selected her for an interview. SOF ¶ 72. The idea that he decided to interview her (knowing her gender presentation) but then decided not to hire here because of her gender presentation is non-sensical.

Plaintiff makes much of the fact that Mr. Sullivan selected Shelly Williams, a director from outside the County, to be on the panel and that Ms. Williams was also one of Mr. Clark's references. Ironically, Ms. Williams was the only panel member who may have had Plaintiff in her top three candidates. SOF ¶ 118. Further, Sharon Brown was also on the panel, and Plaintiff listed Ms. Brown as one of her references. SOF ¶ 86. Regardless, none of this has any relation to Plaintiff's gender, gender presentation, or sexual orientation.

Plaintiff also argues that Mr. Sullivan had made up his mind before the interview process. The evidence does not support this, but even if it did, no evidence even hints at the fact that the decision had anything whatsoever to do with Plaintiff's gender, gender presentation or sexual orientation. Finally, Plaintiff's suggestion that comments made by people years earlier and by people who left the County decades before this decision was made somehow leads to an inference of discrimination is patently illogical.

The undisputed evidence illustrates that Mr. Clark's qualifications were far superior to Plaintiff's. It also demonstrates that other candidates who were not hired had qualifications better

suited to the position than Plaintiff's. Indeed, Sharon Brown, who was intimately familiar with both the requirements of the position and Plaintiff's experience and performance, did not have Plaintiff in her list of top candidates. SOF ¶¶ 119-123. Ms. Brown was uniquely suited to evaluate this decision, and she testified that Keith Clark and Megan Milner were "clearly" the top two candidates. *Id*. Plaintiff's unsupported belief that she was more qualified than all of the other candidates is simply not enough to establish the third element of her claim.

### 4. Plaintiff Cannot Establish a *Prima Facie* Case of FMLA Retaliation.

As discussed above, to establish a *prima facie* case of FMLA retaliation, Plaintiff must establish a causal connection between her FMLA leave and the decision not to hire her for the position. *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012). In order to establish this causation, Plaintiff must "show that the individual who took adverse action against her knew of the protected [exercise of rights under the FMLA]" and that "the individual who took adverse action treated [her] differently than they would have if she had not engaged in protected activity." *Elliot v. American Airlines, Inc.*, 540 F.Supp.2d 1203, 1209 (N.D. Okla. 2008) (quoting *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) and *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006)). Plaintiff has not, and cannot, establish this.

Plaintiff first requested intermittent FMLA in September 2018. SOF ¶ 423. At the time the Director of Field Services position was filled, only two members (Shala Bloomberg and Sharon Brown) even potentially knew of Plaintiff's FMLA leave, and there is no evidence that fact played any role in their deliberations, much less those of the other panel members. SOF ¶¶ 432, 435-436. Mr. Sullivan, the hiring manager and ultimate decision maker for the DFS position, had no knowledge that Plaintiff took FMLA leave until he read her charge of discrimination (filed months later). SOF ¶ 434. *See Didier v. Abbott Laboratories*, 21 F.Supp.3d 1152, at 1175 (D. Kan. 2014) (where plaintiff did not dispute that "most of the decisionmakers in this case had no knowledge

that plaintiff had requested or was taking intermittent leave under the FMLA," she failed to set forth evidence from which a jury could conclude her FMLA leave constituted a negative factor in the employer's decision).

The record contains no evidence of any causal connection between Plaintiff's FMLA leave and the decision not to promote her into the DFS position. Apparently, Plaintiff hopes to prove her claim by setting forth only evidence that she took FMLA leave, and she was not hired. That hope, however, ignores the third element of her claim. Because no evidence supports this element, Plaintiff's FMLA retaliation claim fails as a matter of law

### 5. Plaintiff Cannot Establish Pretext.

In the Statement of Facts, the County has detailed the reasons it chose Keith Clark for this position and will not repeat all of that evidence here. In short, even viewing the facts in the light most favorable to Plaintiff, the evidence establishes that Mr. Clark's experiences and proven skills simply exceed those of Plaintiff's. *See generally* SOF ¶¶ 86-106. Indeed, no one on the panel, with the possible exception of Shelly Williams, even had Plaintiff in their top three candidates. SOF ¶¶ 117-118. This is not personal to Plaintiff and certainly not discriminatory. It is just the facts, and the record contains no trace of evidence that the decision was a pretext for gender discrimination, disability discrimination, or FMLA retaliation.

