IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SHANNON KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:21-cv-02049-KHV-KGG |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS OF | ) | |
| JOHNSON COUNTY, KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff provides the following Memorandum in Opposition to Defendant's Motion for Summary Judgment.

## I.  **INTRODUCTION**

Plaintiff is a 52-year-old masculine-presenting, lesbian female and has been employed with Defendant from 1992 until 1996, and then again from 1997 to the present.  However, she has hit a glass ceiling.  Throughout her career with Defendant in the Johnson County Department of Corrections, Plaintiff has been denied multiple promotions and lateral transfers, two of which are the subject of this motion.[1]  Plaintiff contends that Defendant refuses to promote her to face-forward positions because they do not want an older, masculine-presenting lesbian woman presenting to the Board of County Commissioners.

---

[1] Plaintiff will not be pursuing her claims at trial relating to the Department of Mental Health positions.  Plaintiff waives her arguments related to those claims.  *See* Doc. 72, Def. Sugg. in Supp., at ECF 86-88.

After Robert Sullivan was hired as the full-time Director of the Department of Corrections in 2018, the interview process changed.  The rather objective scoring rubric was no longer used to rate candidates. Instead, interviewees were asked a series of questions by the panelists and panelists provided their top candidates to the group to begin the discussion. Mr. Sullivan, Susan Dougan, and HR Partner Shala Bloomberg all agreed this was a subjective process.  However, the evidence demonstrates that Mr. Sullivan either selected who he wanted to hire prior to the interview process and selected interviewers likely to support his preferred candidate, or he disregarded objective measures in favor of purely subjective considerations in his hiring decisions.

In February 2019, Plaintiff applied for a Division Director position, Director of Field Services (DFS), for which she was well-qualified, and was subsequently given an interview. Mr. Sullivan was the hiring manager for the position. In late March of 2019, Robert Sullivan notified plaintiff by phone that she did not receive the position.  Plaintiff was later told by Sharon Brown, the retiring DFS and Plaintiff's supervisor, who was on the interview committee for the DFS position, that Mr. Sullivan made up his mind to hire Keith Clark prior to the interviews and that it was a "done deal."  Plaintiff never had a chance.

To stack the deck, Mr. Sullivan invited a director from outside Johnson County, Shelly Williams, to sit in on the DFS interviews and provide feedback. It was not normal to invite individuals from outside the county, and Mr. Sullivan had not done this since the hiring for the DFS and Deputy Directory of the Adult Rehabilitation Center (DDARC) positions – two positions Plaintiff applied for and was denied close to the same time period.  Mr. Clark's listed Ms. Williams as a direct reference in his application for the position, which Mr. Sullivan had prior to the interviews and hiring for the position. Mr. Sullivan admitted that the optics of this

look bad, especially because Mr. Clark was ultimately hired for the position with the assistance of Shelly Williams' feedback.

In late May 2019, Plaintiff interviewed for an open Business Intelligence Analyst position, a lateral transfer, but one with potential for increased salary opportunities, for which she was well-qualified. Plaintiff was one of the top two candidates for the position and it came down to her and Olivia Allen (Parks), a significantly less-experienced, much younger, feminine-presenting heterosexual female.   The interview panel consisted of Robert Sullivan, Susan Dougan (the Deputy Director of Corrections), and Brian Seidler (Senior BI Analyst). While Susan Dougan was listed as the hiring manager for the position, she was leaning heavily toward Mr. Sullivan's opinion on who to hire for the position because she was retiring, and he worked more closely with the BI Analysts.

On June 5, 2019, Susan Dougan notified Plaintiff by phone that she did not receive the position and stated that the position went to "someone with more data analysis experience" even though Plaintiff had been analyzing data for Johnson County's Department of Corrections in her role for the past 20 years. When the announcement came out that Ms. Allen, who was 26 years old and had the same degree as Plaintiff but with 20+ fewer years of experience in corrections and with data, Plaintiff was shocked and immediately believed the hiring decision was discriminatory.   Moreover, Ms. Allen did not have any Tableau experience and limited data analytics and Microsoft Excel experience. During the interview Plaintiff provided examples of her experience with data analytics, including that she had previously used the Tableau program. She also outlined her data analysis experience and Excel knowledge and performed great on the set of data exercises they had her perform. Ms. Allen did not even answer one of the exercise questions because of her lack of experience with Excel. This worried Mr. Seidler, who was the

3

Senior BI Analyst. Mr. Seidler brought up Ms. King for discussion, but this was shot down by Mr. Sullivan.  By *every* objective measure, Plaintiff was more qualified than Ms. Allen.

Mr. Sullivan and Ms. Dougan's stated reasons for not hiring Plaintiff were false and pretextual. Plaintiff had experience working with juveniles and in the juvenile system, even though this was not something that was required for the position. Further, Mr. Sullivan stated that Plaintiff appeared "very tired" and provided "dated" examples and "lacked innovation", all words alluding to Plaintiff's age. He further stated "Shannon seems very tried to me. I don't know how she would do taking over the juvenile portfolio." Ms. Dougan brought up the fact that Plaintiff turned "red" while presenting and that she did not provide "recent" innovative examples.

Mr. Sullivan takes issue with "grown women" stating their concerns. Plaintiff, Olivia Allen, and Sharon Brown all provided examples of this. Ms. Parks brought concerns about interactions she had with a coworker to Mr. Sullivan and she felt that Mr. Sullivan was inappropriate with his statements toward her, and it felt "like [she] was being looked at as a child, not as a grown woman who is stating her concerns." Ms. Parks also observed this treatment of other women. Moreover, Ms. Allen stated that Mr. Sullivan treats men better than women based upon her experiences with him, observations, and hiring practices where he favored a male candidate over a female candidate after that female candidate had already been ranked higher previously.  When Ms. Allen brought up harassment claims by another female against a hiring candidate, Mr. Sullivan told her to "get tough."

Plaintiff has been a valuable employee for Johnson County Department of Correction, but every time she tries to better her position, she is undermined for pretextual reasons.  Plaintiff will

demonstrate that there are genuine issues of material facts such that summary judgment is not warranted in this case.  Defendant's Motion for Summary Judgment should be denied.[2]

## II.   PLAINTIFF'S RESPONSES TO DEFENDANT'S STATEMENT OF STATEMENT OF UNCONTROVERTED[3] FACTS

Plaintiff's response to each of the 439 statements of fact alleged by Defendant in its Motion is set forth in the section below, followed by her statement of additional material facts that must be considered by the Court in ruling on Defendant's motion.

### Relevant Johnson County Policies

1.     County policies prohibit discrimination on the basis of sex, age, and disability (among other protected characteristics). Ex. 1, Pltf's depo. 84:5-8; Ex. 2, pre-2021 EEO Policy and Procedure; Ex. 3, 2021 EEO Policy and Procedure; *See also* Ex. 4, Positive Employee Relations Policy; Ex. 5, Productive Work Environment Policy and Procedure.

**RESPONSE:**  Uncontroverted that the policies state as such, however controverted to the extent that Defendant attempts to imply that it followed the policies outlined in Exhibits 2-5 in its treatment of Plaintiff.   Plaintiff believed and raised concerns about the hiring decisions of Defendant regarding the Director of Field Services and BI Analyst positions. Plaintiff first made a complaint of discrimination in June 2019.   Exhibit A, Plaintiff's Deposition at 31:11-14, 203:12-19.  Specifically, on June 11, 2019, Plaintiff sent an email to Shala Bloomberg indicating that she had concerns about the hiring decisions and had contacted the EEOC.  *See* Defendant's Exhibit 60 (Depo. Ex. 42).  Plaintiff later filed two Charges of Discrimination with the EEOC and this lawsuit.  *See* Exhibit B, Plaintiff's

---

[2] On March 31, 2022, the parties filed a Joint Response to the Order to Show Cause.  [Doc. 78].  In the filing, Plaintiff voluntarily dismissed her ADAAA claims in Counts V and VI of the Complaint.  Therefore, Plaintiff waives any arguments that her diagnosed disabilities were factors in her adverse employment actions.  However, Plaintiff will show that there are genuine issues of material fact regarding her other claims.

[3] For purposes of this Motion, Defendant has assumed the truth of Plaintiff's testimony and outlined the facts in the light most favorable to Plaintiff. In actuality, Defendant disputes many of the facts included herein but assumes their truth for purposes of this Motion.

Charge of Discrimination, August 27, 2019, (Depo. Ex. 52); Exhibit C, Plaintiff's Second

Charge of Discrimination, December 4, 2020, (Depo. Ex. 85); *see also* Plaintiff's

Complaint [Doc.1] and Plaintiff's First Amended Complaint [Doc. 21].


2.     In 2021, the County updated its policies and explicitly listed sexual orientation,

gender identity, and gender presentation among the protected categories, but the County

prohibited discrimination on those bases for many years before that. Ex. 6, Hentschel Decl. ¶ 4.

**RESPONSE:** Uncontroverted that the County updated its policies and the policies state

as such, however irrelevant and controverted to the extent that Defendant attempts to

imply that it followed the policies in its treatment of Plaintiff.  Plaintiff believed and

raised concerns about the hiring decisions of Defendant regarding the Director of Field

Services and BI Analyst positions.  Plaintiff first made a complaint of discrimination in

June 2019.  Exhibit A, Plaintiff's Deposition at 31:11-14, 203:12-19.  Specifically, on

June 11, 2019, Plaintiff sent an email to Shala Bloomberg indicating that she had

concerns about the hiring decisions and had contacted the EEOC.  *See* Defendant's

Exhibit 60 (Depo. Ex. 42).  Plaintiff later filed two Charges of Discrimination with the

EEOC and this lawsuit.  *See* Exhibit B, Plaintiff's Charge of Discrimination, August 27,

2019, (Depo. Ex. 52); Exhibit C, Plaintiff's Second Charge of Discrimination, December

4, 2020, (Depo. Ex. 85); *see also* Plaintiff's Complaint [Doc.1] and Plaintiff's First

Amended Complaint [Doc. 21].


3.     All supervisors and managers receive regular training on the County's anti-

discrimination and anti-harassment policies. Supervisors also receive training on recruitment, selection, and interviewing, which includes reference to the EEO policies. Ex. 6, Hentschel Decl. ¶ 5; Ex. 7, House depo. 56:5-59:24.

> **RESPONSE:** Uncontroverted that the supervisors and managers receive regular training on the County's anti-discrimination, anti-harassment, and EEO policies, however irrelevant and controverted to the extent that Defendant attempts to imply that its managers and supervisors followed its policies in its treatment of Plaintiff. Plaintiff believed and raised concerns about the hiring decisions of Defendant regarding the Director of Field Services and BI Analyst positions. Plaintiff first made a complaint of discrimination in June 2019. Exhibit A, Plaintiff's Deposition at 31:11-14, 203:12-19. Specifically, on June 11, 2019, Plaintiff sent an email to Shala Bloomberg indicating that she had concerns about the hiring decisions and had contacted the EEOC. *See* Defendant's Exhibit 60 (Depo. Ex. 42). Plaintiff later filed two Charges of Discrimination with the EEOC and this lawsuit. *See* Exhibit B, Plaintiff's Charge of Discrimination, August 27, 2019, (Depo. Ex. 52); Exhibit C, Plaintiff's Second Charge of Discrimination, December 4, 2020, (Depo. Ex. 85); *see also* Plaintiff's Complaint [Doc.1] and Plaintiff's First Amended Complaint [Doc. 21].

4.     Since at least 2017, the County has specifically trained its employees to understand that the prohibition on sex discrimination extends to discrimination based on sexual orientation, gender identity, and gender presentation. Ex. 6, Hentschel Decl. ¶ 6; Ex. 8, 2017 STI Training at JoCo 3224, 3237; Ex. 9, May 2019 STI Training at JoCo 3268; Ex. 10, September 2019 STI Training at JoCo 3298; Ex. 11, portion of 2016 Harassment Training at JoCo 7662-

7663.

> **RESPONSE:** Uncontroverted that the County trained its employees as such, however irrelevant and controverted to the extent that Defendant attempts to imply that its managers and supervisors followed its policies in its treatment of Plaintiff. Plaintiff believed and raised concerns about the hiring decisions of Defendant regarding the Director of Field Services and BI Analyst positions. Plaintiff first made a complaint of discrimination in June 2019. Exhibit A, Plaintiff's Deposition at 31:11-14, 203:12-19. Specifically, on June 11, 2019, Plaintiff sent an email to Shala Bloomberg indicating that she had concerns about the hiring decisions and had contacted the EEOC. *See* Defendant's Exhibit 60 (Depo. Ex. 42). Plaintiff later filed two Charges of Discrimination with the EEOC and this lawsuit. *See* Exhibit B, Plaintiff's Charge of Discrimination, August 27, 2019, (Depo. Ex. 52); Exhibit C, Plaintiff's Second Charge of Discrimination, December 4, 2020, (Depo. Ex. 85); *see also* Plaintiff's Complaint [Doc.1] and Plaintiff's First Amended Complaint [Doc. 21].

5.      On June 19, 2020, Johnson County issued an announcement to its employees to highlight the Supreme Court holding that Title VII prohibits discrimination on the basis of sexual orientation and gender identity. The announcement notes that Johnson County "has considered such discrimination and inconsistent with our policies, values and expectations for decades." Ex. 12 (Depo. Ex. 6) Inside JoCo Announcement.

> **RESPONSE:** Uncontroverted, but not a material fact (hereinafter "Uncontroverted").

6.      Plaintiff claims the training she attended did not include mention of those protected categories, but Plaintiff admits she took the training outlined in Exhibits 10 and 11. Ex.

1, Pltf's depo. 85:25-87:1; Ex. 13 (Depo. Ex. 7), Plaintiff's Training Transcript; Ex. 1, Pltf's

depo. 91:2-8.

    **RESPONSE:** Uncontroverted.


    7.    Plaintiff is aware of the County's policy against discrimination. She has received

hard copies over the years and is aware it is located online. Ex. 1, Pltf's depo. 83:20-85:6.

    **RESPONSE:** Uncontroverted, that Plaintiff testified as such, but controverted to the

    extent that Defendant attempts to imply that Defendant followed its own policies

    regarding discrimination and retaliation.  Plaintiff believed and raised concerns about the

    hiring decisions of Defendant regarding the Director of Field Services and BI Analyst

    positions.  Plaintiff first made a complaint of discrimination in June 2019.  Exhibit A,

    Plaintiff's Deposition at 31:11-14, 203:12-19.  Specifically, on June 11, 2019, Plaintiff

    sent an email to Shala Bloomberg indicating that she had concerns about the hiring

    decisions and had contacted the EEOC.  *See* Defendant's Exhibit 60 (Depo. Ex. 42).

    Plaintiff later filed two Charges of Discrimination with the EEOC and this lawsuit.  *See*

    Exhibit B, Plaintiff's Charge of Discrimination, August 27, 2019, (Depo. Ex. 52); Exhibit

    C, Plaintiff's Second Charge of Discrimination, December 4, 2020, (Depo. Ex. 85); *see*

    *also* Plaintiff's Complaint [Doc.1] and Plaintiff's First Amended Complaint [Doc. 21].


    8.The policies also contain information about how to report discrimination and

harassment. Ex. 1, Pltf's depo. 85:4-6.

    **RESPONSE:** Uncontroverted that the policies contain such information, however

    controverted to the extent Defendant attempts to imply that Plaintiff failed to follow the

procedures outlined in the policies in her reports of discrimination and harassment or that the procedures outlined in the policies are the only way to report discrimination and harassment and that employees of Defendant cannot also report discrimination and harassment to an outside agency such as the Equal Employment Opportunity Commission (EEOC) or the Kansas Commission on Human Rights (KCHR). Defendant's policy 105 outlines that "protected activity" as "objecting to conduct prohibited by this policy [and] good faith reporting of violations of this policy internally *or to an outside agency responsible for enforcing anti-discrimination laws*". Defendant's Exhibit 3 at JoCo-King 3197 (emphasis added); *see also* Defendant's Exhibit 10 at JoCo-King 3306 (describing reporting discrimination and that an employee does not have to use "the word 'complaint' need not be spoken in order for it to be one").

9.      Plaintiff has received training on the policies against discrimination and harassment, as well as training regarding how to report discrimination and harassment, on numerous occasions throughout her employment with the County. Ex. 1, Pltf's depo. 83:19-25; Ex. 14 (Depo. Ex. 2) Training Acknowledgements.

**RESPONSE:** Uncontroverted that the policies contain such information, however controverted to the extent Defendant attempts to imply that Plaintiff failed to follow the procedures outlined in the policies in her reports of discrimination and harassment or that the procedures outlined in the policies are the only way to report discrimination and harassment and that employees of Defendant cannot also report discrimination and harassment to an outside agency such as the Equal Employment Opportunity Commission (EEOC) or the Kansas Commission on Human Rights (KCHR).

Defendant's policy 105 outlines that "protected activity" as "objecting to conduct prohibited by this policy [and] good faith reporting of violations of this policy internally *or to an outside agency responsible for enforcing anti-discrimination laws*". Defendant's Exhibit 3 at JoCo-King 3197 (emphasis added); *see also* Defendant's Exhibit 10 at JoCo-King 3306 (describing reporting discrimination and that an employee does not have to use "the word 'complaint' need not be spoken in order for it to be one").

10.     County policies also prohibit retaliation based on reports of discrimination or harassment and based on the use of FMLA leave. Ex. 6, Hentschel Decl. ¶ 7; Ex. 15 (FMLA policy); s*ee e.g.* Ex. 2 at JoCo 111; Ex. 5 at JoCo 116. The training the County provides also includes training on retaliation. Ex. 6, Hentschel Decl. ¶ 7; *see e.g.* Ex. 8 at JoCo 3225; Ex. 7, House depo. 102:3-103:2.

**RESPONSE:**  Uncontroverted that the policies state as such, however controverted to the extent that Defendant attempts to imply that it followed the policies outlined in Exhibits 15, 2, 5, and 8 in its treatment of Plaintiff.  Plaintiff believed and raised concerns about the hiring decisions of Defendant regarding the Director of Field Services and BI Analyst positions.  Plaintiff first made a complaint of discrimination in June 2019.  Exhibit A, Plaintiff's Deposition at 31:11-14, 203:12-19.  Specifically, on June 11, 2019, Plaintiff sent an email to Shala Bloomberg indicating that she had concerns about the hiring decisions and had contacted the EEOC.  *See* Defendant's Exhibit 60 (Depo. Ex. 42). Plaintiff later filed two Charges of Discrimination with the EEOC and this lawsuit.  *See* Exhibit B, Plaintiff's Charge of Discrimination, August 27, 2019, (Depo. Ex. 52); Exhibit C, Plaintiff's Second Charge of Discrimination, December 4, 2020, (Depo. Ex. 85); *see*

*also* Plaintiff's Complaint [Doc.1] and Plaintiff's First Amended Complaint [Doc. 21].

### **Johnson County Department of Corrections**

11.     Johnson County's Department of Corrections (JDOC) is headed by a Director of Corrections. From April 2007 until September 29, 2017, Betsy Gillespie held that position. Ex. 6, Hentschel Decl. ¶ 8.

**RESPONSE:** Uncontroverted.


12.     Robert Sullivan became the interim Director of Corrections in October 2017 and officially took over the position inn 2018. Ex. 18, Sullivan depo. 119:6-120:3. Mr. Sullivan is 49 years old. *Id.* at 119:4-5.

**RESPONSE:** Uncontroverted.


13.     JDOC has four division directors, all of whom report to the Director of Corrections. Those include the Administrative Division, the Director of Juvenile Services, the Director of Field Services, and the Director of the Adult Residential Center (ARC). Ex. 19, Sullivan Decl., ¶ 2.

**RESPONSE:**  Uncontroverted to the extent this is how the JDOC was divided during the time that Robert Sullivan was the Director of Corrections.


14.     In addition, the Director of Corrections and/or Assistant Director of Corrections oversee financial functions, administrative functions, and project management functions. Ex. 20, Dougan depo. 14:5-23:24.

**RESPONSE:** Uncontroverted.

15.    When Mr. Sullivan became the Director of Corrections, the Assistant Director was Susan Dougan. Ex. 20, Dougan depo. 16:3-17:7.

**RESPONSE:** Uncontroverted.

16.    Ms. Dougan (YOB 1963) had a great working relationship with Mr. Sullivan. Ex. 20, Dougan depo. 45:22-24; Ex. 6, Hentschel Decl. ¶ 15.

**RESPONSE:** Uncontroverted, but irrelevant.

17.    Each department in Johnson County is supported by a Human Resources Partner, Senior Partner or Principal Partner. Shala Bloomberg has supported the JDOC since February 2017. Ex. 17, Bloomberg depo. 15:5-9, 21:18-19.

**RESPONSE:**  Uncontroverted.

**The Recruitment Process**

**Reviewing Candidates and Determining Who to Interview**

18.    Each department within the County handles the recruitment process differently. Ex. 7, House depo. 33:3-7.

**RESPONSE:** Uncontroverted.

19.    In the Department of Corrections, the Human Resources Partner supporting the department typically posts open positions and screens applicants for minimum qualifications. Ex.

17, Bloomberg depo. 111:4-112:2.

**RESPONSE:** Uncontroverted.


20.     If an applicant meets minimum qualifications, the HR Partner moves the applicant to "candidate status" in the applicant tracking system. Ex. 17, Bloomberg depo. 112:25-113:6.

**RESPONSE:** Uncontroverted.


21.     The hiring manager then decides who to interview. Ex. 17, Bloomberg depo. 118:20-119:3.

**RESPONSE:** Controverted.  For example, with the BI Analyst position, Mr. Sullivan, Ms. Dougan, and Mr. Seidler all had input on the decision of who to interview, and selected the candidates they liked.  Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).  Mr. Sullivan told Ms. Bloomberg, "Technically, this was [Ms. Dougan]'s decision who to interview, but I know I heavily influenced her decision."  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).  Ms. Dougan told Ms. Bloomberg that "I was leaning more to what Robert wants, what are you looking for Robert?"  "I was relying heavily on Robert's list."  Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).


22.     By contrast, in the Mental Health department, the HR Partner (currently Samantha Veronda) posts open positions but is not involved in reviewing applicants for minimum qualifications before interviews. Ex. 22, Veronda depo. 16:18-21:17.

**RESPONSE:** Uncontroverted.

23.     The hiring managers review applications, select candidates to interview, complete interviews, select those candidates to hire and send the list of candidates they want to hire to Ms. Veronda. Ex. 22, Veronda depo. 16:18-21:17.

**RESPONSE:**  Uncontroverted.

24.     After the hiring managers select candidates, Ms. Veronda reviews the materials to ensure the selected candidates meet minimum qualifications and begins the hiring process. Ex. 22, Veronda depo. 18:22-19:10. The hiring managers review the candidates for minimum qualifications first. Ms. Veronda just double-checks them at the background check phase. *Id.* at 19:5-10.[4]

**RESPONSE:**  Uncontroverted.

25.     Ms. Veronda sometimes enters information into the applicant tracking system to show which candidates were interviewed and the outcome, but she does not choose who to interview, does not review the candidates selected for interviews before the interviews, and is not involved in determining who will be on the interview panel. Ex. 22, Veronda depo. 18:16-18, 21:13-24, 25:23-26:2, 28:5-9.

**RESPONSE:**  Uncontroverted.

26.     Ms. Veronda never makes hiring recommendations and never makes hiring decisions. Ex. 22, Veronda depo. 35:14-18.

**RESPONSE:**  Uncontroverted.

---

[4] The Library uses a similar process. Ex. 7, House depo. 32:13-42:9.

27.    After the hiring manager selects a person to hire, Ms. Veronda reviews that person's information, but she does not review information on anyone else who applied for the position. Ex. 22, Veronda depo. 25:23-26:12.

**RESPONSE:**  Uncontroverted.

28.    The County's Recruitment and Selection Policy states that the County "prefers to promote from within and may first consider current employees with the necessary qualifications and skills to fill vacancies, unless outside recruitment is considered to be in the County's best interest." Ex. 23, Policy 202; Ex. 17, Bloomberg depo. 114:25-115:12.

**RESPONSE:** Uncontroverted.

### Conducting Interviews

29.    JDOC generally conducts panel interviews to fill positions, and the hiring manager determines who will be on the panel. Ex. 1, Pltf's depo. 63:1-8; Ex. 17, Bloomberg depo. 119:16-19.

**RESPONSE:** Uncontroverted that this is generally the case.

30.    Members of the interview panel provide input, but the decision is ultimately made by the hiring manager for the position. Ex. 1, Pltf's depo. 63:1-8; Ex. 24, Bloomberg Decl. ¶ 6.

**RESPONSE:** Controverted.  For example, while Susan Dougan was listed as the hiring manager for the BI Analyst, Robert Sullivan was the ultimate decisionmaker for the

position. Mr. Sullivan told Ms. Bloomberg, "Technically, this was [Ms. Dougan]'s decision who to interview, but I know I heavily influenced her decision." Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102). Mr. Seidler believed that Mr. Sullivan was able to influence the decision on who was going to be hired for the BI Analyst position and Mr. Seidler took Mr. Sullivan's list of characteristics as what they should be looking for in an Analyst. Exhibit F, Brian Seidler Deposition at 44:18-45:15. Ms. Dougan told Ms. Bloomberg that "I was leaning more to what Robert wants, what are you looking for Robert?" "I was relying heavily on Robert's list." Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100). Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen. Exhibit G, Robert Sullivan Deposition at 189:14-19.

31. Historically, each panel member scored each interviewed candidate on their answers to interview questions. Ex. 1, Pltf's depo. 63:4-17.

**RESPONSE:** Uncontroverted, however incomplete and therefore misleading. The panel members used a rubric scoring process to rank the interview candidates and the responses to questions. These scores were taken and averaged to get the top candidate through a more objective process. Exhibit H, House Deposition at 52:17-55:7; Exhibit I Brown Deposition at 49:20-50:20; Susan Dougan Deposition at 69:17-70:10.

32. Using this process, there were occasions when the candidate with the highest score was not the person the hiring manager wanted to hire. Ex. 6, Hentschel Decl. ¶ 12; Ex. 7, House depo. 52:20-53:11; Ex. 25, Brown depo. 49:20-50:10.

**RESPONSE:** Uncontroverted.


33.    For this reason, Human Resources has recommended against using scoring matrixes. Ex. 6, Hentschel Decl. ¶ 13.

**RESPONSE:** Uncontroverted that Human Resources recommended against using the scoring rubric because it meant that the interview panel would have to go with the top ranked candidate even if the hiring manager disagreed, however controverted to the extent that Defendant attempts to imply that hiring managers could not use hiring rubrics or scoring matrixes. Ms. House testified that if they were going to use a rubric system, they must "use it as it was meant for and go with the top candidate" because that would be fair based upon the scoring system and "that's what it's intended for." Exhibit H, House Deposition at 52:24-54:2. Robert Sullivan made the decision to change the interviewing process in the Department of Corrections from using a rubric where the highest scored individual on the panel had to be hired, to a more subjective process where the decision was based upon open-ended interview questions. Exhibit G, Robert Sullivan Deposition at 21:11-22:9, 29:10-18; Ex. J, Susan Dougan Deposition at 69:17-70:10. Further, Ms. House testified that other departments, including the Johnson County Library still use scoring rubrics for interviews. Exhibit H, House Deposition at 48:23-49:24.


34.    After Mr. Sullivan became the Director of JDOC, he agreed to stop using scoring rubrics in the interview process. Ex. 18, Sullivan depo. 20:5-25:15.

**RESPONSE:** Uncontroverted that he stopped using the scoring rubric. Robert Sullivan

made the decision to change the interviewing process in the Department of Corrections from using a rubric where the highest scored individual on the panel had to be hired, to a more subjective process where the decision was based upon open-ended interview questions.  Exhibit G, Robert Sullivan Deposition at 21:11-22:9, 29:10-18; Ex. J, Susan Dougan Deposition at 69:17-70:10.

**Background on Plaintiff and her Employment with the County**

35.     Plaintiff is a masculine-presenting, homosexual female. Doc. 68, Pretrial Order, Plaintiff's Contentions.[5] Plaintiff's 's date of birth is June 27, 1969. Ex. 1, Pltf's depo. 15:22-24.

**RESPONSE:** Uncontroverted.

36.     Plaintiff began her college career at LaBette Community College and then transferred to the University of Central Florida ("UCF"). Plaintiff's original major at UCF was computer science and mathematics, but she graduated with a criminal justice degree in 1991. Ex. 1, Pltf's depo. 22:14-24:10.

**RESPONSE:** Uncontroverted.

37.     Plaintiff started graduate school in 1992 at UMKC in the Administration of Justice Program and received a Master's degree from there in 1994. *Id.* at 22:22-25. In that program, she had several statistical classes in quantitative and qualitative data analysis. *Id.* at 23:11-12.

**RESPONSE:** Uncontroverted.

---

[5] Consistent with the Court's instructions, citations to the Pretrial Order are left blank and will be supplemented upon entry of the final Order.

38.     Plaintiff first began with Johnson County in 1992 as a House Arrest Officer in the Department of Corrections and held that position until she resigned in 1996. Ex. 1, Pltf's depo. 99:20-100:10.

**RESPONSE:** Uncontroverted.

39.     Plaintiff then worked for the State of Kansas in Court Services for approximately one year. In 1997, Plaintiff applied to return to the County and was hired as an Adult Intensive Supervision Officer (ISO) (a probation officer) position within the JDOC. Ex. 1, Pltf's depo. 100:22-103:8.

**RESPONSE:** Uncontroverted.

40.     In March 1999, Plaintiff became an ISO II, which was later retitled a Senior Case Manager (SCM). Ex. 1, Pltf's depo. 106:9-12.

**RESPONSE:** Uncontroverted.

41.     The SCM position is a supervisory position overseeing ISOs. Plaintiff oversaw ISOs on the Adult side of the criminal justice system. *Id*. at 105:18-22; Ex. 26, Pltf's Resume; Ex. 19, Sullivan Decl. ¶ 5.

**RESPONSE:** Uncontroverted.

42.     In her position, Plaintiff typically supervised a team of eight or nine ISOs. She also supervised a secretary at times. Ex. 19, Sullivan Decl. ¶ 6.

**RESPONSE:**   Uncontroverted the Plaintiff supervised a team of eight or nine ISOs, depending on staffing, and a secretary, but controverted as incomplete and therefore misleading as Plaintiff also supervised two Probation Intake Officers, a Resource Developer, and Pre-Trial Staff.  Ex. R, Depo. Ex. 64.

43.     Sharon Brown became the Director of Field Services in 2007. Ex. 25, Brown depo. 5:24-6:1. Plaintiff reported to Ms. Brown from that time until Ms. Brown retired in March 2019. Ex. 25, Brown depo. 5:24-6:9.

**RESPONSE:** Uncontroverted.

44.     Ms. Brown describes Plaintiff as very smart. Plaintiff took a lot of pride in her work. She did a good job. She was able to interact with clients and staff. She understood the mission and the Department's vision. She showed maturity and did a very good job in her SCM role. Ex. 25, Brown depo. 7:5-14.

**RESPONSE:** Uncontroverted.

45.     Ms. Brown viewed Plaintiff's areas for improvement as learning to fight appropriate battles and to be sure to gather all the information before jumping to conclusions. Ms. Brown also coached Plaintiff to be open to different ideas and ways of approaching situations. Ms. Brown did not necessarily believe Plaintiff could not be innovative, but observed that sometimes if she did not agree with something, it became a point of contention. Ex. 25, Brown depo. 10:12-11:18.

**RESPONSE:** Controverted.  Ms. Brown never coached Plaintiff on the issues outlined in

21

SOF 45.   As Plaintiff had been supervising staff longer than Ms. Brown and their relationship was more like peers than Ms. Brown being "over" Plaintiff.   Ms. Brown relied on Plaintiff to handle the ISP office, including operations, as Ms. Brown spent very little time at the location in Lenexa and Plaintiff was the most experienced in the office. Ms. Brown relied on Plaintiff to make decisions for that office.   Therefore, there was rarely, if ever, any coaching involved.   Exhibit K, Plaintiff's Declaration, ¶ 5.   Moreover, the issues outlined in SOF 45 do not appear in any of Plaintiff's reviews or PPDs.   *See* Exhibit Z, Plaintiff's Employee Appraisals.   In fact, Ms. Brown recognized Plaintiff's innovation on multiple occasions in Plaintiff's reviews explaining that Plaintiff "encourages *innovation* with regard to client supervision" that she has been open to "*innovative*" ways to get the job done and has "challenged her supervisory peers to be more open to this same concept."   Exhibit Z, Plaintiff's Employee Appraisal at JoCo-King 607, 618.   She also noted that Plaintiff "recommends solutions to problem situations and provides proactive solutions."   *Id.* at JoCo-King 601.   Ms. Brown also recognized that Plaintiff has taken the lead in ensuring the office is running smoothly and that Plaintiff "encourages that sharing of ideas and respects and values the contributions of others."   *Id.* at 606-07.

46.     During much of her tenure as an SCM in Adult Supervision, Plaintiff handled side projects related to data. For example, Plaintiff took over a report that Brian Seidler[6] had previously handled that required her to engage in a detailed data collection process each month. Ex. 1, Pltf's depo. 204:13-205:9.

---

[6] As discussed in more detail, below, Brian Seidler worked as a Project Manager/BI Analyst, a position that Plaintiff later sought and which involves significant data analysis. *See* SOF 157-167.

**RESPONSE:** Uncontroverted.


47.     This report gathered revocation data to try to ascertain whether there was a pattern regarding why clients had their probations revoked. They looked at a variety of data such as the charge, reason for revocation, officer involved, age, race, gender, etc. Ex. 28, Seidler depo. 58:8-59:1.

**RESPONSE:** Uncontroverted.


48.     At some point, Mr. Seidler turned that report over to the Adult Field Services department, and Plaintiff worked on it. Ex. 28, Seidler depo. 58:8-59:9.

**RESPONSE:** Uncontroverted.


49.     Mr. Seidler did not view this work as data analysis, but Plaintiff inputted information about, for example, the reason an officer revoked someone's probation and likely looked at trends related to that. Ex. 28, Seidler depo. 59:10-60:18; *see also* Ex. 25, Brown depo. 101:15-102:18 (Plaintiff's work on the revocation report was basic).

**RESPONSE:** Controverted.  Plaintiff was entering and analyzing revocation data, which included data analysis.  This process was very time consuming for Plaintiff as it required large amounts of data entry, manually looking up and reviewing data, running reports, and cleaning the data so it could be analyzed.  For the revocation data project, Plaintiff compiled all the recommendations made by Intensive Supervision Officers (ISOs) at revocation hearings (thousands of hearings) and then analyzed how often judges followed the ISO's recommendations.  Plaintiff found that 92% of the time, the judge followed the

department's recommendations.  This was important to know in terms of how ISOs might reduce revocation rates to prison.  None of the other supervisors in the department knew how to run the reports or clean the data for the analysis.  Even Olivia Allen did not know how to run the reports for this particular revocation data.  After doing all of this work on the revocation data, Plaintiff used the data to drive decisions with the staff she supervised and ISP as a whole.  She reviewed the data looking for patterns in revocations and where the Department could better utilize resources to improve revocation rates.  She used that data directly with her individual officers and shared it with them and discussed the trends she was seeing.  Plaintiff was also reviewing closely the data that Mr. Seidler and Mr. Clark compiled in the Tableau Dashboard re: LSIR assessments.  Plaintiff used that data in individual coaching sessions with staff and helped them determine what areas to focus on for improvement.  No other supervisor in adult services or the department was doing this type of data analysis.  Exhibit K, Plaintiff's Declaration at ¶6.

50.     During her tenure, Ms. Brown gave Plaintiff positive performance reviews on an annual basis. Ex. 29, Pltf's Performance Reviews for performance years 2011 through 2018.[7] The reviews consistently rate Plaintiff very highly and include many favorable comments. *Id.*

**RESPONSE:** Uncontroverted.

51.     In 2013, Plaintiff received a letter of expectation because Ms. Brown received a report that Plaintiff engaged in a heated verbal exchange with another supervisor, which was inappropriate and did not display the department's values. Ex. 30 (Depo. Ex. 20) Pltf's 2013

---

[7] Starting in 2019, the County stopped conducting formal performance reviews and began using a system called Pillars of Performance Development (PPD), which is a forward-thinking system where supervisors check in with their employees on a regular basis. Ex. 6, Hentschel Decl. ¶ 10.

Review; Ex. 1, Pltf's depo. 206:10-207:1.

> **RESPONSE:**  Uncontroverted that the cited review states that a letter of expectation was received, however irrelevant and controverted as incomplete and therefore misleading to the extent that Defendant attempts to imply a Letter of Expectation is considered discipline in the Department of Corrections.  Instead, a Letter of Expectation is a document outlining that an issue came up that the individual needs to address and that it should not occur again.  This particular letter was related to an officer safety training exercise, which Plaintiff disagreed with, and Plaintiff testified there was not a "heated verbal exchange."  Exhibit A, Plaintiff's Deposition at 121:14-122:1, 206:10-207:1.

52.     In June 2016, SCM Nanette Rosas reported to Ms. Brown that she had heard Plaintiff go into the office of SCM Robert Johnson and scream at him that he better fucking do what she told him to do. Ex. 32, Rosas Decl. ¶ 4.

> **RESPONSE:**  Controverted.   Plaintiff denies screaming at Mr. Johnson or telling him that "he better fucking do what [I say]."  Plaintiff recalls Mr. Johnson getting upset with her about something and storming off into his office.  Plaintiff went into his office to discuss that issue with him and work together to figure out a solution to the problem. Exhibit XX, Plaintiff's Declaration at ¶7.

53.     In September 2018, the County received an anonymous hotline complaint about all of the SCMs in Adult supervision. The caller reported that Plaintiff was rude to her staff and that Plaintiff had indicated she was going to wear a t-shirt that says "STFU" (Shut the Fuck Up)

so staff would stop asking her to help with the caseload. Ex. 33 (Depo. Ex. 24).

> **RESPONSE:** Objection.  The anonymous hotline complaint presented is hearsay and inadmissible.  *See* FED. R. CIV. P. 56(c)(2).  To the extent and answer is required, this SOF is uncontroverted that the document states as such, how controverted that the material contained in the document is accurate or truthful.  Plaintiff testified that she did not remember suggesting that she wear a shirt saying STFU.   Exhibit A, Plaintiff's Deposition at 141:20-23.

54.     Mr. Sullivan forwarded the complaint to Ms. Brown for investigation. Ms. Brown then reported her findings to Ms. Bloomberg and Mr. Sullivan. Among other things, Ms. Brown reported that Plaintiff admitted to making the comment about the shirt but said she was joking. Ex. 34 (Emails related to hotline complaint).[8]

> **RESPONSE:**  Uncontroverted that Mr. Sullivan forwarded the complaint to Ms. Brown and that Ms. Brown replied by email to Ms. Bloomberg and Mr. Sullivan in an email regarding the "hotline complaint", however controverted to the extent that Plaintiff made the comment as stated in Ms. Brown's email or that Ms. Brown met with Plaintiff. Plaintiff does not recall meeting with Ms. Brown about this event and did not make the comment as described in the complaint.  Exhibit K, Plaintiff's Declaration at ¶12; *see also* Exhibit A, Plaintiff's Deposition at 141:20-23.

**<u>Alleged Discrimination Outside of Hiring Decisions</u>**

---

[8] Plaintiff testified that she did not remember suggesting that she wear a shirt saying STFU. Ex. 1, Pltf's depo. 141:20-23.

Following is the discrimination Plaintiff alleges, other than hiring decisions.

55.     In 1992, Beverly Marshbank, the ARC Director at the time, told Plaintiff she should wear a dress twice a week with makeup and panty hose. Ex. 1, Pltf's depo. 75:18-76:5, 77:19-3.

**RESPONSE:**  Uncontroverted.

56.     Ms. Marshbank was actually employed by the state but stopped working at the ARC in the 1990s. She was never employed by Johnson County. Ex. 6, Hentschel Decl. ¶ 14.

> **RESPONSE:**  Controverted and irrelevant.  Beverly Marshbank was the Director of the ARC, which was a Johnson County position, even if it was funded through a different method.  She worked with Plaintiff and other Johnson County employees on a regular basis.  Exhibit K, Plaintiff's Declaration at ¶13.

57.     When Plaintiff was in House Arrest (a position she left in 1996), a director named Bruce Rider told her she should not give a gay client preferential treatment. Ex. 1, Pltf's depo. 76:6-14

> **RESPONSE:**   Uncontroverted, however controverted to the extent that Defendant attempts to imply that Plaintiff would or did provide preferential treatment to clients who identified as gay.  Plaintiff performed the duties of her position as instructed and treated all clients equally.  Plaintiff did not provide any preferential treatment to LGBTQIA+ clients.  Ex. K, Plaintiff's Declaration at ¶14.

58.     A former Division Director named Doug Gertsema told Plaintiff to wear a dress

when a County Commissioner was going to visit the facility and periodically had conversations with her about dressing less masculine. Ex. 1, Pltf's depo. 76:15-22, 80:2-8

**RESPONSE:** Uncontroverted.


59.     Mr. Gertsema's employment was terminated in 2006. Ex. 6, Hentschel Dec. ¶ 9.

**RESPONSE:**  Uncontroverted.


60.     Bill Keith, Plaintiff's supervisor when she was first promoted to ISO (in 1997), told her he wanted to make the expectations regarding her dress clear. Plaintiff told him she was familiar with the dress code and would follow it. Ex. 1, Pltf's depo. 76:23-77:11.

**RESPONSE:**  Uncontroverted.


61.     Mr. Keith left the County in 1999. Ex. 6, Hentschel Decl. ¶ 16.

**RESPONSE:**  Uncontroverted that Mr. Keith's employment ended with the County in 1999, however controverted that Mr. Keith "left" the County willingly.  Mr. Keith was terminated by Tracee Borger.   Exhibit K, Plaintiff's Declaration at ¶15.


62.     Plaintiff believes she was also passed over for promotion to ISO (which would have occurred before 1997). Ex. 1, Pltf's depo. 78:20-80:1.

**RESPONSE:** Uncontroverted.


63.     After a discipline hearing with Sheri Almer, an employee Plaintiff supervised, Ms. Almer and Ms. Gillespie told Plaintiff she should think about smiling more. Ex. 80:10-25.

Plaintiff believes that statement is sexist. *Id*. at 81:8-20.

**RESPONSE:** Uncontroverted.

64.     When Ms. Gillespie became the Director of JDOC in 2007, she indicated that she wanted the employees in the department to dress more professionally. Ex. 25, Brown depo. 19:4-16, 108:4-17.

**RESPONSE:** Controverted as incomplete and misleading. Plaintiff dressed like 99% of the men in her same position dressed and with khaki pants, collared long-sleeved button-down shirt, and casual shoes. Sharon Brown told Plaintiff that "Betsy doesn't like the way you dress". Plaintiff was extremely upset by the conversation and had to leave the room because she was crying. Ms. Brown later apologized to Plaintiff stating that she "shouldn't have done that", referring to relaying the message from Ms. Gillespie to Plaintiff about the way she dressed. Plaintiff had encounters with Ms. Gillespie where Ms. Gillespie praised her whenever she wore anything considered traditionally more feminine (i.e., pink shirt, or woman's suit for an interview rather than a more masculine suit). Plaintiff does not know of any male employees who were told to change the way they dressed by Ms. Gillespie. Male employees were allowed to continue to dress the way Plaintiff was dressing after this conversation with Ms. Brown. Exhibit K, Plaintiff's Declaration at ¶¶ 16-18.

65.     Ms. Gillespie never told or implied to Ms. Brown that she wanted Plaintiff to dress in a more feminine way or anything to that effect. Ex. 25, Brown depo. 18:1-16.

**RESPONSE:** Controverted.  Plaintiff dressed like 99% of the men in her same position dressed and with khaki pants, collared long-sleeved button-down shirt, and casual shoes. Sharon Brown told Plaintiff that "Betsy doesn't like the way you dress".  Plaintiff was extremely upset by the conversation and had to leave the room because she was crying. Ms. Brown later apologized to Plaintiff stating that she "shouldn't have done that", referring to relaying the message from Ms. Gillespie to Plaintiff about the way she dressed.  Plaintiff had encounters with Ms. Gillespie where Ms. Gillespie praised her whenever she wore anything considered traditionally more feminine (i.e., pink shirt, or woman's suit for an interview rather than a more masculine suit). Plaintiff does not know of any male employees who were told to change the way they dressed by Ms. Gillespie. Male employees were allowed to continue to dress the way Plaintiff was dressing after this conversation with Ms. Brown.  Exhibit K, Plaintiff's Declaration at ¶¶ 16-18.

66.    Ms. Brown subsequently spoke with others, including Plaintiff, and informed them they needed to dress more professionally. Ex. 25, Brown depo. 18:23-19:25, 108:4-109:9.

**RESPONSE:** Uncontroverted.

67.    Plaintiff believes Ms. Gillespie's intent was discriminatory but admits Ms. Brown never made any discriminatory statement and never claimed Ms. Gillespie indicated the conversation had anything to do with Plaintiff's sex, sexual orientation, or gender presentation. Ex. 1, Pltf's depo. 81:21-82:12.

**RESPONSE:** Uncontroverted that Plaintiff believes Ms. Gillespie's intent was discriminatory, otherwise controverted. Plaintiff dressed like 99% of the men in her same

position dressed and with khaki pants, collared long-sleeved button-down shirt, and casual shoes.   Sharon Brown told Plaintiff that "Betsy doesn't like the way you dress". Plaintiff was extremely upset by the conversation and had to leave the room because she was crying.  Ms. Brown later apologized to Plaintiff stating that she "shouldn't have done that", referring to relaying the message from Ms. Gillespie to Plaintiff about the way she dressed.   Plaintiff had encounters with Ms. Gillespie where Ms. Gillespie praised her whenever she wore anything considered traditionally more feminine (i.e., pink shirt, or woman's suit for an interview rather than a more masculine suit). Plaintiff does not know of any male employees who were told to change the way they dressed by Ms. Gillespie. Male employees were allowed to continue to dress the way Plaintiff was dressing after this conversation with Ms. Brown.  Exhibit K, Plaintiff's Declaration at ¶¶ 16-18.

68.    Plaintiff received cards from Commissioners congratulating her on 20 years of service that were directed to "Mr. King." Ex. 1, Pltf's depo. 82:21-83:2.

**RESPONSE:** Uncontroverted.

69.    Ms. King had never met the Commissioners who sent those cards. Ex. 1, Pltf's depo. 111:25-112:7.

**RESPONSE:** Uncontroverted.

70.    Other than the hiring decisions discussed below, Plaintiff cannot recall any other

discriminatory treatment. 83:3-15; 278:6-19; 292:23-293:4.[9]

> **RESPONSE:**  Controverted.  In addition to the hiring decisions below, based on the same comments discussed in SOF 55-69, above, Plaintiff believes it is not desirable for a masculine presenting female to present to advisory boards or commissioners or be in positions of authority, and Plaintiff experienced discriminatory treatment in this way. Exhibit A, Plaintiff's Deposition at 197:20-198:10.

## Department of Corrections Positions At Issue

### Director of Field Services

71.     After Sharon Brown retired, Plaintiff applied to fill her position as the Director of Field Services. Ex. 35 (Depo. Ex. 31).

> **RESPONSE:** Controverted.  Sharon Brown was not retired at the time that Plaintiff applied to fill the Director of Field Services position nor was she retired when the interviews occurred.  Instead, Ms. Brown had only announced her retirement from the position.  Exhibit K, Plaintiff's Declaration at ¶ 19.

72.     By that time, Mr. Sullivan had been the Director of Corrections for approximately 15 months and was familiar with Plaintiff as one of the SCMs in Adult Field Services. Ex. 19, Sullivan Decl. ¶ 7.

> **RESPONSE:** Uncontroverted the Mr. Sullivan knew that Plaintiff was one of the SCMs in the Adult Field Services, however controverted to the extent Defendant attempts to imply that Mr. Sullivan knew Plaintiff's work performance or work history at this time.

---

[9] Plaintiff also claims that County employees have told her to get out of the restroom or asked what she is doing in the restroom, but Plaintiff does not know who they were. They were people who did not know her. Ex. 1, Pltf's depo. 278:23-280:8. Plaintiff never reported any of this behavior until June 2019. *See* SOF ¶ 327.

While Mr. Sullivan was her second level supervisor, he was housed in a different facility than Plaintiff and most of their interactions were by email.  Exhibit G, Robert Sullivan Deposition at 70:24-72:7.

73.     The job posting for this position can be found at Exhibit 36. Mr. Sullivan was the hiring manager. Ex. 24, Bloomberg Decl. ¶ 7; Ex. 36.

**RESPONSE:** Uncontroverted.

74.     The Director of Field Services oversees both Adult and Juvenile Intensive Supervision (supervised probation). The position also oversees Adult and Juvenile House Arrest, Juvenile Case Management, Juvenile Programming, Probation Intake, and Bond Assessment. Ex. 21, Clark depo. 72:16-21.

**RESPONSE:** Uncontroverted.

75.     The Director of Field Services maintains strong familiarity with department policies, as well as Kansas Department of Corrections (KDOC) adult and juvenile offender contact standards. The Director maintains a working knowledge of current trends and actions with both Adult and Juvenile Field Services. Ex. 36.

**RESPONSE:** Uncontroverted that the job description for the Director of Field Services outlined in Exhibit 36 states this is as a part of the job description.

76.     This Director maintains continued awareness of the status of the Department's budget and adjusts operations accordingly. This Director authorizes purchases according to

budget status and need, and oversees compliance with state and local statutes. Ex. 36.

     **RESPONSE:** Uncontroverted that the job description for the Director of Field Services outlined in Exhibit 36 states this is as a part of the job description.

77.    This Director participates in the development of the agency's comprehensive plan, serves as the Administrative Contact to the KDOC Juvenile Services, and ensures the district complies with KDOC juvenile policies and regulations. Ex. 36. This Director must also develop positive working relationships with the KDOC, the Adult and Juvenile Community Corrections Advisory Boards, and serves on the Statewide Community Advisory Committee. Ex. 36.

     **RESPONSE:** Uncontroverted that the job description for the Director of Field Services outlined in Exhibit 36 states this is as a part of the job description.

78.    A total of 44 people applied for this position. Ex. 24, Bloomberg Decl. ¶ 8.

     **RESPONSE:** Uncontroverted.

79.    Mr. Sullivan determined who to interview, and he selected eight candidates, including Plaintiff, for interviews. Ex. 18, Sullivan depo. 87:21-88:15; Ex. 19, Sullivan Decl. ¶ 9; Ex. 24, Bloomberg Decl. ¶ 10; Ex. 37, List of Interviewees.

     **RESPONSE:** Controverted that Robert Sullivan was only one reviewing and determining interviewees for the position. Senior HR Partner Shayla Bloomberg was the recruiter for this position and screened the applicants for minimum qualifications to determine if they were even able to be selected for an interview, which Robert Sullivan relied upon.

Exhibit L, Shayla Bloomberg Deposition at 110:13-111:17; Exhibit G, Robert Sullivan Deposition at 85:9-15.

80.     Resumes for these eight candidates can be found at Exhibit 16. Ex. 24, Bloomberg Decl. ¶ 10.

**RESPONSE:** Uncontroverted.

81.     There were 12 candidates who met the minimum qualifications for the position but whom Mr. Sullivan decided not to interview: Jennifer Douglas, Shawn Fletcher, Randy Focken, Andrew Harold, Alexander Kump, Claude Maye, Momodou Nije, Adam Patterson, Nanette Rosas, Richard Skaggs, Jesse Williams, and Julie Wright. Ex. 38, Information from the County's Applicant Tracking System; Ex. 24, Bloomberg Decl. ¶ 11.

> **RESPONSE:** Uncontroverted that there were 12 candidates who met the minimum qualifications for the position who were not interviewed, however, controverted that Robert Sullivan was the only one reviewing and determining interviewees for the position. Senior HR Partner Shayla Bloomberg was the recruiter for this position and screened the applicants for minimum qualifications to determine if they were even able to be selected for an interview, which Robert Sullivan relied upon. Exhibit L, Shayla Bloomberg Deposition at 110:13-111:17; Exhibit G, Robert Sullivan Deposition at 85:9-15.

82.     In addition to Mr. Sullivan, the following people were on the interview panel: Sharon Brown, Susan Dougan (Deputy Director of Corrections), Tedd Jester (Director of

Juvenile Services), Shelly Williams (Director of Community Corrections for Riley County, Kansas), and Shala Bloomberg. Ex. 1, Pltf's depo. 162:22-163:6; Ex. 18, Sullivan depo. 83:13-16, 88:16-89:5.

> **RESPONSE:** Uncontroverted.

83.     At times, hiring managers within Johnson County ask people outside the organization to sit on interview panels for high level positions in order to obtain an outside perspective. Other governmental organizations also do this. Ex. 18, Sullivan depo. 89:6-15; Ex. 21, Clark depo. 138:10-139:8; Ex. 22, Veronda depo. 95:24-96:6.

> **RESPONSE:** Controverted.  In the Department of Corrections within Johnson County, it was not a typical practice to ask people outside of the organization to sit on the interview panels, and the only hiring manager who did this was Robert Sullivan for three of the positions that Plaintiff applied for.[10]  Exhibit G, Keith Clark Deposition at 138:21-139:10 (Mr. Clark could not remember any other positions than the DFS and DDARC with Robert where outsiders were brought in); Exhibit I, Sharon Brown Deposition at 48:10-49:19 (Ms. Brown stated this was not customary in her experience in the Department of Corrections); Exhibit N, Samantha Veronda Deposition at 95:24-96:6 (Ms. Veronda testified that this was not common for Mental Health Department).  Robert Sullivan chose the people outside of the organization to sit in on these interview panels.  Exhibit G, Robert Sullivan Deposition at 90:12-19.   He is not aware of anyone else selecting people outside the organization for interviews for Department of Corrections positions and he is no longer doing this.  Exhibit G, Robert Sullivan Deposition at 89:23-90:22.  He

---

[10] Robert Sullivan asked another ARC Director from outside the County to sit in on the interviews for the DDARC position, even though Earl Taylor was the hiring manager for that position.  Exhibit G, Sullivan Deposition at 90:12-19.

only did it for the DFS and DDARC positions and he has not done this since.  Exhibit G, Robert Sullivan Deposition at 89:23-90:22.


84.     For example, the Kansas Department of Corrections (KDOC) has asked Mr. Sullivan to participate in interview panels for them, and when Mr. Sullivan left Emporia, the chief judge asked another director to help him pick Mr. Sullivan's replacement. Ex. 18, Sullivan depo. 89:6-15.

> **RESPONSE:** Objection, hearsay and cannot be used for the truth of matter asserted that the Chief Judge in Emporia as another director to assist in replacing Mr. Sullivan.  *See* FED. R. CIV. P. 56(c)(2).  To the extent a response is required, it is uncontroverted that Mr. Sullivan testified as such but controverted to the extent that Defendant suggests that the fact that a judge in Emporia asking another director to help interview for Mr. Sullivan's replacement or that Mr. Sullivan participated in interview panels for state agencies, and not the Defendant County, means that this was a regular or appropriate practice for the Johnson County Department of Corrections or that Mr. Sullivan did not request Ms. Williams be part of the interview panel to ensure that one of Keith Clark's listed references was on the panel.   In the Department of Corrections within Johnson County, it was not a typical practice to ask people outside of the organization to sit on the interview panels, and the only hiring manager who did this was Robert Sullivan for three of the positions that Plaintiff applied for.  Exhibit M, Keith Clark Deposition at 138:21-139:10 (Mr. Clark could not remember any other positions than the DFS and DDARC with Robert where outsiders were brought in); Exhibit I, Sharon Brown Deposition at 48:10-49:19 (Ms. Brown stated this was not customary in her experience in the

Department of Corrections); Exhibit N, Samantha Veronda Deposition at 95:24-96:6 (Ms. Veronda testified that this was not common for Mental Health Department).   Robert Sullivan chose the people outside of the organization to sit in on these interview panels. Exhibit G, Robert Sullivan Deposition at 90:12-19.   He is not aware of anyone else selecting people outside the organization for interviews for Department of Corrections positions and he is no longer doing this.  Exhibit G, Robert Sullivan Deposition at 89:23-90:22.  He only did it for the DFS and DDARC positions and he has not done this since. Exhibit G, Robert Sullivan Deposition at 89:23-90:22.

85.     Mr. Sullivan asked the Director from Sedgwick County to be on the panel for the Director of the ARC position. Ex. 18, Sullivan depo. 89:23-90:7; Ex. 21, Clark depo. 139:5-8.[11] And Earl Taylor asked the Deputy Director from Sedgwick County to be on the panel for the Deputy Director of the ARC position. Ex. 18, Sullivan depo. 94:13-19.

> **RESPONSE:** Uncontroverted that Mr. Sullivan asked Shelly Williams, the Director from Sedgwick County, and one of Keith Clark's listed references, to be on the panel for the Director of Field Services position.  Exhibit G, Robert Sullivan Deposition at 89:6-92:6. Controverted that Earl Taylor asked the Deputy Director from Sedgwick County to be on the panel; instead, this was also Robert Sullivan.  Exhibit G, Robert Sullivan Deposition at 90:12-19.  Mr. Sullivan agreed that he had access to Mr. Clark's references and that the "optics of [choosing Ms. Williams for an interview panelist] look terrible" when she was one of Mr. Clark's references.  Exhibit G, Robert Sullivan Deposition at 91:7-18, 224:14-

[11] Notably, Mr. Clark also applied for the ARC Director position but was not selected for an interview. Ex. 21, Clark depo. 139:9-22.

226:8.   He further agreed he could have chosen a different director from outside of Johnson County.  Exhibit G, Robert Sullivan Deposition at 225:25-226:8.

86.     Plaintiff completed an application for the position and listed Sharon Brown (who was on the interview panel) as a reference. Ex. 39 at JoCo 3448.

**RESPONSE:** Uncontroverted that Plaintiff listed Ms. Brown as a reference, however controverted to the extent that Defendant attempts to imply that Ms. Brown being on the interview panel was the same situation as Robert Sullivan asking Ms. Williams from outside the County to participate and her being directly listed as a reference for Mr. Clark.  Ms. Brown was retiring from the position of DFS and it was customary for the outgoing position holder to be on the interview panel if they were still with the County. Exhibit K, Plaintiff's Declaration at ¶20.   For example, Tony Booker was part of the panel for the Director of ARC position from which he retired and Ms. Dougan also sat in on the interviews to fill her position as Deputy Director of Corrections after she announced her retirement.  Exhibit K, Plaintiff's Declaration at ¶20.

87.     Exhibit 35 (Depo. Ex. 31) contains the other materials Plaintiff submitted in connection with her application for this position.[12] Ex. 1, Pltf's depo. 161:18-20.

**RESPONSE:**  Uncontroverted.

88.     As shown on her resume, Plaintiff had one year of experience with juveniles, which occurred in 1992-1993. Ex. 35 (Depo. Ex. 31); Ex. 1, Pltf's depo. 168:14-17.

---

[12] Plaintiff's cover letter is dated January 28, 2018, but there is no dispute she submitted them in 2019. Ex. 1, Pltf's depo. 167:18-168:10.

**RESPONSE:** Uncontroverted.

89.     Plaintiff had limited experience with budgets. She understood and read budgets but had never created them. Ex. 1, Pltf's depo. 168:18-22.

> **RESPONSE:** Uncontroverted, however controverted to the extent that Defendant attempts to imply that the creation of budgets was a requirement of the DFS position. The job description for the DFS position does not mention anything about the creation of budgets. *See* Defendant's Exhibit 36 – DFS Job Posting.

90.     Plaintiff's experience with writing grants was limited to helping another employee write one grant in 2007. Ex. 1, Pltf's depo. 169:14-24.

> **RESPONSE:** Uncontroverted, however controverted to the extent defendant attempt to imply that granting writing experience or even solo grant writing was a requirement of the DFS position. *See* Defendant's Exhibit 36 – DFS Job Posting.

91.     The writing sample Plaintiff submitted was a letter she had written to a judge in 2008. *Id*.

> **RESPONSE:** Controverted.  Plaintiff's writing sample was not recycled or a letter she wrote in 2008.  Instead, as Plaintiff explained to Ms. Bloomberg, her writing sample was a hypothetical letter to a real situation Plaintiff was a part of during that time period in 2008.   The writing sample was a letter drafted to a Kansas legislator addressing a committee's concerns about what was referred to as SB123 funding with ISP clients. Sharon was at the committee meeting with Plaintiff where this was discussed.  Exhibit K,

Plaintiff's Declaration at ¶21.

92.     Exhibits 40, 41 and 42 contain the submissions Keith Clark provided for this position. Ex. 24, Bloomberg Decl. ¶ 9.

**RESPONSE:** Uncontroverted.

93.     Like Plaintiff, Mr. Clark was born in 1969. Ex. 43, Clark Decl. ¶ 3.

**RESPONSE:**  Uncontroverted.

94.     Mr. Clark had been working in corrections since 1994. Ex. 40.

**RESPONSE:** Objection.  The cited material is hearsay, lacks foundation, and cannot be cited for the truth of the matter asserted.  *See* Fed. R. Civ. P. 56(c)(2).  To the extent that a response is required, it is uncontroverted that the cited exhibit, Mr. Clark's cover letter states he has twenty-five years of corrections experience.  *See* Defendant's Exhibit 40.

95.     From 2003 until 2016, Mr. Clark was the Director of Community Corrections for the Fourth Judicial District, meaning he held a Director position similar to the position held by Mr. Sullivan but in a much smaller District. Ex. 40; Ex. 21, Clark depo. 28:10-15, 34:18-35:1; Ex. 43, Clark Decl. ¶ 4.

**RESPONSE:** Controverted.  Mr. Clark shared that the role he held as the Director of Community Corrections for the Fourth Judicial District was actually more similar to the Project Manager position (later BI Analyst) he took with Johnson County in 2016.

Exhibit G, Clark Deposition at 29:13-30:25.   In fact, he testified that it was not a promotion, and he would describe it as a lateral move.   *Id.*

96.     In that position, Mr. Clark was directly responsible for community-based supervision in a four-county area. This included Adult Intensive Supervision, Juvenile Intensive Supervision, Community Case Management, Behavior Health Services, and various programming to meet the needs of the populations being served. Ex. 40; Ex. 41 (Depo. Ex. 32), Clark Cover Letter and Resume; Ex. 1, Pltf's depo. 170:3-11.

> **RESPONSE:**  Objection.  The cited material is hearsay, lacks foundation, and cannot be cited for the truth of the matter asserted regarding Mr. Clark's experience.  *See* FED. R. CIV. P. 56(c)(2).  To the extent that a response is required, it is uncontroverted that the cited exhibit, Mr. Clark's cover letter and resume state as outlined above.  *See* Defendant's Exhibit 40.

97.     Mr. Clark developed and monitored six budgets totaling $1.1 million, and he wrote and executed multiple grant applications that support the continuation of evidence-based practices in community supervision. Ex. 41, Depo. Ex. 32, p. 2.

> **RESPONSE:** Objection.  The cited material is hearsay, lacks foundation, and cannot be cited for the truth of the matter asserted regarding Mr. Clark's experience with budgets. *See* FED. R. CIV. P. 56(c)(2).  To the extent that a response is required, it is uncontroverted that the cited exhibit, Mr. Clark's cover letter and resume state as outlined above.  *See* Defendant's Exhibit 41.

98.     Mr. Clark supervised 10 to 12 employees in that role. He also wrote the adult comprehensive plan, the behavioral health plan, submitted quarterly reports for the Kansas Department of Corrections, and worked on data and outcomes. Ex. 21, Clark depo. 30:14-20; Ex. 43, Clark Decl. ¶ 5.

**RESPONSE:** Uncontroverted.


99.     An adult comprehensive plan is an annual report required by the Kansas Department of Corrections which details the services. It discusses the District's population, the District's Advisory Board, the programming available in the District, Quality Assurance programs, and outcomes. It also includes budget and funding considerations. Ex. 21, Clark depo. 32:25-33:13.

**RESPONSE:** Uncontroverted.


100.    The quarterly reports are also required by the KDOC to provide documentation of the District's progress related to the outcomes in the comprehensive plan. Ex. 21, Clark depo. 35:2-10.

**RESPONSE:** Uncontroverted.


101.    During part of the time Mr. Clark was the Director in the 4th Judicial District, Mr. Sullivan was the Director in the 5th Judicial District, a neighboring jurisdiction, and they had some interaction in those roles. For example, they had transfer cases between them, attended all of the same meetings, consulted to complete plans or budgets, and consulted about new initiatives. Ex. 21, Clark depo. 23:13-24:4, 28:25-29:2.

**RESPONSE:** Uncontroverted.


102.     Beginning in February 2016, Mr. Clark held a Project Manager position at the Johnson County Department of Corrections. Ex. 21, Clark depo. 20:19-24; Ex. 43, Clark Decl. ¶ 6.

>    **RESPONSE:** Uncontroverted, although for clarification purposes the Project Manager position was later retitled to the Business Intelligence Analyst position that Plaintiff was denied.  *See* Defendant's Exhibit 43, Clark Declaration at ¶ 6.


103.     When Mr. Clark was in that position and Mr. Sullivan was Johnson County's Criminal Justice Coordinator (the position he held before became the Director of JDOC), Mr. Clark and Mr. Sullivan interacted on various projects. Ex. 18, Sullivan depo. 149:3-152:21.

>    **RESPONSE:** Uncontroverted.


104.     Mr. Sullivan had familiarity with Mr. Clark's experience based on his interactions with him when they were Directors of Community Corrections in neighboring jurisdictions and based on his interactions with him in their roles at Johnson County. Ex. 19, Sullivan Decl. ¶ 8.

>    **RESPONSE:** Uncontroverted.


105.     The writing sample Mr. Clark provided was a 43-page Community Corrections Comprehensive Plan he had drafted in April 2016. Ex. 40 at JoCo 3401-3444.

>    **RESPONSE:** Uncontroverted that Mr. Clark submitted a 43-page Community Corrections Comprehensive Plan as his writing sample, however controverted that Mr.

Clark wrote the entire comprehensive plan that he submitted as much of the plan is a combination of information collected and put together by other departments within Johnson County Corrections. *See* Defendant's Exhibit 40. Moreover, controverted as irrelevant and immaterial, as Mr. Sullivan testified that he did not review all the materials prior to interviewing or making the decision to hire Mr. Clark and instead reviewed: resumes, cover letters, and the employment history from the Deltek system. Exhibit G, Robert Sullivan Deposition at 86:18-87:20.

106. Of the bullet points listed on the job posting, which describe the duties of the Director of Field Services (*See* Ex. 36 at JoCo 911), the only duty Mr. Clark did not already have experience with was service delivery associated with house arrest. Ex. 21, Clark depo. 202:2-204:8.

**RESPONSE:** Controverted. Mr. Clark testified that he did not have contract, services, or services delivery experience related to house arrest. He also testified that when it came to fiscal considerations and payments from the County, he did not have some of those experiences. Exhibit G, Keith Clark Deposition at 203:18-204:8.

107. Mr. Clark also submitted an application, which can be found at Exhibit 42. Ex. 24, Bloomberg Decl. ¶ 9. Mr. Clark listed Shelly Williams as one of his references on his application. Ex. 42.

**RESPONSE:** Uncontroverted.

108. Mr. Clark has known Ms. Williams for 25 years and considers her a friend. Ms.

Williams was a Director of Community Corrections for the 21st Judicial District when Mr. Clark was the Director of Community Corrections for the 4th Judicial District.  Ex. 21, Clark depo. 137:4-23, 138:5-6.

**RESPONSE:** Uncontroverted.


109.    At the time he listed Ms. Williams as a reference, Mr. Clark did not know Ms. Williams would be on the interview panel. Ex. 21, Clark depo. 199:2-7.

**RESPONSE:**  Uncontroverted, but immaterial.


110.    Similarly, when Mr. Sullivan asked Ms. Williams to be on the panel, he had not noticed that Mr. Clark had listed Ms. Williams as a reference. Ex. 18, Sullivan depo. 91:7-9.

**RESPONSE:** Uncontroverted that Mr. Sullivan testified as such, however, controverted as Mr. Sullivan has access to this information to review it ahead of time.  Mr. Sullivan agreed that he had access to Mr. Clark's references and that the "optics of [choosing Ms. Williams for an interview panelist] look terrible" when she was one of Mr. Clark's references.  Exhibit G, Robert Sullivan Deposition at 91:7-18, 224:14-226:8.  He further agreed he could have chosen a different director from outside of Johnson County.  Exhibit G, Robert Sullivan Deposition at 225:25-226:8.


111.    Mr. Sullivan agrees that the optics of that look bad, but he is not concerned about asking Ms. Williams to serve. Ex. 18, Sullivan depo. 91:7-18.

**RESPONSE:** Uncontroverted

112.     Megan Milner also applied for the Director of Field Services position. Ex. 37.

**RESPONSE:**  Uncontroverted.


113.     At the time, Ms. Milner was the Director of Community Based Juvenile Services

for the KDOC. In that role, she oversaw the daily operations of the Juvenile Services division at

the KDOC central office. She also created and administered the $5 million Reinvestment and

Regional Collaboration for grants and provided oversight for the federal Title II funds and

Comprehensive Plan Grant funds for judicial districts. Ex. 44, Milner Resume. Before that, she

spent five years as the Deputy Superintendent of the Kansas Juvenile Correctional Complex.

Before that, she had spent five years as a Program Consultant for the Kansas Juvenile Justice

Authority. She also had Case Management experience. Ex. 44.

> **RESPONSE:**   Objection, Exhibit 44 is hearsay, lacks foundation, and cannot be
>
> presented for the truth of the matter asserted.  *See* FED. R. CIV. P. 56(c)(2).  To the extent
>
> a response is required, Plaintiff states it is uncontroverted that the document speaks for
>
> itself and that the allegations in SOF are contained in the resume found in Exhibit 44.


114.     Rachel Mestad also applied for the position. At the time, Ms. Mestad was the

Training Coordinator for JDOC. Previously, she had been a SCM in Adult Intensive Supervision

for six years. Before that, she had experiences with the Jackson County Family Court, Safer

Foundation (an Adult Transition Center in Chicago), and the National Institute of Corrections.

Ex. 16 at JoCo 3470-3471.

**RESPONSE:** Uncontroverted that Ms. Mestad applied for the position, however objection that Exhibit 16 is hearsay, lack foundation, and cannot be used for the truth of the matter asserted and therefore the information provided about Ms. Mestad is inadmissible in this form. *See* FED. R. CIV. P. 56(c)(2). To the extent that a response is required, it is uncontroverted that the allegations contained in SOF 114 are contained in Exhibit 16 resume of Ms. Mestad.

The Interviews

115. The interviews were conducted on March 15, 2019. Ex. 37.

**RESPONSE:** Uncontroverted.

116. After completing the interviews, the panel had a debrief session. Ex. 17, Bloomberg depo. 125:21-126:2; Ex. 25, Brown depo. 22:25-23:3.

**RESPONSE:** Uncontroverted.

117. The interview panelists generally recall that Keith Clark, Rachel Mestad, and Megan Milner were the top three candidates. Ex. 18, Sullivan depo. 216:4-22; Ex. 20, Dougan depo. 53:17-55:11, 74:6-16, 77:19-22; Ex. 17, Bloomberg depo. 129:11-131:10, 137:5-138:5, 180:4-25, 182:16-25; Ex. 25, Brown depo. 22:24-25:2, 40:10-22.

**RESPONSE:** Controverted. Robert Sullivan testified that he had all the panel members write their top three candidates on the white board and if a candidate did not get someone's top spot, that candidate was erased from the board and not discussed. Exhibit G, Robert Sullivan Deposition at 35:10-37:9, 37:24-38:6. This means that a candidate

ranked in the second position, even by all the panelists, would be deleted (erased) and not considered. *Id.* That candidate ranked second by all would be removed from the conversation even though some panelists ranked them above other candidates still in consideration. *Id.* Therefore, to state that Keith Clark, Rachel Mestad, and Megan Milner were the top three candidates is misleading at best. *Id.* These three candidates were the only three discussed even though Plaintiff was listed as at least one of the panelist's top three candidates. *See* SOF 118 (citing to Defendants Exhibits: Ex. 18, Sullivan depo. 217:3-8; Ex. 20, Dougan depo. 53:17-55:11; Ex. 25, Brown depo. 23:14-25:14, 37:7-22, 40:10-22; Ex. 17, Bloomberg depo. 133:1-16). Further, Mr. Sullivan erased the white board with the rankings and deleted the photo he took of the white board. Exhibit G, Robert Sullivan Deposition at 67:12-22; Defendant's Exhibit 19 at ¶ 14. Moreover, this SOF is controverted to the extent that Defendant attempts to imply that Robert Sullivan had not already predetermined he was going to select Keith Clark for this position prior to conducting interviews. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that. Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146. Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13. Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark. Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis

added).   Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

118.   The only panel member who may have had Plaintiff in her top three is Shelly Williams. Ex. 18, Sullivan depo. 217:3-8; Ex. 20, Dougan depo. 53:17-55:11; Ex. 25, Brown depo. 23:14-25:14, 37:7-22, 40:10-22; Ex. 17, Bloomberg depo. 133:1-16.

> **RESPONSE:** Uncontroverted that Shelly Williams had Plaintiff is her top three, however controverted to the extent that Plaintiff was only in the Ms. Williams' top three.  The evidence cited does not support this proposition.  Each individual listed testified they did not have Plaintiff in their personal top three and that Ms. Williams did. Exhibit G, Robert Sullivan Deposition at 217:3-11; Exhibit J, Susan Dougan Deposition at 53:17-55:11; 86:9-21; Exhibit I, Sharon Brown Deposition at 37:23-38:11, 40:1-9.  However, none of the individuals could recall who Ted Jester had in his top three.  *Id.*

119.   Plaintiff reported to Sharon Brown for 12 years. According to Plaintiff, the only person who may have had more familiarity with her performance than Ms. Brown was Tony Booker.[13] Ex. 1, Pltf's depo. 172:21-173:4

> **RESPONSE:** Uncontroverted that Sharon Brown was Plaintiff's supervisor and that structurally she "reported to" Ms. Brown in the organization chart, however controverted as incomplete and therefore misleading as Plaintiff had been supervising staff longer than Ms. Brown and their relationship was more like peers than Ms. Brown being "over"

---

[13] Mr. Booker was the Director of the ARC for many years. Ex. 19, Sullivan Decl. ¶ 3.

Plaintiff.  Ms. Brown relied on Plaintiff to handle the ISP office, including operations, as Ms. Brown spent very little time at the location in Lenexa and Plaintiff was the most experienced in the office.  Ms. Brown relied on Plaintiff to make decisions for that office. Exhibit K, Plaintiff's Declaration at ¶5.

120.    Plaintiff had a very trusting relationship with Ms. Brown. Ex. 1, Pltf's depo. 138:9-17; Ex. 25, Brown depo. 5:24-6:9.

**RESPONSE:** Uncontroverted.

121.    In addition, Ms. Brown had actually held the Director of Field Services position for 12 years. Ex. 25, Brown depo. 5:24-6:1.

**RESPONSE:** Uncontroverted.

122.    In Ms. Brown's view, Mr. Clark and Ms. Milner were clearly the top candidates, based on their experiences at the state level and in local jurisdictions. Ex. 25, Brown depo. 22:25-24:8.

**RESPONSE:** Uncontroverted that Ms. Brown testified as such, however irrelevant and controverted to the extent that Defendant attempts to imply that other candidates were actually considered for the position and that Keith Clark was not already predetermined for the position. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF

146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.   Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.   Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).   Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".   Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).


123.    Ms. Brown remembers discussing which of those two candidates was a better fit, meaning they looked at the maturity, the experience, understanding the system, understanding the numbers, understanding both the adult and the juvenile world, ability to interact with staff, open to feedback, and the totality of how they will do on the leaderships team and overseeing the division. Ex. 25, Brown depo. 23:14-24.

**RESPONSE:** Uncontroverted that Ms. Brown testified as such, however irrelevant and controverted to the extent that Defendant attempts to imply that other candidates were actually considered for the position and that Keith Clark was not already predetermined for the position.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF

146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.   Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.   Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).   Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".   Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).   Importantly, Ms. Brown also testified that she thought those two candidates "gained more of the attention" and they were "to [her] the top candidates", not that they were the only candidates that were discussed or qualified as Defendant attempts to imply.   Exhibit I, Sharon Brown Deposition at 23:4-13.

124.    Mr. Clark had an advantage because he was an internal candidate. He had worked for the department for a few years as a project manager, so he understood the work they were doing, the numbers, and he knew the staff. He also had lots of experience on the state level because he had been a director in a smaller jurisdiction. He was also a good grant writer. Ex. 25, Brown depo. 24:9-25:2.

**RESPONSE:** Uncontroverted that Ms. Brown testified as such, however irrelevant and controverted to the extent that Defendant attempts to imply that other candidates were actually considered for the position and that Keith Clark was not already predetermined

for the position. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.   Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.   Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews.   Exhibit A, Plaintiff's Deposition at 188:18-190:13.   Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.   Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).   Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".   Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).   Regarding Mr. Clark's previous experience, he shared that the role he held as the Director of Community Corrections for the Fourth Judicial District was actually more similar to the Project Manager position (later BI Analyst) he took with Johnson County in 2016.   Exhibit M, Clark Deposition at 29:13-30:25.   In fact, he testified that it was not a promotion and he would describe it as a lateral move.   *Id.* Moreover, controverted to the extent Defendant attempts to imply that Plaintiff did not also have the advantage of being an internal candidate, understanding the work that was being done, and knowing the staff.   Plaintiff's knowledge of the Corrections department was vast.   The DFS position was over Adult ISP, Juvenile Field Services, Probation Intake, Bond Assessment, and House Arrest.

Plaintiff worked in House Arrest for over 4 years prior to joining Adult ISP, which she had been in for over 20 years at the time of interviewing for the position. She supervised the staff that worked in Probation Intake and Bond Assessment. In fact, Plaintiff was involved in building the Probation Intake program from the beginning, which included attending meetings with judges, attorneys, courts services, and others in corrections, to make sure to meet the needs of all involved. In her position as a Senior Case Manager, Plaintiff built relationships and had a solid rapport with multiple stakeholders, including judges, ADAs, defense attorneys, Court Services (probation), Adult Residential services, and juvenile services, which was essential for the DFS position. Plaintiff collaborated with these stakeholders on multiple occasions to create mutually beneficial solutions to issue that arose and implement them in the most efficient way.    Exhibit K, Plaintiff's Declaration at ¶8. Plaintiff was highly educated on the concepts of qualitative and quantitative research methods and understood the importance of the differences for interpreting data within the department. This was something she brought up as a concern multiple times to Susan Dougan that the LSIR dashboard that Mr. Clark was creating with the data collect was attempting quantify something that was qualitative measure, how good staff was at conducting the LSIR. These measures are important for the Corrections department and needed to be fixed. *Id.* Further, controverted to the extent defendant attempt to imply that granting writing experience or even solo grant writing was a requirement of the DFS position. *See* Defendant's Exhibit 36 – DFS Job Posting. Moreover, Plaintiff did have grant writing experience with Tom Dugan. Exhibit A, Plaintiff's Deposition at 169:14-24.

125.     Ms. Brown had worked with Ms. Milner extensively on the juvenile side and really appreciated her maturity. Ms. Milner did not have the experience on the adult side, but Ms. Brown felt she could do the job because she had watched Ms. Milner on the state level. Ex. 25, Brown depo. 25:3-14.

> **RESPONSE:**  Uncontroverted that Ms. Brown testified as such, however irrelevant and
>
> controverted to the extent that Defendant attempts to imply that other candidates were
>
> actually considered for the position and that Keith Clark was not already predetermined
>
> for the position. Ms. Brown told Plaintiff that it was "already a done deal" on the day of
>
> the interview and she wished she had not missed Beth Daily's retirement party because of
>
> the interviews and was upset about that.   Exhibit A, Plaintiff's Deposition at 188:18-
>
> 190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF
>
> 146.   Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up
>
> that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's
>
> Deposition at 188:18-190:13.    Further, Mr. Sullivan stated that "I can tell you
>
> unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a
>
> favorite *before* going into the interview process", which was Mr. Clark.   Exhibit G,
>
> Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).   Moreover,
>
> Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of
>
> discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an
>
> internal candidate better than [Mr. Clark]".   Exhibit E, Interview Notes of Robert
>
> Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

126.     In Ms. Brown's experience, the juvenile system was more complicated because

there are more moving parts. Ex. 25, Brown depo. 25:15-26:8.

>**RESPONSE:** Controverted as incomplete and therefore misleading as Defendant attempts to imply that the juvenile system was facially more complex or complicated than the adult system.  Ms. Brown testified that from "[her] perspective" the juvenile side was more complicated because "[she] was very well versed on what happens on the adult side" and she had way "more experience" with the adult side.  She testified that it was just "dealing with just a different system."  Exhibit I, Sharon Brown Deposition at 25:15-26:8.  Further Ms. Brown testified that she did not think that the person being hired for the DFS position needed to have experience in both the adult and juvenile systems and that she did not herself coming into the position.  Exhibit I, Sharon Brown Deposition at 41:20-24.

127.    Ms. Brown did not believe Plaintiff was the best fit for the position based on an analysis of who could navigate both the adult and juvenile systems, who had the most administrative experience, and who knew how to do the work not only on a local level, but on a state level. Ex. 25, Brown depo. 40:10-22.

>**RESPONSE:**  Uncontroverted that Ms. Brown testified as such, however irrelevant and controverted to the extent that Defendant attempts to imply that other candidates were actually considered for the position and that Keith Clark was not already predetermined for the position. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF

146.   Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.   Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.   Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).   Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".   Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102). Further this is controverted to the extent Defendant attempts to imply that Ms. Brown expressed this opinion to the panel or believed generally that Plaintiff was not qualified for the position of Director of Field Services, as Plaintiff met all the qualifications and was a top candidate for some of the panelists during the interview process.   Exhibit I, Sharon Brown Deposition at 47:21-48:1.

128.   In Ms. Brown's view, Mr. Clark and Ms. Milner had the best experience in those areas. Ex. 25, Brown depo. 40:10-22.

**RESPONSE:** Uncontroverted that Ms. Brown testified as such, however irrelevant and controverted to the extent that Defendant attempts to imply that other candidates were actually considered for the position and that Keith Clark was not already predetermined for the position. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of

the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.   Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".   Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).   Further this is controverted to the extent Defendant attempts to imply that Ms. Brown expressed this opinion to the panel or believed generally that Plaintiff was not qualified for the position of Director of Field Services, as Plaintiff met all the qualifications and was a top candidate for some of the panelists during the interview process.  Exhibit I, Sharon Brown Deposition at 47:21-48:1.

129.    Ms. Brown believed Plaintiff could have the maturity necessary for the job with growth, but it takes patience to move the needle and bring people along, and Ms. Brown observed that Plaintiff sometimes lacked patience. Ex. 25, Brown depo. 41:25-43:20.[14]

---

[14] Ms. Brown had discussions with Plaintiff about being more patient and learning how to tactfully bring people along because Plaintiff was not always willing to do that. Ex. 25, Brown depo. 43:24-45:7.

**RESPONSE:** Uncontroverted that Ms. Brown believed that Plaintiff had the maturity necessary for the job, and that Ms. Brown testified that "Plaintiff sometimes lacked patience", however controverted as incomplete and therefore misleading to the extent that Defendant attempts to imply this was an issue with only Plaintiff.  Ms. Brown testified that "it wasn't just Shannon" when it came to "talking about people being impatient" or not "using tactful language".  Ms. Brown addressed these issues with the groups of supervisors she was over both as a group and individually.  Moreover, she even had to be reminded about patience and tactful language from her own "boss".  Exhibit I, Sharon Brown Deposition at 45:8-46:1.  Further, Footnote 11 is controverted as Plaintiff contends that her and Ms. Brown never had conversations about patience or Plaintiff lacking patience specifically, nor did she discuss with Plaintiff the use of "tact."  Exhibit K, Plaintiff's Declaration at ¶22.  Moreover, the mention of patience does not come up in any of Plaintiff's PPDs or reviews.  *See* Exhibit Z, Plaintiff's Employee Appraisals.  Ms. Brown and Plaintiff's relationship was more like peers than Ms. Brown being "over" Plaintiff.  Ms. Brown relied on Plaintiff to handle the ISP office, including operations, as Ms. Brown spent very little time at the location in Lenexa and Plaintiff was the most experienced in the office.  Ms. Brown relied on Plaintiff to make decisions for that office.  Exhibit K, Plaintiff's Declaration at ¶5.

130.    Mr. Clark was Mr. Sullivan's top pick. For Mr. Sullivan, it was an easy decision. In his opinion, none of the other candidates came close. Ex. 18, Sullivan depo. 219:5-25.

**RESPONSE:** Uncontroverted that Mr. Clark was Mr. Sullivan's top pick, and he did not consider anyone else, however controverted to the extent Defendant attempts to imply that the decision had not already been predetermined by Mr. Sullivan to hire Mr. Clark and that he passed over more qualified female candidates, including Plaintiff, Meagan Milner, and Rachel Mestad.  Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5.   Further, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better that [Mr. Clark]". Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

131.   Mr. Sullivan knew that Mr. Clark had been a director in multiple jurisdictions, had years of experience as a community corrections director, and was very aware of Kansas law and KDOC policies. Mr. Sullivan also knew that Mr. Clark had years of experience writing strategic comprehensive plans required by the KDOC, fully understood the method of allocation the KDOC requires, and was used to working with diverse funding. Ex. 18, Sullivan depo. 219:5-25.

**RESPONSE:**  Uncontroverted that Mr. Sullivan testified as such, however controverted to the extent that Defendant attempts to imply that this was the basis of Robert Sullivan's pre-determined decision to hire Mr. Clark over Plaintiff and that Plaintiff's sex, gender

presentation, and use of FMLA were not determining factors in this decision.  It was predetermined by Mr. Sullivan to hire Mr. Clark and that he passed over more qualified female candidates, including Plaintiff, Meagan Milner, and Rachel Mestad.  Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5.  Further, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better that [Mr. Clark]".  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

132.    Mr. Sullivan was also aware that Mr. Clark understood the financial guidelines for the various pots of money in a way that would help position them for audits. Ex. 18, Sullivan depo. 220:1-12.

**RESPONSE:**  Uncontroverted that Mr. Sullivan testified as such, however controverted to the extent that Defendant attempts to imply that this was the basis of Robert Sullivan's pre-determined decision to hire Mr. Clark over Plaintiff and that Plaintiff's sex, gender presentation, and use of FMLA were not determining factors in this decision.  It was predetermined by Mr. Sullivan to hire Mr. Clark and that he passed over more qualified female candidates, including Plaintiff, Meagan Milner, and Rachel Mestad.  Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr.

Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5.  Further, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better that [Mr. Clark]".  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

133.    Ms. Bloomberg remembers Mr. Clark standing out as a top candidate. He had great experience and good answers. Ex. 17, Bloomberg depo. 137:5-138:5.

**RESPONSE:** Uncontroverted that Ms. Bloomberg testified as such, however irrelevant and controverted to the extent that Defendant attempts to imply that other candidates beside Keith Clark were actually considered for the position and that Keith Clark was not already predetermined for the position.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.  Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".

Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

134.    Ms. Dougan remembers that Mr. Clark had significant experience and gave many good examples. Ex. 20, Dougan depo. 77:19-22. She recalls a consensus to hire Mr. Clark. Ex. 20, Dougan depo. 55:17-56:9, 87:3-12.

> **RESPONSE:** Uncontroverted that Ms. Dougan testified that she remembered Mr. Clark having significant experience and gave many good examples, however controverted that there was a consensus to hire Mr. Clark.  There was not a consensus among the interview panel for hiring Mr. Clark for the DFS position, and Mr. Sullivan stated that there was a "split decision between Keith and Rachel" and that he "was the tie breaker for the decision".   Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).  The group did not make a decision to hire Mr. Clark on March 15th, however Mr. Sullivan had already made the decision he was going to hire Mr. Calrk prior to the interviews – "it was a done deal."  Exhibit I, Sharon Brown Deposition at 55:24-56:8; Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2.   Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.

135.    Ms. Brown wanted Ms. Milner for the position and was disappointed Ms. Milner did not get the position, but she understood why Mr. Clark got it. He had the most experience, and he was an internal candidate. Ex. 25, Brown depo. 56:9-21.

**RESPONSE:**  Uncontroverted that Ms. Brown testified as such, however irrelevant and controverted to the extent that Defendant attempts to imply that other candidates were actually considered for the position and that Keith Clark was not already predetermined for the position.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.  Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).  Moreover, controverted to the extent Defendant attempts to imply that Plaintiff did not also have the advantage of being an internal candidate, understanding the work that was being done, and knowing the staff.  Plaintiff's knowledge of the Corrections department was vast.  The DFS position was over Adult ISP, Juvenile Field Services, Probation

Intake, Bond Assessment, and House Arrest.  Plaintiff worked in House Arrest for over 4 years prior to joining Adult ISP, which she had been in for over 20 years at the time of interviewing for the position.  She supervised the staff that worked in Probation Intake and Bond Assessment.  In fact, Plaintiff was involved in building the Probation Intake program from the beginning, which included attending meetings with judges, attorneys, courts services, and others in corrections, to make sure to meet the needs of all involved. In her position as a Senior Case Manager, Plaintiff built relationships and had a solid rapport with multiple stakeholders, including judges, ADAs, defense attorneys, Court Services (probation), Adult Residential services, and juvenile services, which was essential for the DFS position.  Plaintiff collaborated with these stakeholders on multiple occasions to create mutually beneficial solutions to issue that arose and implement them in the most efficient way.    Exhibit K, Plaintiff's Declaration at ¶8. Plaintiff was highly educated on the concepts of qualitative and quantitative research methods and understood the importance of the differences for interpreting data within the department.  This was something she brought up as a concern multiple times to Susan Dougan that the LSIR dashboard that Mr. Clark was creating with the data collect was attempting quantify something that was qualitative measure, how good staff was at conducting the LSIR. These measures are important for the Corrections department and needed to be fixed.  *Id.* Further controverted to the extent Defendant attempts to imply that Ms. Brown expressed this opinion to the panel or believed generally that Plaintiff was not qualified for the position of Director of Field Services, as Plaintiff met all the qualifications and was a top candidate for some of the panelists during the interview process.  Exhibit I, Sharon Brown Deposition at 47:21-48:1.

<u>Meet and Greets</u>

136.    On the same day the candidates interviewed with the hiring panel, they also met with members of Field Services for "meet and greets." This process allowed Field Services employees to meet the candidates and provide feedback on them. Ex. 25, Bloomberg depo. 125:1-126:19.

> **RESPONSE:** Uncontroverted, but incomplete and therefore misleading.  Not all the candidates participated in the "meet and greets" and not all of the employees met with the same candidates or filled out forms with information related to each candidate interviewed.  *See* Defendant's Exhibit 45, Meet and Greet Feedback Forms.  Further, the feedback forms were not provided to the hiring panel prior to the hiring panels' discussion or hiring decision being made by Mr. Sullivan.   Exhibit I, Sharon Brown Deposition at 26:9-24, 28:12-29:4.

137.    Plaintiff scored highly on some of those forms and poorly on others. The same is true of Keith Clark. Ex. 45, Meet and Greet Feedback Forms.

> **RESPONSE:**  Uncontroverted, but immaterial and irrelevant as the Meet and Greet Feedback Forms were not provided to the hiring panel prior to the hiring panels' discussion or hiring decision being made by Mr. Sullivan.   Exhibit I, Sharon Brown Deposition at 26:9-24, 28:12-29:4.

138.    One anonymous ISO indicated that Plaintiff favors certain ISOs over others,

constantly made rude comments about staff, such as calling them "jackwads." Ex. 45 at JoCo
4195.

      **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by
admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this
proposition is an anonymous ISO response on a Feedback Form and cannot be cited for
the truth of the matter asserted.  *Id.*  To the extent a response is required, uncontroverted
that Feedback Form reflects as such, however, controverted as immaterial and irrelevant
as the Feedback Forms were not provided to the hiring panel prior to the hiring panels'
discussion or hiring decision being made by Mr. Sullivan.   Exhibit I, Sharon Brown
Deposition at 26:9-24, 28:12-29:4.  Further, Plaintiff denies making rude comments about
staff or calling staff "jackwads."  Exhibit K, Plaintiff's Declaration at ¶ 23.


139.    Another employee indicated Plaintiff had been reluctant to change, shows
favoritism toward staff and is degrading to staff who does not share her beliefs. Ex. 45 at JoCo
4197.

      **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by
admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this
proposition is an anonymous ISO response on a Feedback Form and cannot be cited for
the truth of the matter asserted.  *Id.*  To the extent a response is required, uncontroverted
that Feedback Form reflects as such, however, controverted as immaterial and irrelevant
as the Feedback Forms were not provided to the hiring panel prior to the hiring panels'
discussion or hiring decision being made by Mr. Sullivan.   Exhibit I, Sharon Brown
Deposition at 26:9-24, 28:12-29:4.  Further, Plaintiff denies being reluctant to change or

being degrading to staff who does not share her beliefs.  Exhibit K, Plaintiff's Declaration at ¶ 24.

140.    Another employee indicated that Plaintiff says the right thing but does not practice it. She has favorites who are not held accountable. Ex. 45 at JoCo 4199.

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition is an anonymous response on a Feedback Form and cannot be cited for the truth of the matter asserted.  *Id.*  To the extent a response is required, uncontroverted that Feedback Form reflects as such, however, controverted as immaterial and irrelevant as the Feedback Forms were not provided to the hiring panel prior to the hiring panels' discussion or hiring decision being made by Mr. Sullivan.   Exhibit I, Sharon Brown Deposition at 26:9-24, 28:12-29:4.

141.    Another employee noted that Plaintiff has an exceptional grasp on relationships with other agencies and is a global thinker but has historically been reluctant to change. Ex. 45 at JoCo 4203.

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition is an anonymous ISO response on a Feedback Form and cannot be cited for the truth of the matter asserted.  *Id.*  To the extent a response is required, uncontroverted that Feedback Form reflects as such, however, controverted as immaterial and irrelevant

as the Feedback Forms were not provided to the hiring panel prior to the hiring panels' discussion or hiring decision being made by Mr. Sullivan.   Exhibit I, Sharon Brown Deposition at 26:9-24, 28:12-29:4.   Further, Plaintiff denies being reluctant to change. Exhibit K, Plaintiff's Declaration at ¶ 24.

Timing of the Decision

142.   Going into the interviews, Mr. Sullivan believed Mr. Clark would be the best candidate, and Mr. Clark's interview solidified that for him. Ex. 18, Sullivan depo. 220:13-19.

**RESPONSE:** Controverted as Mr. Sullivan already made the decision he was going to hire Mr. Clark prior to the interviews.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.   Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.   Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.  Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

143.    Mr. Sullivan does not recall when he made the final decision, but in his mind, Mr. Clark was the clear front runner after the interviews. Ex. 18, Sullivan depo. 220:20-222:9.

**RESPONSE:**  Controverted as Mr. Sullivan already made the decision he was going to hire Mr. Clark prior to the interviews.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.   Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.   Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.  Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.   Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).   Further, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]".  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

144.    On March 23, 2019, Ms. Brown sent an email to Mr. Sullivan regarding the meet and greet feedback forms. At the end of the email, she asked if Mr. Sullivan had decided who he will offer the Field Services Director position to yet. Ex. 45 (Depo. Ex. 35).

**RESPONSE:** Uncontroverted that Ms. Brown sent an email to Mr. Sullivan with the meet and greet feedback forms, which were received post-interviews, and asking if Mr. Sullivan had decided who he will offer the Field Services Director position to, however controverted to the extent that Defendant attempts to imply that Mr. Sullivan had not already made the decision he was going to hire Mr. Clark prior to the interviews.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13. Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]". Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

145.    As of that day, Ms. Brown did not know who Mr. Sullivan had chosen. Ex. 25, Brown depo. 30:24-31:3; *See also* Ex. 17, Bloomberg depo. 126:3-19 (noting Mr. Sullivan did

not indicate what his decision was on the day of the interviews).[15]

> **RESPONSE:** Controverted.  Mr. Sullivan had already made up his mind even prior to the interviews regardless of whether he told Ms. Bloomberg or Ms. Brown that day.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13. Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]". Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

146.    After the decision was made, Plaintiff asked Ms. Brown how Plaintiff performed in the interview. Ms. Brown told Plaintiff she did excellent. Ms. Brown also told Plaintiff she (Ms. Brown) was upset that she missed a retirement party for a colleague to participate in the interviews for the position when it was already a done deal. Ex. 1, Pltf's depo. 188:18-189:12,

---

[15] Susan Dougan initially testified she remembered a decision being made on the evening after the interviews, but later admitted she really does not recall. Ex. 20, Dougan depo. 51:20-53:3.

200:12-201:2.

**RESPONSE:** Uncontroverted.

147.    Plaintiff understood Ms. Brown to be saying Mr. Sullivan made up his mind about Mr. Clark before the interviews, but Plaintiff does not recall if Ms. Brown stated that. Ex. 1, Pltf's depo. 189:12-190:13.

**RESPONSE:** Uncontroverted.

148.    Ms. Brown did not know who Mr. Sullivan was going to select until sometime after she sent her email on March 23, 2019. Ex. 25, Brown depo. 30:24-31:3; Ex. 45.

**RESPONSE: Controverted.** Mr. Sullivan already made the decision he was going to hire Mr. Clark prior to the interviews.  Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.  Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and

that he "didn't have an internal candidate better than [Mr. Clark]".  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

Basis of Plaintiff's Claim

149.    Plaintiff believes she was more qualified for the position than Mr. Clark because, in her opinion, she had a unique perspective regarding the way the various aspects of Field Services run together. She also believes she had the people skills to be able to explain issues to stakeholders, and she believes she had a high level of trust with the supervisors in Field Services. Ex. 1, Pltf's depo. 170:20-171:24.

RESPONSE:  Uncontroverted, however incomplete and therefore misleading.  Plaintiff's knowledge of the Corrections department was vast.  The DFS position was over Adult ISP, Juvenile Field Services, Probation Intake, Bond Assessment, and House Arrest. Plaintiff worked in House Arrest for over 4 years prior to joining Adult ISP, which she had been in for over 20 years at the time of interviewing for the position.  She supervised the staff that worked in Probation Intake and Bond Assessment.  In fact, Plaintiff was involved in building the Probation Intake program from the beginning, which included attending meetings with judges, attorneys, courts services, and others in corrections, to make sure to meet the needs of all involved.  In her position as a Senior Case Manager, Plaintiff built relationships and had a solid rapport with multiple stakeholders, including judges, ADAs, defense attorneys, Court Services (probation), Adult Residential services, and juvenile services, which was essential for the DFS position.  Plaintiff collaborated with these stakeholders on multiple occasions to create mutually beneficial solutions to issue that arose and implement them in the most efficient way.    Exhibit K, Plaintiff's

Declaration at ¶8. Plaintiff was highly educated on the concepts of qualitative and quantitative research methods and understood the importance of the differences for interpreting data within the department.  This was something she brought up as a concern multiple times to Susan Dougan that the LSIR dashboard that Mr. Clark was creating with the data collect was attempting quantify something that was qualitative measure, how good staff was at conducting the LSIR.  These measures are important for the Corrections department and needed to be fixed.  Exhibit K, Plaintiff's Declaration at ¶8. Mr. Clark was previously the director of an extremely small jurisdiction compared to Johnson County previously and he compared the duties of that position to those of the Project Manager (BI Analyst) without the supervisory responsibility.  Exhibit M, Clark Deposition at 28:10-15, 29:13-30:25, 34:18-35:1.  In fact, he testified that it was not a promotion, and he would describe it as a lateral move.  *Id.*  Mr. Clark only supervised a small staff in his previous role.  *Id.*  He also did not have the experience in house arrest, probation intake, or bond assessment that Plaintiff had and certainly did not have the close relationship with stakeholders that Plaintiff had.  Exhibit K, Plaintiff's Declaration at ¶9.

150.    Plaintiff also believes she was more qualified than all of the other candidates but admits she does not know all of them and is not familiar with their qualifications. Ex. 1, Pltf's depo. 171:25-172:8.

**RESPONSE:**  Uncontroverted that Plaintiff believes she is more qualified than the other candidates, however controverted to the extent that Defendant implies that Plaintiff had no familiarity with the qualifications of some of the other candidates.   Plaintiff was

familiar with the qualifications of Rachel Mestad, Teresa Markos, and Megan Milner. Exhibit K, Plaintiff's Declaration at ¶25.

151.    Plaintiff believes the decision was discriminatory based on direction she says she was given regarding the way she dressed from Bev Marshbank, Doug Gertsema, Bill Keith, and Betsy Gillespie. Ex. 1, Pltf's depo. 173:5-175:6.

> **RESPONSE:** Controverted as incomplete and misleading.  Plaintiff testified that the County has does not want a masculine-presenting female to be a representative of the County at higher level and this has been indicated in the direction she has received from the County in the terms of the way she dresses throughout her tenure.  Exhibit A, Plaintiff's Deposition at 175:12-22.  Plaintiff testified that because the DFS position is a very front-facing, public-facing position that makes presentations to the Advisory Board, County Commissioners, and judges, the message conveyed to her by "every supervisor [she] ever had", meaning directors or past directors, was a "masculine female presentation" is "not the face" for the position.  *Id.* at 173:5-174:2.

152.    None of these individuals was involved in the hiring process, and none of them worked for the County in 2019. Indeed, Ms. Marshbank never worked for the County and left her post at the ARC in the 1990s. Mr. Keith left the County in the 1990s, Mr. Gertsema had left the County more than twelve years before this hiring decision, and Ms. Gillespie had retired more than a year earlier. Ex. 6, Hentschel Decl. ¶¶ 8, 9, 14, 16.

> **RESPONSE:** Uncontroverted that none of the individuals mentioned in SOF 151 were involved in the hiring process or worked for the County in 2019, however controverted as

incomplete and misleading.  Plaintiff testified that the County has does not want a masculine-presenting female to be a representative of the County at higher level and this has been indicated in the direction she has received from the County in the terms of the way she dresses throughout her tenure.  Exhibit A, Plaintiff's Deposition at 175:12-22. Plaintiff testified that because the DFS position is a very front-facing, public-facing position that makes presentations to the Advisory Board, County Commissioners, and judges, the message conveyed to her by "every supervisor [she] ever had", meaning directors or past directors, was a "masculine female presentation" is "not the face" for the position.  *Id.* at 173:5-174:2.

153.    Plaintiff does not believe anyone on the panel has any bias against females, older people, or gay people but believes Robert Sullivan and Susan Dougan have a bias against masculine-presenting females. Ex. 1, Pltf's depo. 163:18-164:9.

**RESPONSE:**  Controverted.  Plaintiff testified that she had "no direct knowledge" of people's biases against gay people, older people or females, *not* that she does not believe that anyone on the panel had these biases.  Exhibit A, Plaintiff's Deposition at 163:18-164:6.

154.    As to Mr. Sullivan, she bases her opinion on the fact that she has not seen Mr. Sullivan promote masculine-presenting females, and she saw in documents that Mr. Sullivan referred to male candidates being sharp or polished. Ex. 1, Pltf's depo. 164:7-166:7.

**RESPONSE:** Uncontroverted.

155.     Plaintiff is not aware of any other masculine-presenting females who have applied for positions where Mr. Sullivan has been on the hiring panel. Ex. 1, Pltf's depo. 199:12-16.

**RESPONSE:** Uncontroverted.

156.     As to Ms. Dougan, she bases her opinion on the fact that Ms. Dougan and the previous JDOC Director, Betsy Gillespie, gave a PowerPoint presentation on the dress code, and all of the women's clothing shown as examples were feminine-presenting. Ex. 1, Pltf's depo. 166:8-167:2.

**RESPONSE:**  Uncontroverted.

**BIA Position**

157.     After Mr. Clark took the Director of Field Services position, Plaintiff applied for the position Mr. Clark vacated, which would have been a lateral move for Plaintiff. Doc. 68, Pretrial Order; Ex. 18, Sullivan depo. 231:21-232:4.

> **RESPONSE:**  Uncontroverted that Plaintiff applied for the BI Analyst position vacated
> by Mr. Clark, however controverted that this was a pure lateral move for Plaintiff as this
> position had a higher salary grade (up to 36.04) than her Senior Case Manager position
> and had the opportunities for raises and promotion (including to Senior BI Analyst),
> which she did not have in her Senior Case Manager position.  Defendant's Exhibit 46, BI
> Analyst Job Description and Salary Grade; Exhibit K, Plaintiff's Declaration at ¶26.

158.     The position was originally known as a "Project Manager" position, but at some point, the County changed the title to Business Intelligence Analyst (BIA) to better match the

duties the individuals in those positions were actually performing. Ex. 28, Seidler depo. 15:16-16:10.

**RESPONSE:** Uncontroverted.

159.    At the time Plaintiff applied, there were only two BIA positions – the one previously occupied by Mr. Clark and one held by Brian Seidler. Ex. 28, Seidler depo. 34:8-24.

**RESPONSE:** Uncontroverted.

160.    The Project Manager role evolved over time. Ex. 28, Seidler depo. 15:16-16:10, 33:23-34:7. The job description for the position at the time Plaintiff applied for it can be found in Exhibit 46 (Depo. Ex. 111) and includes:

a. Acting as the domain expert understanding existing systems as well as the culture and business objectives.

b. Cleaning, reviewing, manipulating and conducting high level data analysis.

c. Designing and developing higher data solutions, reviewing and analyzing data from multiple internal and external sources, proactively analyzing data to answer key questions from stakeholders or out of self-initiated curiosity with an eye for what drives business performance.

d. Through higher level analysis of data identifies areas or ways to increase success of the department, tracks performance, optimizes operations, predicts the success of new programs, identifies trends and business issues, and compares data with other entities.

e. Creates advanced data visualization for presentations.

f. Writes and submits grant applications to pursue funding, and related duties.

Ex. 46.

**RESPONSE:** Uncontroverted that the job posting for the BI Analyst position is found at Defendant's Exhibit 46 and that it includes a job description within the posting that includes what Defendant has outlined here, however the job description cited here by Defendant is

incomplete and therefore misleading. The full job description can be found within Defendant's Exhibit 46 and importantly includes some of the following:

- "this position plays a collaborative role working within the Department and/or with external partners to develop business intelligence data to inform decision makers on emerging internal/external trends"

- "Works collaboratively with others internally across departments and externally in order to communicate the business's data requirements; assists in determining viable solutions for identified deliverables; . . . works with departments, management, and key stakeholders, in developing detailed business requirements, conducts gap analysis, creates functional designs, and guides business's leadership through complex analytical data processing."

161.    The posting sought to fill either a BIA role or a Senior BIA role. The job requirements for the BIA role were a Bachelor's degree in Computer Science, Information Technology, Economics, Information Systems, Statistics, Applied Math, Business Administration, or a department specific degree. Ex. 46.

**RESPONSE:** Uncontroverted.

162.    One year of Corrections knowledge was preferred. Ex. 46.

**RESPONSE:** Uncontroverted that one year of corrections knowledge was preferred for the BI Analyst role, however incomplete as the Senior BI Analyst position required three years of Corrections knowledge and three years of working successfully within a business analytics tool. *See* Defendant's Exhibit 46.

163.     Susan Dougan was the hiring manager for the position, but Ms. Dougan relied heavily on Mr. Sullivan in making this decision because Mr. Sullivan worked much more closely with the BIAs. Ex. 20, Dougan depo. 95:3-13; Ex. 28, Seidler depo. 40:16-19, 44:7-45:15; Ex. 18, Sullivan depo. 240:2-8.

> **RESPONSE:** Uncontroverted that Susan Dougan was listed as the hiring manager for the position, however, controverted as Mr. Sullivan was actually the person making the decision for this position.  Mr. Sullivan told Ms. Bloomberg, "Technically, this was [Ms. Dougan]'s decision who to interview, but I know I heavily influenced her decision." Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).  Mr. Sullivan sent an email to Susan Dougan and Brian Seidler about what he was looking for in a "great" candidate for the BI Analyst position (see SOF 164) and had already screened out applicants for the position.  *See* Defendant's Exhibit 47. Mr. Seidler believed that Mr. Sullivan was able to influence the decision on who was going to be hired for the BI Analyst position and Mr. Seidler took Mr. Sullivan's list of characteristics as what they should be looking for in an Analyst.  Exhibit F, Brian Seidler Deposition at 44:18-45:15.  Ms. Dougan told Ms. Bloomberg that "I was leaning more to what Robert wants, what are you looking for Robert?"  "I was relying heavily on Robert's list."  Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).  Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  Exhibit G, Robert Sullivan Deposition at 189:14-19.

164.     On May 24, 2019, Mr. Sullivan sent an email outlining the characteristics of what

he saw as a great candidate, as follows:

(1) loves working with data and can teach us a thing or two;

(2) is innovative;

(3) has people skills and is willing to shadow operations to gain domain experience;

(4) can present information in a manner that is understandable; and

(5) is humble (bonus points for humor).

Ex. 47 (Depo. Ex. 39).[16]

**RESPONSE:** Uncontroverted that Mr. Sullivan sent this email message on May 24, 2019, to Ms. Dougan and Mr. Seidler along with the resumes of nine (9) candidates for the position that he had selected to interview after Ms. Bloomberg reviewed and screened out one candidate and he screened out three candidates. *See* Defendant's Exhibit 47.

165.    BIAs give presentations on a regular basis. Ex. 52, Allen depo. 127:7-128:11; Ex. 21, Clark depo. 53:1-54:21; Ex. 20, Dougan depo. 119:16-120:6.

**RESPONSE:** Uncontroverted.

166.    They present to advisory boards and must be able to present data and explain it to people who know nothing about corrections. Ex. 20, Dougan depo. 119:16-120:7.

**RESPONSE:** Uncontroverted.

167.    They also present to other people, such as judges and District Attorneys. Ex. 20, Dougan depo. 152:17-153:16.

---

[16] Mr. Sullivan sent this email before Plaintiff applied. *See* SOF ¶¶ 188-189.

**RESPONSE:** Uncontroverted.


The Two Portfolios – Juvenile and Adult

168.    At the time Mr. Clark left the BIA/Project Manager role, he was handling the adult portfolio, and Brian Seidler was handling the juvenile portfolio. Ex. 21, Clark depo. 48:11-16.

> **RESPONSE:**  Uncontroverted that Mr. Clark worked primarily on the adult portfolio and Mr. Seidler worked primarily on the juvenile portfolio, however controverted to the extent Defendant attempts to imply that the positions had no overlap or were not performing similar duties.  Exhibit M, Keith Clark Deposition at 48:8-49:14.  The two BI Analysts would work together as needed and within each other's portfolios.  *Id.*  The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio.  *Id.*; Exhibit F, Brian Seidler Deposition at 34:24-35-15.


169.    Some of the duties are similar, but some are different. There were some portions of the juvenile portfolio Mr. Clark could have taken over instantly, but others would have presented a learning curve. Ex. 21, Clark depo. 48:11-50:4.

> **RESPONSE:** Uncontroverted, however incomplete as Mr. Clark agreed that the two BI Analyst positions were performing substantially the same work duties.  Exhibit M, Keith Clark Deposition at 49:8-14.


170.    In the weeks leading to posting the BIA position, Mr. Seidler decided he wanted

to take over the adult portfolio, so Ms. Dougan and Mr. Sullivan were looking for someone to handle the juvenile portfolio. Ex. 18, Sullivan depo. 241:12-24; Ex. 28, Seidler depo. 36:2-37:13.

> **RESPONSE:** Controverted.  During the interviews juvenile experience did not come up as something specific for the position.  Ms. Dougan could not remember and did not find any place in her interview notes where the panel inquired about juvenile experience, even though in the "back of [her] mind" she thought Ms. Allen had juvenile experience.  *Id.* at 111:21-25, 112:20-113:3.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.  Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).  Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience.  Exhibit F, Brian Seidler Deposition at 38:25-39:18.  The two BI Analysts would work together as needed and within each other's portfolios.  Exhibit M, Keith Clark Deposition at 48:8-49:14.  The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio.  *Id.*; Exhibit F, Brian Seidler Deposition at 34:24-35-15.  Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience.  Exhibit J, Susan Dougan Deposition at 155:9-21.  This included work with juveniles for one year.  Exhibit XX, Plaintiff's Deposition at 168:14-17.

171.    The juvenile portfolio has some fairly specific nuances that are different from the adult portfolio such that having juvenile experience would be beneficial to the person taking on

the juvenile portfolio. Ex. 28, Seidler depo. 38:6-39:6.

> **RESPONSE:**   Controverted.   Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.   Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).   Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience.   Exhibit F, Brian Seidler Deposition at 38:25-39:18. The two BI Analysts would work together as needed and within each other's portfolios. Exhibit M, Keith Clark Deposition at 48:8-49:14.   The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio.   *Id.*; Exhibit F, Brian Seidler Deposition at 34:24-35-15.   Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience.   Exhibit J, Susan Dougan Deposition at 155:9-21.   This included work with juveniles for one year.   Exhibit A, Plaintiff's Deposition at 168:14-17.

172.   In 2016, the Kansas legislature passed Senate Bill 367, which was one of the biggest paradigm shifts in juvenile justice since 1997, and there were many changes associated with the juvenile portfolio as a result. Ex. 18, Sullivan depo. 58:12-23.

> **RESPONSE:**   Uncontroverted, but irrelevant and immaterial as the changes implemented by Senate Bill 367 were upcoming under a three year roll out and none of the candidates for the BI Analyst role were familiar with them.   Exhibit G, Robert Sullivan Deposition at 188:4-17.   Mr. Sullivan acknowledged that both Ms. Allen and

Ms. King were "going to be new to that juvenile portfolio," and "so [he] had to make a decision" and he chose Ms. Allen. *Id.* at 189:14-19.   Either way, the person coming into the BI Analyst position was going to have to leave the new laws for the juvenile portfolio. *Id.* at 241:12-24.

173.    Conversely, the adult portfolio has not changed much in a number of years. Ex. 18, Sullivan depo. 58:24-59:8.

**RESPONSE:** Uncontroverted.

Data Visualization Software

174.    Originally, Project Managers used Excel because that was the only tool available. Ex. 28, Seidler depo. 23:15-19; Ex. 21, Clark depo. 37:16-38:24.

**RESPONSE:**  Uncontroverted that Project Managers only used Excel because that was the only tool available prior to Tableau, however controverted to the extent that Defendant attempts to imply the BI Analyst position does not still use Excel for their position as this is necessary for the databases and sometimes they have to revert to Excel formulas for the creation of dashboards.  Exhibit F, Brian Seidler Deposition at 90:16-92:2.

175.    Sometime before the title changed to BIA, they began using a data visualization tool called Tableau. Ex. 28, Seidler depo. 23:15-25; Ex. 21, Clark depo. 37:16-38:24.

**RESPONSE:** Uncontroverted.

176.    Tableau allows you to take a data source, manipulate the data to create charts and graphs to visualize the information in a way that is simple for people to understand. Ex. 28, Seidler depo. 25:6-17.

**RESPONSE:** Uncontroverted.

177.    Once they started using Tableau, the data still generally came over in Excel, but they no longer used Excel to do the data analysis. Ex. 28, Seidler depo. 25:18-26:12.

**RESPONSE:**  Controverted.  Sometimes the BI Analysts had to revert to Excel formulas for the creation of dashboards.  Exhibit F, Brian Seidler Deposition at 90:16-92:2.

178.    Mr. Seidler believes it was necessary for the person hired into the BIA position to have enough experience with Excel that they could clean the data in order to connect it to Tableau, but by the time they were filling this position, they used Tableau most of the time, so Excel formulas were not as important. Ex. 28, Seidler depo. 39:7-10, 90:16-91:20.

**RESPONSE:**  Uncontroverted, however, controverted to extent that Defendant attempts to imply that Mr. Seidler did not believe that Excel was necessary for the person hired for the position. Exhibit F, Brian Seidler Deposition at 39:7-10.  Mr. Seidler specifically asked the first question of his exercise for the purpose of determining whether the candidates "understood Excel formulas" and "could speak Excel" in the interpretation of data.  *Id.* at 91:21-93:18.  Ms. Allen did not even try on this exercise and just said she did not know.  *Id.*  This concerned Mr. Seidler because he thought based on her listed education and experience she would have had familiarity with Excel and a candidate for the position would have been able to perform between on that part of the exercise.  *Id.*

179.     When Mr. Sullivan became the Director of JDOC, he was able to negotiate for two Tableau creator licenses. Ex. 18, Sullivan depo. 153:3-155:7.

**RESPONSE:** Uncontroverted.

180.     Many employees within JDOC, including Plaintiff, had Tableau reader licenses, meaning they had the ability to view the dashboards created by others, but only the BIAs had creator licenses. Ex. 18, Sullivan depo. 153:7-154:18, 243:19-245:1.

**RESPONSE:**  Uncontroverted.

181.     In order to create dashboards through Tableau, a creator license is required. Ex. 18, Sullivan depo. 153:7-154:18.

**RESPONSE:**  Controverted.  Tableau offers a free version of its software that allows for the creation of dashboards.   Exhibit F, Brian Seidler Deposition at 115:16-23.

182.     Based on his experience as a Project Manager/BIA, Mr. Clark indicated that having end user experience with Tableau would be helpful in learning to create in a limited way. End users can see a dashboard and use filters, but being an end user would not help you to know how to create worksheets or format dashboards. An end user can see the way the dashboard looks, but that will not help much on the creation side. Ex. 21, Clark depo. 54:24-55:25.[17]

**RESPONSE:**  Plaintiff objects to footnote 16 as an improper hypothetical.  Further this SOF and footnote is controverted as having end user experience would be helpful to

---

[17] Mr. Seidler likened the benefit that being a Tableau end user would have in creating Tableau dashboards to the benefit a person might receive by using the Chipotle website in creating the website. Ex. 28, Seidler depo. 127:23-128:12.

make a dashboard that is easy to follow and simple to use and provides the information necessary for the person who is consuming the information.   Exhibit F, Brian Seidler Deposition at 128:23-129:7.

183.     Tableau offers a free version of its software, but any data you input onto the free version is publicly available. Ex. 28, Seidler depo. 115:16-23. Much of the data the County analyzes is confidential and should not be available to the public. Ex. 19, Sullivan Decl. ¶ 10.

**RESPONSE:**  Uncontroverted.

184.     Plaintiff obtained the free version of the Tableau software, but not until February 2021 (more than a year after this BIA position was filled). Ex. 58, Email correspondence.

**RESPONSE:** Uncontroverted.

185.     Before the BIA interviews, Plaintiff had experience creating data visualizations in a program called Google Data Studios. Ex. 1, Pltf's depo. 194:7-15.

**RESPONSE:**  Uncontroverted.

186.     According to Plaintiff, the program is similar to Tableau. Ex. 1, Pltf's depo. 29:21-30:6. Plaintiff also had experience cleaning data and developing reports and dashboards to convey data. She also had knowledge of the relational databases SQL and MySQL. Ex. 72.

**RESPONSE:**  Uncontroverted.

Selecting Candidates to Interview

187.    The posting for this position was open until May 29, 2019. Ex. 46.

**RESPONSE:**  Uncontroverted.


188.    On May 24, 2019 at 6:01 a.m., Mr. Sullivan sent an email to Ms. Dougan and Mr. Seidler indicating that Ms. Bloomberg had reviewed the original 13 applicants and screened out one. Mr. Sullivan screened three more. Mr. Sullivan asked Ms. Dougan to decide who she wanted to interview, indicating he was comfortable with any of the applicants whose applications he attached. Ex. 47 (Depo. Ex. 39).

**RESPONSE:**  Uncontroverted that the Exhibit 47 email states as such.


189.    Plaintiff submitted her application at 9:39 a.m. on May 24, 2019 (after Mr. Sullivan reviewed the original 13 applications). Ex. 48 at JoCo 6460, Applicant Tracking Information; Ex. 24, Bloomberg Decl. ¶ 13.

**RESPONSE:** Uncontroverted.


190.    At 10:15 a.m. on May 24, 2019, Ms. Dougan sent an email to Ms. Bloomberg indicating she had seen that Plaintiff had applied for the BIA position and asking if Plaintiff met the minimum requirements. Ex. 49 (Depo. Ex. 125).

**RESPONSE:**  Uncontroverted.


191.    Ms. Bloomberg responded that Plaintiff met the minimum requirements for the lower level position (meaning the BIA position, as opposed to the Senior BIA position) and that she had moved Plaintiff into "candidate status." Ex. 49.

**RESPONSE:** Uncontroverted that Exhibit 49 states as such, however controverted that Plaintiff only qualified for the lower level BI Analyst position and not the Senior BI Analyst position as well. Plaintiff had the requisite qualifications of three years of Corrections knowledge and three years' experience working successfully within a business analytics tool, including Excel and Google Data Studio, which qualified her for the Senior BI Analyst position based upon the posting in Defendant's Exhibit 46. Exhibit K, Plaintiff's Declaration at ¶27; Exhibit R, Plaintiff's Resume for the BI Analyst position (listing over 5 years of experience with data analysis including developing reports and dashboards to communicate findings.)

192.   Olivia Allen submitted her application on May 29, 2019. Ex. 50, Applicant Tracking Information; Ex. 24, Bloomberg Decl. ¶ 14.

**RESPONSE:** Uncontroverted.

193.   By the time the position closed, the County had received 25 applications for the BIA position. Ex. 24, Bloomberg Decl. ¶ 15.

**RESPONSE:** Uncontroverted.

194.   Ms. Dougan selected to interview Plaintiff and Ms. Allen,[18] along with six of the nine individuals Mr. Sullivan had included in his email and three others, for a total of 11. Ex. 20, Dougan depo. 102:24-103:6; Ex. 47; Ex. 51 (Depo. Ex. 126).

**RESPONSE:**   Uncontroverted that Ms. Dougan selected the Plaintiff and Ms. Allen to

---

[18] Olivia Allen's current name is Olivia Parks. Defendant refers to her as Olivia Allen throughout this brief because that was her name at the time of the interviews.

interview, otherwise controverted.  Mr. Sullivan told Ms. Bloomberg, "Technically, this was [Ms. Dougan]'s decision who to interview, but I know I heavily influenced her decision."  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).  Mr. Sullivan sent an email to Susan Dougan and Brian Seidler about what he was looking for in a "great" candidate for the BI Analyst position (see SOF 164) and had already screened out applicants for the position.  *See* Defendant's Exhibit 47.  Ms. Dougan told Ms. Bloomberg that "I was leaning more to what Robert wants, what are you looking for Robert?"  "I was relying heavily on Robert's list."  Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).

Olivia Allen

195.    Ms. Allen has both a Bachelor of Arts in Criminal Justice and Criminology and a Masters of Science in Criminal Justice and Criminology from UMKC. She graduated with her Masters in 2016. Ex. 53, Allen Resume.

**RESPONSE:** Uncontroverted, however it should be noted that Plaintiff had the same Masters of Sciences in Criminal Justice and Criminology degree from UMKC that Ms. Allen.  Exhibit R, Plaintiff's Resume for the BI Analyst position.

196.    Ms. Allen wrote her thesis on Teens in Transition, a program held at the ArtsTech in Kansas City, Missouri, where they were offering a summer arts program to youth that were identified as gang affiliated. Ex. 52, Allen depo. 56:22-58:3.

**RESPONSE:** Uncontroverted.

197.    This spanned throughout the time she was getting her masters. She read articles on how the criminal justice system works for youth, specifically disadvantaged black youth. She worked with them all summer, interviewed them, and observed them. Ex. 52, Allen depo. 56:22-58:3.

>    **RESPONSE:**   Uncontroverted in part, however, controverted that she "worked with them".  Ms. Allen testified that she was working with youth on a "much more research base" and she "didn't supervise juveniles."  Exhibit O, Olivia Allen Deposition at 56:22-58:24.

198.    Ms. Allen worked on the project with Dr. Andrew Fox and prepared it for a presentation. Dr. Fox did not attend the conference, so Ms. Allen spearheaded the presentation herself. Ex. 52, Allen depo. 71:10-23.

>    **RESPONSE:** Uncontroverted.

199.    Ms. Allen also worked as a research assistant during her schooling. Ex. 53.

>    **RESPONSE:** Uncontroverted.

200.    As a research assistant, Ms. Allen had helped with a Byrne grant and a KC No Violence Alliance grant. Most of her work on the grants was literature review, but Dr. Fox also had her scrub and clean all of the data for the evidence they were using to show the need for the grant. She started work on a third grant but then transitioned to working with another professor. For that grant, she was pulling census tract data. Ex. 52, Allen depo. 135:4-25.

>    **RESPONSE:**   Uncontroverted that Ms. Allen helped with a Byrne and KC No Violence

Alliance grant and that the work was just mostly the literature review and to "fluff up" some analysis and the conclusion, otherwise controverted to the extent Defendant attempts to imply Ms. Allen had completed grants on her own, and that she did work on three grants, as the she only did parts of grant work for professors, and transitioned of any work on the "third" grant before she got "real" into it and had only begun pulling some census tract data for it, which is not grant writing work.  Exhibit O, Olivia Allen Depo. at 135:4-25

201.    Ms. Allen wrote the entire literature review and conclusion for the Byrne grant. Ex. 52, Allen depo. 136:12-20. She also presented the portions of the grant she wrote. Ex. 52, Allen depo. 70:21-72:12.

> **RESPONSE:**  Controverted.  Ms. Allen assisted in writing and presenting these portions of the grant as she had only done "parts of work needed for grants written by professor", she "[h]as more experience gathering info for grants than she has actually writing them", and she mainly pulled data and did the literature reviews for the grants.  *See* Exhibit 55 at JoCo-King 1296, 1300, 1304.  Moreover, Ms. Allen had never completed a grant on her own, and only worked on two grants, not three, and the work was just mostly the literature review and to "fluff up" some analysis and the conclusion.  Exhibit O, Olivia Allen Depo. at 135:4-25; *see also* Responses to SOF 200, 246-247.

202.    Ms. Allen also completed a social network analysis, which is a way of mapping human relationships and interactions, to try to understand how close youth were to key gang members. Ex. 52, Allen depo. 61:15-19.

**RESPONSE:** Uncontroverted, however controverted to the extent that Defendant attempts to imply that this was not done in Ms. Allen's graduate program.


203.    Ms. Allen's work as a research assistant prepared her to work with youth data because she was well versed and able to talk about youth issues and present on those topics. Although most of her experience was on the Missouri side, she was confident her experience would allow her to flow into understanding the Kansas side of the juvenile system with time and experience. Ex. 52, Allen depo. 61:25-62:14.

**RESPONSE:** Uncontroverted that Ms. Allen testified as such, however controverted to the extent that Defendant attempts to imply that Ms. Allen was performing data analysis in this position or needed to know any "juvenile-specific policy." Ms. Allen would "sit behind a computer screen" and "pull records". Exhibit O, Olivia Allen's Deposition at 58:24-59:13. She was doing the basic work at the bottom of pulling and providing data to her director. *Id.* The director was doing the analysis. *Id.* She was just prepping everything so that it could be analyzed. *Id.* As Ms. Allen characterized it, "I was just so low on the totem pole that I was just entering the data and cleaning it." *Id.* Further, Ms. Allen supplied that she "didn't have to know a lot of [juvenile policy]" and she "didn't know what [the data] were being used for." *Id.* Further, this is controverted as irrelevant and misleading as this was not discussed during her interview. *Id.* at 63:24-65:15 (she believes she shared what she had done in school). Ms. Allen specifically stated that she had "quite the learning curve" coming into the position. Exhibit O, Olivia Allen Deposition at 30:15-31:6. Further, Ms. Allen testified before the position, she "wasn't aware with, really, what was going on with the Senate bills" and the jargon she was able

to pick up with specific to the bills that were just coming out.  Exhibit O, Olivia Allen Deposition at 63:2-24.

204.    Before coming to Johnson County, Ms. Allen also worked as a research clerk at the Jackson County Family court for approximately two years, where she consistently entered and scrubbed data related to juvenile side of family court. Ex. 52, Allen depo. 56:22-58:3, 60:11-19.

> **RESPONSE:** Uncontroverted that Ms. Allen worked as a research clerk at the Jackson County Family Court, however controverted to the extent that Defendant attempts to imply that this was data analysis experience.  Ms. Allen would "sit behind a computer screen" and "pull records".  Exhibit O, Olivia Allen's Deposition at 58:24-59:23.  She was doing the basic work of pulling and providing data to her director.  *Id.*  The director was doing the analysis.  *Id.*  She was just prepping everything so that it could be analyzed.  *Id.*  As she characterized it, "I was just so low on the totem pole that I was just entering the data and cleaning it."  *Id.*

205.    This work involved huge Excel spreadsheets with massive amounts of data. Often, another person would input the data, and Ms. Allen would clean it because she was able to see patterns and able to make corrections. Ex. 52, Allen depo. 59:24-60:19.

> **RESPONSE:**  Uncontroverted that Ms. Allen testified as such, however controverted to the extent that Defendant attempts to imply that Ms. Allen was performing data analysis

in this position or needed to know any "juvenile-specific policy." Ms. Allen would "sit behind a computer screen" and "pull records". Exhibit O, Olivia Allen's Deposition at 58:24-59:13. She was doing the basic work at the bottom of pulling and providing data to her director. *Id.* The director was doing the analysis. *Id.* She was just prepping everything so that it could be analyzed. *Id.* As Ms. Allen characterized it, "I was just so low on the totem pole that I was just entering the data and cleaning it." *Id.* Further, Ms. Allen supplied that she "didn't have to know a lot of [juvenile policy]" and she "didn't know what [the data] were being used for." *Id.* Further, this is controverted as irrelevant and misleading as this was not discussed during her interview. *Id.* at 63:24-65:15 (she believes she shared what she had done in school).

206.    In addition, she was an intern at the evening reporting center at Johnson County where she worked with adjudicated youth on cognitive thinking programs. Ex. 52, Allen depo. 56:22-58:3. She did that for about three months, ten hours per week. Ex. 52, Allen depo. 58:4-19.

**RESPONSE:** Uncontroverted, but incomplete and therefore misleading. Ms. Allen worked very few hours of the course of the summer: approximately 100. Exhibit O, Olivia Allen Depo., at 62:15-19. This was her only previous experience with juveniles in Kansas. *Id.*

207.    Ms. Allen began working for Johnson County in January 2016 as a Pretrial Officer in Court services. Ex. 52, Allen depo. 123:6-20

**RESPONSE:** Uncontroverted.

208.    In that role she supervised a caseload of more than 100 adults who were out on bond in Johnson County for criminal charges, met with them to assess compliance with their bond conditions, created Pretrial Supervision orders, non-compliance and status reports, and various motions, among other duties. Ex. 54, Allen Application.

**RESPONSE:** Uncontroverted.

209.    As a pretrial officer, Ms. Allen handled adult clients, but many of them were in the age range of 18-24. Ms. Allen knew the Senate bills were changing the way they did business on the juvenile side, and she was able to pick up on the jargon quickly because it was not very different from the jargon in Missouri. Ex. 52, Allen depo. 63:2-24.

**RESPONSE:** Controverted.  The referenced testimony speaks to Ms. Allen's experience of what she needed to learn when she started the position as BI Analyst in corrections. Ms. Allen specifically stated that she had "quite the learning curve" coming into the position.  Exhibit O, Olivia Allen Deposition at 30:15-31:6.  Further, Ms. Allen testified before the position, she "wasn't aware with, really, what was going on with the Senate bills" and the jargon she was able to pick up with specific to the bills that were just coming out.  Exhibit O, Olivia Allen Deposition at 63:2-24.

210.    During the time she was a pretrial officer, Ms. Allen also helped Dr. Alex Holsinger. Ex. 52, Allen depo. 72:21-74:23.

**RESPONSE:** Uncontroverted.

211.    Dr. Holsinger was a professor at UMKC, and he is known nationally in criminal justice circles. Ex. 28, Seidler depo. 74:24-75:20.

**RESPONSE:** Uncontroverted.

212.    Dr. Holsinger, a data scientist, had previously held the Criminal Justice Coordinator role at Johnson County, and his recommendation was significant to the interview panel. Ex. 17, Bloomberg depo. 156:5-12; Ex. 18, Sullivan depo. 241:25-242:16; Ex. 28, Seidler depo. 75:15-20, 89:16-90:6.

> **RESPONSE:**   Objection. The cited material is hearsay as to what Mr. Sullivan was told from Dr. Holsinger and cannot be presented in a form that would be admissible in evidence.  *See* FED. R. CIV. P. 56(c)(2).  None of the interview panelists had any personal knowledge of what Dr. Holsinger stated to Mr. Sullivan about Ms. Allen or if Dr. Holsinger even talked with him.  To the extent that a response is required, controverted that these citations support this SOF that Dr. Holsinger's "recommendation was significant to the interview panel."

213.    Dr. Holsinger's niche is community assessments and how those assessments affect the criminal justice system. Ms. Allen helped Dr. Holsinger with a project that analyzed how their program affected adults. Ex. 52, Allen depo. 72:21-74:23.

**RESPONSE:** Uncontroverted.

214.    Ms. Allen and Dr. Holsinger planned to present the results of their research at the National Association of Pretrial Services, but they did not end up presenting because Ms. Allen was inundated with her new role as a BIA. Ex. 52, Allen depo. 72:21-74:23.

**RESPONSE:**   Uncontroverted, however, irrelevant to whether discriminatory factors played a role in Mr. Sullivan's decision to hire Ms. Allen over Plaintiff.

215.    While working as a pretrial officer, Ms. Allen also worked with Tim Mulcahy on trying to understand pretrial data to support her supervisor in those efforts. Ex. 52, Allen depo. 68:10-69:1.

**RESPONSE:**  Uncontroverted.

216.    Mr. Mulcahy was the Director of JIMS, Justice Information Management System, Ex. 18, Sullivan Depo. 171:11-17; Ex. 52, Allen depo. 71:24-72:1.

**RESPONSE:** Uncontroverted.

217.    Ms. Allen was working with JIMS to create a report so they could analyze at the ins and outs of pretrial clients. At the time, the JIMS supervisor was very supportive of these

efforts, but that supervisor left, and the new supervisor was not supportive of it, so that project fell by the wayside. Ex. 52, Allen depo. 141:7-23.

**RESPONSE:** Uncontroverted.

218.    After that, Ms. Allen began work to revalidate the pretrial assessment tool and creating a report for that. Ex. 52, Allen depo. 141:7-23.

**RESPONSE:** Uncontroverted.

219.    Ms. Allen did all of this on her own. It was not related to her pretrial officer position, and no other pretrial officers did that kind of work. Ex. 52, Allen depo. 141:7-142:10.

**RESPONSE:** Uncontroverted.

220.    Ms. Allen had significant experience cleaning data in Excel from her work in Jackson County and also in connection with her work with Dr. Fox. Ms. Allen learned how to scrub data at the family court, but Dr. Fox kicked it up another level because she understood the rationale behind it. Ex. 52, Allen depo. 77:4-14.

**RESPONSE:** Uncontroverted that she testified to having this experience, however misleading and irrelevant as this was not discussed during the interview process.  Exhibit O, Olivia Allen's Deposition at 63:24-65:15 (she believes she shared what she had done in school).  Further, with the Jackson County position Ms. Allen would "sit behind a

computer screen" and "pull records". *Id.* at 58:24-59:13. at She was doing the basic work

at the bottom of pulling and providing data to her director. *Id.* The director was doing

the analysis. *Id.* She was just prepping everything so that it could be analyzed. *Id.* As

Ms. Allen characterized it, "I was just so low on the totem pole that I was just entering

the data and cleaning it." *Id.* Further, Ms. Allen supplied that she "didn't have to know a

lot of [juvenile policy]" and she "didn't know what [the data] were being used for." *Id.*

Further, this is controverted as irrelevant and misleading as this was not discussed during

her interview.

221.    Ms. Allen also had experience cleaning her own data, including arrest data for her

thesis and data for the social network analysis. Ex. 52, Allen depo. 77:15-19.

**RESPONSE:** Uncontroverted.

222.    Ms. Allen used Excel as the platform to get data ready for software analysis. She

did not use formulas in Excel because she did all her analysis in SPSS (Statistical Package for

the Social Sciences). Ex. 52, Allen depo. 79:5-21.

**RESPONSE:**  Uncontroverted, however controverted to extent that Defendant attempts

to imply that that Excel and Excel formula knowledge was not necessary for the person

hired for the position. Exhibit F, Brian Seidler Deposition at 39:7-10.  Mr. Seidler

specifically asked the first question of his exercise for the purpose of determining

whether the candidates "understood Excel formulas" and "could speak Excel" in the interpretation of data. *Id.* at 91:21-93:18. Ms. Allen did not even try on this exercise and just said she did not know. *Id.* This concerned Mr. Seidler because he thought based on her listed education and experience, she would have had familiarity with Excel and a candidate for the position would have been able to perform between on that part of the exercise. *Id.*

223.    When Ms. Allen worked with Mr. Mulcahy, he talked about Cognos, a data visualization program, so Ms. Allen took a one-day training on Cognos. Ex. 52, Allen depo. 68:10-69:1.

**RESPONSE:** Uncontroverted.

224.    Ms. Allen also saw tables created in Cognos because they were used to present pretrial data to judges, but she had not been involved on the creator side. Ex. 52, Allen depo. 69:2-11.

**RESPONSE:** Uncontroverted.

225.    At the time of the interviews, Ms. Allen had not used any other data analytics software besides Excel and SPSS. Ex. 52, Allen depo. 67:15-17.

**RESPONSE:** Uncontroverted.

226.    Ms. Allen was 26 years old at the time of the interview. Ex. 52, Allen depo. 117:17-20.

**RESPONSE:** Uncontroverted.

The Interviews

227.    The interviews took place on May 31, 2019. Ex. 1, Pltf's depo. 192:4-7. The interview panel included Ms. Dougan, Mr. Sullivan and Mr. Seidler. Ex. 20, Dougan depo. 97:15-19; Ex. 45.

**RESPONSE:** Uncontroverted.

228.    Ms. Allen knew Mr. Sullivan before her interview because she attended meetings where Mr. Sullivan presented pretrial data. Ms. Allen's supervisor had her go to most of those meetings to support him because of her statistical background. Ex. 52, Allen depo. 85:16-86:6; Ex. 19, Sullivan Decl. ¶ 11.

**RESPONSE:** Uncontroverted.

229.    Ms. Allen had also contacted Mr. Sullivan about revalidating the pretrial risk

assessment tool, and he referred her to Mr. Seidler. They had a meeting about that topic, which Ms. Allen believes Mr. Sullivan attended. Ex. 52, Allen depo. 86:7-23, 87:9-12; Ex. 19, Sullivan Decl. ¶ 11.

> **RESPONSE:** Uncontroverted.

230.    Mr. Sullivan had been working closely with Dr. Holsinger and Tim Mulcahy on pretrial risk assessment data. In that context, they both told Mr. Sullivan how impressed they were with Ms. Allen's work in that space. Ex. 19, Sullivan Decl. ¶ 12.

> **RESPONSE:** Objection. The cited material is hearsay as to what Mr. Sullivan was told from Tim Mulcahy and Dr. Holsinger and cannot be presented in a form that would be admissible in evidence. *See* FED. R. CIV. P. 56(c)(2)

231.    Before the interviews, Mr. Seidler understood that Ms. Allen was a pretrial services officer and worked with data at court services. Ex. 28, Seidler depo. 53:22-54:2. Mr. Seidler had also attended a Cognos[19] training Ms. Allen. Ex. 28, Seidler depo. 49:2- 51:12.

> **RESPONSE:** Uncontroverted.

232.    Ms. Allen believes Mr. Seidler emailed the BIA job posting to her. Ex. 52, Allen depo. 86:23-25.

> **RESPONSE:** Uncontroverted, however irrelevant.

---

[19] As noted above, Cognos is a data visualization tool. Ex. 28, Seidler depo. 49:2-51:12.

233.    Mr. Seidler knew Plaintiff from the 20-plus years they had both worked for the Department. He rarely worked directly with her, but found her to be competent and talked to her when he needed information from Adult Services. Ex. 28, Seidler depo. 56:3-57:2.

**RESPONSE:** Uncontroverted.

234.    As discussed above, Mr. Seidler was aware that Ms. King started working on a revocation report that Mr. Seidler had previously handled. Ex. 28, Seidler depo. 57:3-60:18.

**RESPONSE:** Uncontroverted.

235.    After Mr. Seidler stopped doing the report, he does not recall it getting done to the degree he had done it in the past. He does not know if that was because of Plaintiff or if the other supervisors should have or could have helped her with it. Ex. 28, Seidler depo. 60:24-61:19.

**RESPONSE:**  Uncontroverted.

Ms. Allen's Interview

236.    Ms. Allen remembers feeling good about her interview for the BIA position. Ex. 52, Allen depo. 66:7-11.

**RESPONSE:** Uncontroverted.

237.    She remembers being asked about data analytics software, and she was able to share that she had been trained in SPSS. Ex. 52, Allen depo. 67:3-14.

**RESPONSE:** Uncontroverted.

238.    Ms. Allen shared that she was well versed in PowerPoint because that is how she created all her presentations. She used that for classes, her thesis, and presented at a couple conferences in California while she was getting her Master's. Ex. 52, Allen depo. 70:3-20.

> **RESPONSE:** Uncontroverted that Ms. Allen shared that she was well-versed in PowerPoint, however controverted as incomplete and therefore misleading to the extent Ms. Allen testified she could not "recall exactly what was said about PowerPoint" and what she had used it for.  Exhibit O, Olivia Allen Depo. at 70:10-20.  Therefore, the second sentence of this paragraph is irrelevant to the determination of Ms. Allen's qualifications discussed during the interview process.

239.    Ms. Allen recalls that Mr. Sullivan's ears perked up when she started discussing the social network analysis and indicated that corrections would be interested in doing that at some point or maybe were already gearing towards that. Ex. 52, Allen depo. 139:24-140:10.

> **RESPONSE:** Uncontroverted Ms. Allen recalls that Mr. Sullivan's ears perked up when she mention the social network analysis and she recalls *Mr. Sullivan* indicating that

Corrections would be interested in possibly doing at some point, however controverted as incomplete and therefore misleading.  Ms. Allen brought up in the interview that she hadn't used the program since she was a graduate student and that it "wasn't the most fresh process for [her]."  Exhibit O, Olivia Allen Depo. at 140:11-16.  Moreover, Ms. Allen did not know what was going on in corrections with any social network analysis and this was never mentioned again by Mr. Sullivan to Ms. Allen after the interview. Exhibit O, Olivia Allen Depo. at 139:24-140:10.

240.    Ms. Allen remembers discussing her experience with the juvenile side of corrections. She remembers talking about her thesis, which was specifically on teens, and she talked about the evaluation study she did for the Center for Conflict Resolution, which was a youth-in-schools program. Ex. 52, Allen depo. 63:25-64:15.

**RESPONSE:**   Controverted that Ms. Allen was asked questions about her juvenile experience or that she discussed anything other that her graduate work with her thesis related to juveniles.  Ms. Allen only remembers discussing what she had done in school during her interview.  controverted to the extent that Defendant attempts to imply that Ms. Allen was performing data analysis in this position or needed to know any "juvenile-specific policy."  Exhibit O, Olivia Allen's Deposition at 63:24-65:15 (she believes she shared what she had done in school).  Ms. Dougan could not remember and did not find any place in her interview notes where the panel inquired about juvenile experience, even though in the "back of [her] mind" she thought Ms. Allen had juvenile experience.  *Id.* at 111:21-25, 112:20-113:3.  Mr. Seidler testified that juvenile experience was not discussed

during the interview process or in the process of selecting a candidate for the position. Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).

241.    Ms. Allen was interested in juveniles and ready to use those skills to see what programs they could evaluate and whether you could introduce random controlled trials. She was excited to work with good data. Ex. 52, Allen depo. 64:22-65:12.

> **RESPONSE:**  Uncontroverted, however irrelevant, as she did not discuss this during the interview or with the panelists.  Ms. Dougan could not remember and did not find any place in her interview notes where the panel inquired about juvenile experience, even though in the "back of [her] mind" she thought Ms. Allen had juvenile experience. *Id.* at 111:21-25, 112:20-113:3.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position. Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).

242.    In her interview, Ms. Allen also discussed work she as doing with Dr. Lori Sexton. They interviewed prisoners to understand, on a qualitative level, how their prison experience affected them. She then coded the interviews for themes, and then looked at those on

a macro level. Ex. 52, Allen depo. 78:2-79:4.

    **RESPONSE:** Uncontroverted.

243.    The interview questions, along with each panel member's notes of Ms. Allen's responses, can be found in Exhibit 55. Ex. 24, Bloomberg Decl. ¶ 16.

    **RESPONSE:** Uncontroverted

244.    When asked to provide a time when she was able to identify a complex problem, evaluate the options, and implement a solution as well as explaining how the solution benefited her organization (Question 4), Ms. Allen referenced a situation where she talked directly to a prosecutor, and her supervisor was not happy she had done that. Ex. 55 at JoCo 1303.

    **RESPONSE:** Objection.  Ms. Allen's response taken from the handwritten interview notes of Brian Seidler in Exhibit 55 is hearsay and cannot be used for the truth of the matter asserted.  *See* FED. R. CIV. P. 56(c)(2); Exhibit 55 at JoCo-King 1303.  To the extent a response is required, this SOF is uncontroverted to the extent that the referenced interview notes describe Ms. Allen's answer as stated.  *Id.*

245.    Neither Mr. Sullivan nor Mr. Seidler was impressed with Ms. Allen's answer. Ex. 18, Sullivan depo. 177:5-18; Ex. 28, Seidler depo. 98:20-99:15.

    **RESPONSE:** Uncontroverted.

246.    In response to Question 8, Ms. Allen stated she wished she had more experience writing grants. She did a lot of the groundwork for grants and was behind writing three grants, including the Byrne Grant, and she is confident in her writing skills. Ex. 55.

> **RESPONSE:**  Objection.  Ms. Allen's response taken from the handwritten interview notes of Susan Dougan, Robert Sullivan, and Brian Seidler in Exhibit 55 is hearsay and cannot be used for the truth of the matter asserted.  *See* FED. R. CIV. P. 56(c)(2); Exhibit 55 at JoCo-King 1296, 1300, 1304.  To the extent a response is required, this SOF is uncontroverted to the extent that the referenced interview notes describe Ms. Allen's answer as stating she "wished she had more experience writing grants," and that "she is confident in her writing skills", however controverted as incomplete and therefore misleading as the interview notes also state that Ms. Allen had only done "parts of work needed for grants written by professor", that she "[h]as more experience gathering info for grants than she has actually writing them", and that she mainly pulled data and did the literature reviews for the grants.  *Id.*  Moreover, Ms. Allen had never completed a grant on her own, and only worked on two grants, not three, and the work was just mostly the literature review and to "fluff up" some analysis and the conclusion.  Exhibit O, Olivia Allen Depo. at 135:4-25; *see also* Plaintiff's Response to SOF 200.

247.    She also discussed the presentation she gave related to the Byrne grant, which analyzed whether sprucing up the area around the Prospect Corridor changed the crime data and

also looking at the social network analysis. Ex. 52, Allen depo. 70:21-71:9; Ex. 55.

> **RESPONSE:** Controverted.  Ms. Allen did not recall that she discussed her presentation she gave related to the Byrne grant or the details of the grant.  Instead, Ms. Allen testified she knew she shared about using PowerPoint because that how she created her presentations "may have alluded" to the presentation she assisted in giving in California with Dr. Fox.  Exhibit O, Olivia Allen Depo. at 70:9-20.  Moreover, in the interview notes in Exhibit 55, the question regarding presentations (number 3) makes no mention of the Byrne Grant, and the only time Byrne Grant is seen in the interview notes is in Susan Dougan's notes related to experience writing grants and there is no mention of a presentation associated with it.  *See* Exhibit 55 at JoCo-King 1294, 1296, 1298, 1302.  Further, Ms. Dougan and Mr. Sullivan never mentioned this presentation or Ms. Allen's experience with the Byrne Grant in speaking with Shala Bloomberg in Human Resources about the interviews for the BI Analyst position or as a reason why they selected Ms. Allen.  *See* Exhibit D, Shayla Bloomberg's Interview Notes for Susan Dougan, 6/19/2019 (Deposition Ex. 100); Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102).  *See also* Plaintiff's Response to SOF 201.

248.    As noted above, Ms. Allen wrote the literature and conclusion portions of that grant and presented the portions she wrote. Ex. 52, Allen depo. 70:21-72:12.

> **RESPONSE:** Controverted.  Ms. Allen assisted in writing and presenting these portions of the grant as she had only done "parts of work needed for grants written by professor", she "[h]as more experience gathering info for grants than she has actually writing them",

and she mainly pulled data and did the literature reviews for the grants. *See* Exhibit 55 at JoCo-King 1296, 1300, 1304. Moreover, Ms. Allen had never completed a grant on her own, and only worked on two grants, not three, and the work was just mostly the literature review and to "fluff up" some analysis and the conclusion. Exhibit O, Olivia Allen Depo. at 135:4-25; *see also* Responses to SOF 200, 246-247.

249. Ms. Dougan had experience with the Byrne grant and knew that collecting the data for the grants is the biggest part of the process. Ex. 20, Dougan depo. 108:12-19, 114:18-115:21.

**RESPONSE:** Uncontroverted that Ms. Dougan testified as such, however controvert as misleading to the extent defendant attempts to imply that data collection for grants was the experience asked for in Question No. 8 of the interviews, which instead asked candidates to "Describe your experience writing grants." *See* Exhibit 55 at JoCo-King 1296, 1300, 1304. Moreover, Ms. Dougan testified you need someone to actually write the grant, which is different than the data collection part. Exhibit J, Susan Dougan Depo. at 115:13-116:1.

250. In response to Question No. 9, Ms. Allen discussed her education, SPSS, and her work with Dr. Holsinger. Ex. 55 at JoCo 1300, 1304; Ex. 28, Seidler depo. 99:24-101:19.

**RESPONSE:** Controverted. While Ms. Allen Did bring up SPSS in response to

Question No. 9, her education and work with Dr. Holsinger are not evidenced in response to Question No. 9.  *See* Exhibit 55 at JoCo-King 1296, 1300, 1304.  Moreover, the cited testimony does not support that she discussed her education or work with Dr. Holsinger in response to Question No. 9.  Instead, Mr. Seidler testified he thought Ms. Allen would have had some formal education with SPSS given she had worked with Dr. Holsinger, not that this was her response to Question No. 9.  Exhibit F, Brian Seidler Depo. at 99:22-101:22.

251.    Mr. Seidler assumed Ms. Allen had significant data analysis experience through her work with Dr. Holsinger. Ms. Allen also discussed regression and Chi-square testing, which was something they were just getting into with corrections. That was more advanced than what they had been doing in corrections. Ex. 55 at JoCo 1304; Ex. 28, Seidler depo. 99:24-101:19.

**RESPONSE:** Uncontroverted that Mr. Seidler *assumed* Ms. Allen had significant data analysis experience through her work with Dr. Holsinger and that Ms. Allen discussed regression and Chi-square testing, however, controverted to the extent that Defendant attempts to imply that this was more advanced that what they were doing in corrections, as corrections was getting into this work, it just was not the type of work corrections people "were typically doing everyday."  Exhibit F, Brian Seidler Depo. at 100:25-101:19. Moreover controverted to the extent that Defendant attempts to imply this type of experience was necessary for the BI Analyst position or a requirement for the position. Exhibit P, BI Analyst Job Posting.

252.     Mr. Sullivan also liked Ms. Allen's answer to question No. 11, where she discussed qualitative work with Dr. Sexton to understand prison experiences and how that impacted inmates, learning to code qualitative data, and collecting data by listening to stories. Ex. 18, Sullivan depo. 173:16-19; Ex. 55, JoCo 1301.

**RESPONSE:** Uncontroverted.

253.     Brian Seidler created a three-part exercise for the candidates to complete during the interview process. One had an Excel formula, and then there were two charts where they were asked to interpret the information. Ex. 28, Seidler depo. 69:3-15.

**RESPONSE:** Uncontroverted.

254.     Mr. Seidler created the exercise based on his experience and to get a sense of the candidates' experience, knowledge, and ability to interpret data, their Excel abilities, and statistics. Ex. 28, Seidler depo. 69:16-24.

**RESPONSE:** Uncontroverted.

255.     According to Mr. Seidler's interview notes, when asked to complete his exercise, Ms. Allen did not try to answer the first question, saying she has not used excel formulas. Ex. 55

(Depo. Ex. 112) at JoCo at 1305.

**RESPONSE:** Uncontroverted.

256.    That raised concern for Mr. Seidler. He thought with her education and experience, she would have had some familiarity with Excel and would have performed better on that part of the exercise. Ex. 28, Seidler depo. 92:16-93:22.

**RESPONSE:** Uncontroverted.

257.    Ms. Allen answered the second two questions correctly. Ex. 55 (Depo. Ex. 112) at JoCo 1305.

**RESPONSE:** Uncontroverted.

Plaintiff's Interview

258.    The interview questions, and all three panel members' notes of Plaintiff's responses can be found at Exhibit 56. Ex. 24, Bloomberg Decl. ¶ 16.

**RESPONSE:** Uncontroverted.

259.    Mr. Sullivan really liked Plaintiff's answer to Question No. 1 because she had 28 years of corrections experience, a strong educational background, and had dabbled in computer

science for two years. Ex. 18, Sullivan depo. 174:22-175:7, Ex. 56 (Depo. Ex. 40) at JoCo 1368.

> **RESPONSE:**  Controverted that Plaintiff only "dabbled" in computer science as she was
>
> a computer science major for two years and learned statistical analysis, advanced math,
>
> had coding classes, and statistics, otherwise uncontroverted.  *See* Defendant's Exhibit 56
>
> (Depo. Ex. 40) at JoCo-King 1360, 1364, 1368.

260.    During the interview, when asked what motivated her to apply for the position
(Question 2), the first thing Plaintiff said was that she was ready for a change. She then said she
saw the position as a key role to push the department forward and likes the idea of basing policy
decisions on data, which keeps her thinking and problem solving. She indicated she has a natural
curiosity, it would be a personal challenge, and saw the position having a huge role in the
department. Ex. 56 (Depo Ex. 40) at JoCo 1364; Ex. 1, Pltf's depo. 191:23-192:24.

> **RESPONSE:** Uncontroverted, but incomplete as Plaintiff also stated that she was ready
>
> to "move forward with data" and "move forward w[ith] new initiatives".  *See*
>
> Defendant's Exhibit 56 (Depo. Ex. 40) at JoCo-King 1360.

261.    When asked to share an experience where she presented in a group (Question 3),
Plaintiff said most of her experience was in a training capacity related to Trauma Informed Care.
She presented with another person and made it interactive. She stated she was not afraid to speak
in front of groups and had the ability to connect to audiences. She has also presented at a CCAB
meeting. Ex. 56 (Depo. Ex. 40); Ex. 1, Pltf's depo. 193:13-15.

> **RESPONSE:**  Uncontroverted.

262.   Mr. Sullivan liked that Plaintiff had presented on trauma-informed care and was comfortable presenting. Ex. 18, Sullivan depo. 175:8-15.

**RESPONSE:** Uncontroverted, however incomplete and therefore misleading.   Mr. Sullivan had watched Plaintiff present on trauma-informed care and acknowledged that she's comfortable presenting.  Exhibit G, Robert Sullivan Depo. at 175:10-15.  Moreover, Mr. Sullivan stated that he could picture Shannon presenting in the BI Analyst job and that when the he saw her present on TIC, she "does well".   Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.

263.   When asked to provide a time when she was able to identify a complex problem, evaluate the options, and implement a solution as well as explaining how the solution benefited her organization (Question 4), Plaintiff referenced a sexual misconduct issue that had occurred approximately 15 years earlier. Ex. 56 (Depo. Ex. 40) at JoCo 1369; Ex. 1, Pltf's depo. 193:16-18; Ex. 18, Sullivan depo. 175:17-176:2.

**RESPONSE:** Uncontroverted, however controverted to the extent that Defendant attempts to suggest that the example that Plaintiff provided, even though occurring earlier in her career, did not answer the question being asked of Plaintiff.  The example provided by Plaintiff involved a complex problem where: it involved her being made aware of allegations; completing an investigation when no investigation process or policy existed

at the time; receiving no assistance from her director at the time; researching and proposing major overhauls to agency policy and procedure including national training on the topic; and implementing these procedures prior to the Prison Rape Elimination Act being instituted. Exhibit K, Plaintiff's Declaration at ¶28.  Mr. Sullivan called this example "dated" and said he thought Ms. King appeared "very tired" and had a "lack of innovation."  Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.  Ms. Dougan was concerned this was an "old example" from "years and years ago," even though there was no indication that the answers to the questions needed to be "new and recent."  Exhibit J, Susan Dougan Depo. at 132:9-135:14.  Ms. Dougan was thinking during the interview: "Okay. Can you come up with something newer that you've done[?]" "What's something newer?"  *Id.* at 133:1-24.  However, Ms. Dougan never sought a more recent example from Plaintiff or any of the other interviewees.  Exhibit J, Susan Dougan Depo. at 134:10-16; Exhibit K, Plaintiff's Declaration at ¶30.  Moreover, to the extent that any of the interview panel was seeking a more recent example from Plaintiff, or any of the interviewees, this was not made clear in the question and the interview panelists did not ask for a more recent example even though they could have done so.  *Id.*  Further, to the extent Defendant attempts to imply Ms. Allen (who provided a "bad example" as an answer to this question) provided a more recent example, the only examples Ms. Allen had to provide were more recent as she was 24 years younger than Plaintiff and had only been out of school for three years, as Ms. Dougan admitted; a clear indication of age being taken into account in determining the ranking of candidates.  Exhibit J, Susan Dougan Depo. at 134:17-135:14; Exhibit O, Allen depo. at 117:17-20; Defendant's Exhibit 55 at JoCo-

King 1303.

264.    Mr. Sullivan and Ms. Dougan both believed Plaintiff should have been able to come up with something more related to her current duties as a supervisor where she was able to identify a complex problem and talk through how she evaluated options and implemented a solution. In addition, they did not view a sexual misconduct issue as a complex problem. Ex. 18, Sullivan depo. 175:17-176:2; Ex. 20, Dougan depo. 133:12-134:7.

> **RESPONSE:**  Controverted.  The example provided by Plaintiff involved a complex problem where: it involved her being made aware of allegations; completing an investigation when no investigation process or policy existed at the time; receiving no assistance from her director at the time; researching and proposing major overhauls to agency policy and procedure including national training on the topic; and implementing these procedures prior to the Prison Rape Elimination Act being instituted. Exhibit K, Plaintiff's Declaration at ¶28.  Mr. Sullivan called this example "dated" and said he thought Ms. King appeared "very tired" and had a "lack of innovation."  Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.  Ms. Dougan never stated she did not view sexual misconduct issue as a complex problem.  Exhibit J, Susan Dougan Depo. at 132:9-135:14.  Ms. Dougan was concerned this was an "old example" from "years and years ago," even though there was no indication that the answers to the questions needed to be "new and recent."  Exhibit J, Susan Dougan Depo. at 132:9-135:14.  Ms. Dougan was thinking during the interview: "Okay. Can you come up with something newer that you've

done[?]" "What's something newer?"  *Id.* at 133:1-24.  However, Ms. Dougan never sought a more recent example from Plaintiff or any of the other interviewees.  Exhibit J, Susan Dougan Depo. at 134:10-16; Exhibit K, Plaintiff's Declaration at ¶30.  Moreover, to the extent that any of the interview panel was seeking a more recent example from Plaintiff, or any of the interviewees, this was not made clear in the question and the interview panelists did not ask for a more recent example even though they could have done so.  *Id.*  Further, to the extent Defendant attempts to imply Ms. Allen (who provided a "bad example" as an answer to this question) provided a more recent example, the only examples Ms. Allen had to provide were more recent as she was 24 years younger than Plaintiff and had only been out of school for three years, as Ms. Dougan admitted; a clear indication of age being taken into account in determining the ranking of candidates. Exhibit J, Susan Dougan Depo. at 134:17-135:14; Exhibit O, Allen depo. at 117:17-20; Defendant's Exhibit 55 at JoCo-King 1303.

265.    Mr. Sullivan does not recall if they asked Plaintiff for a more recent example but noted that this is the time for the candidates to impress them, so he would have thought Plaintiff would have chosen a different and more recent example.[20] Ex. 18, Sullivan depo. 175:17-177:4; *see also* Ex. 22, Veronda depo. 82:14-83:7.

> **RESPONSE:** Uncontroverted that Mr. Sullivan testified as such, however controverted to the extent that they did not ask Plaintiff of any of the interviewees to provide more recent examples, and the example provided by Plaintiff involved a complex problem

---

[20] Ms. Dougan testified they did not ask Plaintiff to provide a more recent example because they try to ask the panel the same questions Ex. 20, Dougan depo. 134:10-16.

where: it involved her being made aware of allegations; completing an investigation when no investigation process or policy existed at the time; receiving no assistance from her director at the time; researching and proposing major overhauls to agency policy and procedure including national training on the topic; and implementing these procedures prior to the Prison Rape Elimination Act being instituted. Exhibit K, Plaintiff's Declaration at ¶28.   Mr. Sullivan called this example "dated" and said he thought Ms. King appeared "very tired" and had a "lack of innovation."   Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.  Ms. Dougan never stated she did not view sexual misconduct issue as a complex problem.  Exhibit J, Susan Dougan Depo. at 132:9-135:14.  Ms. Dougan was concerned this was an "old example" from "years and years ago," even though there was no indication that the answers to the questions needed to be "new and recent."  Exhibit J, Susan Dougan Depo. at 132:9-135:14.  Ms. Dougan was thinking during the interview: "Okay. Can you come up with something newer that you've done[?]" "What's something newer?"  *Id.* at 133:1-24.  However, Ms. Dougan never sought a more recent example from Plaintiff or any of the other interviewees.   Exhibit J, Susan Dougan Depo. at 134:10-16; Exhibit K, Plaintiff's Declaration at ¶30.  Moreover, to the extent that any of the interview panel was seeking a more recent example from Plaintiff, or any of the interviewees, this was not made clear in the question and the interview panelists did not ask for a more recent example even though they could have done so (contrary to the implication in footnote 20).  *Id.*  Further, to the extent Defendant attempts to imply Ms. Allen (who provided a "bad example" as an answer to this question) provided a more recent example, the only examples Ms. Allen had to provide were more recent as she was

24 years younger than Plaintiff and had only been out of school for three years, as Ms. Dougan admitted; a clear indication of age being taken into account in determining the ranking of candidates.   Exhibit J, Susan Dougan Depo. at 134:17-135:14; Exhibit O, Allen depo. at 117:17-20; Defendant's Exhibit 55 at JoCo-King 1303.   Further Mr. Sullivan testified that Ms. Allen's answer to Question No. 4 was not a "complex problem" and was just an "everyday problem" and that her answer was not any better than Plaintiff's in comparison.   Exhibit G, Robert Sullivan Depo. at 177:5-18.   However, he made sure to mention to HR that he was still concerned about the dated examples Plaintiff provided. Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492

266.    When asked about a time she developed her own way of doing things (Question 5), Plaintiff indicated she had used data visualization tools, specifically Google Data Studios, to look at officer revocation rates and recommendations made in court. Ex. 56 (Depo. Ex. 40) at JoCo 1365; Ex. 1, Pltf's depo. 193:19-21.

**RESPONSE:** Uncontroverted.

267.     Mr. Sullivan was not impressed with that answer because it did not illustrate how Plaintiff had her own way of doing things, and the data sets she referenced were very basic.[21] Ex. 18, Sullivan depo. 177:25-178:6.

> **RESPONSE:** Controverted. Mr. Sullivan testified that he did not know how Plaintiff evaluating individual ISO revocation rates was "her own her own way of doing things other than the Google Data Studio". Exhibit G, Robert Sullivan Depo. at 177:25-178:6. Further, controverted that the data set was "very basic" or that Plaintiff stated as such. These were not basic data sets. The data that Plaintiff was analyzing was directly related to the state wanting to find a way to reduce revocations to prison in all jurisdictions. Plaintiff request that this data be pull previously, however, she was ignored by Mr. Clark and Mr. Sullivan in her requests. Plaintiff compiled all the recommendations made by Intensive Supervision Officers (ISOs) at revocation hearings (thousands of hearings) and then analyzed how often judges followed the ISO's recommendations. Plaintiff found that 92% of the time, the judge followed the department's recommendations. This was important to know in terms of how ISOs might reduce revocation rates to prison. None of the other supervisors in the department knew how to run the reports or clean the data for the analysis. Even Olivia Allen did not know how to run the reports for this particular revocation data. After doing all of this work on the revocation data, Plaintiff used the data to drive decisions with the staff she supervised and ISP as a whole. Exhibit K, Plaintiff's Declaration at ¶6.

268.     When asked to provide an example of how she had used data to answer a question

---

[21] Mr. Sullivan noted that Plaintiff also described the visualization as basic. Ex. 18, Sullivan depo. 177:25-178:6; Ex. 56 at JoCo 1369. That is something Mr. Sullivan would have expected a Senior Case Manager to be doing. Ex. 18, Sullivan depo. 178:7-20.

(Question 6), Plaintiff stated that when evidence-based practices were first implemented, the staff did not believe the judges were on board. Plaintiff tracked the data and demonstrated that their perceptions were incorrect. Ex. 56 (Depo. Ex. 40) at JoCo 1369. Mr. Sullivan liked that answer. Ex. 18, Sullivan depo. 181:2-5; Ex. 1, Pltf's depo. 193:22-24.

**RESPONSE:** Uncontroverted.

269.    When asked to describe a time where she came up with and implemented a solution "that was bold – perhaps even risky, creative, maybe even unconventional," (Question 7) Plaintiff responded by saying she is not real risky. Her solutions tend to be more grounded. She thinks grounded solutions will help transition staff and not scare them off. Ex. 56 (Depo. Ex. 40) at JoCo 1365; Ex. 1, Pltf's depo. 193:25-194:2.

**RESPONSE:** Objection.  Plaintiff's response taken from the handwritten interview notes of Brian Seidler in Exhibit 56 is hearsay and cannot be used for the truth of the matter asserted.  *See* Fed. R. Civ. P. 56(c)(2).  To the extent a response is required, this SOF is controverted that Plaintiff stated she was "not real risky", otherwise uncontroverted. Plaintiff explained to the panel that she did not believe "risky" to typically be the best approach to decision making when it came to staff and clients.  Instead, Plaintiff explained that she preferred a more grounded approach of keeping one foot planted solid on the ground while trying out new ideas.  Plaintiff' focus in responding to this question was on how to bring staff along with new initiatives and that "risky" was not how she saw her role in the process.  Exhibit K, Plaintiff's Declaration at ¶29.

270.   Plaintiff's answer to this question caused Mr. Sullivan to question whether Plaintiff would be innovative enough to successfully handle the ever-changing juvenile portfolio. Ex. 18, Sullivan depo. 189:20-192:20.

> **RESPONSE:** Controverted.   The cited testimony does not state that Mr. Sullivan questioned whether Plaintiff would be "innovative enough to successfully handle the ever-changing juvenile portfolio."   Mr. Sullivan testified that between Plaintiff and Ms. Allen, they were "both going to be new to that juvenile portfolio, and so I had to make a decision.   And I felt, in my opinion, that I needed to tell Susan Olivia was my best choice if, in fact, Brian was going to move from the juvenile portfolio to the adult portfolio." Exhibit G, Robert Sullivan Depo. at 189:14-19.   Moreover, Mr. Sullivan testified that "[Plaintiff] was one of my top two candidates for this BI analyst position."   Exhibit G, Robert Sullivan Depo. at 192:15-20.   However, Mr. Sullivan stated that Plaintiff's response to Question No. 7 "kind of worried me a bit" because she "didn't answer the question" and "for somebody that had been here 28 years, I guess I was expecting more." Exhibit G, Robert Sullivan Depo. at 189:20-190:01, 191:9-18.   Mr. Sullivan said he "would expect the enthusiasm and … the energy and the excitement that Olivia brought would be the kind of person that would need to take on a portfolio that would involve programs that have yet to exist that we still needed to create and processes that didn't exist that we still needed to create, and to be able to take those challenges on.  . . . Versus on the adult side, where not much has changed since 2008 , I think Shannon would have been the best choice."   Exhibit G, Robert Sullivan Depo. at 191:19-192:10.   Mr. Sullivan also told HR that he thought Ms. King appeared "very tired" and had a "lack of

innovation."   Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.   Importantly, Mr. Sullivan noted that Ms. Allen's answer to Question No. 7 "did not impress [him]."   Exhibit G, Robert Sullivan Depo. at 192:23-193:4.

271.   When asked about grant experience (Question 8), Plaintiff stated she had helped Tom Dugan with a grant. Ex. 56 (Depo. Ex. 40); Ex. 1, Pltf's depo. 194:3-5. Mr. Dugan worked for Ms. Dougan, so she was aware that Plaintiff's involvement in the grant was minimal. In addition, it had occurred 14 years earlier. Ex. 20, Dougan depo. 135:17-137:25.

> **RESPONSE:** Uncontroverted that Plaintiff stated she helped Tom Dugan with a grant, and that Mr. Dugan worked for Ms. Dougan, however controverted that Plaintiff's involvement was minimal and to the extent that Defendant attempts to imply that grant experience has a time limit and is no longer relevant after 14 years.   Plaintiff met with Mr. Dugan ongoing for several months developing an outline for the grant.   Plaintiff spent many hours working to determine what Corrections was going to request in the grant and how Corrections was going to use it to enhance the Evidence Based Practices the state was implementing during that time period.   The work was not minimal.   Exhibit K, Plaintiff's Declaration at ¶7.

272.   When asked to describe her experience with data processing/analysis software (Question 9), Plaintiff identified Google Sheets, Google Data Studios, SPSS, and Excel. She

indicated she has some knowledge about Google analytics and website traffic. She explained she had learned data visualization tools through online classes and self-teaching and had created dashboards. Ex. 56 (Depo. Ex. 40) at JoCo 1365; Ex. 1, Pltf's depo. 191:23-194:21.

**RESPONSE:** Uncontroverted.

273.    Mr. Sullivan liked that answer as well. Ex. 18, Sullivan depo. 181:11.

**RESPONSE:** Uncontroverted.

274.    Question 10 states: "Have you ever used Tableau or other data visualization software? Were you the end user or the creator? Ex. 56, Depo. Ex. 40.

**RESPONSE:** Uncontroverted.

275.    Ms. Dougan's notes of Plaintiff's response state:

A. Yes – and others both end user and creator – would love to have license and be able to play with it. Google isn't as user friendly as Tableau. Not in Tableau. Like end user feature in Tableau.

Ex. 56, Depo. Ex. 40 at JoCo 1363, Q. 10.

**RESPONSE:** Uncontroverted that the notes in Exhibit 56 state this.

276.    Mr. Seidler's notes of Plaintiff's response state:

Has used Tableau and Google Data Studios. Has created dashboards and been end user with Tableau dashboards. Visualizations help people consume data better.

Ex. 56 (Depo. Ex. 40) at JoCo.1367, Q. 10.

**RESPONSE:** Uncontroverted that the notes in Exhibit 56 state this.

277.    Mr. Sullivan's notes of Plaintiff's response state, "Tableau end user and creator of Google Data Studies." Ex. 56 (Depo. Ex. 40) at JoCo 1371, Q. 10.

**RESPONSE:** Uncontroverted that the notes in Exhibit 56 state this.

278.    Mr. Sullivan and Mr. Seidler understood Plaintiff to say she had end-user experience with Tableau and creator experience with Google Data Studios. Ex. 18, Sullivan depo. 155:13-157:25, 182:1-14; Ex. 28, Seidler depo. 114:13-115:12.

**RESPONSE:**    Uncontroverted that Mr. Sullivan and Mr. Seidler testified as such, however, controverted to the extent that Defendant attempts to imply that Plaintiff was not familiar with Tableau creator-side experience or that the only experience Defendant was looking for was creator side Tableau experience.  Ms. Dougan testified that her notes say Plaintiff told them she had both end-user and creator experience with Tableau. Exhibit J, Susan Dougan Deposition at 129:20-130:6.  Before the BI Analyst interviews, Plaintiff had experience creating data visualizations in Google Data Studios, which she told the interviewees was a very similar platform to Tableau.  Exhibit A, Plaintiff's Deposition at 29:21-30:6, 194:7-15.  Only looking for creator experience with Tableau

was not denoted anywhere in the interview questions, nor did it come up in the Ms. Bloomberg's interview notes with Plaintiff, Ms. Dougan, or Mr. Sullivan.  *See* Defendant's Exhibit 56 (Depo. Ex. 40) Notes from Plaintiff's Interview – Question 10.  It is uncontroverted that Plaintiff had Tableau experience and Ms. Allen did not.  Exhibit O, Olivia Allen Deposition at 67:18-68:9 ("I had no idea what Tableau was until a couple month prior to the interview . . . I'd never used it"); Exhibit F. Brian Seidler Deposition at 101:23-102:13, 105:13-107:13, 112:18-115:2; Exhibit R, Plaintiff's Resume for the BI Analyst position (Depo Ex. 64).

279.    Ms. Dougan testified that her notes say Plaintiff told them she had both end-user and creator experience with Tableau. Ex. 20, Dougan depo. 129:20-130:6.

**RESPONSE:**  Uncontroverted.

280.    Regardless, Ms. Dougan knew Plaintiff did not have a license, so she understood Plaintiff's response to mean she had end-user experience. Ex. 20, Dougan depo. 147:13-148:15.

**RESPONSE:** Uncontroverted that Johnson County only had two Tableau user licenses for Corrections and that this precluded Plaintiff and other internal candidates from being able to achieve "creator" skills in Tableau, even though Plaintiff had requested this. Exhibit G, Robert Sullivan deposition at 153:3-155:7.  However, this is controverted to extent that Defendant attempts to imply that end-user experience with Tableau was not

important or that the panel was only requesting creator experience. Before the BI Analyst interviews, Plaintiff had experience creating data visualizations in Google Data Studios, which she told the interviewees was a very similar platform to Tableau. Exhibit A, Plaintiff's Deposition at 29:21-30:6, 194:7-15. Only looking for creator experience with Tableau was not denoted anywhere in the interview questions, nor did it come up in the Ms. Bloomberg's interview notes with Plaintiff, Ms. Dougan, or Mr. Sullivan. *See* Defendant's Exhibit 56 (Depo. Ex. 40) Notes from Plaintiff's Interview – Question 10. It is uncontroverted that Plaintiff had Tableau experience and Ms. Allen did not. Exhibit O, Olivia Allen Deposition at 67:18-68:9 ("I had no idea what Tableau was until a couple month prior to the interview . . . I'd never used it"); Exhibit F. Brian Seidler Deposition at 101:23-102:13, 105:13-107:13, 112:18-115:2; Exhibit R, Plaintiff's Resume for the BI Analyst position (Depo Ex. 64).

281.    Neither Mr. Seidler nor Mr. Sullivan viewed Plaintiff's experience with Google Data Studios as helpful for the BIA position. Ex. 28, Seidler depo. 116:17-117:2; Ex. 18, Sullivan depo. 182:1-14.

**RESPONSE:** Controverted. Mr. Seidler acknowledged that he probably did not "have a great understanding of what that program does or how similar it is to anything we used either." Exhibit F, Brian Seidler Deposition at 116:21-117:2. Mr. Sullivan testified he did not know that Google Data Studios existed prior to Plaintiff's interview. Exhibit G, Robert Sullivan Deposition at 182:1-14. Before the BI Analyst interviews, Plaintiff had

experience creating data visualizations in Google Data Studios, which she told the interviewees was a very similar platform to Tableau.  Exhibit A, Plaintiff's Deposition at 29:21-30:6, 194:7-15.

282.    Plaintiff did surprisingly well on Mr. Seidler's exercise. Ex. 28, Seidler depo. 81:15-19, 117:8-118:15.

**RESPONSE:**  Uncontroverted that Plaintiff did well on Mr. Seidler's exercise, getting all of the answers correct, however controverted that this was "surprising" given Plaintiff's education and experience.  Exhibit F, Brian Seidler Depo. at 117:8-119:7.  Plaintiff was "able to answer the questions the way [Mr. Seidler] would have answered".  *Id.* at 117:10-17.  The last question required the ability to "interpret the statistical significance of a line . . . – you either know if or you don't" and Plaintiff got it right.  Mr. Seidler thought she did a good job on the questions.  *Id.* at 118:13-15.

Impressions of the Panelists

283.    In Ms. Dougan's view, Ms. Allen knocked it out of the park. Ms. Dougan was in awe of Ms. Allen's speaking knowledge, her presentation skills, and her confidence. Ex. 20, Dougan depo. 109:2-11. Something about Ms. Allen's presentation skills stood out, not just compared to Plaintiff, but in comparison to all of the candidates they interviewed. Ex. 20, Dougan depo. 123:9-11.

**RESPONSE:**  Controverted.  Ms. Dougan testified that she did not even remember speaking with Shayla Bloomberg and Sam Veronda in HR regarding the hiring decisions

for the BI Analyst position.  Exhibit J, Susan Dougan Depo. at 151:15-25.  Moreover, Ms. Dougan testified that she could not remember whether there was a presentation component to the interviews and that while there was something about Ms. Allen that stood out with presentation skills, she "can't remember" why.  Exhibit J, Susan Dougan Deposition at 122:18-123:11.

284.    Ms. Allen came across as very positive and knowledgeable during her interview. She had great presentation skills, had done a lot in analytics. She had worked with the County's Criminal Justice Coordinator, and she had co-authored a textbook, which indicated an ability to write. Ex. 20, Dougan depo. 107:5-21.

> **RESPONSE:** Uncontroverted that Mr. Dougan testified to this, however, it should be noted that Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  *Id.* at 189:14-19.  He thought it came down to her "enthusiasm" that set her apart from Plaintiff, who he thought was "tired."  *Id.* at 168:14-169:4.

285.    Mr. Sullivan was impressed that Ms. Allen had co-authored a textbook chapter on homicides, and he was aware of the work she had done with Dr. Holsinger on pretrial assessment data, which he found impressive. Ex. 18, Sullivan depo. 170:4-171:3.

> **RESPONSE:** Uncontroverted that Mr. Sullivan testified to this, however, it should be noted that Mr. Sullivan thought that both there were instances where Plaintiff has better answers than Ms. Allen and vice versa, so this was not the deciding factor.  Exhibit G,

Robert Sullivan Deposition at 170:4-14.  Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  *Id.* at 189:14-19.  He thought it came down to her "enthusiasm" that set her apart from Plaintiff, who he thought was "tired."  *Id.* at 168:14-169:4.

286.    Mr. Sullivan was also impressed with the work Ms. Allen had done reevaluating the pretrial assessment tool in order to share information to be presented at a national conference. Ex. 18, Sullivan depo. 171:11-17.

> **RESPONSE:** Uncontroverted that Mr. Sullivan testified to this, however, it should be noted that Mr. Sullivan thought that both there were instances where Plaintiff has better answers than Ms. Allen and vice versa, so this was not the deciding factor.  Exhibit G, Robert Sullivan Deposition at 170:4-14.  Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  *Id.* at 189:14-19.  He thought it came down to her "enthusiasm" that set her apart from Plaintiff, who he thought was "tired."  *Id.* at 168:14-169:4.

287.    Mr. Sullivan found this particularly impressive because, at the time, Ms. Allen was a pretrial supervision officer, and analyzing data was not part of her job duties. Ex. 18, Sullivan depo. 205:12-206:1.

> **RESPONSE:** Uncontroverted that Mr. Sullivan testified to this, however, it should be noted that Mr. Sullivan thought that both there were instances where Plaintiff has better

answers than Ms. Allen and vice versa, so this was not the deciding factor.  Exhibit G, Robert Sullivan Deposition at 170:4-14.  Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  *Id.* at 189:14-19.  He thought it came down to her "enthusiasm" that set her apart from Plaintiff, who he thought was "tired."  *Id.* at 168:14-169:4.  Further, Plaintiff was doing work that was not a part of her job duties and that no other Senior Case Managers were doing.

288.  Mr. Sullivan liked the fact that Ms. Allen had been exposed to writing code, which was getting much closer to the direction Mr. Sullivan had been trying to take the BIA position. Ex. 18, Sullivan depo. 171:19-24.

> **RESPONSE:** Uncontroverted that Mr. Sullivan testified as such, however, controverted to the extent that Defendant attempts to imply that Plaintiff did not have this same skill set or that this did not come up in Plaintiff's interview.  Plaintiff discussed her experience with writing code in her computer science degree programs and wanting to push the BI Analyst position forward.  *See* Defendant's Exhibit 56 (Depo. Ex. 40) at JoCo-King 1360, 1364, 1368; *see also* Plaintiff's Response to SOF 259, 260.  Moreover, this is further controverted as irrelevant as Mr. Sullivan never mentioned this as a reason why Ms. Allen was hired over Ms. King and he did not bring this up to HR during his interview.  Exhibit E Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 490-92.

289.   Mr. Sullivan also recalls Ms. Allen discussing a social networking study and recalls that she was excited to work on a project that would track massive amounts of GPS data to analyze where clients spent their time and with whom and leverage that information. Ex. 18, Sullivan depo. 171:25-172:25.

> **RESPONSE:** Controverted.  Mr. Sullivan testified that he was excited about working on the social networking study and that he doesn't know how it came out in the interview process.  Further, Ms. Allen did not remember this coming out.  Exhibit G, Robert Sullivan Deposition at 171:25-172:25.  Moreover, Ms. Allen did not know what was going on in corrections with any social network analysis and this was never mentioned again by Mr. Sullivan to Ms. Allen after the interview. Exhibit O, Olivia Allen Depo. at 139:24-140:10.

290.   Mr. Sullivan also liked the fact that Ms. Allen had spent significant time cleaning data because the data they use often needs to be cleaned for analysis, and Ms. Allen had significant experience with that. Ex. 18, Sullivan depo. 173:5-21.[22]

> **RESPONSE:**  Uncontroverted.

291.   Ms. Dougan thought Plaintiff did a very good job in her interview. She was disappointed that some of the examples Plaintiff gave in her interview were from years earlier and thought she could have gone into more depth on some of her answers. She also thought her

---

[22] Mr. Sullivan put an asterisk by that information in his interview notes. Ex. 55 at JoCo 1300.

presentation skills were somewhat lacking, but overall, she had a good interview. Ex. 20, Dougan depo. 132:9-25.

> **RESPONSE:** Uncontroverted that Ms. Dougan testified to this, however see SOFs 264 and 292 related to the examples Plaintiff provided being dated and Plaintiff's presentation skills.

292.     In terms of presentation skills, Ms. Dougan indicated that Plaintiff turned bright red in the interview, and she had some concern about whether Plaintiff would be able to present to advisory boards with confidence in what she was presenting.[23] Ex. 20, Dougan depo. 121:13-122:6.

> **RESPONSE:** Uncontroverted that Ms. Dougan testified to this, however controverted to the extent that Plaintiff was already presenting to advisory boards, and further controverted that Plaintiff never had the discussion with Ms. Dougan about being nervous in interviews or turning red outlined in footnote 23.   Moreover, Mr. Seidler does not recall Plaintiff being nervous.  Exhibit F, Seidler Deposition at 135:20-25.  And Mr. Sullivan thought that Shannon did "really good, probably the best interview she had with [him]."   Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.  Mr. Sullivan had watched Plaintiff present on trauma-informed care and acknowledged that she's comfortable presenting.  Exhibit G, Robert Sullivan Depo. at 175:10-15.  Moreover, Mr. Sullivan stated that he could picture Shannon presenting in the BI Analyst job and that when he saw her present on TIC, she "does well".   Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan,

---

[23] Sometime before the BIA interview, Ms. Dougan had talked to Plaintiff about why she turns red during interviews. Plaintiff told Ms. Dougan she gets very nervous. Ex. 20, Dougan depo. 124:22-125:17.

6/24/2019 (Deposition Ex. 102) at JoCo-King 492.  Mr. Seidler also thought Plaintiff did "pretty well" in the interview.  Exhibit F, Brian Seidler Depo. at 81:15-19.   Further, Plaintiff stated she was not afraid to speak in front of groups and had also presented at CCAB meetings.  *See* Defendant's Exhibit 56 (Depo. Ex. 40); Exhibit A, Plaintiff's Deposition at 193:13-15.

293.    By contrast, Mr. Seidler does not recall Plaintiff being nervous. Ex. 28, Seidler depo. 135:20-25.

**RESPONSE:** Uncontroverted.  Further, Mr. Sullivan thought that Shannon did "really good, probably the best interview she had with [him]."   Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.

294.    Mr. Seidler remembers he learned more about some of Plaintiff's education and experience, and he was surprised at how well she did on the exercise. In Mr. Seidler's observation, Plaintiff was not super dynamic, and there were areas where he thought she would have better answers, so overall, her interview was okay. She was not his top candidate, but she was in the top three. Ex. 28, Seidler depo. 117:8-119:7.

**RESPONSE:** Uncontroverted that Mr. Seidler testified as such, except controverted that he was a "little" surprised by how well she did on the exercise and that he thought "her interview was okay." Exhibit F, Brian Seidler Depo. at 117:8-119:7; *see also* Plaintiff's

Response to SOF 282.  Plaintiff was "able to answer the questions the way [Mr. Seidler] would have answered".  *Id.* at 117:10-17.  The last question required the ability to "interpret the statistical significance of a line . . . – you either know if or you don't" and Plaintiff got it right.  Mr. Seidler thought she did a good job on the questions.  *Id.* at 118:13-15.  Mr. Seidler also thought Plaintiff did "pretty well" in the interview.  *Id.* at 81:15-19.   Further the fact is controverted to the extent that Defendant attempts to imply that Ms. Allen did better than Plaintiff in the interview according to Mr. Seidler or that Ms. Allen was his top candidate.  Mr. Seidler remembers Plaintiff being in his top three candidates and bringing her up for discussion after his number one choice Casey Johnson was shot down by Mr. Sullivan.  Exhibit F, Brian Seidler Depo. at 87:24-88:8. He "thinks" that Ms. Allen was within his top three, but he does not "remember a hundred percent."  Exhibit F, Brian Seidler Depo. at 103:7-15.

Deliberation Process

295.    After the interviews, Mr. Sullivan wrote each panelists' top three candidates on a white board and took a picture. Ex. 28, Seidler depo. 72:4-10.[24]

**RESPONSE:**  Uncontroverted.

296.    Both Susan Dougan and Robert Sullivan had Olivia Allen as their top candidate. Ex. 20, Dougan depo. 140:3-20; Ex. 28, Seidler depo. 72:21-25.

---

[24] Mr. Sullivan searched for this picture when Plaintiff filed her charge, but was not able to find it. Ex. 18, Sullivan depo. 67:12-22; Ex. 19, Sullivan Decl. ¶¶ 13-14.

**RESPONSE:** Controverted.  Mr. Sullivan stated that it came down to two candidates for him, Plaintiff and Ms. Allen, and he did not necessarily have one above the other. Exhibit G, Robert Sullivan Deposition at 184:11-185:2.  He believed the same was true for Ms. Dougan.  *Id.*  Further, Ms. Dougan stated she was going off of Mr. Sullivan's recommendation in who to hire for the position.  *Id.* at 186:23-187:03.

297.    They also had Plaintiff in their top two. Ex. 18, Sullivan depo. 184:12-185:2; Ex. 20, Dougan depo. 140:3-20.

**RESPONSE:**  Uncontroverted.

298.    Mr. Sullivan believed Ms. Allen was the top choice since the position was taking over the juvenile portfolio. As discussed above, Senate Bill 367 fundamentally changed the way juvenile justice happens in the state of Kansas, and not all of the provisions for that statute were going to be fully implemented until July of 2019. As a result there were lots of changes occurring. Ex. 18, Sullivan depo. 188:2-189:19.

**RESPONSE:**  Controverted that Mr. Seidler had already made the decision that he was taking over the adult portfolio at the time of the interviews for the BI Analyst position. The candidates' juvenile experience was not a topic of conversation during the interviews or during the deliberation process.  Exhibit F, Brian Seidler Deposition at 83:14-84:7, 85:5-9.  Moreover, the BI Analyst taking over the juvenile portfolio, whether Ms. Allen or Plaintiff, would have had to learn the changes that were occurring in juvenile justice as

a result of Senate Bill 367 rolling out over three years, and therefore this is irrelevant and controverted to the extent Defendant attempts to imply that either candidate had more knowledge of this going into the position.   Exhibit G, Robert Sullivan Deposition at 188:4-17, 189:14-19, 241:12-24.   And this SOF is further controverted to the extent that Defendant attempts to imply that the BI Analyst being hired was going to be focusing solely on juvenile work.   The two positions overlapped in work and worked together on projects.   Exhibit M, Keith Clark Deposition at 48:8-49:14.

299.    Based on the interviews he had with Plaintiff and her answer to Question No. 7 (Ex. 56 (Depo. Ex. 40) at JoCo 1362, 1366, 1370), Mr. Sullivan was concerned about Plaintiff's ability to think outside the box and handle programs that had yet to be created. Ex. 18, Sullivan depo. 189:20-192:20.

**RESPONSE:** Controverted.  Mr. Sullivan never mentioned this as a reason why he chose to hire Ms. Allen over Plaintiff.  Plaintiff's ability to think outside the box and handle programs that had yet to be created is absent Mr. Sullivan's interview notes and the notes of his conversation with Ms. Bloomberg and Ms. Veronda in HR after Plaintiff's complaints of discrimination.  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102); Defendant's Exhibit 56 (Depo. Ex. 40). Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  *Id.* at 189:14-19.   He thought it came down to her "enthusiasm" that set her apart from Plaintiff, who he thought was "tired."  *Id.* at 168:14-169:4.

300.    Mr. Sullivan was not impressed with Ms. Allen's answer to Question No. 7 either, but it also did not scare him or indicate a reluctance to come up with bold, risky, or creative solutions. Ex. 18, Sullivan depo. 192:23-193:9; Ex. 55 at JoCo 1296, 1300, 1304.

> **RESPONSE:**  Uncontroverted that Mr. Sullivan was not impressed with Ms. Allen's answer to Question No. 7, however controverted to the extent that Defendant attempts to imply that Plaintiff's answered "scared" Mr. Sullivan or that she indicated that she would not come up with bold, risky, or creative solutions to problems. Mr. Sullivan never mentioned this as a reason why he chose to hire Ms. Allen over Plaintiff.  Plaintiff's ability to think outside the box and handle programs that had yet to be created is absent Mr. Sullivan's interview notes and the notes of his conversation with Ms. Bloomberg and Ms. Veronda in HR after Plaintiff's complaints of discrimination.  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102); Defendant's Exhibit 56 (Depo. Ex. 40).  Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  *Id.* at 189:14-19.  He thought it came down to her "enthusiasm" that set her apart from Plaintiff, who he thought was "tired."  *Id.* at 168:14-169:4.

301.    By contrast, Plaintiff specifically stated she did not like to take risks. Ex. 56 (Depo. Ex. 40) at JoCo 1362, 1366, 1370; Ex. 1, Pltf's depo. 192:4-194:15

**RESPONSE:**  Controverted.  Plaintiff explained to the panel that she did not believe "risky" to typically be the best approach to decision making when it came to staff and clients.  Instead, Plaintiff explained that she preferred a more grounded approach of keeping one foot planted solid on the ground while trying out new ideas.  Plaintiff' focus in responding to this question was on how to bring staff along with new initiatives and that "risky" was not how she saw her role in the process.  Exhibit K, Plaintiff's Declaration at ¶29.

302.    If the selected candidate were going to take over the adult portfolio, Mr. Sullivan would have had Plaintiff as his top candidate due to her extensive experience with adult services. Ex. 18, Sullivan depo. 191:19-192:10, 242:17-243:1.

**RESPONSE:**  Uncontroverted that Mr. Sullivan testified to this and stated that in his interview with Ms. Bloomberg and Ms. Veronda, however controverted to the extent that Defendant attempts to imply that Mr. Sullivan did not make this decision discriminatorily due to Plaintiff's age, gender identity and presentation, and FMLA status.  Further, Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.  Exhibit G, Robert Sullivan Deposition at 242:17-243:1.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.  Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).  Mr. Seidler did not think it necessary for the person hired for the BI Analyst

role to have juvenile experience.  Exhibit F, Brian Seidler Deposition at 38:25-39:18.

The two BI Analysts would work together as needed and within each other's portfolios.

Exhibit M, Keith Clark Deposition at 48:8-49:14.  The duties for the BI Analysts were

the same for each portfolio, except that the source data and the developing visualizations

around that data would have looked a little different depending on the portfolio.  *Id.*;

Exhibit F, Brian Seidler Deposition at 34:24-35-15.  Moreover, of all the candidates

interviewed for the position, Plaintiff has the most domain experience.  Exhibit J, Susan

Dougan Deposition at 155:9-21.  Further, Ms. Allen's juvenile experience was not more

than Plaintiff's and when it came to this position, the person coming into did not need to

have juvenile experience.  Plaintiff worked with supervision of juveniles for one year.

Exhibit A, Plaintiff's Deposition at 168:14-17.

303.    Mr. Seidler's top choice was an external candidate named Casey Johnson. Ex. 28,

Seidler depo. 67:1-19. Plaintiff and Olivia Allen were in Mr. Seidler's top three, but he does not

remember in which order. Ex. 28, Seidler depo. 72:21-73:6, 82:21-83:1.

**RESPONSE:**  Uncontroverted that Casey Johnson was Mr. Seidler's top choice and that

Plaintiff was in Mr. Seidler's top three, however controverted that Ms. Allen was in his

top three.  Mr. Seidler remembers Plaintiff being in his top three candidates and bringing

her up for discussion after his number one choice Casey Johnson was shot down by Mr.

Sullivan.  Exhibit F, Brian Seidler Depo. at 87:24-88:8.  He "thinks" that Ms. Allen was

within his top three, but he does not "remember a hundred percent."  Exhibit F, Brian

Seidler Depo. at 103:7-15.  Moreover, Ms. Allen was classified as an external candidate

because she was outside the Department of Corrections.   Exhibit Q, BI Analyst Application information – JoCo-King 6736-39.

304.    Casey Johnson was Mr. Seidler's top choice because, although he had no corrections experience, Mr. Johnson had much more experience with Tableau and other statistical analysis programs than Mr. Seidler did. Mr. Seidler thought that would complement Mr. Seidler's skills and abilities. In other words, Mr. Seidler could help Mr. Johnson learn corrections, and Mr. Johnson could help Mr. Seidler take Mr. Seidler's knowledge in statistics and analysis to the next level. Ex. 28, Seidler depo. 73:16-74:8.[25]

**RESPONSE:**  Uncontroverted.

305.    Mr. Sullivan and Ms. Dougan, however, were not in favor of Mr. Johnson because he had no Corrections experience. Ex. 28, Seidler depo. 74:11-22.

**RESPONSE:** Uncontroverted.

306.    After the panel decided against Mr. Johnson, Mr. Seidler raised Plaintiff as a possibility. Ex. 28, Seidler 81:20-82:20.

**RESPONSE:** Uncontroverted.

---

[25] Mr. Johnson's resume and the notes of his interview can be found at Exhibit 57.

307.     Mr. Seidler remembers Mr. Sullivan saying , in response, that Plaintiff had been in a position for a long time where she could have been innovative and made changes, and she had largely not done that. Mr. Sullivan indicated he did not have reason to believe that would be different by switching positions. Ex. 28, Seidler depo. 76:5-19.

RESPONSE: Uncontroverted that Mr. Sullivan brought up, during deliberations after the interviews, that Plaintiff had been in her position for a "long time", otherwise controverted that Plaintiff was not innovative in that position or had made changes or that Mr. Sullivan knew about whether Plaintiff had been innovative or made changes as he had only been the Director of Corrections for a short time and Plaintiff's second level supervisor.   This was a direct comment related to Plaintiff's age in the consideration of the hiring for this position.  Ms. Brown outlined in multiple reviews, that Mr. Sullivan had access to, that Plaintiff was innovative.  Ms. Brown recognized Plaintiff's innovation on multiple occasions in Plaintiff's reviews explaining that Plaintiff "encourages *innovation* with regard to client supervision" that she has been open to "*innovative*" ways to get the job done and has "challenged her supervisory peers to be more open to this same concept."  Exhibit Z, Plaintiff's Employee Appraisal at JoCo-King 607, 618.  She also noted that Plaintiff "recommends solutions to problem situations and provides proactive solutions."  Exhibit Z, Plaintiff's Employee Appraisal at JoCo-King 601.   Ms. Brown also recognized that Plaintiff has taken the lead in ensuring the office is running smoothly and that Plaintiff "encourages that sharing of ideas and respects and values the contributions of others."  Exhibit Z, Plaintiff's Employee Appraisal at JoCo-King 606, 607.  Further, Plaintiff was involved in numerous changes involving innovation in the Corrections department over the 22 years she worked there, including but not limited to

147

the following:

a. Implemented systems to cut back on the massive amount of paperwork that was burying staff;
b. Implemented safety protocols for staff in the office and the field ;
c. Implemented Trauma Informed interventions with interacting with staff;
d. Sexual misconduct of staff - Wrote entire policy and procedure for the department;
e. Implemented the SB123 invoice processing system when the program was initiated;
f. Created the agency's Evidence Based Practices implementation plan with Tom Dugan as assigned by Betsy Gillespie;
g. Charged with training all department supervisors on the County's change from annual reviews to a Performance (PPD) based system in Oracle.
h. Volunteered to the Department's United Way Campaign several years in a row and developed innovative ways of encouraging people to donate to a worthy cause;
i. Served on the KDOC Standards Committee. Plaintiff was charged with updating the state supervision standards that all agencies followed. Responsible for introducing the idea of basing the reporting standards on what the client's case supervision plan goals were.
j. Implemented the change in case supervision reviews. The ISO previously would meet regularly with a supervisor and fill out a case review sheet on every single client. Due to the volume of unnecessary paperwork, Plaintiff reformed it to completing only those on client's that were pending a revocation hearing;
k. Initiated contact with KDOC to get the green light to stop dual data base entries for drug tests;
l. Worked with Court Services to implement a system for the pre-sentence LSIR process.

Exhibit K, Plaintiff's Declaration at ¶31.

308.    Mr. Seidler does not recall any discussion about the importance of experience in

the juvenile sector when they were discussing the candidates. Ex. 28, Seidler depo. 85:5-9.

**RESPONSE:** Uncontroverted.

309.    After Mr. Johnson was eliminated as a candidate, Mr. Seidler was pretty

indifferent. He knew he would work with whoever they chose, and he was not invested once his

top candidate was eliminated. Ex. 28, Seidler depo. 85:21-87:23.

**RESPONSE:** Controverted.  Mr. Seidler brought up Plaintiff right away and was shut

down by Mr. Sullivan, again.  Exhibit F, Brian Seidler Depo. at 87:24-88:8, 94:8-22. This caused Mr. Seidler to be indifferent as he knew he was going to be out voted; "Got two against one, I guess."  *Id.* at 94:8-95:6.

310.     Mr. Seidler had opportunities to speak up if he felt strongly after that. He just did not feel strongly. *Id.* at 87:6-23.

> **RESPONSE:** Uncontroverted that Mr. Seidler had opportunities to speak up if he felt strongly, however controverted that he did not speak up about Plaintiff.  Mr. Seidler remembers Plaintiff being in his top three candidates and bringing her up for discussion after his number one choice Casey Johnson was shot down by Mr. Sullivan.  Exhibit F, Brian Seidler Depo. at 87:24-88:8.  Mr. Seidler brought up Plaintiff for discussion and that was shot down.  *Id.* at 94:8-22.  This caused Mr. Seidler to be indifferent as he knew he was going to be out voted; "Got two against one, I guess."  *Id.* at 94:8-95:6.

311.     Mr. Seidler recalls that Ms. Allen had come highly recommended from Alex Holsinger and Tim Mulcahy, and that Mr. Sullivan and Ms. Dougan put a lot of weight on that. Ex. 28, Seidler depo. 75:2-14. They also felt like Ms. Allen was very passionate about coming in and being able to make changes based on her prior experience with Dr. Holsinger. Ex. 28, Seidler depo. 89:2-13.

> **RESPONSE:** Objection, the cited testimony is hearsay and cannot go to the truth of the matter asserted.  *See* FED. R. CIV. P. 56(c)(2).  Mr. Seidler had no personal knowledge of

whether Ms. Allen had come highly recommended from Alex Holsinger and Tim Mulcahy and had only heard this from Mr. Sullivan.  Further, Mr. Seidler does not have any personal knowledge of what Mr. Sullivan put weight on in his decision.

312.    Mr. Seidler agrees that parts of Ms. Allen's interview were very good. She presented herself very well. Her education, experience, and some of the opportunities she had in school were very good. She came across as very positive, very genuine in her desire to make changes. Ex. 28, Seidler 95:21-96:19.

> **RESPONSE:**  Uncontroverted that Mr. Seidler testified as such, however, controverted to the extent that Defendant attempts to imply that Ms. Allen's qualifications were better than Plaintiff or that Ms. Allen had a better interview than Plaintiff.  Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.  Exhibit G, Robert Sullivan Deposition at 242:17-243:1.

313.    On the other hand, he did not think she did well on the practical exercise, which worried him, but based on the fact that she had a master's degree and had worked with Dr. Holsinger, he assumed she would be able to do the job. Ex. 28, Seidler depo. 89:16-90:6.

> **RESPONSE:** Controverted.  Mr. Seidler specifically asked the first question of his exercise for the purpose of determining whether the candidates "understood Excel formulas" and "could speak Excel" in the interpretation of data.  Exhibit F, Brian Seidler

Deposition at 91:21-93:18.  Ms. Allen did not even try on this exercise and just said she did not know.  *Id.*  This concerned Mr. Seidler because he thought based on her listed education and experience, she would have had familiarity with Excel and a candidate for the position would have been able to perform between on that part of the exercise.  *Id.*

314.   Mr. Seidler agrees that the ability to present was critical because they present often. At that point, he had not seen Ms. Allen present. He had seen Plaintiff present and did not think she was particularly dynamic, but she was competent and knowledgeable about the material she was presenting. Ex. 28, Seidler depo. 96:20-98:2.

> **RESPONSE:** Uncontroverted Mr. Seidler testified as such, however controverted to the extent that Defendant attempts to imply that Plaintiff was not good at presenting, or that Mr. Seidler's testimony here factored into Mr. Sullivan's decision, as Mr. Sullivan had seen Plaintiff present previously and thought she was comfortable presenting and did a good job.  Exhibit G, Robert Sullivan Depo. at 175:10-15.  Moreover, Mr. Sullivan stated that he could picture Shannon presenting in the BI Analyst job and that when he saw her present on TIC, she "does well".  Exhibit E, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.

315.   After discussion, the panel decided to sleep on it over the weekend and come on Monday to make a final decision. Ex. 18, Sullivan depo. 186:8-13; Ex. 28, Seidler depo. 67:1-14.

> **RESPONSE:**  Uncontroverted.

316.    Ultimately, Ms. Dougan and Mr. Sullivan decided to hire Olivia Allen. Mr. Sullivan was really impressed with the enthusiasm Ms. Allen brought to the interview. She was excited to be there and grateful for the opportunity. Ms. Allen brought energy and excitement about the position and her ability to contribute to making the criminal justice system better. Ex. 18, Sullivan depo. 168:14-169:2.[26]

> **RESPONSE:** Uncontroverted that Mr. Sullivan, not Ms. Dougan, decided to hire Olivia Allen, however controverted to the extent that Defendant attempts to imply that Mr. Sullivan did not make this decision discriminatorily due to Plaintiff's age, gender identity and presentation, and FMLA status. Plaintiff believes the decision was discriminatory because Ms. Allen is significantly younger than Plaintiff and is feminine presenting. Exhibit A, Plaintiff's Deposition at 97:20-198:10.  Plaintiff was more qualified than Ms. Allen because they were looking for domain experience (i.e. experience in corrections) and Tableau data visualization experience. They also wanted presentation experience. And Plaintiff had all this experience and a career expanding 28 years in corrections. Exhibit A, Plaintiff's Deposition at 196:23-197:19.  Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.  Exhibit G, Robert Sullivan Deposition at 242:17-243:1.  There was no objective reason Plaintiff should not have been hired over Ms. Allen, as juvenile experience was not required, and Plaintiff had some.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the

---

[26] Plaintiff's counsel has suggested that the words excited and enthusiastic refer to young people. Mr. Sullivan disagrees, as he is 49 years old (approximately two years younger than Plaintiff). People describe Mr. Sullivan as excited and enthusiastic. He really likes the profession. Ex. 18, Sullivan depo. 169:12-25.

process of selecting a candidate for the position.  Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).  Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience.  Exhibit F, Brian Seidler Deposition at 38:25-39:18.  The two BI Analysts would work together as needed and within each other's portfolios.  Exhibit M, Keith Clark Deposition at 48:8-49:14. The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio.  *Id.*; Exhibit F, Brian Seidler Deposition at 34:24-35-15.  Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience.  Exhibit J, Susan Dougan Deposition at 155:9-21.  Further, Ms. Allen's juvenile experience was not more than Plaintiff's and when it came to this position, the person coming into did not need to have juvenile experience.  Plaintiff worked with supervision of juveniles for one year.  Exhibit A, Plaintiff's Deposition at 168:14-17.

317.    Mr. Sullivan noted that Tableau experience obviously was not the determining factor behind the decision. They passed on someone with extensive Tableau experience (Casey Johnson). Had they put a premium on that, the decision would have been different. Ex. 18, Sullivan depo. 167:16-168:8, 182:15-183:10.

**RESPONSE:**  Controverted and misleading.  To the extent that Defendant attempts to imply that Tableau experience was not important or that a premium was not placed upon

it, this is contrary to the fact that Question No. 10 specifically requested interview candidates to answer whether "you have ever used Tableau". *See* Defendant's Exhibit 56 (Depo. Ex. 40) Notes from Plaintiff's Interview – Question 10. Only looking for creator experience with Tableau was not denoted anywhere in the interview questions, nor did it come up in the Ms. Bloomberg's interview notes with Plaintiff, Ms. Dougan, or Mr. Sullivan. *See* Defendant's Exhibit 56 (Depo. Ex. 40) Notes from Plaintiff's Interview – Question 10. Moreover, it is uncontroverted that of the two top candidates with domain (corrections) experience, Plaintiff and Ms. Allen, Plaintiff was the only one with Tableau experience. Exhibit O, Olivia Allen Deposition at 67:18-68:9 ("I had no idea what Tableau was until a couple month prior to the interview . . . I'd never used it"); Exhibit F, Brian Seidler Deposition at 101:23-102:13, 105:13-107:13, 112:18-115:2; Exhibit R, Plaintiff's Resume for the BI Analyst position (Depo Ex. 64).

318.    Mr. Sullivan was looking for someone with domain experience as well as data analytics experience or working with data. He also wanted to find someone with a desire to be innovative. In Mr. Sullivan's view, Tableau was a "nice to have" characteristic, but not a requirement. Ex. 18, Sullivan depo. 195:17-25; Ex. 47, Sullivan email outlining traits of a great candidate.

**RESPONSE:**  Uncontroverted that the email cited as Exhibit 47 from Mr. Sullivan to Mr. Seidler and Ms. Dougan indicates he was looking for a candidate who was innovative, however controverted to the extent that Defendant attempts to imply that Tableau was a nice to have or that Plaintiff did not have all of these qualifications. To

the extent that Defendant attempts to imply that Tableau experience was not important or that a premium was not placed upon it, this is contrary to the fact that Question No. 10 specifically requested interview candidates to answer whether "you have ever used Tableau". *See* Defendant's Exhibit 56 (Depo. Ex. 40) Notes from Plaintiff's Interview – Question 10.   Only looking for creator experience with Tableau was not denoted anywhere in the interview questions, nor did it come up in the Ms. Bloomberg's interview notes with Plaintiff, Ms. Dougan, or Mr. Sullivan.  *See* Defendant's Exhibit 56 (Depo. Ex. 40) Notes from Plaintiff's Interview – Question 10.   Moreover, it is uncontroverted that of the two top candidates with domain (corrections) experience, Plaintiff and Ms. Allen, Plaintiff was the only one with Tableau experience.  Exhibit O, Olivia Allen Deposition at 67:18-68:9 ("I had no idea what Tableau was until a couple month prior to the interview . . . I'd never used it"); Exhibit F. Brian Seidler Deposition at 101:23-102:13, 105:13-107:13, 112:18-115:2; Exhibit R, Plaintiff's Resume for the BI Analyst position (Depo Ex. 64).   Plaintiff was more qualified than Ms. Allen because they were looking for domain experience (i.e. experience in corrections) and Tableau data visualization experience. They also wanted presentation experience. And Plaintiff had all this experience and a career expanding 28 years in corrections.  Exhibit A, Plaintiff's Deposition at 196:23-197:19.   Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.  Exhibit G, Robert Sullivan Deposition at 242:17-243:1.  There was no objective reason Plaintiff should not have been hired over Ms. Allen, as juvenile experience was not required, and Plaintiff had some.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a

candidate for the position.  Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).  Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience.  Exhibit F, Brian Seidler Deposition at 38:25-39:18.  The two BI Analysts would work together as needed and within each other's portfolios.  Exhibit G, Keith Clark Deposition at 48:8-49:14.  The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio.  *Id.*; Exhibit F, Brian Seidler Deposition at 34:24-35-15. Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience.  Exhibit J, Susan Dougan Deposition at 155:9-21.  Further, Ms. Allen's juvenile experience was not more than Plaintiff's and when it came to this position, the person coming into did not need to have juvenile experience.  Plaintiff worked with supervision of juveniles for one year.  Exhibit A, Plaintiff's Deposition at 168:14-17.

319.    The energy, enthusiasm, and curiosity to think outside the box and not try to solve problems using the same methods they had been using for a long time and expecting different outcomes. Those things, along with the factors discussed above, are what drove Mr. Sullivan's decision/recommendation. Ex. 18, Sullivan depo. 183:11-23.

**RESPONSE:** Uncontroverted that Mr. Sullivan testified as such, however, controverted that the these were the true reasons for Mr. Sullivan's decision and not Plaintiff's age,

gender presentation, sexual orientation, or that she had taken FMLA leave. Plaintiff believes the decision was discriminatory because Ms. Allen is significantly younger than Plaintiff and is feminine presenting. Exhibit A, Plaintiff's Deposition at 97:20-198:10. Plaintiff was more qualified than Ms. Allen because they were looking for domain experience (i.e. experience in corrections) and Tableau data visualization experience. They also wanted presentation experience. And Plaintiff had all this experience and a career expanding 28 years in corrections. Exhibit A, Plaintiff's Deposition at 196:23-197:19. Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff. Exhibit G, Robert Sullivan Deposition at 242:17-243:1. There was no objective reason Plaintiff should not have been hired over Ms. Allen, as juvenile experience was not required, and Plaintiff had some. Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position. Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience). Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience. Exhibit F, Brian Seidler Deposition at 38:25-39:18. The two BI Analysts would work together as needed and within each other's portfolios. Exhibit M, Keith Clark Deposition at 48:8-49:14. The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio. *Id.*; Exhibit F, Brian Seidler Deposition at 34:24-35-15. Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience. Exhibit J, Susan

Dougan Deposition at 155:9-21.  Further, Ms. Allen's juvenile experience was not more than Plaintiff's and when it came to this position, the person coming into did not need to have juvenile experience.   Plaintiff worked with supervision of juveniles for one year. Exhibit A, Plaintiff's Deposition at 168:14-17.

Post-Hire Information

320.    Ms. Dougan contacted the candidates they did not select to inform them of the decision. Ex. 20, Dougan depo. 143:2-8. She told Plaintiff they went with someone with more data analysis experience. Ex. 1, Pltf's depo. 210:19-211:1.

**RESPONSE:** Uncontroverted.

321.    On June 7, 2019, Ms. Dougan sent an email announcing that they had hired Olivia Allen for the position. The email had Ms. Allen's picture and bio, which is a customary practice. Ex. 59 (Depo. Ex. 122); Ex. 20, Dougan depo. 169:6-11.

**RESPONSE:** Uncontroverted.

322.    After taking the BIA position, Ms. Allen took a couple Excel classes because she wanted to be able to do more with Excel, but she did not really need them because Tableau did not require much Excel besides building the databases to transfer to Tableau. Ex. 52, Allen depo. 80:5-81:1.

**RESPONSE:** Uncontroverted that Ms. Allen testified as such, however controverted to the extent that Defendant attempts to imply that the use and understanding of Excel is not required for Tableau.   Excel is still needed in the BI Analyst position for the databases and sometimes they have to revert to Excel formulas for the creation of dashboards. Exhibit F, Brian Seidler Deposition at 90:16-92:2.

323.    In other words, she used Excel as a platform for getting the data ready for analysis in Tableau, which is something she knew how to do before she was a BIA. Ex. 52, Allen depo. 146:11-147:6.

**RESPONSE:** Controverted.   Ms. Allen stated during the interview process that she "hasn't used Excel formulas [sic] doesn't know".   *See* Defendant's Exhibit 55 (Depo. Ex. 112).

324.    Shortly after Ms. Allen was hired, Mr. Seidler told her she should be humble because there were people in the department who had applied for the position and did not get it. Ex. 52, Allen depo. 88:1-89:10.

**RESPONSE:** Uncontroverted.

Basis of Plaintiff's Claims

325.    Plaintiff believes she was more qualified than Ms. Allen because they were looking for domain experience (i.e. experience in corrections) and Tableau data visualization experience. They also wanted presentation experience. And Plaintiff had all of this experience. Ex. 1, Pltf's depo. 196:23-197:19.

**RESPONSE:** Uncontroverted.

326.    Plaintiff believes the decision was discriminatory because Ms. Allen is significantly younger than Plaintiff and is feminine presenting. In addition, based on the same comments discussed in SOF 55-70, above, from supervisors in the past (none of whom was involved in the decision, or even working for the County at the time), Plaintiff believes it is not desirable for a masculine presenting female to present to advisory boards or commissioners. Ex. 1, Pltf's depo. 197:20-198:10.

**RESPONSE:** Uncontroverted.

**Plaintiff's Complaint to Human Resources**

327.    Plaintiff first made a complaint of discrimination in June 2019. Ex. 1, Pltf's depo. 31:11-14, 203:12-19.

**RESPONSE:** Uncontroverted.

328.    Specifically, on June 11, 2019, Plaintiff sent an email to Shala Bloomberg

indicating that she had concerns about the hiring decisions and had contacted the EEOC. Ex. 60 (Depo. Ex. 42).

**RESPONSE:** Uncontroverted.

329.     In response, Ms. Bloomberg and another HR Partner, Sam Veronda, met with Plaintiff on June 13, 2019. Ex. 61 (Depo. Ex. 44); Ex. 1, Pltf's depo. 207:5-15.

**RESPONSE:** Uncontroverted.

330.     In that meeting, Plaintiff raised concerns about the hiring decisions referenced above.[27] Plaintiff stated she did not believe anyone had any malicious intent but suggested the decisions may have been related to her gender presentation, and the BIA decision may have been related to her age. Ex. 61 (Depo. Ex. 44); Ex. 1, Pltf's depo. 207:5-212:10.

**RESPONSE:** Uncontroverted.

331.     Plaintiff also stated that prior supervisors had talked to her about the way she dressed, but she specifically noted that she had not experienced anything like that with Mr. Sullivan or Mr. Clark. Ex. 61 (Depo. Ex. 44) at JoCo 476; Ex. 24, Bloomberg Decl. ¶ 17.

**RESPONSE:** Uncontroverted.

---

[27] Plaintiff also raised concerns about the hiring decision for the Deputy Director of the ARC, but she is not pursuing a claim based on that position. *See* Doc. 68, Pretrial Order, §6.

**The Investigation**

332.    After speaking with Plaintiff, Ms. Bloomberg and Ms. Veronda interviewed all of the hiring managers for the positions Plaintiff identified as concerning. The notes of those interviews can be found at Exhibits 62 through 64. Ex. 24, Bloomberg Decl. ¶ 18.

> **RESPONSE:** Uncontroverted that after speaking with Plaintiff, Ms. Bloomberg and Ms. Veronda interviewed Mr. Sullivan, Ms. Dougan, and Earl Taylor regarding Plaintiff's complaints of discrimination and those notes are found at Exhibits 62-64, however controverted to the extent that Defendant attempts to imply HR conducted a proper investigation.  Ms. Bloomberg did not interview anyone else from the interview panels, even though she had the ability to do so.  Exhibit L, Shayla Bloomberg Deposition at 264:7-25.  Instead, the hiring managers, who were accused of making discriminatory hiring decisions by Plaintiff, were the only panel members interviewed by Ms. Bloomberg and Ms. Veronda, and their explanations to her about the hiring process were taken as fact without any further investigation or confirmation. *Id.*; Exhibit N, Samantha Veronda Deposition at 50:23-54:24.   Ms. Bloomberg and Ms. Veronda both admitted that someone being accused of discrimination would not normally admit to it.  Exhibit L, Shayla Bloomberg Deposition at 264:1-18; Exhibit N, Samantha Veronda Deposition at 56:5-20. Further, Ms. Bloomberg, who was a part of the hiring process for the DFS position, was in charge of the investigation into the discriminatory process, a clear conflict of interest.  Exhibit L, Shayla Bloomberg Deposition at 264:7-25.

333.    As to the Director of Field Services position, Mr. Sullivan informed Ms. Bloomberg and Ms. Veronda that it was a split decision between Mr. Clark and Ms. Mestad. Mr. Sullivan stated he has known Mr. Clark for a long time. There had been a lack of trust with the prior Director, and he needed to restore that trust. Ex. 62 (Depo. Ex. 102); Ex. 24, Bloomberg Decl. ¶ 18.[28]

**RESPONSE:**    Objection, hearsay and inadmissible. *See* FED. R. CIV. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted. *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted to the extent that there was a split decision and that Mr. Sullivan had not already made the decision to hire Mr. Clark prior to the interviews. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.  Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.  Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an

---

[28] Mr. Sullivan believes Ms. Brown stopped trusting him after they had to deal with a personnel issue unrelated to Plaintiff or the claims in this case. Ex. 18, Sullivan depo. 125:3-127:1. Ms. Brown testified she felt Mr. Sullivan did back her in that situation. Ex. 25, Brown depo. 88:6-90:25.

easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]". Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

334.    Mr. Sullivan stated he was the tie breaker for that decision and opted to go with Mr. Clark. Mr. Sullivan stated he knew Mr. Clark when Mr. Clark was the Director in the 4th judicial district, and he knows Mr. Clark was a contender for the Deputy Secretary of Corrections position. He stated Mr. Clark is one of the best grant writers in the state. The state has reached out to Mr. Clark for Evidence Based Practices and Quality Assurance, which is one of Johnson County's biggest challenges. *Id.*

**RESPONSE:** Objection, hearsay and inadmissible. *See* FED. R. CIV. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted. *Id.* Therefore, this Statement of Fact is unsupported. To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted to the extent that there was a split decision and that Mr. Sullivan had not already made the decision to hire Mr. Clark prior to the interviews. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that. Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146. Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr.

Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13. Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.   Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).   Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]". Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

335.     Mr. Sullivan stated it was an easy decision for him. Mr. Clark had been a Director previously and knows Kansas law. Ex. 62 (Depo. Ex. 102).

**RESPONSE:**   Objection, hearsay and inadmissible.   *See* Fed. R. Civ. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted. *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted to the extent that there was a split decision and that Mr. Sullivan had not already made the decision to hire Mr. Clark prior to the interviews. Ms. Brown told Plaintiff that it was "already a done deal" on the day of the interview and she wished she had not missed Beth Daily's retirement party because of the interviews and was upset about that.   Exhibit A, Plaintiff's Deposition at 188:18-190:13, 200:12-201:2; Exhibit I, Sharon Brown Deposition at 31:18-32:4; *see also* SOF 146.  Ms. Brown

also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews. Exhibit A, Plaintiff's Deposition at 188:18-190:13.  Further, Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  Exhibit G, Robert Sullivan Deposition at 220:13-19, 221:17-222:5 (emphasis added).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]". Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).

336.    As to the BIA position, Ms. Bloomberg and Ms. Veronda interviewed both Robert Sullivan and Susan Dougan. They did not interview Brian Seidler because they did not feel they needed more information, and Mr. Seidler was not the hiring manager. Ex. 17, Bloomberg depo. 261:18-263:25.

**RESPONSE:**  Uncontroverted that Ms. Bloomberg and Ms. Veronda interviewed Mr. Sullivan and Ms. Dougan, and that the Ms. Bloomberg testified as such, however controverted to the extent that Defendant attempts to imply HR conducted a proper investigation.  Ms. Bloomberg did not interview anyone else from the interview panels, even though she had the ability to do so.  Exhibit L, Shayla Bloomberg Deposition at 264:7-25.  Instead, the hiring managers, who were accused of making discriminatory hiring decisions by Plaintiff, were the only panel members interviewed by Ms.

Bloomberg and Ms. Veronda, and their explanations to her about the hiring process were taken as fact without any further investigation or confirmation.  *Id.*; Exhibit N, Samantha Veronda Deposition at 50:23-54:24.   Ms. Bloomberg and Ms. Veronda both admitted that someone being accused of discrimination would not normally admit to it.  Exhibit L, Shayla Bloomberg Deposition at 264:1-18; Exhibit N, Samantha Veronda Deposition at 56:5-20. Further, Ms. Bloomberg, who was a part of the hiring process for the DFS position, was in charge of the investigation into the discriminatory process, a clear conflict of interest.  Exhibit L, Shayla Bloomberg Deposition at 264:7-25.

337.    Ms. Dougan indicated that Mr. Sullivan worked with the BIA position more than she did, so she was leaning more toward what Mr. Sullivan wanted. Ex. 63 (Depo. Ex. 100).

**RESPONSE:** Objection, hearsay and inadmissible. *See* FED. R. CIV. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted.  *Id.* To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted to the extent that Defendant attempts to imply that Ms. Dougan was the ultimate decisionmaker for this position.   Mr. Sullivan told Ms. Bloomberg, "Technically, this was [Ms. Dougan]'s decision who to interview, but I know I heavily influenced her decision."  Exhibit E, Interview Notes of Robert Sullivan, June 24, 2019 – JoCo-King 0000491 (Depo. Ex. 102).  Mr. Seidler believed that Mr. Sullivan was able to influence the decision on who was going to be hired for the BI Analyst

position and Mr. Seidler took Mr. Sullivan's list of characteristics as what they should be looking for in an Analyst.   Exhibit F, Brian Seidler Deposition at 44:18-45:15.   Ms. Dougan told Ms. Bloomberg that "I was leaning more to what Robert wants, what are you looking for Robert?"  "I was relying heavily on Robert's list."  Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).   Mr. Sullivan acknowledged "[he] had to make a decision" and he chose Ms. Allen.  Exhibit G, Robert Sullivan Deposition at 189:14-19.

338.   When Ms. Dougan was interviewed, she stated that they were looking for Tableau and data experience and domain experience (Corrections experience), and that did not come to fruition as much as they thought. Ex. 63 (Depo. Ex. 100).

**RESPONSE:**  Objection, hearsay and inadmissible. *See* FED. R. CIV. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted. *Id.* To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted as Plaintiff had all three of these items: Tableau, data, and domain experience and was the most qualified for the BI Analyst position. Ms. Bloomberg testified that it was true that Plaintiff had Tableau and domain experience and that this is what Mr. Sullivan and Ms. Dougan said they were looking for but did not have with any of the interviewees; and that this was inconsistent with the interview notes. Exhibit L, Shayla Bloomberg Deposition at 245:3-14, 245:25-246:15, 248:18-249:6, 256:4-17.  Ms. Dougan understood that Plaintiff had Tableau experience and she knew

that prior to the interview, and this would have been something "important in hiring for this position".  Exhibit J, Susan Dougan Deposition at 130:4-131:1, 186:12-187:4.  Ms. Dougan testified that where Ms. Bloomberg's notes state "Shannon didn't have strong data experience.  She kept saying all she had was Google Analytics" it was "not an accurate statement" that Plaintiff had no Tableau experience, when in fact, she did.  *Id.* at 156:5-17, 167:9-17; Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).  Ms. Allen had no Tableau experience, her only data analytics software experience was with SPSS and data input into Excel, and she had very little corrections experience. Exhibit XX, Olivia Allen Deposition at 67:15-68:9 ("I had no idea what Tableau was until a couple month prior to the interview . . . I'd never used it").  Further, Plaintiff was more qualified than Ms. Allen because they were looking for domain experience (i.e. experience in corrections) and Tableau data visualization experience. They also wanted presentation experience. And Plaintiff had all this experience and a career expanding 28 years in corrections.  Exhibit A, Plaintiff's Deposition at 196:23-197:19.  Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.  Exhibit G, Robert Sullivan Deposition at 242:17-243:1.  There was no objective reason Plaintiff should not have been hired over Ms. Allen, as juvenile experience was not required, and Plaintiff had some.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.  Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).  Mr. Seidler did not think it necessary for the person

hired for the BI Analyst role to have juvenile experience. Exhibit F, Brian Seidler Deposition at 38:25-39:18. The two BI Analysts would work together as needed and within each other's portfolios. Exhibit M, Keith Clark Deposition at 48:8-49:14. The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio. *Id.*; Exhibit F, Brian Seidler Deposition at 34:24-35-15. Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience. Exhibit J, Susan Dougan Deposition at 155:9-21. Further, Ms. Allen's juvenile experience was not more than Plaintiff's and when it came to this position, the person coming into did not need to have juvenile experience. Plaintiff worked with supervision of juveniles for one year. Exhibit A, Plaintiff's Deposition at 168:14-17.

339.    Ms. Dougan and Mr. Sullivan explained to Ms. Bloomberg that they were looking for creator experience with Tableau, which neither Plaintiff nor Ms. Allen had. Ex. 17, Bloomberg depo. 241:10-16, 295:5-24; Ex. 62 (Depo. Ex. 102) at JoCo 492.

**RESPONSE:** Controverted. Neither Mr. Sullivan nor Ms. Dougan mentioned that they were looking specifically for "creator experience" in Tableau. Only looking for creator experience with Tableau was not denoted anywhere in the interview questions, nor did it come up in the Ms. Bloomberg's interview notes with Plaintiff, Ms. Dougan, or Mr. Sullivan. *See* Defendant's Exhibit 56 (Depo. Ex. 40) Notes from Plaintiff's Interview – Question 10. It is uncontroverted that Plaintiff had Tableau experience and Ms. Allen did not. Exhibit O, Olivia Allen Deposition at 67:18-68:9 ("I had no idea what Tableau was

until a couple month prior to the interview . . . I'd never used it"); Exhibit F, Brian Seidler Deposition at 101:23-102:13, 105:13-107:13, 112:18-115:2; Exhibit R, Plaintiff's Resume for the BI Analyst position (Depo Ex. 64). However, after denying Plaintiff the position in favor of the younger, more feminine presenting, straight Olivia Allen, and after Plaintiff's complaints of discrimination, Defendant attempts to justify the original emphasis placed on Tableau by stating that it needed to be "creator experience", when this was not the case. Ms. Bloomberg testified that it was true that Plaintiff had Tableau and domain experience and that this is what Mr. Sullivan and Ms. Dougan said they were looking for but did not have with any of the interviewees; and that this was inconsistent with the interview notes. Exhibit L, Shayla Bloomberg Deposition at 245:3-14, 245:25-246:15, 248:18-249:6, 256:4-17. Ms. Dougan understood that Plaintiff had Tableau experience and she knew that prior to the interview, and this would have been something "important in hiring for this position". Exhibit J, Susan Dougan Deposition at 130:4-131:1, 186:12-187:4. Ms. Dougan testified that where Ms. Bloomberg's notes state "Shannon didn't have strong data experience. She kept saying all she had was Google Analytics" it was "not an accurate statement" that Plaintiff had no Tableau experience, when in fact, she did. *Id.* at 156:5-17, 167:9-17; Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).

340. Ms. Bloomberg understood from her interviews with Mr. Sullivan and Ms. Dougan, and from her review of the panel's notes of their interview with Plaintiff, that Plaintiff had end user experience with Tableau, but not creator experience with Tableau. Ex. 17,

Bloomberg depo. 241:10-16; 295:5-24.

> **RESPONSE:** Controverted.  Ms. Bloomberg formed this opinion about Tableau after reviewing the panel's notes of their interview with Plaintiff a week prior to Ms. Bloomberg's deposition.  Exhibit L, Shayla Bloomberg Deposition at 166:24-167:24. This opinion was not formed during the June 2019 interviews with Mr. Sullivan and Ms. Dougan.  *Id.*   While Ms. Bloomberg had access to the interview notes during her "investigation" into Plaintiff's claims of discrimination, she cannot state for certain she reviewed them until the week prior to her deposition.  *Id.* at 247:8-24.  Ms. Bloomberg testified that it was true that Plaintiff had Tableau and domain experience and that this is what Mr. Sullivan and Ms. Dougan said they were looking for but did not have with any of the interviewees; and that this was inconsistent with the interview notes.  *Id.* at 245:3-14, 245:25-246:15, 248:18-249:6, 256:4-17.  Ms. Dougan understood that Plaintiff had Tableau experience and she knew that prior to the interview, and this would have been something "important in hiring for this position".  Exhibit L, Susan Dougan Deposition at 130:4-131:1, 186:12-187:4.  Ms. Dougan testified that where Ms. Bloomberg's notes state "Shannon didn't have strong data experience.  She kept saying all she had was Google Analytics" it was "not an accurate statement" that Plaintiff had no Tableau experience, when in fact, she did.  *Id.* at 156:5-17, 167:9-17.

341.    Ms. Dougan stated that Ms. Allen had domain experience with the juvenile justice system and noted that the position was going to take over the juvenile portfolio. Ex. 63 (Depo. Ex. 100).

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted regarding Ms. Allen's domain experience or that the position was going to be taking over the juvenile portfolio.  *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted as Ms. Dougan did not even remember giving this interview to Ms. Bloomberg and does not recall was stated in the interview.  Exhibit L, Susan Dougan Deposition at 151:15-25.  Ms. Dougan could not remember and did not find any place in her interview notes where the panel inquired about juvenile experience, even though in the "back of [her] mind" she thought Ms. Allen had juvenile experience.  *Id.* at 111:21-25, 112:20-113:3.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.  Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at 255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).  Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience.  Exhibit F, Brian Seidler Deposition at 38:25-39:18.  Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience.  Exhibit XX, Susan Dougan Deposition at 155:9-21.   Further, Ms. Allen's juvenile experience was not more than Plaintiff's and when it came to this position, the person coming into did not need to have juvenile experience.  Plaintiff worked with supervision of juveniles for one year.  Exhibit A, Plaintiff's Deposition at 168:14-17.

342.    Ms. Dougan also explained that Ms. Allen had worked with Dr. Alex Holsinger and planned to present at a conference with Mr. Holsinger in September. She stated that Ms. Allen also had extensive experience with another professor doing data analytics. *Id.*

> **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted regarding Ms. Allen's work with Dr. Holsinger or her experience with data analytics.  *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted as Ms. Dougan did not even remember giving this interview to Ms. Bloomberg and does not recall was stated in the interview.  Exhibit J, Susan Dougan Deposition at 151:15-25.

343.    Ms. Dougan stated they put their top three candidates on a white board and Mr. Sullivan took a picture. She initially said everyone had Ms. Allen as number 1 but later clarified that Mr. Seidler leaned toward the Tableau and presentation side of things. She stated Mr. Seidler struggled with Ms. Allen but then Ms. Allen was his top when they returned on Monday. *Id.* Ms. Dougan stated she did not think Mr. Seidler had Plaintiff in his top three. *Id.*

> **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be

cited for the truth of the matter asserted regarding the ranking of the candidates or Mr. Seidler's ranking of candidates or if he struggled with the decision. *Id.* To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted as Ms. Dougan did not even remember giving this interview to Ms. Bloomberg and does not recall was stated in the interview. Exhibit J, Susan Dougan Deposition at 151:15-25.

344.    Ms. Dougan said Ms. Allen was her top pick, and Plaintiff was her second. Mr. Johnson was her third pick. Mr. Johnson had Tableau knowledge, but they thought he was overqualified and would not want to stay. *Id.*

> **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted regarding Mr. Johnson and the reasons that others on the panel thought he was "overqualified" and "would not want to stay". *Id.* To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted as Ms. Dougan did not even remember giving this interview to Ms. Bloomberg and does not recall was stated in the interview. Exhibit J, Susan Dougan Deposition at 151:15-25. Ms. Dougan did testify that Ms. Allen was her top pick, Plaintiff was her second, and Mr. Johnson was her third. Exhibit J, Susan Dougan Deposition.

345.    Ms. Dougan stated that Plaintiff did not have strong data experience. She kept saying all she had used was Google Analytics, and the examples she gave were from "like 15 years ago." *Id.*

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted regarding Plaintiff's data experience.  *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted as Ms. Dougan did not even remember giving this interview to Ms. Bloomberg and does not recall was stated in the interview.  Exhibit J, Susan Dougan Deposition at 151:15-25. Plaintiff did have strong data experience.  She had the same degree as Ms. Allen and over 20 years of experience working with data. Exhibit A, Plaintiff's Deposition at 204:13-205:21, 212:3-10.   Plaintiff various data projects as a supervisor with ISP, including taking a database over form Mr. Seidler with a very detailed data collection process and compiling data about officer recommendations at court hearings and interpreting that data, among others.  *Id.*  Further, Plaintiff discussed during the interview her use of Google Data Studio and Tableau.  *Id.* at 30:4-20, 204:13-205:21. She talked in-depth about how she learned data visualization tools through online classes and was self-taught; created dashboards; cleaned data; transferred data from databases to Excel for cleaning and creating dashboards; and reviewing and interpreting that data (which she shared with Keith Clark prior to the interview).  *Id.*  To the extent that any of the interview panelist was seeking a more recent example from Plaintiff, or

any of the interviewees, this was not made clear in the question and the interview panelists did not ask for a more recent example even though they could have done so. Exhibit K, Plaintiff's Declaration at ¶30; Exhibit J, Susan Dougan Depo. at 134:10-16.

346.    In addition, Plaintiff could not come up with recent innovative things she had done. *Id.*

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted that "Plaintiff could not come up with recent innovative things she had done." *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted.  This SOF is inaccurate and misleading.  During the interview, Plaintiff was never asked to come up with "recent innovative things she had done."  This question was not asked by the panel, nor were any follow up questions asked requesting Plaintiff to provide more recent examples.  Exhibit K, Plaintiff's Declaration at ¶30.  To the extent that any of the interview panelist was seeking a more recent example from Plaintiff, or any of the interviewees, this was not made clear in the question and the interview panelists did not ask for a more recent example even though they could have done so.  Exhibit K, Plaintiff's Declaration at ¶30; Exhibit J, Susan Dougan Depo. at 134:10-16.  In addition, Ms. Dougan did not even remember giving this interview to Ms. Bloomberg and does not recall was stated in the interview.  Exhibit J, Susan Dougan Deposition at 151:15-25.

347.    Ms. Dougan stated that Ms. Allen was the first interview and took the full hour. She stated she was "awe struck with her." Ms. Dougan explained that the person in this position does a lot of presentations, and Ms. Allen was a good presenter *Id.*

> **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted that "Plaintiff could not come up with recent innovative things she had done."  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state "awe struck with her", "first interview", "full hour", and "good presenter", however, otherwise controverted.  In the cited exhibit, Ms. Dougan did not discuss or "explain" that the position does a lot of presentations.  *See* Defendant's Exhibit 63.

348.    By contrast, Ms. Dougan stated that Plaintiff gets nervous and that she turned red during interviews and was nervous. *Id.*

> **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted that "Plaintiff gets nervous and that she turned red during interviews and was nervous."  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as such, however controverted.  Both

Mr. Sullivan and Mr. Seidler stated that Plaintiff did well in the interview and did not mention anything about her being nervous during this interview or other presentations. Mr. Sullivan stated that Plaintiff did a really good job. It was probably the best interview she had with him yet.   Exhibit L, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.   Mr. Sullivan had watched Plaintiff present on trauma-informed care and acknowledged that she's comfortable presenting.   Exhibit G, Robert Sullivan Depo. at 175:10-15.   Moreover, Mr. Sullivan stated that he could picture Shannon presenting in the BI Analyst job and that when the he saw her present on TIC, she "does well".   Exhibit L, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.   Mr. Seidler also thought Plaintiff did "pretty well" in the interview.   Exhibit F, Brian Seidler Depo. at 81:15-19.   Further, Plaintiff stated she was not afraid to speak in front of groups and had also presented at CCAB meetings.   *See* Defendant's Exhibit 56 (Depo. Ex. 40); Exhibit A, Plaintiff's Deposition at 193:13-15.

349.   Ms. Dougan stated when they asked her what motivated her to apply, Plaintiff stated she was just ready for a change. She also indicated her only presentation skills were doing training on Trauma Informed Care to staff. *Id.*

**RESPONSE:** Objection, hearsay and inadmissible.   This fact is not supported here by admissible evidence.   Rule 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted that Plaintiff was "just ready for a change" and her "only presentation skills were doing training on Trauma Informed Care to staff."   To the extent

a response is required, uncontroverted that Ms. Bloomberg's notes state as such, however controverted.  Plaintiff explained that while she was ready for a change, said she saw the position as a key role to push the department forward and likes the idea of basing policy decisions on data, which keeps her thinking and problem solving.  *See* Defendant's Exhibit 56 (Depo. Ex. 40) at JoCo-King 1364; Exhibit A, Plaintiff's Deposition at 191:23-192:24.  Plaintiff also stated that she was ready to "move forward with data" and "move forward w[ith] new initiatives".  *See* Defendant's Exhibit 56 (Depo. Ex. 40) at JoCo-King 1360.  She indicated she has a natural curiosity, it would be a personal challenge, and saw the position having a huge role in the department.  *See* Defendant's Exhibit 56 (Depo. Ex. 40) at JoCo-King 1364; Exhibit A, Plaintiff's Deposition at 191:23-192:24.  Moreover, Both Mr. Sullivan and Mr. Seidler stated that Plaintiff did well in the interview and did not mention anything about her being nervous during this interview or other presentations.  Mr. Sullivan stated that Plaintiff did a really good job. It was probably the best interview she had with him yet.  Exhibit L, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492. Mr. Sullivan had watched Plaintiff present on trauma-informed care and acknowledged that she's comfortable presenting.  Exhibit G, Robert Sullivan Depo. at 175:10-15. Moreover, Mr. Sullivan stated that he could picture Shannon presenting in the BI Analyst job and that when the he saw her present on TIC, she "does well".  Exhibit L, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.  Mr. Seidler also thought Plaintiff did "pretty well" in the interview. Exhibit F, Brian Seidler Depo. at 81:15-19.   Further, Plaintiff stated she was not afraid to speak in front of groups and had also presented at CCAB meetings.  *See* Defendant's

Exhibit 56 (Depo. Ex. 40); Exhibit A, Plaintiff's Deposition at 193:13-15.

350.    Ms. Dougan stated that Ms. Allen had co-authored a textbook with a professor on data concerning street gangs and had been doing a qualitative and quantitative analysis to evaluate the pre-trial tools. *Id.*

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  Rule 56(c)(2). Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Susan Dougan and cannot be cited for the truth of the matter asserted regarding Ms. Allen's experience.  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however, controverted as Ms. Dougan did not even remember giving this interview to Ms. Bloomberg and does not recall was stated in the interview.  Exhibit J, Susan Dougan Deposition at 151:15-25.

351.    Mr. Sullivan stated that Plaintiff did a really good job. It was probably the best interview she had with him yet. She did very well on Mr. Seidler's exercise, and she was one of their two finalists. Ex. 62 (Depo. Ex. 102).

**RESPONSE:** Uncontroverted.

352.    Mr. Sullivan noted that Mr. Seidler had decided he wanted to take over the adult

portfolio, which influenced their decision. He indicated that none of the candidates knew Tableau, between Ms. Allen and Plaintiff.[29] He noted that he was impressed with Ms. Allen and that she was going to be presenting on research she did with Alex Holsinger. *Id.*

> **RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted. *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, otherwise controverted.  Ms. Dougan understood that Plaintiff had Tableau experience and she knew that prior to the interview, and this would have been something "important in hiring for this position".  Exhibit J, Susan Dougan Deposition at 130:4-131:1, 186:12-187:4.  Ms. Dougan testified that where Ms. Bloomberg's notes state "Shannon didn't have strong data experience. She kept saying all she had was Google Analytics" it was "not an accurate statement" that Plaintiff had no Tableau experience, when in fact, she did.  *Id.* at 156:5-17, 167:9-17; Exhibit D, Interview Notes of Susan Dougan, June 19, 2019 – JoCo-King 000486 (Depo Ex. 100).  Ms. Allen had no Tableau experience, her only data analytics software experience was with SPSS and data input into Excel, and she had very little corrections experience. Exhibit O, Olivia Allen Deposition at 67:15-68:9 ("I had no idea what Tableau was until a couple month prior to the interview . . . I'd never used it").  Further, Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.  Exhibit F, Brian Seidler Deposition at 83:6-85:9; *see also* Exhibit G, Robert Sullivan Deposition at

---

[29] The notes actually read that none of the candidates knew tableau, but the context makes it clear it references Ms. Allen and Plaintiff. It is undisputed that a different candidate (Casey Johnson) had extensive creator experience with Tableau. *See also*, Ex. 18, Sullivan depo. 243:2-244:1.

255:17-24 (Mr. Sullivan did not ask Ms. King about any juvenile experience).   Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience.  Exhibit F, Brian Seidler Deposition at 38:25-39:18.  Moreover, of all the candidates interviewed for the position, Plaintiff has the most domain experience. Exhibit XX, Susan Dougan Deposition at 155:9-21.    Further, Ms. Allen's juvenile experience was not more than Plaintiff's and when it came to this position, the person coming into did not need to have juvenile experience.  Plaintiff worked with supervision of juveniles for one year.  Exhibit A, Plaintiff's Deposition at 168:14-17.

353.    Mr. Sullivan said he could picture Ms. Allen doing the job. He further stated, that in fairness, he could also picture Plaintiff doing the job. He had seen her present on Trauma Informed Care, and she does well. *Id.*

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted.  *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected.

354.    Mr. Sullivan liked the way Ms. Allen answered the questions. He liked her enthusiasm. *Id.*

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by

admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted.  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected that Mr. Sullivan told Ms. Bloomberg that he like Ms. Allen's enthusiasm.

355.    Mr. Sullivan stated that Plaintiff seemed very tired to him, and he did not know how she would do taking over the juvenile portfolio. *Id.*

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted. *Id.*   To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected and Mr. Sullivan stated to Ms. Bloomberg that Plaintiff seemed "tired".  Exhibit L, Shayla Bloomberg's Interview Notes for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.

356.    Earl Taylor gave similar feedback about Plaintiff when Ms. Bloomberg and Ms. Veronda interviewed him about the Deputy Director of ARC position. He stated that Plaintiff does not always seem plugged in and engaged. Ex. 64 (Depo. Ex. 101); Ex. 24, Bloomberg Decl. ¶ 18.

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by

admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Earl Taylor and cannot be cited for the truth of the matter asserted.  *Id.*  To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however controverted to the extent that Defendant attempts to argue that Plaintiff was not plugged in and engaged. In the same interview with Ms. Bloomberg, Mr. Taylor provided a specific example of when he had seen Plaintiff have "desire" and "fire" and be plugged in and engaged, with PREA implementation.  Exhibit S, Earl Taylor Interview Notes, June 21, 2019  at JoCo-King 488.

357.    Mr. Sullivan also noted that Plaintiff used the same dated examples in all of her interviews and lacks innovation. Ex. 62 (Depo. Ex. 102).

**RESPONSE:** Objection, hearsay and inadmissible.  This fact is not supported here by admissible evidence.  *See* FED. R. CIV. P. 56(c)(2).  Defendant's cited evidence for this proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot be cited for the truth of the matter asserted.  *Id.* To the extent a response is required, uncontroverted that Ms. Bloomberg's notes state as reflected, however controverted that Plaintiff's examples were the same for all of the interviews or that Plaintiff lacks innovation.  Exhibit K, Plaintiff's Declaration at ¶31.  To the extent Mr. Sullivan desired more recent examples, he could have requested those from Plaintiff, but he did not. Mr. Sullivan called Plaintiff's examples "dated" and said he thought Ms. King appeared "very tired" and had a "lack of innovation."  Exhibit E, Shayla Bloomberg's Interview Notes

for Robert Sullivan, 6/24/2019 (Deposition Ex. 102) at JoCo-King 492.  Ms. Dougan too

was concerned this was an "old example" from "years and years ago," even though there

was no indication that the answers to the questions needed to be "new and recent."

Exhibit J, Susan Dougan Depo. at 132:9-135:14.  Ms. Dougan was thinking during the

interview: "Okay. Can you come up with something newer that you've done[?]" "What's

something newer?"  *Id.* at 133:1-24.  However, Ms. Dougan never sought a more recent

example from Plaintiff or any of the other interviewees.  Exhibit J, Susan Dougan Depo.

at 134:10-16; Exhibit K, Plaintiff's Declaration at ¶30.  Moreover, to the extent that any

of the interview panel, including Robert Sullivan, was seeking a more recent example

from Plaintiff, or any of the interviewees, this was not made clear in the question and the

interview panelists did not ask for a more recent example even though they could have

done so.  *Id.*

358.    Mr. Sullivan indicated he and Ms. Dougan wanted to hire Ms. Allen. Mr. Seidler

was more ambivalent. He really wanted the external candidate from Topeka (Casey Johnson),

but Mr. Sullivan did not believe Mr. Johnson would be a good fit. He stated he did not think Mr.

Seidler was excited about either Plaintiff or Ms. Allen. *Id.*

**RESPONSE:**  Objection, hearsay and inadmissible.  This fact is not supported here by

admissible evidence.  *See* Fed. R. Civ. P. 56(c)(2). Defendant's cited evidence for this

proposition are notes from Ms. Bloomberg's interview with Robert Sullivan and cannot

be cited for the truth of the matter asserted.  *Id.*  To the extent a response is required,

uncontroverted that Ms. Bloomberg's notes state as reflected, otherwise controverted that

Mr. Seidler was not excited about Plaintiff or Ms. Allen.  Mr. Seidler remembers Plaintiff being in his top three candidates and bringing her up for discussion after his number one choice Casey Johnson was shot down by Mr. Sullivan.  Exhibit F, Brian Seidler Depo. at 87:24-88:8.  Mr. Seidler brought up Plaintiff for discussion and that was shot down.  *Id.* at 94:8-22.  This caused Mr. Seidler to be indifferent as he knew he was going to be out voted; "Got two against one, I guess."  *Id.* at 94:8-95:6.

359.    After interviewing the decision makers and reviewing relevant documents, Ms. Bloomberg and Ms. Veronda determined that the department hired the most qualified candidate in each recruitment. Ex. 17, Bloomberg depo. 280:4-12.

**RESPONSE:**  Controverted.  Ms. Bloomberg and Ms. Veronda did not review all of the relevant documents pertinent to Plaintiff's complaints of discrimination in early June of 2019.  While Ms. Bloomberg had access to the interview notes during her "investigation" into Plaintiff's claims of discrimination, she cannot state for certain she reviewed them until the week prior to her deposition.  *Id.* at 247:8-24.  Further, Ms. Bloomberg chose not to interview of the interview panels members beside the hiring managers.  Ms. Bloomberg did not interview anyone else from the interview panels, even though she had the ability to do so.  Exhibit L, Shayla Bloomberg Deposition at 264:7-25.  Instead, the hiring managers, who were accused of making discriminatory hiring decisions by Plaintiff, were the only panel members interviewed by Ms. Bloomberg and Ms. Veronda, and their explanations to her about the hiring process were taken as fact without any further investigation or confirmation.  *Id.*; Exhibit N, Samantha Veronda Deposition at 50:23-54:24.    Ms. Bloomberg and Ms. Veronda both admitted that someone being

accused of discrimination would not normally admit to it. Exhibit L, Shayla Bloomberg Deposition at 264:1-18; Exhibit N, Samantha Veronda Deposition at 56:5-20. Further, Ms. Bloomberg, who was a part of the hiring process for the DFS position, was in charge of the investigation into the discriminatory process, a clear conflict of interest. Exhibit L, Shayla Bloomberg Deposition at 264:7-25.

360.    Ms. Bloomberg and Ms. Veronda then met with Plaintiff on July 16, 2019 to discuss their findings. In that meeting, Ms. Bloomberg also told Plaintiff they could offer interview assistance if she was interested in that. Ex. 65 (Depo. Ex. 203); Ex. 24, Bloomberg Decl. ¶ 19; Ex. 22, Veronda depo. 105:8-107:14, 109:3-5.

**RESPONSE:** Uncontroverted.

361.    Plaintiff stated she was certain the decisions were discriminatory. She said she did not want interview assistance but appreciated the offer. Ex. 65 (Depo. Ex. 203), Ex. 22, Veronda depo. 107:15-25

**RESPONSE:**  Uncontroverted.

362.    Plaintiff also represented to Ms. Bloomberg and Ms. Veronda that she had heard from hiring managers and others in the interviews that Plaintiff was their top candidate. Ex. 65

(Depo. Ex. 203); Ex. 1, Pltf's depo. 218:9-14.

> **RESPONSE:**   Controverted that Plaintiff represented to Ms. Bloomberg and Ms. Veronda that she heard from "hiring managers" that she was their top candidate, otherwise uncontroverted. Plaintiff indicated to them that she had heard that other panelists had her as their top candidate, not hiring managers.   Exhibit K, Plaintiff's Declaration at ¶32.  Plaintiff heard from Brian Seidler's wife Becky that he was "'pissed' that [she] wasn't selected."  Exhibit A, Plaintiff's Deposition at 201:3-10, 218:9-18.

363.    When asked to identify the people who allegedly told her this, the only person Plaintiff identified was Brian Seidler's wife. She did not identify any hiring manager, or even anyone who was in any of the interviews. Ex. 1, Pltf's depo. 218:9-21.[30]

> **RESPONSE:**  Uncontroverted.

364.    Ms. Bloomberg then sent Plaintiff a letter further explaining the findings and providing feedback for Plaintiff's use in the future. Ex. 66 (Depo. Ex. 143); Ex. 17, Bloomberg depo. 279:6-280:1.

> **RESPONSE:** Uncontroverted that Ms. Bloomberg sent Plaintiff a letter that discussed her findings and the feedback she received, however controverted that the letter was an accurate depiction of the conversations that Plaintiff had with HR, that the contents of the letter accurately depict the contents of the interviews conducted by Ms. Bloomberg, or

---

[30] Plaintiff claims Brian Seidler's wife told Plaintiff that Mr. Seidler was "pissed" Plaintiff did not get the position. This is inadmissible hearsay that Mr. Seidler denies. Ex. 28, Seidler depo. 86:7-18, 135:7-19.

that Ms. Bloomberg conducted a complete and thorough investigation into Plaintiff's complaints of discrimination.   *See* SOFs 332, 336, & 359.

365.    After the investigation concluded, Ms. Bloomberg and Ms. Veronda brainstormed about ways they could assist Plaintiff with her desire to move forward in the organization and decided to offer Plaintiff the opportunity to meet with an executive coach. Ex. 22, Veronda depo. 125:4-14.

**RESPONSE:** Uncontroverted.

366.    They wanted to give her assistance in getting her where she wanted to be. Ex. 22, Veronda depo. 128:1-20.

**RESPONSE:** Controverted.   Plaintiff believed this was discriminatory and retaliatory because her "leadership" was never called into question until after she made complaints of discrimination and she told HR she was concerned they were raising it now.   *See* Defendant's Exhibit 68 (Depo. Ex. 169).

367.    Ms. Bloomberg got approval to hire a coach, and then Ms. Bloomberg and Ms. Veronda met with Plaintiff on August 2, 2019 to talk to her about the possibility. Ex. 67 (Depo. Ex. 165) at JoCo 484-485; Ex. 24, Bloomberg Decl. ¶ 19.

**RESPONSE:** Uncontroverted.

368.    They informed Plaintiff they had received approval for Plaintiff to work with an external consultant on growth and development in her current role, and they had received favorable feedback about the coach from other employees. They informed Plaintiff the coach could help her with whatever Plaintiff wanted. Ms. Bloomberg gave examples of things the coach could address, such as items on Plaintiff's PPD or leadership. Ex. 67 (Depo. Ex. 165) at JoCo 484.

> **RESPONSE:** Uncontroverted that this is indicated in Ms. Veronda's notes, however controverted to the extent that Defendant attempts to imply that Plaintiff needed development in her current role or that she needed to address her leadership or had anything identified in her PPD to address.    *See* Exhibit Z, Plaintiff's Employee Evaluations.    Plaintiff believed this was discriminatory and retaliatory because her "leadership" was never called into question until after she made complaints of discrimination and she told HR she was concerned they were raising it now.  *See* Defendant's Exhibit 68 (Depo. Ex. 169).

369.    Plaintiff stated she would have to give it some thought and also asked what prompted this. Ms. Bloomberg responded that they were brainstorming different options they could offer Plaintiff in her current role, and they have done this with others in the past who have a desire to do something different. Ex. 67 (Depo. Ex. 165) at JoCo 485.

**RESPONSE:** Uncontroverted.

370.    On August 7, 2019, Plaintiff informed Ms. Bloomberg that she was interested in meeting with the consultant. She also stated she found it concerning that she was being offered the training now since she had not received feedback that she  needed leadership training in the past. She said it was concerning that no one offered the training to her until she made a complaint of discrimination. Ex. 68 (Depo. Ex. 169).

**RESPONSE:** Uncontroverted.

371.    Plaintiff attended sessions with the consultant but did not find them helpful. Ex. 1, Pltf's depo. 220:25-221:7.

**RESPONSE:** Uncontroverted.

**Plaintiff's Mental Health Applications**

372.    The Mental Health Department's clients typically are not in the criminal justice system, and the Mental Health Department takes a different approach to working with clients than the Department of Corrections does. Ex. 71, Worth Decl. ¶ 3.

**RESPONSE:** Uncontroverted that the Mental Health Department's clients might not be in the criminal justice system and that the Department takes a different approach to working with clients than the Department of Corrections, however controverted in part.

Many of the clients that Plaintiff works with are within the criminal justice system or have been.  Further this is controverted to the extent that Defendant attempts to imply that because Mental Health takes a different approach with clients that employees from the Department of Corrections, such as Plaintiff, are not qualified to work in the department because of their experience, as the Department of Corrections has hired dozens of Corrections staff in the past.  Exhibit K, Plaintiff's Declaration at ¶33.

373.    Leadership in Mental Health has observed that Corrections employees are often tasked with holding clients/offenders accountable for their actions and ensuring they meet certain requirements, while the Mental Health Department treats clients like patients, providing support and resources to help them improve their mental health. Ex. 71, Worth Decl. ¶ 4.

**RESPONSE:** Uncontroverted.

374.    Unlike in Corrections, the Mental Health Department does not impose punitive measures. Mental Health takes a less regimented approach. Ex. 71, Worth Decl. ¶ 5.

**RESPONSE:** Uncontroverted.

375.    The leadership team in the Mental Health Department has observed that case managers who come from the Corrections space often struggle to adapt to the differing approaches. That is not to say that applicants with Corrections experience cannot succeed in the

position, but when hiring for those positions, Mental Health leadership looks for indicators that applicants coming from Corrections desire a change in order to help treat clients from a mental health perspective, rather than holding clients accountable to certain requirements. Ex. 71, Worth Decl. ¶ 6.

**RESPONSE:** Uncontroverted.

376.   Case Managers deal directly with clients and do not have any supervisory responsibilities, so supervisory experience is not necessarily relevant to the job. Ex. 71, Worth Decl. ¶ 7; *see also* Ex. 69 (Depo. Ex. 74) at JoCo 2806-2812 (job description).

**RESPONSE:** Uncontroverted.

377.   In September 2020, Plaintiff applied for a position as a Case Manager in the Mental Health Department. Ex. 69 (Depo. Ex. 74), Ex. 1, Pltf's depo. 254-256:2.

**RESPONSE:** Uncontroverted.

378.   The resume Plaintiff submitted for this position can be found in Exhibit 72 (Depo. Ex. 75). The first section of the resume, titled "Professional Summary," states:

Skilled manager with over 20 years of experience in corrections and probation management and over 27 years working in the criminal justice system. Over 5 years of experience in Data Analysis including collection, cleaning data sets, and developing reports and dashboards to communicate findings. Knowledge of relational data bases and SQL and MySQL. 2 years of experience with data visualization tools including Tableau and Google Data Studio.

Ex. 72 (Depo. Ex. 75); Ex. 1, Pltf's depo. 255:24-256:2.

**RESPONSE:** Uncontroverted.

379.    The second section of the resume, titled "Skills," focuses on skills related to management, evaluating complex data, and public speaking. It also includes more generic skills such as verbal and written communications and a willingness to learn, but has no focus on mental health or even case management skills. Ex. 72.

**RESPONSE:** Uncontroverted.

380.    The third section, titled "Employment History," focuses on Plaintiff's experience in the criminal justice arena with no information about her experience in dealing with mental health issues. Ex. 72.

**RESPONSE:**  Uncontroverted that the focus is on the criminal justice arena, however controverted that there is no information about her experience dealing with mental health issues.  This section of Plaintiff's resume states, "[o]versee[s] officers with specialized knowledge of mental health issues" and that this "requires a specific knowledge base of statutory laws and updates as well as procedural issues for billing of state paid treatment".  Further, under this section Plaintiff's experience as a Youth Care Worker at the Crittenton Center where she "supervised adolescent and preadolescent at risk youth in a mental hospital setting" was listed.  *See* Defendant's Exhibit 72.

381.   Jason Waldmeier was the hiring manager for this position and made the decisions about who to interview based on his review of resumes. Ex. 70 (Depo. Ex. 233); Ex. 71, Worth Decl. ¶ 8; Ex. 73, Waldmeier Decl. ¶¶ 2-3.

**RESPONSE:**  Uncontroverted.

382.   Mr. Waldmeier did not choose to interview Plaintiff. Ex. 1, Pltf's depo. 291:16-292:4.

**RESPONSE:** Uncontroverted.

383.   Mr. Waldmeier did not know Plaintiff. He did not know Plaintiff's gender, sexual orientation, gender presentation, or age. He also did not know that Plaintiff had any kind of medical condition, did not know she had taken FMLA, and did not know she had made any complaints of discrimination (either internally or externally). Ex. 73, Waldmeier Decl. ¶¶ 4-6.

**RESPONSE:** Uncontroverted.

384.   Mr. Waldmeier hired Kyle Dolph and Courtney Shaffer for these positions. Ex. 88, Veronda Decl. ¶¶ 5-6. The materials they submitted can be found at Exhibit 91; Ex. 88, Veronda Decl. ¶ 6.

**RESPONSE:**  Uncontroverted.

385.    In October 2020, Plaintiff Applied for an Access Team Manager position in the Mental Health Department. Ex. 74 (Depo. Ex. 76); Ex. 1, Pltf's depo. 256:21-257:4. The hiring manager for the position was Renee Van Meter. Ex. 75, Van Meter Decl. ¶ 3.

**RESPONSE:** Uncontroverted.

386.    The people who work in this position meet with and triage prospective new and returning clients to Johnson County Mental Health Center as well as respond to emergency calls and walk-ins. They regularly interact with individuals in mental health crisis, work to de-escalate the crisis, and make determinations about how to best coordinate the client's care. They also provide follow-up phone calls to outreach and encourage clients to engage with recommended services. Ex. 75, Van Meter Decl. ¶ 4; Ex. 74 (Depo. Ex. 76).

**RESPONSE:** Uncontroverted.

387.    The resume Plaintiff submitted for this position can be found at Exhibit 76 (Depo. Ex. 77) and is the same as the one she submitted for the Mental Health Case Manager position. Ex. 1, Pltf's depo. 256:21-257:4; Ex. 76 (Depo. Ex. 77), compared to Ex. 72 (Depo Ex. 75).

**RESPONSE:** Uncontroverted.

388.    The position was initially posted only internally, but Ms. Van Meter later asked to

post the position externally as well because in the first round of applicants, she only received applicants from Corrections who did not appear to have mental health experience. Ex. 92, Emails; Ex. 75, Van Meter Decl. ¶ 5.

> **RESPONSE:** Uncontroverted that Ms. Van Meter stated as such in her declaration, however, controverted as Plaintiff had mental health experience and this was outlined on her resume. Plaintiff's resume states, "[o]versee[s] officers with specialized knowledge of mental health issues" and that this "requires a specific knowledge base of statutory laws and updates as well as procedural issues for billing of state paid treatment". Further, Plaintiff's experience as a Youth Care Worker at the Crittenton Center where she "supervised adolescent and preadolescent at risk youth in a mental hospital setting" was listed. *See* Defendant's Exhibit 76 (Depo. Ex. 77).

389.    Ms. Van Meter made the decisions about who to interview for this position based on her review of resumes and application materials and did not choose to interview Plaintiff. Ex. 75, Van Meter Decl. ¶ 6; Ex. 1, Pltf's depo. 291:16-292:4.

> **RESPONSE:** Uncontroverted that Ms. Van Meter stated as such in her declaration.

390.    Ms. Van Meter did not know Plaintiff. She did not know Plaintiff's gender, sexual orientation, gender presentation, or age. She also did not know that Plaintiff had any kind of medical condition, did not know she had taken FMLA, and did not know she had made any complaints of discrimination (either internally or externally). Ex. 75, Van Meter Decl. ¶¶ 9-10

**RESPONSE:** Uncontroverted.

391.    Ms. Van Meter hired Dylan Hurt to fill this position. Ex. 88, Veronda Decl. ¶ 10. Mr. Hurt's submissions can be found at Exhibit 93.[31] Ex. 88, Veronda Decl. ¶ 10.

**RESPONSE:**  Uncontroverted.

392.    In November 2020, Plaintiff applied for another Case Manager position in Mental Health. Ex. 77 (Depo. Ex. 82); Ex. 1, Pltf's depo. 263:1-10.

**RESPONSE:** Uncontroverted.

393.    The resume Plaintiff submitted for this position can be found at Exhibit 80 (Depo. Ex. 83) and is the same as the one she submitted for the first Mental Health Case Manager position. Ex. 1, Pltf's depo. 263:1-10; Ex. 80 (Depo. Ex. 83), compared to Ex. 72 (Depo Ex. 75).

**RESPONSE:** Uncontroverted.

394.    Ms. Spieker was the hiring manager for this position. She made the decisions about who to interview for this position based on her review of resumes and application

---

[31] Defendant notes this Exhibit also contains a cover letter for another position, which is because the application tracking system includes submissions for other positions as well.

materials and did not choose to interview Plaintiff. Ex. 79, Spieker Decl. ¶¶ 3-4; Ex. 1, Pltf's depo. 291:16-292:4.

**RESPONSE:** Uncontroverted

395.    Ms. Spieker did not know Plaintiff. She did not know Plaintiff's gender, sexual orientation, gender presentation, or age. She also did not know that Plaintiff had any kind of medical condition, did not know she had taken FMLA, and did not know she had made any complaints of discrimination (either internally or externally). Ex. 79, Spieker Decl. ¶ 5.

**RESPONSE:** Uncontroverted.

396.    Ms. Spieker hired four individuals based on this posting: Daijah Porchia, Jessica Banes, Thomas Lynch (YOB 1965), and Stacey Stinson. Ex. 88, Veronda Decl. ¶ 14. Their submissions can be found at Exhibit 94. *Id.*

**RESPONSE:** Uncontroverted.

397.    Samantha Veronda was involved in posting the two Case Manager positions and the Access Manager position discussed above, but she had no involvement in determining who should be interviewed or who should be hired for those positions. Ex. 22, Veronda depo. 139:12-142:12; Ex. 88, Veronda Decl. ¶¶ 5, 9, 13; Ex. 79, Spieker Decl. ¶ 4; Ex. 75, Van Meter Decl. ¶ 6.

**RESPONSE:** Uncontroverted.

398.    Ms. Veronda did not speak to any of the hiring managers about Plaintiff's application for those positions. Ex. 22, Veronda depo. 142:7-12, 154:1-156:5.

**RESPONSE:**  Uncontroverted.

399.    In fact, Ms. Veronda did not know Plaintiff had applied for those positions until she was asked to pull documents related to Plaintiff's second charge of discrimination which was after all of the selected candidates had been interviewed. Ex. 22, Veronda depo. 140:6-25; Ex. 88, Veronda Decl. ¶¶ 16-18.

**RESPONSE:**  Uncontroverted that Ms. Veronda stated as such as in her declaration.

400.    Four of the people hired for these positions were hired before Plaintiff even filed her charge. Ex. 88, Veronda Decl. ¶ 18; Ex. 95.

**RESPONSE:**  Uncontroverted that Ms. Veronda stated as such in her declaration, however irrelevant and immaterial as Plaintiff had already filed a Charge of Discrimination and made complaints of discrimination, of which Ms. Veronda was aware.

401.    On January 29, 2021, the County responded to Plaintiff's charge of discrimination and pointed out that the resume Plaintiff submitted for the Mental Health positions did not reflect relevant experience. Ex. 84.

**RESPONSE:** Uncontroverted.

402.    On February 26, 2021, Plaintiff again applied for a Case Manager position in Mental Health. Ex. 82, Depo. Ex. 88; Ex. 1, Pltf's depo. 271:12-18; Ex. 88, Veronda Decl. ¶ 19.

**RESPONSE:** Uncontroverted.

403.    Kevin McGuire was the hiring manager. Ex. 22, Veronda depo. 163:19-21; Ex. 1, Pltf's depo. 271:13-18.

**RESPONSE:** Uncontroverted.

404.    This time, Plaintiff submitted a different resume, which can be found at Exhibit 83 (Depo. Ex. 89). Ex. 1, Pltf's depo. 271:12-272:4.

**RESPONSE:** Uncontroverted.

405.    In this version of Plaintiff's resume, the first section, titled "Summary," states:

Proficient Senior Case Manager prepared to bring experience and professional knowledge to new role with room for growth and advancement. Specializing in resource

advocacy, case planning and team communication. Excellent communicator and problem solver with a focus and results-oriented approach.

Ex. 83 (Depo. Ex. 89).

**RESPONSE:** Uncontroverted.

406.    Plaintiff also completely revamped the "Skills" section of her resume to focus on resource coordination, needs evaluations, case planning, care advocacy, treatment plans, and emotional awareness.  Ex. 83.

**RESPONSE:** Uncontroverted.

407.    The section of Plaintiff's resume summarizing her prior employment experience also changed drastically and focused on case management and client-centered work. *Compare* Ex. 72 (Depo. Ex. 75), to Ex. 83 (Depo Ex. 89).

**RESPONSE:** Uncontroverted.

408.    Kevin McGuire made the decisions about who to interview for this position and chose to interview Plaintiff. Ex. 85, McGuire Decl. ¶ 2.

**RESPONSE:** Uncontroverted.

409.    After the interviews, Mr. McGuire contacted Keith Clark to obtain a reference

about Plaintiff. Ex. 21, Clark depo. 78:22-79:10.

**RESPONSE:** Uncontroverted.

410. Mr. Clark gave Plaintiff a positive reference, as reflected in Exhibit 86 (Depo. Ex. 215). Ex. 21, Clark depo. 79:15-23.

**RESPONSE:** Uncontroverted.

411. Mr. McGuire then offered Plaintiff the position, which she verbally accepted. Ex. 85, McGuire Decl. ¶ 3.

**RESPONSE:** Uncontroverted.

412. At the time Mr. McGuire offered Plaintiff the position, he had no knowledge of Plaintiff's prior complaints, charges of discrimination, or lawsuit. Ex. 85, McGuire Decl. ¶ 5.

**RESPONSE:** Uncontroverted.

413. On April 12, 2021, Plaintiff informed Mr. Clark that she was accepting the position in Mental Health, and her last day would be April 30, 2021. Ex. 87, Depo. Ex. 90, Ex. 1, Pltf's depo. 272:15-20.

**RESPONSE:** Uncontroverted.

**Plaintiff's Alleged Disability**

414.    Plaintiff was diagnosed with major depressive disorder with generalized anxiety in approximately 2010. Ex. 1, Pltf's depo. 31:23-32:11, 36:14-16.

**RESPONSE:** Uncontroverted.

415.    On a day-to-day basis, Plaintiff's condition is controlled by medication, but she has panic attacks on occasion, which can be somewhat debilitating. Ex. 1, Pltf's depo. 36:5-21.

**RESPONSE:** Uncontroverted that Plaintiff's conditions are controlled by medication on most days, however, controverted to the extent that Defendant attempts to imply that Plaintiff's medical conditions do not affect her major life activities.  Plaintiff suffers panic attacks, which were frequent and severe under Robert Sullivan and Keith Clark. Exhibit A, Plaintiff's Deposition at 36:5-38:5.

416.    Plaintiff claims that between June 2019 and April 2021, she had panic attacks on a weekly or monthly basis, which she claims related to ongoing retaliation. Ex. 1, Pltf's depo. 37:2-38:5.

**RESPONSE:** Uncontroverted.

417.    Between April 2021, when Plaintiff moved to the Case Manager position, and September 2021, Plaintiff only had one panic attack. Ex. 1, Pltf's depo. 37:2-19.

**RESPONSE:** Uncontroverted.

418.    The only medical provider Plaintiff has seen for her condition is Dr. Foos. Ex. 1, Pltf's depo. 72:9-11.

**RESPONSE:** Uncontroverted.

419.    Dr. Foos is a general practice family doctor. Ex. 1, Pltf's depo. 98:7-9.

**RESPONSE:**  Uncontroverted.

420.    Plaintiff has not seen a counselor or therapist in the last ten years. 98:10-17.

**RESPONSE:** Uncontroverted.

421.    Plaintiff has never been hospitalized for panic attacks or depression and has never had to go to the ER or an urgent care because of a panic attack. Ex. 1, Pltf's depo. 98: 1-6.

**RESPONSE:** Uncontroverted.

422.    In both August 2019 and August 2020, Plaintiff reported to Dr. Foos that she had no depression or anxiety. Ex. 89 (Depo. Ex. 12 plus additional records so that all of the records produced by Plaintiff are included).

**RESPONSE:**  Controverted.  However, Plaintiff has dismissed her disability claims under the ADAAA in Counts V and VI and Defendant has agreed to withdraw Exhibit 89 and therefore this SOF is moot.  *See* Doc. 78, The Parties' Joint Response to Order to Show Cause [Doc. 76].

**Plaintiff's FMLA Leave**

423.    Plaintiff first requested intermittent FMLA in September 2018. Ex. 1, Pltf's depo. 33:8-11; Ex. 24, Bloomberg Decl. ¶ 20.

**RESPONSE:** Uncontroverted.

424.    Plaintiff went through Human Resources to request FMLA and informed her supervisor when she needed to take FMLA leave but otherwise did not have any conversations with anyone at the County about her condition. Ex. 1, Pltf's depo. 32:19-33:25.

**RESPONSE:**  Controverted. Ms. Bloomberg, Ms. Brown, and Ms. Dougan all knew that Plaintiff took FMLA prior to and at the time of the hiring for the DFS and BI Analyst positions.  Ms. Bloomberg handled Plaintiff's FMLA leave requests.  Sharon Brown normally approved Plaintiff's FMLA leave.  However, while Plaintiff's supervisor Sharon Brown was out on leave, Ms. Dougan approved Plaintiff's FMLA leave and knew

she was approved for and taking the leave.  Exhibit K, Plaintiff's Declaration at ¶34.

425.    Plaintiff has never had any trouble with the process of getting her FMLA leave approved and has never had any trouble taking the time she needed to take. Ex. 1, Pltf's depo. 34:8-16.

**RESPONSE:** Uncontroverted.

426.    Plaintiff's peer SCMs have informed Plaintiff that employees in the department feel like Plaintiff is not available when they need her, but Plaintiff does not recall whether those statements related to when Plaintiff called in for FMLA. Ex. 1, Pltf's depo. 34:17-36:4.

**RESPONSE:** Uncontroverted, however irrelevant.

427.    Regardless, Plaintiff's peer SCMs were not aware Plaintiff was taking FMLA leave. Ex. 1, Pltf's depo. 35:17-36:1.

**RESPONSE:** Uncontroverted, however irrelevant.

**Misc.**

428.    Plaintiff filed her first charge of discrimination on August 26, 2019. Ex. 90

(Depo. Ex. 52); Ex. 1, Pltf's depo. 1-7.

    **RESPONSE:** Uncontroverted

429.    Plaintiff filed her second charge of discrimination on December 4, 2020. Ex. 81 (Depo. Ex. 85).

    **RESPONSE:** Uncontroverted,

430.    The only comment Plaintiff recalls related to age is her subordinate, Amy Bond, stating that some people needed to retire and move on. Ex. 1, Pltf's depo. 288:23-289:8.

    **RESPONSE:** Uncontroverted.

431.    No one has ever made offensive comments about Plaintiff's FMLA leave. Ex. 1, Pltf's depo. 289:9-15.

    **RESPONSE:** Uncontroverted.

432.    At the time of the interviews for the Director of Field Services, Ms. Bloomberg was aware Plaintiff had intermittent FMLA, but she did not know the reason for the FMLA. Ex. 17, Bloomberg depo. 133:17-134:12.

    **RESPONSE:** Uncontroverted, however Plaintiff has dismissed her disability claims

under the ADAAA in Counts V and VI and Defendant has agreed to withdraw Exhibit 89 and therefore this SOF is moot.  *See* Doc. 78, The Parties' Joint Response to Order to Show Cause [Doc. 76].

433.   At the time of the hiring decisions for the Director of Field Services and the BI Analyst positions, Ms. Dougan was not aware that Plaintiff had been diagnosed with anxiety or depression and did not know she took FMLA for those reasons. Ex. 20, Dougan depo. 129:6-16.

> **RESPONSE:**  Uncontroverted that Ms. Dougan did not know the reason Plaintiff was taking FMLA leave for her anxiety and depression, however controverted as Ms. Dougan knew that Plaintiff took FMLA prior to and at the time of the hiring for the DFS and BI Analyst positions.   While Plaintiff's supervisor Sharon Brown was out on leave, Ms. Dougan approved Plaintiff's FMLA leave and knew she was approved for and taking the leave.  Exhibit K, Plaintiff's Declaration at ¶34.

434.   Mr. Sullivan did not become aware that Plaintiff had been diagnosed with depression and anxiety and did not know Plaintiff had taken FMLA leave until he read it in her charge of discrimination. Ex. 18, Sullivan depo. 81:14-82:16. [32]

> **RESPONSE:**  Uncontroverted.

435.   Sharon Brown could not recall whether Plaintiff took FMLA leave, but that was no issue for Ms. Brown. She preferred people not come to work sick and to take off when they

---

[32] There is also no evidence that Shelly Williams or Ted Jester was aware of Plaintiff's FMLA leave or alleged disability.

needed to do that. Ex. 25, Brown depo. 16:14-17:1.

    **RESPONSE:** Uncontroverted.

436.    Ms. Brown was aware Plaintiff got counseling from time to time to address anxiety, but she had no conversation with anyone else about that. Ex. 25, Brown depo. 16:14-17:23.

    **RESPONSE:**  Uncontroverted.

437.    Ms. Brown never heard anyone express any concern about Plaintiff taking time off. Ex. 25, Brown depo. 17:2-9.

    **RESPONSE:**  Uncontroverted.

438.    Mr. Clark never received any complaints that Plaintiff was not present enough because she was out of the office. Ex. 21, Clark depo. 121:16-19.

    **RESPONSE:**  Uncontroverted.

439.    At the time of hiring for the BIA position, Mr. Seidler was not aware that Ms. King took FMLA leave, that she had any kind of diagnosed disability, or that she had depression or anxiety. Ex. 28, Seidler depo. 125:10-18.

    **RESPONSE:**  Uncontroverted.

## II.        PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

To provide a complete record for the Court in evaluating Defendant's Motion, Plaintiff sets forth the following additional material facts that illustrate the discriminatory actions of Defendant.

440.    Plaintiff is a masculine-presenting, homosexual female.  Plaintiff's date of birth is June 27, 1969; she is 52 years old. Ex. XX, Plaintiff's Depo. 15:22-24; Pretrial Order, Doc. 68.

441.    Plaintiff dressed similarly to men in her position: khaki pants, collared long-sleeve button-down shirts, and casual shoes.  Ex. K, Plaintiff's Declaration, ¶ 16.

442.    Sharon Brown told Plaintiff that one of her co-workers did not like the way Plaintiff dressed.  Plaintiff believed Ms. Brown was insinuating that Plaintiff should dress more femininely.  Ex. K, Plaintiff's Declaration, ¶ 17.

443.    Ms. Brown later apologized to Plaintiff stating that she "shouldn't have done that" referring to relaying the message from the co-worker about the way I dressed.  Ex. K, Plaintiff's Declaration, ¶ 18.

444.    Plaintiff received a Bachelor's degree in Criminal Justice from the University of Central Florida where she also studied computer science, statistics, and advanced math.  [Ex. R, Depo. Ex. 64].

445.    Plaintiff earned her Master's in Administration degree from the University of Missouri – Kansas City in 1994 where she studied quantitative and qualitative data analysis. [Ex. R, Depo. Ex. 64; Ex. A, Plaintiff's Depo., 23:11-12].

446.    Plaintiff began working for Defendant in 1992 and, with the exception of a brief

period from November 1, 1996 to October 5, 1997, has been employed by Defendant since that time.  [Pretrial Order, Stipulations, Doc. 68].

447.    From 1992 to 1996, Plaintiff worked in Adult Residential Services for the Johnson County Department of Corrections ("JCDC").  *Id.*

448.    In 1997, Plaintiff was hired into JCDC's Field Services as an Adult Intensive Supervision Officer ("ISO").  *Id.*

449.    In 1999, Plaintiff was promoted to Senior Case Manager ("SCM") in Adult Field Services.  *Id.*

450.    In Plaintiff's performance appraisals, Ms. Brown recognized Plaintiff's innovation on multiple occasions in Plaintiff's reviews explaining that Plaintiff "encourages *innovation* with regard to client supervision" that she has been open to "*innovative*" ways to get the job done and has "challenged her supervisory peers to be more open to this same concept." Exhibit Z, Plaintiff's Employee Appraisal at JoCo-King 607, 618.

451.    She also noted that Plaintiff "recommends solutions to problem situations and provides proactive solutions."  Exhibit Z, Plaintiff's Employee Appraisal at JoCo-King 601.

452.    Ms. Brown also recognized that Plaintiff has taken the lead in ensuring the office is running smoothly and that Plaintiff "encourages that sharing of ideas and respects and values the contributions of others."  Exhibit Z, Plaintiff's Employee Appraisal at JoCo-King 606-07.

453.    Plaintiff applied for and began taking intermittent FMLA in 2018, and she continues to take such approved leave.  Pretrial Order, Stipulations, Doc. 68

454.    Plaintiff utilized her FMLA three times prior to applying for and interviewing for the Director of Field Services ("DFS") position: January 7, January 28, and February 11.  [Ex. K, Plaintiff's Declaration, ¶ 35].

455.    In or about March 2019, Plaintiff applied for the position of Director of Field Services (JCDC). Keith Clark was hired for that position.  Pretrial Order, Stipulations, Doc. 68.

456.    Sharon Brown told Plaintiff that hiring Mr. Clark for the DFS position was a "done deal before the interviews were conducted."  [Ex. A, King Depo., 189:24-190:01].

457.    Mr. Clark admitted that he "had a favorite before going into the interview process. [Ex. G, Sullivan Depo., 220:15-16].

458.    Mr. Sullivan hand-selected Shelly Williams from an outside department (Riley County) to sit on the interview panel for the DFS position; Mr. Clark listed Ms. Williams as a reference.  [Ex. G, Sullivan Depo., 89:06-15; Ex. T, Sullivan/Williams email JoCo 4837-38, 4855].

459.    Mr. Sullivan denied knowing Mr. Clark listed her as a reference because he did not look at Mr. Clark's references.  [Ex. G, Sullivan Depo., 91:10-12].

460.    Ms. Williams was planning a vacation for the week of March 11-15, so Mr. Sullivan scheduled the interviews around her vacation plans.  [Ex. T, Sullivan/Williams email JoCo 4837-38, 4855]

461.    Mr. Sullivan told Ms. Williams that Defendant would pay for lodging, mileage, and meals so she could sit-in on the DFS interviews.  Ex. T, Sullivan/Williams email JoCo 4837-38, 4855]

462.    Mr. Sullivan admitted that the "optics look very bad" of hand-selecting an interview panelist who is a reference of the person hired.  [Ex. G, Sullivan Depo., 91:13-18].

463.    Ms. Brown and Samantha Veronda testified that the practice of bringing in outside the department to interview was not customary in the Department of Corrections or the Mental Health Department.  [Exhibit I, Sharon Brown Deposition at 48:10-49:19; Exhibit N,

Samantha Veronda Deposition at 95:24-96:6].

464.    For another later position, a Business Intelligence Analyst position to which Plaintiff did not apply, Mr. Sullivan had pre-selected another male candidate over a female candidate before interviews were conducted.  [Ex. O, Allen Depo., 25:12-17].

465.    During that first round of interviews, the panel (consisting of Ms. Allen, Ms. Dougan, and Mr. Sullivan) had ranked Mr. Clark first, Jodi Kelly second (female), and Chris Schneweis (male) third.  [Ex. O, Allen Depo., 17:24-18:07].

466.    After Mr. Clark declined the job offer, Mr. Sullivan insisted on a second round of interviews between Ms. Kelley and Mr. Schneweis who were to give presentations so the panel could see their skills and how much work they put into the presentation.  [Ex. O, Allen Depo., 20:09-24].

467.    However, for the second round of interviews, Mr. Sullivan put Mr. Clark on the panel even though he had just turned down the offer for the same position.  [Ex. O, Allen Depo., 24:14-24].

468.    Both Ms. Allen and Ms. Dougan thought Ms. Kelley's presentation was "50% better" and "very, very impressive" whereas Mr. Schneweis's presentation seemed like a "last-minute thing."  [Ex. O, Allen Depo., 22:16-23:09].

469.    Even though Ms. Kelley was ranked #2 in the initial round of interviews, and she had a much more impressive presentation, Mr. Sullivan wanted to hire Mr. Schneweis because he had worked with him prior.  [Ex. O, Allen Depo., 24:07-09].

470.    At the conclusion of the presentations, Ms. Allen stood her ground and rated Ms. Kelly No. 1.  [Ex. O, Allen Depo., 27:03-04].

471.    In response, Mr. Sullivan suggested that he reach out to other people who had

worked with Mr. Schneweis for their opinions.  [Ex. O, Allen Depo., 27:05-07].  Mr. Sullivan

ended up contacting Rodney Weber who was known for being a fan of Mr. Schneweis, and Mr.

Weber gave him a raving review.  [*Id.* at 28:01-04].

472.    Ms. Allen believed that Mr. Sullivan had already made up his mind to hire Mr.

Schneweis before the interviews.  [Ex. O, Allen Depo., 25:12-17].

473.    Ms. Allen believed that Mr. Sullivan had problems with women stating their

concerns and that he treated men better than women.  [Ex. O, Allen Depo., 28:05-11, 152:03-06].

474.    Ms. Allen had expressed her concerns to Mr. Sullivan about how Mr. Schneweis

was having affairs with women in the Mental Health department and that he was known to be a

womanizer.  [Ex. O, Allen Depo., 15:10-21].

475.    Ms. Allen informed Mr. Sullivan, Ms. Dougan, and Mr. Clark about Mr.

Schneweis's behavior and that a former employee had levied a harassment complaint against

him.  [Ex. O, Allen Depo., 13:24-14:11, 15:24-16:02].

476.    Mr. Sullivan dismissed her concerns and told her that she "needed to be tougher"

twice.  [Ex. O, Allen Depo., 25:18-26:18].

477.    Plaintiff used FMLA on March 25, 2019.  [Ex. K, Plaintiff's Declaration, at ¶35].

478.    In or about May 2019, Plaintiff applied for the Business Intelligence Analyst ("BI

Analyst") position that Mr. Clark had vacated when he was hired into the DFS position.  Pretrial

Order, Stipulations, Doc. 68.

479.    This would have been a lateral move for Plaintiff.   [Ex. G, Sullivan Depo.,

231:21-232:04].

480.    Mr. Sullivan was not the hiring manager for this position, yet he made the final

hiring decision.  [Ex. G, Sullivan Depo., 56:11-19].

481.     After HR Shala Bloomberg screened-out candidates for minimum qualifications, Mr. Sullivan screened-out at least three more prior to scheduling interviews.  [Ex. L, Bloomberg Depo., 154:09-15; Ex. G, Sullivan Depo., 203:20-204:02; Ex. U, Depo. Ex. 39].

482.     After screening the applicants, Mr. Sullivan provided a list of subjective qualities he was looking for in a "great candidate."  [Ex. U, Depo. Ex. 39].

483.     These subjective qualities included:

a.  Loves working with data and can teach us a thing or to [sic]
b.  Is innovative
c.  Has people skills and is willing to shadow operations to gain domain expertise
d.  Can present information in a manner that is understandable
e.  Is humble (bonus points for humor)

[Ex. U, Depo. Ex. 39].

484.     Mr. Sullivan attached to the email the resumes of the nine applicants he was "comfortable interviewing."  [Ex. U, Depo. Ex. 39].

485.     It was widely known that Mr. Sullivan enjoyed heavy influence over the hiring manager, Sharon Dougan.  [Ex. F, Seidler Depo., 45:11-15; Ex. G, Sullivan Depo., 198:06-09; Ex. E, Depo. Ex. 102, at pp. 491].

486.     Plaintiff was one of the two finalists for the BI Analyst position because Ms. Dougan decided whom to interview.  [Ex. E, Depo. Ex. 102, at pp. 491].

487.     Despite Plaintiff's 28 years of experience in corrections, Mr. Sullivan selected Olivia Allen (Allen), the much younger candidate three years out of graduate school.  [Ex. V, Depo. Ex. 112].

488.     Mr. Sullivan remarked that "Shannon seems very tired to me" and "I liked [Olivia's] enthusiasm."  [Ex. E, Depo. Ex. 102, at pp. 492].  Mr. Sullivan "could picture [Olivia] doing this job."  [*Id.*].

489.    Ms. Allen (Allen) is a feminine-presenting female and was 26 years old at the time.  [Ex. A, Plaintiff's Depo., 197:25-198:06; Ex. J, Dougan Depo., 163:15-18].

490.    In his justification for selecting Ms. Allen over Plaintiff, Mr. Sullivan remarked that "[n]one of our candidates knew tableau."  [Ex. E, Depo. Ex. 102].

491.    Plaintiff had extensive experience using Tableau, and this was noted in Mr. Sullivan's interview notes for the DFS position.  [Ex. W, Depo. Ex. 33, at pp. 956, ¶ 2].

492.    Mr. Sullivan misrepresented Plaintiff's experience in his justification to HR, but he also said that Ms. Allen would need to learn Tableau.  [Ex. E, Depo. Ex. 102].

493.    Ms. Dougan specifically said, "we had hoped to get people with Tableau and data experience as well as domain experience (Corrections experience)."  [Ex. D, Depo. Ex. 100].

494.    Plaintiff had over 20 years working in corrections and probation management and over 27 years total in the criminal justice system.  [Ex. R, Depo. Ex. 64].

495.    Plaintiff had over five years of experience in Data Analysis, including collection, cleaning data sets, and developing reports and dashboards to communicate findings.  [*Id.*].

496.    Plaintiff also supervised Intensive Supervision officers, Pretrial Assessment Officers, Resource Developers, Support Staff, and Probation Intake Officers.  [*Id.*].

497.    Ultimately, Mr. Sullivan hired Ms. Allen over Plaintiff allegedly because she exhibited enthusiasm and Plaintiff seems "tired."  [Ex. E, Depo. Ex. 102].

498.    Mr. Sullivan could "picture" Ms. Allen doing the job; he could "picture" her presenting.  [*Id.*].

499.    Ms. Dougan sent out a photo of the substantially younger, feminine-presenting Ms. Allen to announce her hiring.  [Ex. X, Depo. Ex. 122].

500.    Plaintiff believes that "they don't want me to present at a BOCC meeting

[because] they don't know if I'm male or female."  [Ex. Y, Depo. Ex. 165, at pp. 482].

501.    Ms. Dougan was aware that Plaintiff took FMLA leave because she approved Plaintiff's FMLA leave during this time while Ms. Brown was out.   Ex. K, Plaintiff's Declaration, at ¶ 34].

502.    Ms. Allen worked for Defendant for four years as a Pretrial Supervision Officer supervising adults out on bond on criminal charges.  [Ex. V, Depo. Ex. 112].

503.    On Ms. Allen's application for the BI Analyst position, she listed nine duties and responsibilities of her then-current position as Pretrial Supervision Officer with Defendant.  [Ex. V, Depo. Ex. 112, at pp. 1256].   Down the list at number seven, she listed "Compile and complete monthly statistics."  [*Id.*].

504.    Plaintiff spent three years studying computer science, statistics, and math while pursuing her Bachelor's degree.  [Ex. R, Depo. Ex. 64].

505.    Plaintiff also studied quantitative and qualitative data analysis while pursuing her Master's degree. [Ex. A, Plaintiff's Depo., 23:02-14].

506.    Plaintiff had over five years of experience in Data Analysis, including collection, cleaning data sets, and developing reports and dashboards to communicate findings. [Ex. R, Depo. Ex. 64].

507.    Ms. Allen worked for Defendant as a Pretrial Supervision Officer supervising adults out on bond.  [Ex. V, Depo. Ex. 112].

508.    Mr. Seidler did not think juvenile experience was necessary for the BI Analyst position.  [Ex. F, Seidler Depo., 38:25-39:18].

509.    Moreover, juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.  [Exhibit F, Brian Seidler Deposition at

83:06-85:09].

510.     The two BI Analysts would work together as needed and within each other's portfolios.  [Exhibit M, Keith Clark Deposition at 48:8-49:14].

511.     The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio.  Exhibit F, Brian Seidler Deposition at 34:24-35-15.

512.     The only "juvenile experience" Ms. Allen had was as a 10-hour-a-week summer intern for Johnson County Court Services monitoring at-risk youth in controlled settings.  [Ex. V, Depo. Ex. 112, at pp. 1261].

513.     During this time, significant changes were happening which made the juvenile portfolio more difficult to work than the adult portfolio.  [Ex. G, Sullivan Depo., 58:03-11].

514.     The state of Kansas passed Senate Bill 367 in 2016 which, as Mr. Sullivan put it, was one of the biggest paradigm shifts in juvenile justice since 1997, and this resulted in a lot of changes to the juvenile portfolio.  [Ex. G, Sullivan Depo., 58:12-16].

515.     These changes increased the workload so much that once Ms. Allen was hired, Mr. Sullivan planned to hire an additional BI Analyst to help.  [Ex. G, Sullivan Depo., 58:15-21].

516.     Ms. Allen acknowledged that her learning curve was steep because she had to learn Kansas laws while learning how to use Tableau software (which Plaintiff already knew (SOF 275-77)).  [Ex. O, Allen Depo., 30:20-24].

517.     This limited her ability to be flexible and innovative, and these limitations never changed.  [Ex. O, Allen Depo., 30:24-31:08].

518.     Another alleged justification for not hiring Plaintiff was that, in response to a single question, Mr. Sullivan determined that she was not "innovative enough to successfully

handle the ever-changing juvenile portfolio." (SOF 270).

519.    Furthermore, he was allegedly concerned about Plaintiff's ability to think outside

the box and handle programs *that had yet to be created*. (SOF 299) (emphasis added).

520.    Mr. Sullivan believed Plaintiff was resistant to change. [Ex. G, Sullivan Depo.,

192:11-18].

521.    Mr. Sullivan was not impressed with Ms. Allen's answer to the same question

either. (SOF 300).

522.    Ms. Allen felt like it "just became like pulling teeth to have ideas." [Ex. O, Allen

Depo., 31:25-32:01].

523.     Moreover, Mr. Sullivan, Ms. Dougan (her supervisor), and Mr. Seidler (the other

BI Analyst on the adult side) hardly spoke to her. [Ex. O, Allen Depo., 32:05-33:11].

524.    Ms. Allen's job "was very lonely." [Ex. O, Allen Depo., 33:13].

525.    Ms. Bloomberg and Mr. Seidler recognized that remarking that Plaintiff was

"tired" could be seen as a comment on someone's age. [Ex. L, Bloomberg Depo., 258:08-10;

Ex. F, Seidler Depo., 81:07-14].

526.    Mr. Sullivan remarked that Plaintiff "used the same dated examples" in all of her

interviews. [Ex. G, Sullivan Depo., 247:14-16].

527.    In a meeting with Ms. Allen, Mr. Sullivan made comments about the fact that the

criminal justice coordinator, Allie Dickinson, was taking FMLA leave, and she was "no doing

what she needed to be doing." Mr. Sullivan expressed that he was irritated that he was having to

do things for Ms. Dickinson's role while she was out on leave. [Exhibit O, Olivia Allen

Deposition at 146:6-10, 147:12-148:19.]

528.    Ms. Allen did not believe it was necessary for someone coming into her position

as BI Analyst for the juvenile portfolio to have juvenile experience.  Exhibit O, Olivia Allen Deposition at 97:18-98:3.

529.    Mr. Sullivan made comments in a meeting with Ms. Allen about the fact that the criminal justice coordinator, Allie Dickinson, was taking FMLA leave, and she was "no doing what she needed to be doing."  Mr. Sullivan expressed that he was irritated that he was having to do things for Ms. Dickinson's role while she was out on leave.    Exhibit O, Olivia Allen Deposition at 146:6-10, 147:12-148:19.

530.    Ms. Allen thought that Mr. Sullivan had problems with grown women stating their concerns.  Exhibit O, Olivia Allen Deposition at 151:18-152:06.

## III.   **ARGUMENT**

### A.   **STANDARD OF REVIEW**

The standard for summary judgment is remarkably stringent for good reason.  Summary judgment extinguishes a claim without affording a party its actual day in court, a fundamental right that should be cut off in only the clearest of cases.  Summary judgment should be denied unless the moving party demonstrates there is "no genuine issue as to *any* material fact" and that it is "entitled to a judgment as a matter of law."  *Nautilus Ins. Co. v. Heartland Builders*, No. 2:19-CV-02624-JAR-KGG, 2021 U.S. Dist. LEXIS 45429, at *2 (D. Kan. Mar. 11, 2021).  Accordingly, the court must construe the facts in the light most favorable to the nonmoving party, here the Plaintiff, and credit to Plaintiff's advantage every disputed factual point.  *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007); *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310 (10th Cir. 2006); *Plotke v. White*, 405 F.3d 1092, 1093-94 (10th Cir. 2005).  Moreover, the nonmoving party must receive the benefit of any reasonable inference that might be drawn from the record evidence.  *Piercy*, 480 F.3d at 1197; *Mickelson*, 460 F.3d at 1310; *Plotke*, 405 F.3d at 1093-94.

Therefore, at the summary judgment stage the court may not entertain or decide credibility issues.  Those determinations must be left for the jury in its role as the ultimate finder of fact.  *Plotke*, 405 F.3d at 1094.[33]  Further, cases that turn on issues of intent or state-of-mind are best left for trial and are within the jury's province.  *Id.* at 1102.  As discussed below, this case ultimately hinges on whether Defendant failed to promote Plaintiff to the Director of Field

---

[33] "Certainly, it is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini-trial' to determine the defendant's true state of mind. . . .  For summary judgment purposes, as long as the plaintiff has presented evidence . . . upon which a jury could infer discriminatory motive, the case should go to trial." *Pinkerton v. Colo. DOT*, 563 F.3d 1052, 1066 (10th Cir. 2009) (internal quotations and citations omitted).  If the favorable rendition of the evidence coupled with all reasonable inferences found in the record would support a jury finding for the nonmoving party on a material fact, summary judgment must be denied in deference to a trial.  *Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).

Services or BI Analyst position because of discriminatory or retaliatory *motives*. As shown below, there are genuine issues of material fact such that Defendant's motion should be denied.

### B. FRAMEWORK FOR PLAINTIFF'S CLAIMS

Plaintiff has brought claims against Defendant for discrimination under Title VII, the Americans with Disabilities Act, As Amended (ADAAA) and the ADEA and retaliation under the FMLA by failing to promote her to several positions: (1) Director of Field Services; (2) Business Intelligence Analyst; and (3) three positions in the Mental Health department. Plaintiff will not pursue her claims for Disability Discrimination under the ADAAA for all positions. Further Plaintiff will not pursue her claims for the Mental Health positions at trial and waives any arguments relating to those positions. However, Plaintiff will show genuine issues of material facts exist pertaining to the other two positions such that summary judgment is unwarranted.

Plaintiff agrees with Defendant that her claims should be analyzed under the *McDonnell Douglas* burden-shifting framework. Plaintiff must first establish a prima facie case of discrimination. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Then the burden shifts to the employer to assert a legitimate nondiscriminatory reason for its actions. *Id.* If it does, then the burden shifts back to Plaintiff to introduce evidence that the stated nondiscriminatory reason is merely pretext for Defendant's discriminatory intent. *Id.*

Plaintiff also agrees with Defendant on the elements of a *prima facie* case on each of her claims. For each claim, she must show: (1) she applied for an available position; (2) she was qualified for the position; and (3) she was denied the position under circumstances that give rise to an inference of discrimination. *Laul v. Los Alamos Nat'l Labs.*, 714 Fed. Appx. 832, 839 (10th Cir. 2017) (prima facie elements under Title VII and the ADEA).

"The [Family Medical Leave Act] ("FMLA") makes it unlawful for an employer to retaliate against an employee for exercising her rights to FMLA leave." *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012); *see also* 29 U.S.C. § 2615(a).  Plaintiff agrees with Defendant on the elements of a prima facie case of FMLA retaliation.  Plaintiff must show: (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal relationship between the protected activity and the adverse action.  *Cerda v. Cillessen & Sons*, No. 19-1111-JWB, 2020 U.S. Dist. LEXIS 12612, at *13 (D. Kan. Jan. 27, 2000).

Moreover, the Tenth Circuit has held that Title VII prohibits discrimination based on a combination of protected characteristics, such as sex-plus-age discrimination.  *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1045 (10th Cir. 2020).  More specifically, "Title VII forbids sex-plus discrimination in cases in which the plus- characteristic is not itself protected under the statute."  *Id.* (internal quotations omitted).  "A plaintiff can also state a sufficient claim if [s]he presents evidence that the discrimination was motivated by [her] failure to conform to stereotypical gender norms."  *Throupe v. City of Denver*, 988 F.3d 1243, 1251-52 (10th Cir. 2021); *accord Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion).

Defendant has conceded that Plaintiff has met her burden on the first two *prima facie* elements on each of her discrimination and retaliation claims.  Therefore, Plaintiff must meet only her "de minimus" burden of showing the adverse employment actions occurred under circumstances giving rise to an inference of discrimination or retaliation.  *See Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) ("Establishing a prima facie claim is not onerous."); *see also Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (describing the prima facie burden as "de minimus").  Plaintiff can meet her burden.

As Plaintiff outlines below, she has provided substantial evidence that Defendant pre-selected and hired a male to the Director of Field Services and provided false justifications for doing so. Additionally, Plaintiff has provided substantial evidence that Defendant hired into the Business Intelligence Analyst position a substantially less qualified, substantially younger, feminine-presenting female over Plaintiff and provided false justifications for its decisions. Viewing the evidence in a light most favorable to Plaintiff, there are genuine issues of material facts for the jury to decide.

## C.  DIRECTOR OF FIELD SERVICES POSITION

### 1.  Plaintiff Can Establish a Prima Facie Case of Gender Discrimination.

Plaintiff can satisfy her "not onerous" burden of a *prima facie* case by showing that she was rejected for the promotion under circumstances that give rise to an inference of unlawful discrimination. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). When analyzing Plaintiff's *prima facie* case, Courts should not conflate her claim of discrimination with Defendant's proffered explanation. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). Plaintiff's burden is not onerous which is evidenced by the small amount of proof necessary to create an inference of discrimination. *Id.* (internal quotations omitted).

Here, Plaintiff applied for the Director of Field Services ("DFS") position, and she was well-qualified. This is undisputed. It is also undisputed that a male, Keith Clark, was selected for the position. (SOF 455). This alone satisfies Plaintiff's burden to establish a prima facie case.[34] Requiring more begins to conflate the third step of the *McDonnell Douglas* analysis with the first. Nevertheless, the hiring manager, Mr. Sullivan, pre-determine who he was going to

---

[34] Plaintiff testified that because the DFS position is a very front-facing, public-facing position that makes presentations to the Advisory Board, County Commissioners, and judges, the message conveyed to her by "every supervisor [she] ever had", meaning directors or past directors, was a "masculine female presentation" is "not the face" for the position and that a masculine-presenting, homosexual female would not be right for the job. (RSOF 151).

select prior to conducting interviews.   Defendant argues that whether Mr. Sullivan had predetermined that Mr. Clark would be selected for the position does not relate to Plaintiff's gender, gender presentation, or sexual orientation.   However, if Mr. Sullivan did in fact pre-select a male candidate prior to conducting interviews, then that would give rise to an inference of discrimination.

And there is a genuine issue of material fact as to whether Mr. Sullivan pre-selected Mr. Clark, male candidate, for the position.  Ms. Brown told Plaintiff that hiring Mr. Clark for the DFS position was a "done deal before the interviews were conducted."  (SOF 456).  Ms. Brown also told Plaintiff that Mr. Sullivan's "mind had already been made up that it was going to be [Mr. Clark]" prior to the interviews.  (RSOF 123, 146; SOF 457)  Mr. Sullivan stated that "I can tell you unequivocally Keith [Clark] was the top candidate in my mind" and that he "had a favorite *before* going into the interview process", which was Mr. Clark.  (RSOF 117; SOF 457).  Moreover, Mr. Sullivan told Ms. Bloomberg during the "investigation" into Plaintiff's complaints of discrimination that hiring Mr. Clark "was an easy decision," and that he "didn't have an internal candidate better than [Mr. Clark]," even though the interview panelists were split on the decision and thought other female candidates, including Plaintiff, Rachel Mestad, and Megan Milner should be considered.  (*Id.*)

During the deliberation process, Mr. Sullivan had all the panel members write their top three candidates on the white board and if a candidate did not get someone's top spot, that candidate was erased from the board and not discussed.  (RSOF 117).  (This meant that a candidate ranked in the second position, even by all the panelists, would be deleted (erased) and not considered.  (*Id.*)).  Plaintiff's name appeared on the white board as at least one of the panelist's top candidates, along with Keith Clark, Rachel Mestad, and Megan Milner.  (*Id.*)

However, she was erased from consideration, and eventually the panel left without a consensus. (*Id.*) Interestingly, Mr. Sullivan erased the white board with the rankings and deleted the photo he took of the white board during that process.  (*Id.*)  Obviously, Mr. Sullivan then selected the only male candidate, Keith Clark for the position.

Furthermore, Mr. Sullivan hand-selected a panelist from an outside department to help with filling the position, and Mr. Clark listed this panelist as a reference.   (SOF 458). Interestingly, Mr. Sullivan admits the "optics look very bad" of hand-selecting a panelist, Shelley Williams, who is a reference of the person hired.  (SOF 462).  However, he denies knowing Mr. Clark listed her as a reference because he allegedly did not look at Mr. Clark's references.  (SOF 459).  Yet, he scheduled the interviews around Ms. Williams' vacation plans and offered to pay for her lodging, mileage, and meals.  (SOF 460).  There is a genuine issue of fact as to whether Mr. Sullivan had pre-selected Mr. Clark prior to the interview process, and that he stacked the deck to make sure Mr. Clark was the panel's top choice.  This genuine issue of fact give rise to an inference of discrimination in the hiring process for the DFS position.

Moreover, for another later BI Analyst position, Mr. Sullivan had pre-selected another male candidate over a female candidate before interviews were conducted.  (SOF 464).  In fact, this position was offered to the same Mr. Clark, but he declined the position.  (SOF 465).  During that first round of interviews, the panel (consisting of Ms. Allen, Ms. Dougan, and Mr. Sullivan) had ranked Mr. Clark first, Jodi Kelley (female) second, and Chris Schneweis (male) third. (SOF 465).  However, after Mr. Clark declined the job, Mr. Sullivan insisted on a second round of interviews between Ms. Kelley and Mr. Schneweis, who were to give presentations so the panel could see their skills and how much work they put into the presentation.  (SOF 466).  This

time, Mr. Clark was added to the interview panel for the second round of interviews after he did not accept the offer for the BI Analyst position.

Both Ms. Allen and Ms. Dougan thought Ms. Kelley's presentation was "50% better" and "very, very impressive" whereas Mr. Schneweis's presentation seemed like a "last-minute thing." (SOF 468). Even though Ms. Kelley was ranked #2 in the initial round of interviews, and she had a much more impressive presentation, Mr. Sullivan still wanted to hire Mr. Schneweis. (SOF 469). Ms. Allen stood her ground and ranked Ms. Kelley number one. (SOF 470). To persuade her, Mr. Sullivan reached out to a known "fan" of Mr. Schneweis for a raving review. (SOF 471). Mr. Schneweis was hired for the position, and Ms. Allen believed that Mr. Sullivan had already made up his mind before the interviews, and this was clear based on his actions. (SOF 472). The fact that Mr. Sullivan, on at least two separate occasions, pre-selected a male candidate over a female candidate gives rise to an inference of discrimination in his hiring practices. Plaintiff has established a prima facie case of gender discrimination.

### 2.      Plaintiff Can Establish a Prima Facie Case of FMLA Retaliation.

To establish a claim for FMLA retaliation, Plaintiff must show: (1) she engaged in a protected activity; (2) Defendant took an action that a reasonable employee would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse employment action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006). The causal connection can be established "by evidence of circumstances that justify an inference of retaliatory motive, such as protected activity closely followed by adverse action." *Pfannenstiel v. Mars Wrigley Confectionary US, LLC*, No. 19-02096-JAR, 2021 U.S. Dist. LEXIS 17057, at *40 (D. Kan. Jan. 29, 2021). If the protected activity and the adverse action are close in time, this can establish a prima facie case standing alone. *Id.* For

example, "[a] six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation . . . ."  *Id.*; *see also Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 606-07 (10th Cir. 2020) (one and one-half month); *see also Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004) (two to three months temporal proximity sufficient to establish causation); *Anderson*, 181 F.3d at 1179 (two months and one week); *Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (one and one-half month).

Here, Plaintiff can establish causation on temporal proximity alone because she exercised her right to use FMLA just four weeks prior to interviewing for the DFS position.  Plaintiff was first approved for intermittent FMLA in December 2018.  (SOF 453).  Plaintiff utilized her FMLA three times prior to applied for and interviewing for the DFS position: January 7, January 28, and February 11.  (SOF 454).  Plaintiff applied for the position in February 2019, interviewed for it on March 15, 2019, and she was denied the promotion shortly thereafter.  (SOF 455).  This is a four-to-five-week temporal proximity, at a maximum, which is sufficient to establish causation on its own.

Defendant argues that because Mr. Sullivan was not aware that Plaintiff took FMLA leave, then she cannot establish causation.  However, Defendant concedes that two of the panel members for the DFS interviews, Ms. Bloomberg and Ms. Brown were aware.  Ms. Brown was Plaintiff's direct supervisor during this time, and Mr. Sullivan supervised Ms. Brown.  Further, a third panel member, Susan Dougan, was also aware of Plaintiff's FMLA leave and had approved her use of leave on occasion.  (SOF 501).  Mr. Sullivan was also Ms. Dougan's supervisor. (SOF 523).  Whether Mr. Sullivan was aware of Plaintiff's FMLA use, he allegedly relied on the input of three panelists who were well aware of Plaintiff's FMLA.  Defendant's contention that Plaintiff's FMLA use did not factor into their decision-making is undermined by Mr. Sullivan's

hand-selection of the candidate, the temporal proximity of Plaintiff's FMLA use, and the alleged influence Ms. Brown, Ms. Dougan, and Ms. Bloomberg had on the selection of Mr. Clark for the DFS position.  Plaintiff has established a prima facie case of FMLA retaliation.

### 3.  Plaintiff Can Establish Pretext.

A Plaintiff can show pretext by pointing to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997).  Furthermore, pretext can be demonstrated when employers use subjective evaluation methods, especially when "there is a showing of significant disparity in the representation of a particular group." *Sasser v. Salt Lake City Corp.*, 772 Fed. Appx. 651, 669 (10th Cir. 2019).  While some subjectivity is expected in hiring decisions, Courts will infer pretext from subjective criteria when the employer ultimately relies entirely on subjective criteria and the hiring process is especially opaque.  *Id.*

As discussed above in making a prima facie case, Mr. Sullivan pre-selected Mr. Clark for the DFS position.  There is nothing transparent about selecting the candidate to be hired prior to conducting interviews.  Furthermore, hand-selecting an interview panelist who is that candidate's reference further supports the opaque nature of Defendant's hiring process.  Prior to Mr. Sullivan becoming the hiring manager for this position, each interviewer would score a candidate based on their answers using a rubric.  (SOF 31).  This "rubric system" was meant to be used in an objective manner: the candidate with the highest score is hired.  (RSOF 33).  However, under this more objective process, if the candidate the hiring manager wanted to hire was not the candidate who scored the highest, they could not do so.  (SOF 32).  The objective process was discontinued shortly after Mr. Sullivan assumed his position.  (RSOF 33).  Instead, the subjective

question system and white board ranking scenario was used to ensure Mr. Clark was hired for the position.

Furthermore, Mr. Sullivan has let slip his gender bias.  Ms. Allen believed that Mr. Sullivan had problems with grown women stating their concerns and that he treated men better than women.  (SOF 473).  Ms. Allen had expressed her concerns to Mr. Sullivan about how Mr. Schneweis was having affairs with women in the Mental Health department and that he was known to be a womanizer.  (SOF 474).  Ms. Allen informed Mr. Sullivan, Ms. Dougan, and Mr. Clark about Mr. Schneweis's behavior and that a former employee had levied a harassment complaint against him.  (SOF 475).  Mr. Sullivan dismissed her concerns and told her that she "needed to be tougher" twice in response to her concerns.  (SOF 476).

Mr. Sullivan has also made his negative thoughts regarding the use of FMLA leave known.  In a meeting with Ms. Allen, Mr. Sullivan made comments about the fact that the criminal justice coordinator, Allie Dickinson, was taking FMLA leave, and she was "no doing what she needed to be doing."  (SOF 527).  Mr. Sullivan expressed that he was irritated that he was having to do things for Ms. Dickinson's role while she was out on leave.  (SOF 527).

Further, Plaintiff was every bit as qualified for the position as Mr. Clark.  Plaintiff was an internal candidate, understood the work that was being done, and knew the staff and stakeholders.  (RSOF 124).  Plaintiff's knowledge of the Corrections department was vast. Plaintiff worked in House Arrest for over 4 years prior to joining Adult ISP, which she had been in for over 20 years at the time of interviewing for the position.  She supervised the staff that worked in Probation Intake and Bond Assessment.  (*Id.*).  In fact, Plaintiff was involved in building the Probation Intake program from the beginning, which included attending meetings with judges, attorneys, courts services, and others in corrections, to make sure to meet the needs

of all involved.  (*Id.*).   In her position as a Senior Case Manager, Plaintiff built relationships and had a solid rapport with multiple stakeholders, including judges, ADAs, defense attorneys, Court Services (probation), Adult Residential services, and juvenile services, which was essential for the DFS position.  (*Id.*).  Plaintiff collaborated with these stakeholders on multiple occasions to create mutually beneficial solutions to issue that arose and implement them in the most efficient way.   (*Id.*).   Mr. Clark did not have this same experience in the Johnson County Corrections department.  Mr. Clark shared that the role he held as the Director of Community Corrections for the Fourth Judicial District was more similar to the Project Manager position (later BI Analyst) he took with Johnson County in 2016, and this was more of a lateral move than a promotion. (*Id.*).  Plaintiff was well qualified for this position.

Mr. Sullivan pre-determined his male candidate; employed a subjective hiring process; he went out of his way to ensure Mr. Clark's reference was on the interview panel; and he exhibited bias towards women for expressing concerns.  Viewing the evidence in a light most favorable to Plaintiff, she has shown genuine issues of material facts sufficient for the factfinder to find the proffered reasons for hiring Mr. Clark were pretextual.

## D.  BUSINESS INTELLIGENCE ANALYST POSITION

### 1.  Plaintiff Can Establish a Prima Facie Case of Age Discrimination.

Defendant has conceded the first two elements of Plaintiff's prima facie case; therefore, she must only satisfy her slight burden that she was denied the position under circumstances that give rise to an inference of discrimination.  *Laul*, 714 F. App'x at 839.  First, as discussed above, Mr. Sullivan had a pattern of pre-selecting candidates and using subjective criteria.  And on the Business Intelligence Analyst ("BI Analyst") position, he was not listed as the hiring manager, yet he made the final hiring decision for the position.  (SOF 480).  Furthermore, even after HR

Shala Bloomberg screened-out candidates for minimum qualifications, Mr. Sullivan screened-out at least three more prior to scheduling interviews even though he was not the hiring manager. (SOF 481).  Moreover, Mr. Sullivan attached to the email the resumes of the nine applicants he was "comfortable interviewing."  (SOF 484).  It was widely known that Mr. Sullivan enjoyed heavy influence over the hiring manager, Susan Dougan.  (SOF 485).  The circumstances surrounding the interview process give rise to an inference of discrimination.

Courts are skeptical of subjective evaluation methods because "subjective decision making provides an opportunity for unlawful discrimination."  *Apsley v. Boeing Co.*, 691 F.3d 1184, 1204 (10th Cir. 2012) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002)); *see also Bouricius v. Mesa Cnty.*, No. 1:18-cv-01144-DDD-STV, 2020 U.S. Dist. LEXIS 259844, at *13 (D. Colo. Jan. 21, 2020) ("Subjective promotion procedures are to be closely scrutinized for unlawful discrimination").  While such methods are not per se unlawful, unbridled discretion by management will tend to confirm implications of unlawful discrimination.  *Id.* at 1205.  In determining this, courts carefully evaluate whether the "opaqueness" of the employer's hiring system makes it susceptible to unspoken discriminatory input."  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1200 (10th Cir. 2008).

After screening the applicants, Mr. Sullivan provided a list of exceedingly subjective qualities he was looking for in a "great candidate."  These qualities were:

a. Loves working with data and can teach us a thing or to [sic]
b. Is innovative
c. Has people skills and is willing to shadow operations to gain domain expertise
d. Can present information in a manner that is understandable
e. Is humble (bonus points for humor)

(SOF 483).  These subjective criteria were not given to the applicants.  There was no objective scale or guidance on how to evaluate whether a candidate "is humble," for example, or how

"bonus points for humor" were to be scaled or calculated.   These criteria are completely subjective.   As will be shown below in the pretext section, any objective criteria worked in Plaintiff's favor; therefore, Defendant relied on solely subjective criteria for selecting Ms. Allen over Plaintiff.  *See Jones v. Barnhart*, 349 F.3d 1260, 1267-68 (10th Cir. 2003) ("[W]e typically infer pretext in these contexts only when the criteria on which the employers ultimately rely are entirely subjective in nature.").

Plaintiff was one of the two finalists for the BI Analyst position because selected her to interview.  (SOF 486).  Despite Plaintiff's 28 years of experience in corrections, Mr. Sullivan selected Olivia Allen, the much younger candidate three years out of graduate school to hire for the position.  (SOF 487).  To justify his decision, Mr. Sullivan remarked that "Shannon seems very tired to me" and "I liked [Olivia's] enthusiasm."  (SOF 488).  Mr. Sullivan "could picture [Olivia] doing this job."  [*Id.*].  Further, Mr. Sullivan brought up, during deliberations after the interviews, that Plaintiff had been in her position for a "long time," where she could have been innovative and made changes, and she had largely not done that in his opinion.  (SOF 307).  This was a direct comment related to Plaintiff's age in the consideration of the hiring for this position. (*Id.*).   Mr. Sullivan had only been the Director of Corrections and Plaintiff's second level supervisor for a short time and did not have anyway to know about whether Plaintiff had been innovative or made changes in the department.  (*Id.*)  In fact, Mr. Sullivan's assumption related to Plaintiff's age is directly controverted by Plaintiff's reviews which include the statements from her supervisor Ms. Brown that: Plaintiff "encourages *innovation* with regard to client supervision"; that she has been open to "*innovative*" ways to get the job done and has "challenged her supervisory peers to be more open to this same concept"; and that Plaintiff "recommends solutions to problem situations and provides proactive solutions."  (RSOF 45,

307).  Mr. Sullivan took this assumption about Plaintiff's lack of innovation because of her age and ran with it.  He did nothing to make sure it had merit.

Mr. Sullivan and Ms. Dougan also stated that Plaintiff provided "old examples" and "dated" examples, from "years and years ago" during her interview.  (RSOFs 263-265).  If anyone on interview panel was seeking a more recent example from Plaintiff, or any of the interviewees, this was not made clear in the questions and the interview panelists did not ask for a more recent example even though they could have done so.  (*Id.*)  Further, to the extent Defendant attempts to imply Ms. Allen (who Mr. Sullivan and Mr. Seidler agreed provided a "bad example" as an answer to this question) provided a more recent example, the only examples Ms. Allen had to provide were more recent as she was 24 years younger than Plaintiff and had only been out of school for three years.  (*Id.*)  This was a clear indication of age being considered in determining the ranking of candidates.

While these circumstances bleed into the pretext discussed below, they give rise to an inference of discrimination.  Plaintiff has established a prima facie case of age discrimination.

### 2.  Plaintiff Can Establish a Prima Facie Case of Gender Discrimination.

Again, because Defendant conceded the first two elements of Plaintiff's prima facie case, she must only satisfy her slight burden that she was denied the position under circumstances that give rise to an inference of discrimination.  *Laul*, 714 Fed. Appx. at 839.  To avoid needless repetition, Plaintiff incorporates her arguments from the previous section establishing her prima facie case of age discrimination.  While the many of the same circumstances giving rise to an inference of discrimination apply equally to Plaintiff's gender discrimination claim, her claim is also based on gender stereotyping and sexual orientation.

Plaintiff is a masculine-presenting, homosexual female. (SOF 35). Mr. Sullivan selected a much younger, very feminine-presenting female for the BI Analyst position. (SOF 489). It is undisputed that Plaintiff was well-qualified – if not overqualified – for the BI Analysis position. (SOF 444-52, 486). In his justification for selecting Ms. Allen over Plaintiff, Mr. Sullivan remarked that "[n]one of our candidates knew tableau." (SOF 490). But this is false. Plaintiff had experience using Tableau, and this was noted in Mr. Sullivan's interview notes for the previous DFS position. (SOF 491). Not only did Mr. Sullivan misrepresent Plaintiff's experience in his justification to HR, but he also said that Ms. Allen would need to learn Tableau. (SOF 492). While Defendant attempts to minimize Plaintiff's experience with Tableau by claiming they would have hired Casey Johnson had they put a premium on Tableau, Defendant cannot escape the fact that Tableau experience was something they were looking for originally; Plaintiff had it, and Ms. Allen did not. Moreover, Ms. Dougan specifically said, "we had hoped to get people with Tableau and data experience as well as domain experience (Corrections experience)." (SOF 493). Plaintiff had each.

To the extent that Defendant attempts to imply that Tableau experience was not important or that a premium was not placed upon it, this is contrary to the fact that Question No. 10 specifically requested interview candidates to answer whether "you have ever used Tableau". (RSOF 317). Only looking for creator experience with Tableau was not denoted anywhere in the interview questions, nor did it come up in the Ms. Bloomberg's interview notes with Plaintiff, Ms. Dougan, or Mr. Sullivan. (*Id.*) It is undisputed that of the two top candidates with domain (corrections) experience, Plaintiff and Ms. Allen, Plaintiff was the only one with Tableau experience. (*Id.*).

Plaintiff had over 20 years working in corrections and probation management and over 27 years total in the criminal justice system.  (SOF 494).  Furthermore, Plaintiff had over five years of experience in Data Analysis, including collection, cleaning data sets, and developing reports and dashboards to communicate findings.  (SOF 495).  This experience in and of itself qualified Plaintiff for the Senior BI Analyst position.   Plaintiff also supervised Intensive Supervision officers, Pretrial Assessment Officers, Resource Developers, Support Staff, and Probation Intake Officers.  (SOF 496).  By any objective measure, Plaintiff's experience and qualifications overshadowed Ms. Allen's.  But ultimately, Mr. Sullivan hired Ms. Allen over Plaintiff because she exhibited "enthusiasm" and Plaintiff seems "tired."  (SOF 497).  Mr. Sullivan could "picture" Olivia doing the job; he could "picture" her presenting.  (SOF 498). Incredibly, after hiring Ms. Allen, Ms. Dougan sent out a photo of Ms. Allen in which she appears young and feminine, to announce her hiring.  (SOF 499).  These undisputed facts support Plaintiff's allegations that "they don't want me to present at a BOCC[35] meeting [because] they don't know if I'm male or female" and that it is not desirable for a masculine-presenting female to be in positions of authority. (RSOFs 70, 151, 152 ) [Depo. Ex. 165, at pp. 482]. Plaintiff experienced discriminatory treatment based upon her masculine, homosexual presentation many times from directors, including being told to dress more feminine or seeing male employees wearing what she was told not to wear previously, receiving cards addressed to "Mr. King," and having individuals misgender her in the bathrooms.  (SOFs 58, 64-68, 70, 152).  This time was no different.

The Defendant ultimately relied entirely on subjective criteria in selecting Ms. Allen over Plaintiff.  The circumstances surrounding Defendant's failure to hire Plaintiff into the BI Analyst

---

[35] Board of County Commissioners

position permits an inference of discrimination.   Plaintiff has established a prima facie case of

gender discrimination.

### 3.   Plaintiff Can Establish a Prima Facie Case of FMLA Retaliation.

Because Defendant conceded the first two elements of Plaintiff's prima facie case, to

establish a claim for FMLA retaliation, Plaintiff must show a causal connection between the

protected activity and the adverse employment action.   *Metzler v. Fed. Home Loan Bank of*

*Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).  As discussed above, the causal connection can be

established "by evidence of circumstances that justify an inference of retaliatory motive, such as

protected activity closely followed by adverse action."   *Pfannenstiel v. Mars Wrigley*

*Confectionary US, LLC*, No. 19-02096-JAR, 2021 U.S. Dist. LEXIS 17057, at *40 (D. Kan. Jan.

29, 2021).  If the protected activity and the adverse action are close in time, this can establish a

prima facie case standing alone.   *Id.*   For example, "[a] six-week period between protected

activity and adverse action may be sufficient, standing alone, to show causation . . . ."  *Id.*; *see*

*also Mann v. XPO Logistics Freight, Inc.*, 819 Fed. Appx. 585, 606-07 (10th Cir. 2020) (one and

one-half month); *see also Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240 (10th Cir. 2004) (two to

three months temporal proximity sufficient to establish causation); *Anderson*, 181 F.3d at 1179

(two months and one week).

Here, Plaintiff can establish causation on temporal proximity alone because she exercised

her right to use FMLA just two months prior to interviewing for the BI Analyst position.  As

discussed above, Plaintiff utilized her FMLA three times prior to applied for and interviewing for

the DFS position: January 7, January 28, and February 11.  (SOF 454).  Plaintiff next used

FMLA on March 25, 2019, and she interviewed for the BI Analyst position on May 31st.  (SOF

477).  While this eight-to-nine-week temporal proximity is on the outer edge of what the 10th

Circuit has found to be sufficient, the nature of Plaintiff's intermittent FMLA meant that she could potentially utilize her leave any day.  The temporal proximity combined with the intermittent nature of Plaintiff's FMLA leave gives rise to an inference of retaliation.

Defendant argues that none of the panel members were aware of Plaintiff's FMLA usage. However, this is not the case.  Ms. Dougan approved Plaintiff's FMLA leave during this time while Ms. Brown was out on leave.  (SOF 501).   Ms. Dougan was Plaintiff's acting direct supervisor during this time, and as discussed earlier, Mr. Sullivan and Ms. Dougan worked closely together on filling the BI Analyst position.   Whether Mr. Sullivan was aware of Plaintiff's FMLA use by this time is not as clear as Defendant suggests.  He allegedly relied on Ms. Dougan's recommendation in choosing not to hire Plaintiff for the position.  Defendant's contention that Plaintiff's FMLA use did not factor into their decision-making is challenged by the temporal proximity of Plaintiff's FMLA use, Mr. Sullivan effectively ignoring Plaintiff's overqualifications, and the close working relationship with Ms. Dougan on filling the BI Analysis position.  Plaintiff has established a prima facie case of FMLA retaliation.

**D.    Plaintiff Can Establish Pretext.**

A Plaintiff can show pretext by pointing to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan*, 108 F.3d at 1323.  Many of the arguments and facts established in making Plaintiff's prima facie case apply to this element as well; therefore, Plaintiff incorporates those arguments and facts here.

Defendant argues that Ms. Allen was hired over Plaintiff because of her "significant experience with data, data analysis, and presenting data."  Ms. Allen worked for Defendant for

three years as a Pretrial Supervision Officer supervising adults out on bond on criminal charges. (SOF 502). Interestingly, on Ms. Allen's application for the BI Analyst position, she listed nine duties and responsibilities of her then-current position as Pretrial Supervision Officer with Defendant. (SOF 503). Down the list at number seven, she listed "Compile and complete monthly statistics." [*Id.*]. None of the other duties and responsibilities related to "significant experience with data." Further, at the time of the interview, Ms. Allen had only used the data analytics software SPSS, and had a little Excel knowledge, but not formulas. (RSOF 225, 323). While Ms. Allen had some experience entering data while earning her master's degree, Plaintiff spent three years studying computer science, statistics, and math while pursuing her bachelor's degree, and had experience writing code in her computer science degree programs. (RSOF 288, SOF 504-06). Plaintiff discussed this experience during her interview and wanting to use it to push the BI Analyst position forward. (*Id.*) Plaintiff also studied quantitative and qualitative data analysis while pursuing her master's degree, and obtained it from the same institution as Ms. Allen. (RSOF 37, 195).

Furthermore, Plaintiff had more experience working with data *for Defendant* than Ms. Allen had total, including both Ms. Allen's coursework and professionally as a Pretrial Supervision Officer with Defendant. [Depo. Ex. 62, at pp. 1750; King Depo., 204:13-205:21]. Plaintiff had been working with data for more than 20 years whereas Ms. Allen was just 26 years old. (SOF). Specifically, Plaintiff had over five years of experience in Data Analysis, including collection, cleaning data sets, and developing reports and dashboards to communicate findings, including many years working with Excel, which was still needed for the BI Analyst position. (RSOF 174, 178, 191). For the interviews, Mr. Seidler created a set of exercises to test the candidates' data analysis knowledge related to the BI Analyst's job duties. (RSOF 254). He

specifically asked the first question of his exercise for the purpose of determining whether the candidates "understood Excel formulas" and "could speak Excel" in the interpretation of data. (RSOF 178).  Ms. Allen did not even try on this exercise and just said she did not know.  (*Id.*) This concerned Mr. Seidler because he thought based on her listed education and experience, she would have had familiarity with Excel and a candidate for the position would have been able to perform that part of the exercise.  (*Id.*).  Whether Ms. Allen had "significant experience with data" during her master's program and data cleaning at the family court in Jackson County by pulling records behind a computer screen and not doing any data analysis and is open to interpretation.  However, no interpretation is needed for the fact that Plaintiff's experience with data vastly overshadows Ms. Allen's experience.  Defendant's proffered reason for selecting Ms. Allen over Plaintiff suffers from such weaknesses and incoherencies sufficient for the jury to find it unworthy of credence.

Defendant also argues that Ms. Allen had more juvenile experience than Plaintiff.  This argument is without merit as juvenile experience was not discuss in the interviews and not necessary for the position.  Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position.  (RSOF 302 (noting further that Mr. Sullivan did not ask Plaintiff about anything related to juvenile experience during the interview)).  Mr. Seidler did not think it necessary for the person hired for the BI Analyst role to have juvenile experience.[36]  (*Id.*)  This was because the two BI Analysts would work together as needed and within each other's portfolios.  (*Id.*)  The duties for the BI Analysts were the same for each portfolio, except that the source data and the developing

---

[36] After having experienced the position, Ms. Allen did not believe it was necessary for someone coming into her position as BI Analyst for the juvenile portfolio to have juvenile experience.  (SOF 528).

visualizations around that data would have looked a little different depending on the portfolio. (*Id.*)

Ms. Allen worked for Defendant as a Pretrial Supervision Officer supervising *adults* out on bond. (SOF). The only "juvenile experience" Ms. Allen had was as a 10-hour-a-week summer intern for Johnson County Court Services monitoring at-risk youth in controlled settings. [Depo. Ex. 112, at pp. 1261]. While Plaintiff does intend to minimize Ms. Allen's valuable graduate experience or time doing pulling records at the Jackson County family court (for which she did not know what they were being used for) (*see* RSOF 205), it is a far cry from Plaintiff's more than 28 years working for Johnson County Department of Corrections, including one year working with juveniles. [King Depo., 168:14-17]. "When an employer contends that a plaintiff was not as qualified as successful candidates, pretext can be inferred from evidence that a plaintiff was in fact more qualified than those chosen." *Martinez v. Wyo. Dep't of Family Servs.*, 218 F.3d 1133, 1139 (10th Cir. 2000). The idea that Ms. Allen's undergraduate internship put her over the top of a 28-year Johnson County Corrections professional is unworthy of credence.

Moreover, at this time, significant changes were happening which made the juvenile portfolio more difficult to work than the adult portfolio. (SOF 513). The state of Kansas passed Senate Bill 367 in 2016 which, as Mr. Sullivan put it, was one of the biggest paradigm shifts in juvenile justice since 1997, and this resulted in a lot of changes to the juvenile portfolio. (SOF 514). These changes increased the workload so much that once Ms. Allen was hired, Mr. Sullivan planned to hire an additional BI Analyst to help. (SOF 515). Ms. Allen acknowledged that her learning curve was steep because she had to learn Kansas laws while learning how to use

Tableau software (which Plaintiff already knew (SOF 275-77)).  (SOF 516).  This limited her ability to be flexible and innovative, and these limitations never changed.  (SOF 517).

And this further illustrates the pretext involved in Defendant's hiring decision.  Another alleged justification for not hiring Plaintiff was that, in response to a single question, Mr. Sullivan determined that she was not "innovative enough to successfully handle the ever-changing juvenile portfolio."  (SOF 270).  Furthermore, he was allegedly concerned about Plaintiff's ability to think outside the box and handle programs *that had yet to be created*.  (SOF 299).  Mr. Sullivan believed Plaintiff was resistant to change.  [Sullivan Depo., 192:11-18].  Not only do these critiques ring like ageist dog-whistles, but Mr. Sullivan was not impressed with Ms. Allen's answer either.  (SOF 300).  Despite not being impressed with either answer, Mr. Sullivan held it against Plaintiff, but not Ms. Allen.  Furthermore, as alluded to above, Ms. Allen's steep learning curve – a curve Plaintiff would not have had – prevented her from implementing any alleged innovation or bold solutions she may have proposed.  (SOF 516).  It "just became like pulling teeth to have ideas."  (SOF 522).  Moreover, Mr. Sullivan, Ms. Dougan (her supervisor), and Mr. Seidler (the other BI Analyst on the adult side) hardly spoke to her.  (SOF 523).  Ms. Allen's job "was very lonely."  (SOF 524).  Innovation and risk-taking were not real considerations for the position – a data analyst position.  The question was designed for the younger candidate to thrive.

This decision was discriminatory because Mr. Sullivan chose Ms. Allen, who is significantly younger than Plaintiff and is feminine presenting, and Plaintiff was more qualified on all objective fronts.  (RSOF 316).  Plaintiff was more qualified than Ms. Allen because they were looking for domain experience (i.e. experience in corrections) and Tableau data visualization experience. (*Id.*)  They also wanted presentation experience. And Plaintiff had all

this experience and a career expanding 28 years in corrections.  (*Id.*)  Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.  (*Id.*)  There was no objective reason Plaintiff should not have been hired over Ms. Allen, as juvenile experience was not required, and Plaintiff had it.

Defendant argues that because Mr. Sullivan and Plaintiff are both over 40 years old, any argument of age bias is weakened.  Because discrimination laws prohibit discrimination based on age, "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination . . . ."  *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).  Furthermore, "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discrimination against other members of their group."  *Castaneda v. Partida*, 430 U.S. 482, 499 (1977).  "While the fact that decision makers are in the same class as plaintiff is not dispositive," Plaintiff acknowledges that "[she] may have difficulty establishing discrimination where the alleged decision-maker is in the same protected class."  *Kendrick v. Penske Transp. Servs., Inc.*, No. 98-2289-KHV, 1999 U.S. Dist. LEXIS, at *23 (D. Kan. Apr. 14, 1999).  However, Plaintiff can meet that challenge.

As mentioned above, Mr. Sullivan referred to Plaintiff as "tired" after her interview.  Ms. Bloomberg and Mr. Seidler recognized that remark could be seen as a comment on someone's age.  (SOF 525).  During the deliberation process after the interviews, Mr. Sullivan brought up that Plaintiff had been in her position for a "long time," a direct comment related to Plaintiff's age in the consideration of the hiring for this position.  (SOF 307).  Then, as outlined above, Mr. Sullivan's justifications for choosing the substantially younger Ms. Allen over Plaintiff,

especially that she was "enthusiastic," smack of ageism.  Furthermore, Mr. Sullivan remarked that Plaintiff "used the same dated examples" in all of her interviews.  (SOF 526).  Importantly, Mr. Sullivan's criticism of Plaintiff's examples was not the example themselves, but that they were older.  Of course, a 28-year employee's best examples might be from several years prior where a 26-year-old's examples would necessarily be more recent.  Defendant attempts to dismiss Mr. Sullivan's age-related comments as "stray remarks."  However, these are not stray remarks.  They related directly to Plaintiff, and they relate directly to the challenged action.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("Age-related comments referring directly to the worker may support an inference of age discrimination . . . ."); *see also Melin v. Verizon Bus. Inc.*, 595 Fed. Appx. 736, 740 (10th Cir. 2014) ("[The plaintiff] must demonstrate a nexus exists between these allegedly discriminatory statements and the [adverse employment action].").

Moreover, the Tenth Circuit has held that Title VII prohibits discrimination based on a combination of protected characteristics, such as sex-plus-age discrimination.  *Frappied*, 966 F.3d at 1045.  Therefore, just because Mr. Sullivan is also in the age protected class does not foreclose discrimination based on sex-plus-age – that he wanted a younger, feminine-presenting employee to fill the BI Analyst position.

Plaintiff has provided substantial evidence that Defendant hired a substantially less qualified, substantially younger, feminine-presenting female over Plaintiff and provided false justifications for its decision.  Viewing the evidence in a light most favorable to Plaintiff, there are genuine issues of material facts for the jury to decide.

## IV.     <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiff Shannon King requests the Court deny Defendant's Motion for Summary Judgment in its entirety and allow Plaintiff's claims proceed to trial.

Respectfully submitted,

**SIRO SMITH DICKSON PC**

By  /s/ Raymond A. Dake
    Rik N. Siro               KS FED #77812
    Eric W. Smith           KS #16539
    Athena M. Dickson     KS #21533
    Raymond A. Dake    KS FED #78448
    Ryan P. McEnaney   KS FED #78827
    1621 Baltimore Avenue
    Kansas City, Missouri  64105
    816.471.4881 (Tel)
    816.471.4883 (Fax)
    rsiro@sirosmithdickson.com (email)
    esmith@sirosmithdickson.com (email)
    adickson@sirosmithdickson.com (email)
    rdake@sirosmithdickson.com (email)
    rmcenaney@sirosmithdickson.com (email)

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

    The undersigned hereby certifies that the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF filing system on April 1, 2022, which system sent notification of such filing electronically to the following counsel of record:

    Jeannie M. DeVeney
    Bonnie G. Birdsell
    LITTLER MENDELSON, P.C.
    1201 Walnut, Suite 1450
    Kansas City, MO 64106
    jdeveney@littler.com
    bbirdsell@littler.com
    ATTORNEY FOR DEFENDANT


      /s/ Raymond A. Dake
      ATTORNEY FOR PLAINTIFF