EXHIBIT

K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SHANNON KING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2:21-cv-02049-KHV-KGG |
| | ) |
| BOARD OF COUNTY COMMISSIONERS OF | ) |
| JOHNSON COUNTY, KANSAS, | ) |
| | ) |
| Defendant. | ) |

## **DECLARATION OF SHANNON KING**

I, Shannon King, do hereby declare that the following if true and correct:

1. I am 52 years old and a resident of Kansas City, Missouri.

2. I received a Bachelor's degree in Criminal Justice from the University of Central Florida where she also studied computer science, statistics, and advanced math.

3. I earned my Master's in Administration degree from the University of Missouri – Kansas City in 1994 where she studied quantitative and qualitative data analysis.

4. From 1992 to 1996, I worked in Adult Residential Services for the Johnson County Department of Corrections. In 1997, I was hired into JCDC's Field Services as an Adult Intensive Supervision Officer. In 1999, I was promoted to Senior Case Manager ("SCM") in Adult Field Services.

5. Ms. Brown never coached me on being open to different ideas and ways of approaching situations. My relationship with Ms. Brown was more like peers than Ms. Brown being "over" me. Ms. Brown relied on me to handle the ISP office, including operations, as Ms.

Brown spent very little time at the location in Lenexa, and I was the most experienced in the office. Ms. Brown relied on me to make decisions for that office. There was rarely, if ever, any coaching involved.

6. Part of my job is to enter and analyze revocation data, which includes data analysis. This process is very time consuming for me as it requires large amounts of data entry, manually looking up and reviewing data, running reports, and cleaning the data so it could be analyzed. For the revocation data project, I compiled all the recommendations made by Intensive Supervision Officers (ISOs) at revocation hearings (thousands of hearings) and then analyzed how often judges followed the ISO's recommendations. I found that that over 90% of the time, the judge followed the Department's recommendations. This was important to know in terms of how ISOs might reduce revocation rates to prison. None of the other supervisors in the department knew how to run the reports or clean the data for the analysis. Even Olivia Allen did not know how to run the reports for this revocation data. After doing all this work on the revocation data, I used the data to drive decisions with the staff she supervised and ISP as a whole. I reviewed the data looking for patterns in revocations and where the Department could better utilize resources to improve revocation rates. I used that data directly with my individual officers and shared it with them and discussed the trends I was seeing. I was also reviewing closely the data that Mr. Seidler and Mr. Clark compiled in the Tableau Dashboard re: LSIR assessments. I used that data in individual coaching sessions with staff and helped them determine what areas to focus on for improvement. No other supervisor in adult services or the department was doing this type of data analysis.

7. These were not basic data sets. The data that I was analyzing was directly related to the state wanting to find a way to reduce revocations to prison in all jurisdictions. I requested that this data be pull previously; however, I was ignored by Mr. Clark and Mr. Sullivan.

8. I had considerable knowledge of the Corrections Department. The DFS position was over Adult ISP, Juvenile Field Services, Probation Intake, Bond Assessment, and House Arrest. I worked in House Arrest for over 4 years prior to joining Adult ISP, in which I had been for over 20 years at the time of interviewing for the position. I supervised the staff that worked in Probation Intake and Bond Assessment. I was involved in building the Probation Intake program from the beginning, which included attending meetings with judges, attorneys, courts services, and others in corrections, to make sure to meet the needs of all involved. In my position as a Senior Case Manager, I built relationships and had a solid rapport with multiple stakeholders, including judges, ADAs, defense attorneys, Court Services (probation), Adult Residential services, and juvenile services, which was essential for the DFS position. I collaborated with these stakeholders on multiple occasions to create mutually beneficial solutions to issue that arose and implement them in the most efficient way. Plaintiff studied the concepts of qualitative and quantitative research methods and understood the importance of the differences for interpreting data within the department. I brought my concern to Ms. Dougan multiple times that the LSIR dashboard Mr. Clark was creating with the data collect was attempting to quantify something that was qualitative measure. These measures are important for the Corrections department and needed to be fixed.

9. Mr. Clark did not have the experience in house arrest, probation intake, or bond assessment that I had, and he did not have the close relationship with stakeholders that I had.

10. I met with Mr. Dugan ongoing for several months developing an outline for a grant. I spent many hours working to determine what Corrections was going to request in the grant and how Corrections was going to use it to enhance the Evidence Based Practices the state was implementing during that time period. The work was not minimal.

11. I did not scream at Robert Johnson or tell him that "he better fucking do what I say." I recall Mr. Johnson getting upset with her about something and storming off into his office. I then went into his office to discuss that issue with him and work together to figure out a solution to the problem.

12. I do not believe I made the comment about wearing tha "STFU" t-shirt so staff would stop asking me to help with their caseload.

13. Beverly Marshbank was the Director of the ARC, which was a Johnson County position, even if it was funded through a different method. She worked with me and other Johnson County employees on a regular basis.

14. I did not provide preferential treatment to clients who identified as gay. I performed the duties of my position as instructed, and I treated all clients equally. I did not provide any preferential treatment to LGBTQIA+ clients.

15. In 1999, Bill Keith was terminated by Tracee Borger.

16. I dressed like 99% of the men in my position with khaki pants, collared long-sleeved button-down shirt, and casual shoes.

17. Sharon Brown told me that "Betsy doesn't like the way you dress." I was extremely upset by the conversation and had to leave the room because I was crying. I believed that Ms. Brown was attempting to subtlety convince me to dress more feminine.