A plaintiff can demonstrate pretext when she shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Jones v. Oklahoma City Pub. Schools*, 617 F.3d 1273, 1280 (10th Cir. 2010) (quoting *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1308 (10th Cir. 2005). Courts look to the "strength of the employee's *prima*

*facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for summary judgment. *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148-149 (2000)).

A plaintiff cannot prove pretext by questioning business judgment, or even by proving that the decisions were based on erroneous information. *See Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007) ("Evidence that the employer should not have made the termination decision – for example, that the employer was mistaken or used poor business judgment – is not sufficient to show that the employer's explanation is unworthy of credibility."); *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1083 (10th Cir. 1999) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.").

Again, neither Mr. Sullivan nor most of the panel members even knew Plaintiff had any impairment or that she was taking FMLA leave. SOF ¶¶ 432-435. Plaintiff's gender discrimination claim also defies common sense where Mr. Sullivan selected her for an interview over male candidates. Most importantly, nothing about the relative qualifications of Plaintiff, Mr. Clark, and other candidates even hints at the notion of pretext.

In order to establish pretext, Plaintiff must demonstrate "that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination." *Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). Plaintiff cannot even come close to meeting that burden. Indeed, the undisputed facts not only fail to suggest that the County's reasons for hiring Mr. Clark were weak, they establish that the decision was completely sensible.

They certainly do not raise any question of discrimination or retaliation.

### E.      BUSINESS INTELLIGENCE ANALYST POSITION

#### 1.      The Undisputed Evidence.

After Mr. Clark took the Director of Field Services position, the County sought to fill his role as a Business Intelligence Analyst ("BIA") SOF ¶ 157. Although Susan Dougan was technically the hiring manager for this position, she relied heavily on Mr. Sullivan in making the decision because he worked much more closely with the position than she did. SOF ¶ 163. By the time of the interviews, Mr. Sullivan knew they were looking for someone to take over the Juvenile portfolio at a time when many changes were being made to the Juvenile Justice System. SOF ¶¶ 170-172.

Before either Plaintiff or Olivia Allen even applied for the position, Mr. Sullivan sent an email outlining what he saw as  the characteristics of a great candidate. Those were:

(1) loves working with data and can teach us a thing or two;

(2) is innovative;

(3) has people skills and is willing to shadow operations to gain domain experience;

(4) can present information in a manner that is understandable; and

(5) is humble (bonus points for humor).

Ex. 47, Depo. Ex. 39.

It is undisputed that Ms. Allen is significantly younger than Plaintiff and that she has a more feminine presentation. But it is also undisputed that Ms. Allen had many accomplishments that illustrated her love for working with data. Before coming to Johnson County, she had worked with a UMKC professor on two grants, where she cleaned all of the data, wrote the literature review and conclusion for one of the grants, and presented the portions of the grant she wrote. SOF ¶¶ 200-201. She had completed a social network analysis, mapping human relationships and

interactions to analyze relationships with gang members. SOF ¶ 202. She had spent approximately

two years scrubbing data on huge Excel spreadsheets on the juvenile side of family court in Jackson

County, Missouri. SOF ¶ 204.

As a pretrial officer at Johnson County, Ms. Allen carried a caseload of approximately 100

offenders. SOF ¶ 208. Meanwhile, she also worked with Dr. Alex Holsinger on a project analyzing

how community assessments affected adults in the system. SOF ¶¶ 210-214. She worked with

Johnson County's Director of Justice Information Management System (JIMS) to analyze pretrial

data and later began working on validating the pretrial assessment and creating a report for that.

SOF ¶¶ 215-218. In advance of the hiring process, Mr. Sullivan had received positive feedback

from both Mr. Mulcahy and Dr. Holsinger about Ms. Allen's work in the data analytics space. SOF

¶¶ 230, 311. In addition, Ms. Allen attended meetings where Mr. Sullivan presented pretrial data

because her supervisor asked her to support him with that based on her statistical background. SOF

¶ 228. And she did all of this on her own; it was not part of her job as a pretrial officer. SOF ¶ 219.

Plaintiff had also worked with data in her SCM position and volunteered to help with

reports analyzing revocation data. SOF ¶¶ 46-49; 234. In addition, Plaintiff had become familiar

with Google Data Studios, a data visualization software package. SOF ¶ 185. Plaintiff also had

experience cleaning data and had shown an interest in data during her time as a SCM. SOF ¶ 186.