18. Ms. Brown later apologized to me stating that she "shouldn't have done that", referring to relaying the message from Ms. Gillespie about the way I dressed. I had encounters with Ms. Gillespie where she praised me whenever I wore anything considered traditionally more feminine (i.e., pink shirt, or woman's suit for an interview rather than a more masculine suit). I do not know of any male employees who were told to change the way they dressed by Ms. Gillespie. Male employees were allowed to continue to dress the way I was dressing after this conversation with Ms. Brown.

19. Sharon Brown was not retired at the time that I applied to fill the Director of Field Services position nor was she retired when the interviews occurred. Rather, Ms. Brown had only announced her pending retirement from the position.

20. It was customary for the outgoing position holder to be on the interview panel if they were still employed by the County. For example, Tony Booker was on the panel for the ARC Director position from which he retired. Ms. Dougan also sat-in on the interviews to fill her position as Deputy Director of Corrections after she announced her retirement.

21. The writing sample I submitted for the DFS position was not recycled or a letter I wrote in 2008. As I explained to Ms. Bloomberg, my writing sample was a hypothetical letter to a real situation I was a part of during that time period in 2008. The writing sample was a letter drafted to a Kansas legislator addressing a committee's concerns about what was referred to as SB123 funding with ISP clients. Sharon Brown was at the committee meeting with me where this was discussed.

22. I never had conversations with Ms. Brown about patience or me lacking patience specifically, nor did she discuss with me the use of "tact."

23. I did not make rude comments about staff or call staff members "jackwads."

5

24. I do not consider myself to be reluctant to change nor am I degrading to staff members who do not share my beliefs.

25. I was familiar with the qualifications of Rachel Mestad, Teresa Markos, and Megan Milner.

26. My attempted move to the Business Intelligence Analyst position was not a pure lateral move because it had a higher salary grade than my Senior Case Manager position, and it had opportunities for raises and promotions which were not available to Senior Case Managers.

27. I was qualified for both the BI Analyst and Senior BI Analyst positions because I had the requisite qualifications of three years of Corrections knowledge and three years of experience working successfully within a business analytics tool.

28. My response to Interview Question No. 4 involved me being made aware of allegations; completing an investigation when no investigation process or policy existed at the time; receiving no assistance from my director at the time; researching and proposing major overhauls to agency policy and procedure including national training on the topic; and implementing these procedures prior to the Prison Rape Elimination Act being instituted.

29. In my response to Interview Question No. 7, I explained to the panel that I did not believe "risky" to typically be the best approach to decision making when it came to staff and clients. Instead, I explained that I preferred a more grounded approach of keeping one foot planted solid on the ground while trying out new ideas. My focus in responding to this question was on how to bring staff along with new initiatives and that "risky" was not how I saw my role in the process.

30. Ms. Dougan did not seek more recent examples from me or any of the other candidates for the BI Analyst position. None of the interview panels asked for more recent

examples from me or any of the other candidates.

31.     I was involved in numerous innovative changes involving in the Corrections department over the 22 years she worked there, including but not limited to the following:

   a. Implemented systems to cut back on the massive amount of paperwork that was burying staff;
   b. Implemented safety protocols for staff in the office and the field ;
   c. Implemented Trauma Informed interventions with interacting with staff;
   d. Sexual misconduct of staff - Wrote entire policy and procedure for the department;
   e. Implemented the SB123 invoice processing system when the program was initiated;
   f. Created the agency's Evidence Based Practices implementation plan with Tom Dugan as assigned by Betsy Gillespie;
   g. Charged with training all department supervisors on the County's change from annual reviews to a Performance (PPD) based system in Oracle.
   h. Volunteered to the Department's United Way Campaign several years in a row and developed innovative ways of encouraging people to donate to a worthy cause;
   i. Served on the KDOC Standards Committee. Plaintiff was charged with updating the state supervision standards that all agencies followed. Responsible for introducing the idea of basing the reporting standards on what the client's case supervision plan goals were.
   j. Implemented the change in case supervision reviews. The ISO previously would meet regularly with a supervisor and fill out a case review sheet on every single client. Due to the volume of unnecessary paperwork, Plaintiff reformed it to completing only those on client's that were pending a revocation hearing;
   k. Initiated contact with KDOC to get the green light to stop dual data base entries for drug tests;
   l. Worked with Court Services to implement a system for the pre-sentence LSIR process.

32.     I indicated to Ms. Bloomberg and Ms. Veronda that I had heard other interview panelists had me as their top candidate to the BI Analyst position, not the hiring managers.

33.     Many of the clients that I worked with are within the criminal justice system or have been.  Further, I am qualified to work in the Mental Health Department because of my experience, as the Department of Corrections has hired dozens of Corrections staff in the past.

34. Ms. Bloomberg, Ms. Brown, and Ms. Dougan all knew that I took FMLA prior to and at the time of the hiring for the DFS and BI Analyst positions. Ms. Bloomberg handled my FMLA leave requests. Sharon Brown normally approved my FMLA leave, but while Sharon Brown was out on leave, Ms. Dougan approved my FMLA leave and knew she was approved for and taking the leave.

35. I utilized FMLA three times in 2019 prior to applying for and interviewing for the Director of Field Services ("DFS") position: January 7, January 28, and February 11. I used it again on March 25, 2019.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

SHANNON KING          04/01/2022
                      DATE

8