Plaintiff also interviewed well for the position. SOF ¶ 291. Mr. Sullivan testified that if

they had been hiring for the Adult portfolio, he would have selected Plaintiff. SOF ¶ 302.

Unfortunately, in her interview, Plaintiff gave little indication she was interested in taking

innovative or bold approaches, which Mr. Sullivan saw as problematic given the dynamic nature

of the Juvenile portfolio. SOF ¶¶ 269-270. When asked to a time where she came up with and

implemented a solution "that was bold – perhaps even risky, creative, maybe even

unconventional," Plaintiff responded by saying she is not real risky. *Id.* Her solutions tend to be more grounded. *Id.* She thinks grounded solutions will help transition staff and not scare them off. *Id.*

By contrast, in her interview, Ms. Allen was enthusiastic and excited about the position and her ability to contribute to making the criminal justice system better. SOF ¶ 316. Ms. Dougan was in awe of Ms. Allen's presentation skills and confidence. SOF ¶ 283. In addition, Ms. Allen came highly recommended by Dr. Holsinger, who is a respected data scientist and known nationally in criminal justice circles. SOF ¶¶ 211, 230, 311.

During discovery, Plaintiff's counsel spent significant time asking questions about Tableau. It is undisputed that Plaintiff was an end user of Tableau, and Ms. Allen was not. In other words, Plaintiff had been viewing Tableau dashboards created by others, and Ms. Allen had not. It is not clear whether Plaintiff claims she was a creator in Tableau before the interviews for the BIA position, but it is undisputed that none of the members of the hiring panel believed she was. SOF ¶¶ 278-280. They all knew that Plaintiff did not have a license. SOF ¶¶ 179-181; 280. It is also undisputed that Plaintiff did not even get the free version of Tableau until February 2021, almost two years after the BIA position was filled. SOF ¶ 184.

Mr. Sullivan viewed creator experience with Tableau as a "nice to have," but not a requirement. SOF ¶ 318. He noted that if they put a premium on Tableau creator experience, they would have hired Casey Johnson, who had significant Tableau experience. SOF ¶ 317.

In summary, the undisputed facts illustrate that both Plaintiff and Ms. Allen enjoyed working with data. Both had educational background in data analysis, and both had good interviews. Plaintiff had extensive experience in Adult Intensive Probation, and if they had been hiring for the Adult portfolio, Mr. Sullivan would have chosen Plaintiff. SOF ¶ 302. Since they

were hiring for the Juvenile portfolio, he recommended the candidate who exhibited excitement about making changes and who had more Juvenile experience than Plaintiff. SOF ¶¶ 196-197, 203-204, 206, 316.

Plaintiff alleges that the County's decision to hire Ms. Allen was motivated by gender, age, and/or disability discrimination, discrimination based on her age and alleged disability, as well as retaliation for her exercise of protected leave under the FMLA. Doc. __, Pretrial Order. For the reasons set forth below, Plaintiff cannot meet her burden on any of those claims.

### 2. Plaintiff Cannot Establish a *Prima Facie* Case of Disability Discrimination.

Plaintiff's disability discrimination claim related to the BIA position is even weaker than her disability discrimination claim related to the Director of Field Services position. There is no evidence that a single member of the interview panel had any knowledge that Plaintiff had any impairment at all, let alone an impairment that rises to the level of a disability under the law. SOF ¶¶ 433-434, 439. This is fatal to Plaintiff's claim. *See Scherer v. GE Corp.*, 59 F.Supp.2d 1132, 1136 (D. Kan. 1999) (granting summary judgment to defendant on ADA claim in part based on plaintiff's failure to demonstrate defendant knew of his alleged disability and resulting limitations).

### 3. Plaintiff Cannot Establish a *Prima Facie* Case of Age Discrimination.

It is undisputed that Ms. Allen is significantly younger than Plaintiff, but in the circumstances of this case, that fact alone is not sufficient to create an inference of discrimination. *See e.g. Lewis v. Twenty-First Century Bean Processing*, 2015 WL 4774052, at *4 (D. Kan. Aug. 13, 2015) (finding that the broadest formulation of the elements in an ADEA claim is a requirement to prove that the adverse decision occurred under circumstances giving rise to an inference of discrimination); *Griddine v. GP1 KS-SB, Inc.*, 2019 WL 1002049 (D. Kan. Feb. 28, 2019) (same).

As discussed above, the decision makers for the BIA position were essentially the same as those involved in the DFS hiring decision, and the person selected for the DFS position was born in the same years as Plaintiff. In those circumstances, Plaintiff should be required to demonstrate something more than the simple the fact that the County hired someone younger than Plaintiff. *See also See Velasquez v. Philips Electronics North America Corp.*, 2015 WL 505628, at *6-7 (D. Kan. Feb. 6, 2015) (collecting cases in the 10th Circuit using different language to articulate the elements of a *prima facie* case under the ADEA and noting that the ultimate purpose of those elements is to establish an initial inference of unlawful discrimination).

Plaintiff seems to argue that the observation that Ms. Allen was enthusiastic somehow suggests an age bias. Defendant suggests that – even that argument – is offensive to older people. There is absolutely no reason a 51-year-old woman could not show enthusiasm. Plaintiff also suggests that Mr. Sullivan's statement that Plaintiff seemed tired suggests an age bias. Again, that descriptor is not age-specific. Mr. Sullivan had been on interview panels for several positions where Plaintiff was interviewed and noted that she used the same dated examples each time. SOF ¶ 357. Plaintiff had been in a leadership position with Corrections for many years. Mr. Sullivan could not understand why she was not able to provide recent, relevant examples of changes or contributions she had made. SOF ¶¶ 307, 357. In addition, when asked why she was interested in the BIA position, the first thing she said was that she was ready for a change. SOF ¶ 260: 349.

Notably, Mr. Sullivan hired Mr. Clark for the Director of Field Services position just two months before the BIA position was filled, and Mr. Clark was born in the same year as Plaintiff. SOF ¶ 93. Considering all of Ms. Allen's experiences with data analytics, presentations, and high praise from a data scientist and the Director of JIMS, along with her performance in her interview,

(all of which are explained in more detail in the Statement of Facts), the facts in this case simply do not give rise to an inference of age discrimination.

### 4. Plaintiff cannot establish a *prima facie* case of gender discrimination.

Plaintiff and Ms. Allen are both female, so Defendant understands that the basis of Plaintiff's gender claim for this position is based on her gender presentation and/or her sexual orientation. But the record is devoid of any evidence that anyone on the BIA panel had any such bias. As noted above, Plaintiff's belief that Mr. Sullivan has a bias against masculine-presenting females is based on the fact that Mr. Sullivan has not promoted any masculine-presenting females, but she admits she is not aware that any masculine-presenting females have applied for roles Mr. Sullivan has filled (other than herself). SOF ¶ 155. Plaintiff claims Susan Dougan has a similar bias but bases this belief on the fact that, many years earlier, Ms. Dougan helped the prior JDOC Director give a presentation about the dress code, and the females in the presentation were wearing feminine clothing.

Again, these facts do not give rise to an inference of discrimination. *See Adamson v. Multi-Community Diversified Services, Inc.*, 514 F.3d 1136, 1134 n.2 (10th Cir. 2008) ("[A]t a minimum plaintiff must demonstrate the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'") (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

### 5. Plaintiff Cannot Establish a *Prima Facie* Case of FMLA Retaliation.

Plaintiff cannot even make a colorable claim of FMLA retaliation because none of the panel members was aware that Plaintiff was taking or had taken FMLA leave. SOF ¶¶ 433-434, 439.

### 6. Plaintiff Cannot Establish Pretext.

As described more thoroughly in the Statement of Facts, the County has explained that Ms. Allen was selected for this position due to her qualifications, experiences, and interview. Thus the burden shifts back to Plaintiff to show that the County's explanation is both false and a pretext for discrimination. *Kosak v. Catholic Health Initiatives of Col.*, 400 Fed. Appx. 363, 365 (10th Cir. 2010) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Plaintiff cannot possibly make this showing with respect to her ADA and FMLA claims. As set forth above, none of the interview panelists were aware that she had an alleged disability or that she was taking FMLA leave. SOF ¶¶ 433-434, 439. *See Debord*, 737 F.3d at 655 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision.")

Plaintiff similarly cannot establish the County's reason for hiring Ms. Allen over Plaintiff is pretext for age discrimination. The County notes that the ADEA has a "but-for" causation standard. Thus, to succeed on an age discrimination claim, Plaintiff must show that Defendant would not have taken the challenged action but for her age. *Jones*, 617 F.3d at 1277.

Again, as described more fully in the County's Statement of Facts, Ms. Allen had significant experience with data, data analysis, and presenting data. SOF ¶¶ 198, 200-205. She had been working on data analysis with some of the County's leaders on her own time because she was passionate about it. SOF ¶¶ 215-219. She had also worked with a highly respected data scientist who spoke highly of her work. SOF ¶ 210-215, 230. And she came to the interview with enthusiasm and excitement about making a difference in the department. SOF ¶ 316.  In her interview, she discussed a social network analysis she had completed and Chi square analysis, which were the kinds of things Mr. Sullivan hoped the department would do. SOF ¶¶ 202, 251.

If they had been filling the Adult portfolio position, Plaintiff's extensive experience in Adult Supervision would have trumped the experiences Ms. Allen described, but Ms. Allen had more Juvenile experience than Plaintiff, and Plaintiff did not indicate a willingness to step outside the box. SOF ¶¶ 269-270.

Notably, Mr. Sullivan is approximately two years younger than Plaintiff and falls into the same protected category, thus weakening any argument of age bias. *See Almon v. Goodyear Tire and Rubber Co.*, 2009 WL 1421199, at *6 (D. Kan. May 20, 2009) ("[W]here, as here, the decisionmaker is in the same protected class as the plaintiff, claims of discrimination become less plausible and inference of discrimination are weakened.") Moreover, the terms upon which Plaintiff relies are not objectively reflective of her age, or Mr. Sullivan's perception of her age, but could just as likely refer to Plaintiff's attitude and the content of her responses in her interview. In any event, these stray and ambiguous comments are not enough to establish pretext. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir. 2000) ("Age-related comments referring directly to the plaintiff can support an inference of age discrimination, but isolated or ambiguous comments may be, as here, too abstract to support such an inference.").

Finally, as discussed above, there is simply no evidence to suggest that any of the panel members chose Ms. Allen because of Plaintiff's sexual orientation or gender presentation. The Tenth Circuit has repeatedly noted that the plaintiff's burden in a discrimination case is to prove intentional discrimination. *See e.g. Bennett*, 792 F.3d at 1267; *Laul*, 765 Fed. Appx. at 441; *Miller*, 51 F.Supp.2d at 1191; *Gunnell*, 152 F.3d at 1263. Here, the nothing in the evidence even suggests that the reasons given for hiring Ms. Allen are false, let alone that they are some kind of pretext for discrimination. In short, Plaintiff cannot establish that the County's reason for Ms. Allen into

the BIA position was pretextual, nor has she demonstrated that "but for" her age, the County would have hired her into the role.

## F.    MENTAL HEALTH POSITIONS

Unlike the process used in JDOC, in the Mental Health department, the HR Partner posts open positions and then has no further involvement until the hiring managers determine who they want to hire. SOF ¶¶ 22-23. The hiring managers review applications and resumes and determine who to interview. SOF ¶ 23. Sam Veronda, the HR Partner supporting Mental Health during the relevant time period, but she does not make hiring recommendations or decisions. SOF ¶ 26. She does not review the application information for anyone other than the candidate selected for hire. SOF ¶ 27. In short, Ms. Veronda was not involved in reviewing Plaintiff's applications for Mental Health positions or influencing the hiring managers' decisions in any way. SOF ¶¶ 397-398. In fact, Ms. Veronda had no knowledge that Plaintiff applied for any positions in Mental Health until after all of the selected candidates had been interviewed. SOF ¶ 399.

As set forth in greater detail below, the record demonstrates that the hiring managers for the Mental Health positions at issue did not know Plaintiff. They did not know her age, gender, sexual orientation, or gender presentation, disability status, or FMLA status. They also had no knowledge that she had made any complaints of discrimination within the County or outside the County. Accordingly, Plaintiff's claims fail as a matter of law.

### 1.  Facts Surrounding the September 2020 Case Manager Position.

In September 2020, Plaintiff applied for a position as an Adult Services Case Manager in the Mental Health Department. SOF ¶ 377. The hiring manager for this position, Jason Waldmeier, did not know Plaintiff at the time he decided not to interview her. SOF ¶¶ 381, 383. He likewise had no knowledge of her age, gender, sexual orientation, gender presentation, alleged disability, or FMLA leave at the time they made the decision not to interview her. SOF ¶ 383. Further, Mr.

Waldmeier had no knowledge that Plaintiff had made complaints of discrimination inside or outside the County. *Id.*

### 2.   Facts Surrounding The Access Team Case Manager Position

In October 2020, Plaintiff applied for an Access Team Case Manager position with the Mental Health Department. SOF ¶ 385. The hiring manager for this position, Renee Van Meter, made the decisions about who to interview for this position. SOF ¶¶ 385, 390. At the time she made those decisions, Ms. Van Meter did not know Plaintiff. ¶ SOF 390. She likewise had no knowledge of Plaintiff's age, gender, sexual orientation, gender presentation, disability status, or FMLA status. *Id.* Further, Ms. Van Meter had no knowledge that Plaintiff had made complaints of discrimination inside or outside the County. *Id.*

### 3.   Facts Surrounding the November 2020 Case Manager Position.

In November 2020, Plaintiff applied for another Adult Services Case Manager position with the Mental Health Department. SOF ¶ 392. The hiring manager for this position, Andrea Speiker, made the decisions about who to interview for this position. SOF ¶ 394. At the time, Ms. Speiker did not know Plaintiff. SOF ¶ 395. She likewise had no knowledge of Plaintiff's age, gender, sexual orientation, gender presentation, disability status, or FMLA status. *Id.* Further, Ms. Speiker had no knowledge that Plaintiff had made complaints of discrimination inside or outside the County. *Id.*

### 4.   Plaintiff cannot establish her claims as to any of the Mental Health positions.

As fully explained in the Statement of Facts, the hiring managers for these positions did not select Plaintiff for an interview because her resume did not reflect the kind of experience they were seeking for these positions. Because the decision makers were unaware of Plaintiff's protected statuses, they could not possibly have discriminated or retaliated against her. As such,

Plaintiff cannot make a causal connection between the decision not to hire her and any of the protected characteristics she asserts, and her claims related to this position fail. *See Jones v. Foxx*, 2018 WL 705665, at *4 (D. Kan. Feb. 5, 2018) (where decision maker testified he did not know plaintiff's age at the time of the employment action, plaintiff's ADEA claim failed); *Owens v. Donahoe*, 913 F.Supp.2d 1055, 1062 (D. Colo. 2012) ("[I]f the decisionmaker is not aware of a person's [protected characteristic], a plaintiff cannot establish a *prima facie* [case] because it is impossible to infer that the decision was due to discriminatory intent."); *see Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1234-35 (10th Cir. 2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decision maker knew of plaintiff's protected activity at time decision was made); *see also Laul*, 765 Fed. Appx. at 442 (even where hiring managers for 3 of the 19 jobs plaintiff applied for had knowledge that plaintiff had filed a charge of discrimination, "there is no evidence of any circumstances that would justify an inference of a retaliatory motive.").

In short, the undisputed facts illustrate that Plaintiff falls woefully short of establishing her *prima facie* case as to all of the Mental Health positions. She certainly cannot establish pretext.

## IV.   CONCLUSION

For the reasons set forth above, even assuming the truth of Plaintiff's testimony and viewing the evidence in the light most favorable to her, Plaintiff cannot establish her claims, and Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims.

Respectfully submitted,

/s/ Jeannie M. DeVeney

Jeannie M. DeVeney, #17445
Bonnie G. Birdsell, #78895
LITTLER MENDELSON, P.C.
1201 Walnut Street, Suite 1450
Kansas City, MO 64106
Telephone: 816.627.4400
Facsimile: 816.627.4444
jdeveney@littler.com
bbirdsell@littler.com

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2022, a true and correct copy of the foregoing was electronically submitted via the Court's e-filing system, which generated notice of same to the following counsel of record:

Rik N. Siro
Erik W. Smith
Athena M. Dickson
Raymond A. Dake
Ryan P. McEnaney
SIRO SMITH DICKSON PC
1621 Baltimore Avenue
Kansas City, MO 64108
Telephone: 816.471.4881
Facsimile: 816.471.4883
rsiro@sirosmithdickson.com
esmith@sirosmithdickson.com
adickson@sirosmithdickson.com
rdake@sirosmithdickson.com
rmcenaney@sirosmithdickson.com

ATTORNEYS FOR PLAINTIFF

/s/ Jeannie M. DeVeney

ATTORNEY FOR DEFENDANT