## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **SHANNON KING,** )<br><br>Plaintiff, )<br><br>vs. )<br><br>**BOARD OF COUNTY** )<br>**COMMISSIONERS OF** )<br>**JOHNSON COUNTY, KANSAS,** )<br><br>Defendant. ) | Case No. 2:21-cv-02049-KHV |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Federal Rules have a specific provision for summary judgment, which the United States Supreme Court has explained is "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) (quoting Fed. R. Civ. P. 1). Despite this, Plaintiff's response to the County's Motion appears orchestrated to create the illusion of a fact question where none exists. In response to simple, straightforward facts, Plaintiff often spends pages of space making unrelated statements. Often, the statements are unsupported by or contradicted by the record. In many instances, Plaintiff makes a representation about a fact that is plainly not supported by her (or any other) cite.

The vast majority of the exhibits Plaintiff included in her Response were already exhibits to Defendant's Motion (including full deposition transcripts), yet she included them in her response in an apparent effort to artificially increase the size of the record. Plaintiff claims to controvert Facts contained in Defendant's Statement of Facts and then includes those very same

Facts in her Additional Facts. She also repeats many of the Facts in Defendant's Statement of Facts in her own Additional Facts. She has lengthy responses to many of Defendant's Facts, which have nothing to do with the Fact, and she then repeats those same responses over and over again throughout her response.

All of this seems to be designed to conceal the actual facts in the hopes that the Court throw up its hands and conclude there *must be* a fact question because the briefs are long, the record is large, and analyzing Plaintiff's lengthy responses is tedious. A review of the facts that are actually supported and uncontroverted, however, illustrates that there is no genuine issue about any material fact, and the County is entitled to judgment as a matter of law.

Plaintiff applied for two positions, and she was not selected for either of them. The first one was not a close call. The second one was. Ultimately, the County chose the person it believed was the most qualified. Plaintiff disagrees, and that is her right, but she has not pointed to any evidence suggesting that her sex, sexual orientation, gender presentation, age, or FMLA use had anything at all to do with the decisions. For the reasons more fully set forth below and in the County's original brief, pursuant to Rule 56 and the related precedent, the County's Summary Judgment Motion should be granted.

## THE UNDISPUTED FACTS

In response to Defendant's 439 Facts, Plaintiff does not even claim to controvert 357 of them. She claims to controvert all or portions of the remaining 82, but cites to nothing in the record that actually controverts 67 of them. Defendant agrees that Plaintiff controverts all or a portion of the remaining 15 Facts, but none of those Facts is material to the determination of this Motion.

## I.     Facts Plaintiff Agrees are Uncontroverted.

As noted above, Plaintiff admits 357 of the 439 Facts. In responding to some of those uncontroverted Facts, however, Plaintiff goes on to say, "controverted to the extent Defendant

attempts to imply …" *See* Pltf's Resp to Statement of Facts, generally.  In response to others, Plaintiff admits the Fact but claims it is "incomplete." In response to 22 of the Facts, Plaintiff admits the Fact but goes on to take issue with something underlying the assertion. Defendant has grouped Plaintiff's responses, accordingly, in addressing them below.

### A.      Uncontroverted Facts Without Further Substantive Comment.

Plaintiff takes no issue with the following 261 Facts[1]: 5, 6, 11-20, 22-29, 32, 34-41, 43, 44, 46-48, 50, 55, 58-63, 66, 68, 69, 73-78, 80, 82, 87, 88, 92, 93, 94, 96-104, 107-112, 113-116, 120, 121, 146, 147, 154-156, 158, 159, 161, 164-167, 172, 173, 175, 176, 179, 180, 183-190, 192, 193, 195, 196, 198, 199, 207, 208, 210, 211, 213-221, 223-237, 241-245, 252-258, 261, 266, 268, 272-277, 279, 284-287, 290, 291, 293, 295, 297, 304-306, 308, 311, 315, 320, 321, 324-331, 351, 353-355, 360, 361, 363, 365, 367, 369-371, 373-379, 381-387, 389-414, 416-423, 425-432, 434-439. Of those, the following are of particular note.

**SOF 61** states: Mr. Keith left the County in 1999.

> Plaintiff's response states: Uncontroverted that Mr. Keith's employment ended with the County in 1999, however controverted that Mr. Keith "left" the County willingly. Mr. Keith was terminated by Tracee Borger.

Pltf's Resp., p. 60.

Defendant's Fact says nothing about whether Mr. Keith left voluntarily or involuntarily (more than 20 years ago), nor does that have anything to do with Plaintiff's claims. As such, Defendant does not know why Plaintiff decided to add this information. Regardless, it is uncontroverted that Mr. Keith left the County in 1999.

**SOF 94** states: Mr. Clark had been working in corrections since 1994.

**SOF 96** states: In [Mr. Clark's Director of Community Corrections for the Fourth Judicial District] position, Mr. Clark was directly responsible for

---

[1] Plaintiff inserts objections to a few of these Facts. Defendant addresses those objections below. Regardless, Plaintiff agrees the Facts are not controverted.

community based supervision in a four-county area. This included Adult Intensive Supervision, Juvenile Intensive Supervision, Community Case Management, Behavior Health Services, and various programing to meet the needs of the populations being served.

**SOF 97** states: Mr. Clark developed and monitored six budgets totaling $1.1 million, and he wrote and executed multiple grant applications that support the continuation of evidence-based practices in community supervision.

The Facts cites to the cover letter and resume Mr. Clark submitted for the DFS position and produced in this case. In addition, SOF 96 cites to Plaintiff's deposition where she indicates she has no reason to dispute Mr. Clark's qualifications, as stated in the cover letter.

In response, Plaintiff objects on the basis of foundation and hearsay. She does this despite the fact that the parties *stipulated* that all documents produced in this matter "meet the standards for foundation and authenticity for admissibility under Federal Rule of Evidence 803(6)" as business records. Doc. 68, p. 3. Moreover, in support of several of Plaintiff's Additional Facts, she cites to *her own resume*. This is but one example of Plaintiff's inappropriate gamesmanship.[2] Defendant understands that Plaintiff wishes Mr. Clark had less experience, but there is no dispute that Mr. Clark has been working in corrections since 1994 and had 13 years of experience with nearly all aspects of the Field Services position.[3]

**SOF 101** states: During part of the time Mr. Clark was the Director in the 4th Judicial District, Mr. Sullivan was the Director in the 5th Judicial District, a neighboring jurisdiction, and they had some interaction in those roles. For example, they had transfer case between them, attended all of the same meetings, consulted to complete plans or budgets, and consulted about new initiatives.

---

[2] Beyond that, Mr. Clark testified that the information in his cover letter and resume is accurate. Ex. 21, Clark depo. 196:8-24. Finally, the County used that information (among other information) in making its decision, thus the information is not hearsay.

[3] Plaintiff makes the same objections to SOF 113 and 114, which outline the experience two other DFS candidates (Megan Milner and Rachel Mestad) had. Again, Plaintiff stipulated to the foundation and hearsay exception to the exhibits cited to support those Facts. In addition, they are not hearsay since the hiring panel used this information (among other information) in making its decision.

Plaintiff agrees this Fact is uncontroverted (Pltf's Resp., p. 45), which only emphasizes the ruse Plaintiff is attempting to pull over on the Court. Not only does Mr. Clark's resume and cover letter accurately describe his experience, Mr. Sullivan had first-hand knowledge of Mr. Clark's experience, having held a nearly identical position and having worked directly with Mr. Clark in that position.

> **SOF 172** states: In 2016, the Kansas legislature passed Senate Bill 367, which was one of the biggest paradigm shifts in juvenile justice since 1997, and there were many changes associated with the juvenile portfolios as a result.

Plaintiff does not controvert this fact but argues it is immaterial because the changes had not yet taken place. First, it is somewhat difficult to take this seriously when Plaintiff herself included *the very same fact* in her Additional Facts. *See* PSOF 514. Moreover, the fact that the changes to the juvenile system were new is the whole point. In the interview process, Plaintiff exhibited a resistance to trying new things while Ms. Allen exhibited excitement about trying new things. If Mr. Sullivan and Ms. Dougan had been looking to fill the position handling the adult portfolio, Plaintiff would have been the  most qualified due to her vast experience on the adult side and the fact that it was not changing. Since they were filling the position handling the juvenile portfolio, the calculus was different.

> **SOF 220** states: Ms. Allen had significant experience cleaning data in Excel from her work in Jackson County and also in connection with her work with Dr. Fox. Ms. Allen learned how to scrub data at the family court, but Dr. Fox kicked it up another level because she understood the rationale behind it.

Plaintiff does not controvert this Fact, but she goes on to state (twice) that the Fact is "misleading and irrelevant as this was not discussed during the interview process." Pltf's Resp., pp. 102-103. In support of her claim that Ms. Allen's experience in cleaning data in Excel was not discussed in the interview process, Plaintiff cites to Ms. Allen's deposition at 63:24-65:15. That testimony reads as follows:

Q.  Did your experience on the juvenile side ever come up during your interview for the position?

A.  I believe so, because I know I talked a lot about my, you know, research experience with UMKC, my thesis was specifically on teens. You know, I also – I know I spoke about I did an evaluation on the Center for Conflict Resolution, which was, specifically, a youth-in-schools program. So I observed, you know, youth in schools and how they were using conflict for center resolution. So it was – I just had done numerous projects, and I can't remember exactly how I brought everything up. But I believe that was the interview where I was able to share what I had done in school.

Obviously, this testimony *does not* support any assertion that Ms. Allen did not discuss her extensive experience with cleaning data in her interview. Moreover, the interview notes of all three panelists illustrate that this topic came up more than once. Ex. 55. They also illustrate that she discussed the "Teens in Transition" project, which is the project she did with Dr. Fox. Ex. O, Allen depo. 71:10-23.

Plaintiff then spends a paragraph discussing the fact that Ms. Allen's job at the Jackson County Family Court was an entry level position, and she did not do data analysis in that position. That may be true, but it does not change the fact that she had significant experience cleaning data in Excel, including in that position. Indeed on the page after the one Plaintiff cites, Ms. Allen explained that she cleaned "humongously huge spreadsheets with 'massive amounts of data.'" Ex. O, Allen depo. 59:23-60:10.

**SOF 230** states: Mr. Sullivan had been working closely with Dr. Holsinger and Tim Mulcahy on pretrial risk assessment data. In that context, they both told Mr. Sullivan how impressed they were with Ms. Allen's work in that space.

Plaintiff objects to this Fact as hearsay, but Defendant is not offering it to prove the truth of the matter asserted. *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993) (statements offered to show an employer's state of mind when making an employment decision are generally not hearsay because they are not offered to provide the truth of the matter asserted). It is undisputed that Dr. Holsinger (a nationally respected data scientist) and Tim Mulcahy (the

Director of the Justice Information Management System) both told Mr. Sullivan how impressed they were with Ms. Allen. This is information Mr. Sullivan had about Ms. Allen as he was helping to decide who to hire in the BI Analyst position. Even if Dr. Holsinger and Mr. Mulcahy had decided to lie about their observations of Ms. Allen (which seems absurd), that does not change the fact that they conveyed to Mr. Sullivan that they were both impressed with her skills in data analytics.

> **SOF 241** states: Ms. Allen was interested in juveniles and ready to use those skills to see what programs they could evaluate and whether you could introduce random controlled trials. She was excited to work with good data.

Plaintiff does not controvert this, but claims it is irrelevant, as she did not discuss this during the interview or with the panelists. In support of this argument, Plaintiff cites to testimony from Ms. Dougan that she could not find anything in the interview notes where the panel asked about juvenile experience. The fact that Ms. Dougan's notes do not reflect a question about juvenile experience obviously does not mean Ms. Allen did not discuss it. As noted above, Ms. Allen specifically remembers discussing her juvenile experience. Moreover, notes from all three of the panelists illustrate that she did. Ex. 55.

Next, Plaintiff represents to the Court that "Mr. Seidler testified that juvenile experience was not discussed during the interview process or in the process of selecting a candidate for the position." Pltf's Resp., pp. 109-110. In support of this statement, Plaintiff cites to testimony where Mr. Seidler said he does not remember discussing the importance of juvenile experience *when the panel was discussing the candidates*. Mr. Seidler *did not* testify that Ms. Allen did not discuss her juvenile experience, and the interview notes illustrate that she did. Indeed, Mr. Seidler's notes state that Ms. Allen discussed her social network analysis project "in depth." Ex. 55 at JoCo 1302. That project related to mapping interactions between youth and gang members. Ex. O, Allen depo. 61:15-19.

**SOF 244** discusses that in answer to Question No. 4, Ms. Allen referenced a conversation with a prosecutor. Plaintiff objects to this Fact as hearsay. Again, Plaintiff stipulated that the exhibit is a business record, and Defendant is not offering it to prove the truth of the matter asserted (that Ms. Allen actually did talk to the prosecutor). Defendant offers it to show the information the panel had at the time it was making the hiring decision.

**SOF 285-287** establish that Ms. Allen came across as very positive and knowledgeable in her interview, had great presentation skills, had co-authored a textbook, and had done a lot in analytics. They also establish that she had worked with Dr. Holsinger on a pretrial assessment, which was particularly impressive since that work was outside of her job duties.

Plaintiff agrees these facts are uncontroverted.[4]

> **SOF 311** states: Mr. Seidler recalls that Ms. Allen had come highly recommended from Alex Holsinger and Tim Mulcahy, and that Mr. Sullivan and Ms. Dougan put a lot of weight on that. [citations omitted] They also felt like Ms. Allen was very passionate about coming in and being able to make changes based on her prior experience with Dr. Holsinger.

Plaintiff does not claim to controvert this fact but argues it is hearsay. These statements are not hearsay as they are offered as prior consistent statements. *See* Fed. R. Evid. 801(d); *see also McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1142 (10th Cir. 2006) (prior consistent statements are admissible to rebut charges of fabrication or improper motive); *Crabbe v. Quest Diagnostics Inc.*, 2010 WL 11627479, at *2 (D. Kan. May 14, 2010) (prior out-of-court statements admissible to demonstrate plaintiff's consistency in disputing the grounds for her termination). Mr. Sullivan and Ms. Dougan have consistently noted the weight they put on the fact that two respected data analysts highly recommended Ms. Allen for the position based on their work with her in data analytics.

---

[4] Plaintiff also cuts and pastes additional responses to these Facts. Among other things, Plaintiff argues that Robert Sullivan was the decision maker on the BIA position. She then takes the opposite position in her legal argument.

> **SOF 353** states: Mr. Sullivan said he could picture Ms. Allen doing the job. He further stated that, in fairness, he could also picture Plaintiff doing the job. He had seen her present on Trauma Informed Care, and she does well.

This Fact cites to Ex. 62 (Depo. Ex. 102), which is notes of the HR investigation, and relays the information that Mr. Sullivan provided to HR. In response, Plaintiff does not controvert the Fact, but objects on the basis of hearsay. First, this is not hearsay, as it is offered to prove why Human Resources concluded as they did. Second, in her Additional Facts, Plaintiff cites the exact same exhibit for the proposition that Mr. Sullivan could picture Ms. Allen doing the job.

Plaintiff uses the same tactic in response to **SOF 355**.

### B. Uncontroverted Facts, Plaintiff Claims are Controverted "To the Extent that Defendant Attempts to Imply …"

In response to 49 of Defendant's Facts, Plaintiff agrees they are not controverted, but goes on to say that the Facts are "controverted to the extent that defendant attempts to imply/suggest" something. Plaintiff then follows that phrase with pages and pages of information (often cutting and pasting the exact same response). As Plaintiff's Response admits, none of the extraneous information controverts the Fact Defendant set forth. Plaintiff uses this tactic in response to the following Facts: 1-4, 7-10, 33, 57, 72, 84, 86, 89, 90, 122-125, 127, 128, 130-133, 135, 144, 168, 174, 178, 200, 202-205, 222, 249, 251, 263, 278, 280, 288, 300, 302, 312, 314, 316, 318, 322, 332, 336, 337, 368, and 415. Of those, the following are particularly notable.

> **SOF 84** states: For example, the Kansas Department of Corrections (KDOC) has asked Mr. Sullivan to participate in interview panels for them, and when Mr. Sullivan left Emporia, the chief judge asked another director to help him pick Mr. Sullivan's replacement.

Plaintiff's response to this Fact is a full page long. Plaintiff first objects to the second sentence of the Fact on the basis of hearsay. Mr. Sullivan did not testify about what the chief judge said. He testified about his knowledge that the judge asked that another director help pick Mr.

Sullivan's replacement. Moreover, the statement goes to the reasons Mr. Sullivan knew that asking outside leaders to participate in hiring decisions for high level positions is common in the industry.

Plaintiff then spends nearly a page making statements that have nothing to do with the Fact. Beyond that, the point Plaintiff apparently wants to make is absurd. It is undisputed that this practice is common in the criminal justice arena for *high level* positions. It is also common in some other departments at the County, such as the County Manager's office. Ex. N, Veronda depo. 95:24-96:6.

Moreover, Mr. Sullivan asked Ms. Williams to participate in the panel *before* Mr. Clark even applied for the position. *See* Ex. T (showing that Mr. Sullivan asked Ms. Williams to be on the panel on February 12, 2019) and Ex. 40 (showing that Mr. Clark submitted his application on February 21, 2019). Mr. Sullivan could not possibly have known Mr. Clark would list Ms. Williams as a reference before Mr. Clark even submitted his application.

> **SOF 122** states: In Ms. Brown's view, Mr. Clark and Ms. Milner were clearly the top candidates, based on their experiences at the state level and in local jurisdictions.

Plaintiff does not even pretend to controvert this Fact, yet her response to it is almost a full page long. First, Plaintiff argues that the Fact is irrelevant. Defendant can hardly conceive of a Fact that is *more* relevant. At the time of this hiring decision, Ms. Brown had supervised Plaintiff for 12 years and was intimately familiar with Plaintiff's skills, experience, and performance. In addition, Ms. Brown had held the position the County was filling for 12 years. In short, Ms. Brown was in the very best position to analyze Plaintiff's qualifications for the position. With this in mind, the fact that Ms. Brown found two other candidates (including the chosen candidate) to be clearly above the rest cuts very strongly, if not decisively, against Plaintiff's argument that there was somehow discrimination at play.

Beyond that, Plaintiff misrepresents the record regarding what Ms. Brown told her and when. Plaintiff plucks quotes out of her own testimony and represents that Ms. Brown told her on the day of the interviews that Mr. Sullivan had made up his mind. On the contrary, Plaintiff specifically testified that she did not remember whether Ms. Brown stated Mr. Sullivan made up his mind before the interviews. Ex. 1, Pltf's depo. 189:18-190:11. In addition, it is undisputed that that as of March 23, 2019, Ms. Brown did not know who Mr. Sullivan had chosen. SOF 145- Not Controverted.[5]

> Similarly, **SOF 127** states: Ms. Brown did not believe Plaintiff was the best fit for the position based on an analysis of who could navigate both the adult and juvenile systems, who had the most administrative experience, and who knew how to do the work not only on a local level, but on a state level.

In this case, Plaintiff alleges (among other things) that Mr. Sullivan discriminated against her in choosing a different candidate for the Director of Field Services position. Yet, after admitting the fact is uncontroverted Plaintiff argues that the opinion of the person most familiar with both the DFS position and with Plaintiff's skills, qualifications, and performance is somehow irrelevant. Apparently, Plaintiff believes her own opinion is the only one that matters, but the law (and common sense) say otherwise. This Fact is uncontroverted and incredibly telling.[6]

The same is true for **SOF 128** (where Plaintiff's response is a cut and paste of her response to SOF 127).[7]

> **SOF 131** states: Mr. Sullivan knew that Mr. Clark and been a director in multiple jurisdictions, had years of experience as a community corrections director and was very aware of Kansas law and KDOC policies. Mr. Sullivan also knew that Mr. Clark had years of experience writing strategic comprehensive plans required by the KDOC, fully understood the method of allocation the KDOC

---

[5] Plaintiff then cut and pasted the same long, misleading response in response to SOFs 123 and 125, and adds even more to the response to SOF 123. Regardless, Plaintiff does not claim to controvert any of those Facts.

[6] Plaintiff does the same thing in response to **SOF 133**, which establishes that Mr. Clark also stood out as the top candidate for Shala Bloomberg, another panel member. The fact that Mr. Clark was a top candidate for every candidate whose testimony is in the record is incredibly relevant.

[7] Plaintiff's responses to SOFs 127 and 128 also contain the same misleading statements Plaintiff included in response to SOFs 123 and 125.

requires, and was used to working with diverse funding.

> **SOF 132** states: Mr. Sullivan was also aware that Mr. Clark understood the financial guidelines for the various pots of money in a way that would help position them for audits.

Plaintiff does not claim to controvert either of these Facts, but then states, "controverted to the extent Defendant attempt to imply that this was the basis of Robert Sullivan's pre-determined decision… ." Plt's Resp., pp. 62-64. This is followed by nearly a full page of statements about the fact that Mr. Clark was unequivocally the best candidate in Mr. Sullivan's mind. *Id*. Indeed, that is the whole point of SOFs 131 and 132. Mr. Sullivan had personal knowledge that Mr. Clark had these experiences and skills, having worked with him as a director in a neighboring jurisdiction for years. That is the reason that Mr. Clark was Mr. Sullivan's top candidate heading into the interviews. That does not mean the decision was made before the interviews and certainly does not suggest discrimination.

> **SOF 135** states: Ms. Brown wanted Ms. Milner for the position and was disappointed Ms. Milner did not get the position, but she understood why Mr. Clark got it. He had the most experience, and he was an internal candidate.

Again, Plaintiff does not claim to controvert this Fact, yet she includes nearly two full pages of repetitive and misleading statements, none of which have anything to do with SOF 135. Apparently, Plaintiff believes that if she includes long, repetitive responses to Defendant's Facts, the Court will assume there must be a question of fact. In actuality, Plaintiff does not controvert this or any other material fact.

> **SOF 144** states: On March 23, 2019, Ms. Brown sent an email to Mr. Sullivan regarding the meet and greet feedback forms. At the end of the email, she asked if Mr. Sullivan had decided who he will offer the Field Services Director position to yet.

This is a simple, straightforward fact, supported by the email itself. Plaintiff does not controvert this fact. Instead, she includes almost a *full page* of statements, many of which are

misleading, and all of which have already been included in response to numerous previous Facts.

Plaintiff's attempts to bury the truth aside, the Fact is plainly uncontroverted.

> **SOF 168** states: At the time Mr. Clark left the BIA/Project Manager role, he was handling the adult portfolio, and Brian Seidler was handling the juvenile portfolio.

Plaintiff does not controvert this Fact, but then tries to convince the Court that there was no difference between the adult and juvenile portfolios. That is exactly the opposite of the evidence. Mr. Clark testified as follows:

> Q.    Did you all have the same duties as project managers, or were they different?
>
> A.    **They – they were different**. He was – he had the juvenile portfolio, and I had the adult portfolio. But then we would work together our – or within each other's portfolios as needed.
>
> Q.    And can you explain what the difference is between the two portfolios – if there is a difference besides just the fact that one deals with juvenile data and one deals with adult data?
>
> A.    Yeah. That – that's true. They – but there's – I mean, there's just a there's a juvenile side to our operations and a [sic] adult. And so your primary is serving those divisions to meet their needs. And so the – some of the duties are similar. You have a – you have a – comp plan and budgets and those kinds of things, but then you have things that are different between the two sides that – you know you have needs related to juvenile detention, but you don't have that kind of thing on the (inaudible). There's just some differences.
>
> Q.    But as far as – as – besides the differences in the – the data sets and what might be needed by the departments, were there any substantial differences in actual work duties – like, job duties?
>
> A.    The – the two positions are similar.
>
> Q.    Okay. Do you feel like you could have just jumped over to the juvenile side if you had needed to?
>
> A.    In some areas, I could have jumped over to the juvenile side. In other areas, there would have been a learning curve.

Ex. M, Clark depo. 48:11-49:20 (emphasis added). Mr. Seidler testified as follows:

> Q.    Is there a stark difference in what's going on in your job duties based upon

whether you're working a juvenile portfolio or a [sic] adult portfolio?

A.     I would just say that the – it's more the difference in your knowledge and experience in the – the portfolio more so than the actual duties. You know, if you're – if you're calculating averages or percentages and something that – those duties are the same, whether it's adult data or juvenile data, **but the ability to interpret or, you know, understand what, you know, the impact of that is is – is the difference**.

Q.     Did you feel like you were more qualified to be interpreting juvenile data?

A.     More qualified?

Q.     Well, than adult data?

A.     Oh, okay. Yeah, probably. My – most of my experience was in  -- in juvenile at the time, and I was – I guess I just – I was more familiar with that, and so I don't' know if "more qualified" is the right – is the way I would say it, but my familiarity with that section of corrections was – I certainly had more experience in juvenile.

Ex. F, Seidler depo. 35:1-36:1 (emphasis added).

Plaintiff used this testimony[8] to represent that the duties for the BI Analyst positions "were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio." Pltf's Resp., p. 84. That is not an accurate depiction of the record.

**SOF 200** states: As a research assistant, Ms. Allen had helped with a Byrne grant and a KC No Violence Alliance grant. Most of her work on the grants was literature review, but Dr. Fox also had her scrub and clean all of the data for the evidence they were using to show the need for the grant. She started work on a third grant but then transitioned to working with another professor. For that grant, she was pulling census data.

The Fact is fully supported by Ms. Allen's testimony. Defendant actually omitted the portion of the testimony referencing the analysis portion of the grant because Ms. Allen testified that Dr. Fox did that part, and he had her fluff it up. That does not change the fact that Ms. Allen did the literature review, conclusion and scrubbed all of the data.

---

[8] Plaintiff actually only cited to the portions of this testimony she liked, but not to anything else.

Plaintiff does not controvert the Fact, yet she includes a paragraph that restates the Fact but omits the portion related to scrubbing the data. She then states she controverts the Fact "to the extent Defendant attempts to imply that Ms. Allen completed two grants on her own." Pltf's Resp., pp. 94-95. Defendant's Fact says nothing of the sort. Again, Plaintiff appears to have a desire to add words to her response in an effort to hide the facts.

> **SOF 203** states: Ms. Allen's work as a research assistant prepared her to work with youth data because she was well versed and able to talk about youth issues and present on those topics. Although most her experience was on the Missouri side, she was confident her experience would allow her to flow into understanding the Kansas side of the juvenile system with time and experience.

Plaintiff admits the Fact is uncontroverted. She then includes a *full page* of statements about Ms. Allen's work at the Family Court. This Fact has nothing to do with Ms. Allen's position at the Family Court. Moreover, the statements she includes are plucked out of her testimony and out of context. Then, in exactly the same way she misrepresented the record in response to SOF 220, Plaintiff represents that Ms. Allen testified this was not discussed in her interview. The cited testimony is quoted on page 5-6 above, and says nothing of the sort.

> **SOF 263** states: When asked to provide a time when she was able to identify a complex problem, evaluate the options, and implement a solution as well as explaining how the solution benefited her organization (Question 4), Plaintiff referenced a sexual misconduct issue that had occurred approximately 15 years earlier.

Plaintiff does not controvert the Fact but then includes a page and half of statements that are taken out of context and misleading and, most importantly, have nothing at all to do with the Fact. For example, it is true that Mr. Sullivan called the example dated. It occurred 15 years earlier. It *was* dated. Plaintiff had been a supervisor for the intervening 15 years. Mr. Sullivan was surprised Plaintiff did not provide a more recent example, as she presumably would want to put her best foot forward in the interview. Regardless, the Fact is simple and not controverted.

> **SOF 278** states: Mr. Sullivan and Mr. Seidler understood Plaintiff to say she had

end-user experience with Tableau and creator experience with Google Data Studios.

This is one of many instances where Plaintiff does her best to confuse the record regarding her experience with Tableau and the experience the panel members hoped to find.

- Plaintiff admits that creating dashboards on Tableau requires a license or a public SOFs 181 and 183 (Both Uncontroverted when read together).

- Plaintiff admits she did not have a license and did not have public until February 2021 (well more than a year *after* the interviews for the BI Analyst position). SOFs 180 and 184 (Both Uncontroverted).

Despite this, in response to SOF 278, Plaintiff makes the following statements:

- "controverted to the extent Defendant attempts to imply that Plaintiff was not familiar with Tableau creator-side experience …"

- "Ms. Dougan testified that her notes say Plaintiff told them she had both end-user and creator experience with Tableau."

Pltf's Resp., p. 130.

 By her own admission, Plaintiff had no creator-side Tableau experience in May 2019, yet she appears eager to misstate the record such that the Court believes otherwise. Plaintiff does not controvert the actual statement of fact.

In response to **SOF 280**, Plaintiff admits that Ms. Dougan also knew Plaintiff did not have creator experience in Tableau. She then adds that the interview notes do not specifically state the panel was only looking for creator experience. That may be true, but it does not change the fact that neither Plaintiff nor Ms. Allen had creator experience with Tableau, nor does it have anything to do with the statement in SOF 280.

> **SOF 302** states: If the selected candidate were going to take over the adult portfolio, Mr. Sullivan would have had Plaintiff as his top candidate due to her extensive experience with adult services.

Plaintiff does not controvert this Fact, yet her response to this Fact is a full page long. In the response, Plaintiff repeats SOF 302, using different words. Pltf's Resp., p. 144 ("Mr. Sullivan testified unequivocally that if the adult portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.")

Next, Plaintiff makes the same misrepresentation discussed above regarding Mr. Seidler's testimony about juvenile experience. As discussed above, Mr. Seidler testified he did not remember discussing juvenile experience when they were discussing the interviews. He did *not* testify that "juvenile experience was not discussed during the interview process," as Plaintiff represents. *See* Pltf's Resp. pp. 144-145.

Plaintiff then repeats the same misrepresentations about the differences between handling the two different portfolios.

Plaintiff next states she had the most domain experience. That is true but has nothing to do with SOF 302.

Finally, Plaintiff states that Ms. Allen did not have more juvenile experience than Plaintiff. First, that statement is not supported by the record. Second, it misses the point. Since neither candidate had significant juvenile experience, Mr. Sullivan chose the candidate who had illustrated the enthusiasm and ability to work on a changing portfolio. If they had been hiring for the adult portfolio, Plaintiff's extensive experience on the adult side, coupled with the fact that it was not experiencing significant changes, would have made Plaintiff the best candidate.

**SOF 312** states: Mr. Seidler agrees that parts of Ms. Allen's interview were very good. She presented herself very well. Her education, experience, and some of the opportunities she had in school were very good. She came across as very positive, very genuine in her desire to make changes.

**Plaintiff's response** states: Uncontroverted that Mr. Seidler testified as such, however controverted to the extent that Defendant attempts to imply that Ms. Allen's qualifications were better than Plaintiff or that Ms. Allen had a better interview than Plaintiff. Mr. Sullivan testified unequivocally that if the adult

portfolio was staying with the person being hired for the BI Analyst position, he would have hired Plaintiff.

Pltf's Resp., p. 150. Plaintiff's response is unnecessarily long and (in part) repeats exactly what Defendant previously said.

> **SOF 316** states: Ultimately, Ms. Dougan and Mr. Sullivan decided to hire Olivia Allen. Mr. Sullivan was really impressed with the enthusiasm Ms. Allen brought to the interview. She was excited to be there and grateful for the opportunity. Ms. Allen brought energy and excitement about the position and her ability to contribute to making the criminal justice system better.

Plaintiff does not controvert the Fact, but her response is more than a page long. In it, she repeats the same statements she made over and over again in response to other Facts, including many of the same misrepresentations.

> **SOF 318** states: Mr. Sullivan was looking for someone with domain experience as well as data analytics experience or working with data. He also wanted to find someone with a desire to be innovative. In Mr. Sullivan's view, Tableau was a "nice to have" characteristic, but not a requirement.

In support of this Fact, Defendant cites to Mr. Sullivan's testimony, as well as to an email he sent before he knew that either Plaintiff or Ms. Allen had applied (and which says nothing about Tableau at all). Plaintiff does not controvert this Fact, yet her response is *two pages long*. Pltf's Resp., pp. 154-156. Much of the response is a cut and paste of prior responses, some of it contains misrepresentations (discussed above), and absolutely none of it controverts anything in SOF 318.

Plaintiff's response to **SOF 337** is baffling. That fact states:

> Ms. Dougan indicated that Mr. Sullivan worked with the BIA position more than she did, so she was leaning more toward what Mr. Sullivan wanted.

Plaintiff first objects to this Fact on the basis of hearsay, but the Fact is offered to prove why HR made the determination it did. Plaintiff then includes a response that takes up almost a full page, which is perplexing since Plaintiff repeatedly focuses on the fact that Mr. Sullivan influenced this decision. In fact, in her response to SOF 337, Plaintiff includes a quote from the

record that mirrors SOF 337, almost word-for-word. Defendant cannot understand why Plaintiff would spend a page restating what Defendant has already said, unless it is to artificially lengthen Plaintiff's response.

Plaintiff uses the same tactics in response to all of the other Facts listed at the beginning of this Section. She admits the Fact and then spends pages and pages of space with repetitive and sometimes misleading statements. Regardless, she agrees the Facts are uncontroverted.

### C.     Uncontroverted Facts Plaintiff Claims are Incomplete.

Plaintiff does not controvert SOFs 31, 42, 51, 119, 129, 136-141, 149, 152, 160, 162, 169, 206, 238, 239, 246, 260, or 262, but claims they are incomplete. For example, **SOF 42** establishes that as a SCM, Plaintiff typically supervised a team of eight or nine ISOs and that she also supervised a secretary at times.

In response, Plaintiff claims she also supervised other types of positions. Interestingly, in support of this statement, Plaintiff cites her resume (although she objected to Defendant's use of resumes to establish the experiences of others). In any event, Defendant agrees that over the period of time she held the position, Plaintiff occasionally supervised other positions. That does not change the truth of SOF 42.

**SOF 51** establishes that Plaintiff received a letter of expectation after Ms. Brown received a report that Plaintiff engaged in a heated verbal exchange with another supervisor. The Fact says nothing about whether a letter of expectation is disciplinary, yet Plaintiff claims this Fact is "controverted as incomplete" because letters of expectation are not disciplinary. Plaintiff also goes on to deny the underlying conduct. None of this controverts the Fact, which is not incomplete.

> **SOF 119** states: Plaintiff reported to Sharon Brown for 12 years. According to Plaintiff, the only person who may have had more familiarity with her performance than Ms. Brown was Tony Booker.
>
> **Plaintiff's response** states: Uncontroverted that Sharon Brown was Plaintiff's

supervisor and that structurally she "reported to" Ms. Brown in the organization chart, however controverted as incomplete and therefore misleading as Plaintiff had been supervising staff longer than Ms. Brown and their relationship was more like peers than Ms. Brown being "over" Plaintiff. Ms. Brown relied on Plaintiff to handle the ISP office, including operations, such as Ms. Brown spent very little time at the location in Lenexa and Plaintiff was the most experienced in the office. Ms. Brown relied on Plaintiff to make decisions for that office.

Pltf's Resp., pp. 50-51 (quotations in original).

Based on her response, it appears Plaintiff did not believe she really had or needed a supervisor. Although nothing about Plaintiff's response indicates that SOF 119 is incomplete or controverted in any way, her response does illustrate Plaintiff's inflated view of herself.

SOF 129 states: Ms. Brown believed Plaintiff could have the maturity necessary for the job with growth, but it takes patience to move the needle and bring people along, and Ms. Brown observed that Plaintiff sometimes lacked patience.

In response, Plaintiff does not controvert the Fact but claims it is incomplete because Ms. Brown also coached others on being patient. That is true, but not pertinent to the Fact or to the hiring decision since the other supervisors under Ms. Brown were not interviewed for the position. Plaintiff makes numerous other statements in response to SOF 129, none of which controvert the Fact or illustrate that the Fact is incomplete in any way.[9]

SOF 151 establishes that the reason Plaintiff believed the decision was discriminatory was based on the direction she says she was given regarding the way she dressed from Bev Marshbank, Doug Gertsema, Bill Keith, and Bessy Gillespie. This is supported by Plaintiff's own testimony.

SOF 152 then states: None of these individuals was involved in the hiring process, and none of them worked for the County in 2019. Indeed, Ms. Marshbank never worked for the County and left her post at the ARC in the 1990s. Mr. Keith left the County in the 1990s, Mr. Gertsema had left the County more than 12 years before this hiring decision, and Ms. Gillespie had retired more than a year earlier.

---

[9] Plaintiff again asserts that she and her supervisor were really "more like peers." Pltf's Resp., p. 60.

Plaintiff does not controvert any of the statements in SOF 152, but she claims it is misleading because she believes the County does not want a masculine-presenting female to be a representative of the County at a higher level. Pltf's Resp., pp. 77-78. Whether Plaintiff believes that or not does not make it so, and it plainly had nothing to do with SOF 152.

> **SOF 169** states: Some of the duties [of the two BI Analyst positions] are similar, but some are different. There were some portions of the juvenile portfolio Mr. Clark could have taken over instantly, but others would have presented a learning curve.

This is taken directly from Mr. Clark's testimony. In response, Plaintiff intentionally ignores that portion of Mr. Clark's testimony (which was echoed by Mr. Seidler) and represents that the two BI Analyst positions "were performing substantially the same work duties." Pltf's Resp., p. 84. As discussed on page 12-14, that statement is incredibly (and intentionally) misleading.

> **SOF 238** states: Ms. Allen shared that she was well versed in PowerPoint because that is how she created all her presentations. She used that for classes, her thesis, and presented at a couple conferences in California while she was getting her Master's.

This is supported by Ms. Allen's testimony, as follows:

> Q. [In reference to the notes of Ms. Allen's interview] It says that you had used SPSS and that you were a had also used PowerPoint as an end user. Do you recall talking about that?

> A. I don't recall, maybe, that verbiage. I know I shared about using PowerPoint because that's how I created all my presentations. So I was very well versed in PowerPoint – not only for class purposes but also to do that evaluation presentation, my thesis and al - -- so I did presentations at a couple of different conferences while I was getting my master's as well in California. So I may have alluded to those things – I can't recall exactly what was said about PowerPoint.

Ex. 52, Allen depo. 70:3-20. Citing this same testimony, Plaintiff's response states:

> Uncontroverted that Ms. Allen shared that she was well-versed in PowerPoint, however controverted as incomplete and therefore misleading to the extent Ms. Allen testified she could not "recall exactly what was said about PowerPoint" **and what she had used it for**. Therefore, the second sentence of this paragraph

is irrelevant to the determination of Ms. Allen's qualifications discussed during
the interview process.

Pltf's Resp., p. 108 (emphasis added).

Defendant does not contend anyone will believe this case turns on Ms. Allen's use of
PowerPoint, but this is another example of Plaintiff mischaracterizing the record. Ms. Allen very
clearly testified that she remembered sharing about her use of PowerPoint. She also testified very
clearly about the ways she used it. She just did not remember exactly which of those she shared.
Ms. Allen did not testify that she could not recall what she had used PowerPoint for.

**SOF 262** states: Mr. Sullivan liked that Plaintiff had presented on trauma-
informed care and was comfortable presenting.

Plaintiff does not controvert the Fact, but states it is "incomplete and therefore misleading."
Pltf's Resp., p. 119. Plaintiff goes on to say that "Mr. Sullivan had watched Plaintiff present on
trauma-informed care and acknowledged that she was comfortable presenting." *Id.* Defendant is
not sure how this is different from the Fact.

Plaintiff then states that "Mr. Sullivan stated that he could picture Shannon presenting in
the BI Analyst job and that when the [sic] he saw her present on TIC, she 'does well.'" *Id.* This is
true and, in fact, included in Defendant's Facts, but it certainly does nothing to change the veracity
of SOF 262.

Plaintiff's responses to the other Facts listed at the beginning of this section is similar. She
admits the Facts are uncontroverted. She then claims they are "incomplete" and, therefore,
controverted or misleading but does nothing to show that *anything* about any of the Facts is not
true, or even incomplete.

### D.    Uncontroverted Facts Where Plaintiff Controverts an Underlying Incident.

SOFs 53, 54, 191, 333, 334, 335, 338, 341-350, 352, 356, 357, 358, and 364 all involve
Facts that were reported. The Facts are included to illustrate why the person receiving the report

did what they did. They are not included to prove the underlying Fact. In response to each of these

Facts, Plaintiff admits the report but takes issue with the underlying fact.

> For example, **SOF 53** states: In September 2018, the County received an anonymous hotline complaint about all of the SCMs in Adult supervision. The caller reported that Plaintiff was rude to her staff and that Plaintiff had indicated she was going to wear a t-shirt that says "STFU" (Shut the Fuck Up) so staff would stop asking her to help with the caseload.

**SOF 54** establishes that Ms. Brown investigated the allegation and reported to Ms.

Bloomberg and Mr. Sullivan that Plaintiff admitted to making the comment but said she was

joking.

The County included this Fact because it illustrates information that three of the members

of the DFS panel had at the time they were making the hiring decision. Plaintiff does not controvert

either Fact but states she "does not remember" suggesting that she wear a shirt saying STFU. That

may be true, but it does not change the fact that this complaint was made, and Ms. Brown reported

that Plaintiff admitted to making the suggestion.[10]

**SOFs 333, 334**, and **335** establish what Mr. Sullivan reported about the DFS hiring decision

when he was interviewed by HR. These Facts are offered to show why HR reached the conclusions

they reached and also as evidence of prior consistent statements. They are not offered to prove the

truth of the matter asserted. Thus, Plaintiff's hearsay objection is unfounded. Plaintiff then includes

almost a page of repetitive statements, some of which are unsupported, as previously explained.

In general, though, Defendant agrees that Mr. Sullivan believed Mr. Clark was the most qualified

candidate going into the interviews, and the interviews confirmed that for him. Nothing about that

---

[10] Plaintiff's hearsay objection is also unfounded. This is not offered to prove the truth of the matter asserted but rather to prove the knowledge that three panel members had at the time they made the decision about who to hire for the Director of Field Services position.

suggests any discrimination was at play, and it certainly does not controvert the Facts about what Mr. Sullivan reported to HR.

> **SOF 338** states: When Ms. Dougan was interviewed, she stated that they were looking for Tableau and data experience and domain experience (Corrections experience), and that did not come to fruition as much as they thought.

After making an unfounded hearsay objection, Plaintiff spends more than *two pages* making confusing statements about Tableau and discussing her qualifications compared to Ms. Allen's. As the Court knows, Defendant spent significant time discussing the comparative qualifications of Plaintiff and Ms. Allen, but not in SOF 338. Moreover, as discussed above, Plaintiff admits she did not have Tableau create

or experience at the time of the interview, but takes various statements out of context in an effort to suggest otherwise. In any event, there is no dispute about what Ms. Dougan reported, as stated in SOF 338.

**SOFs 341-350** establish what Ms. Dougan reported to HR when she was interviewed about the BI Analyst position in June 2019. In response to each Fact, Plaintiff makes unfounded hearsay objections and then states that Ms. Dougan (in 2021) did not remember giving an interview in 2019. That is true, but it does not change what she reported in 2019. Plaintiff then repeats numerous of the same statements she makes over and over again throughout her Response, many of which are unsupported or contradicted by the record (as previously discussed), and none of which have anything to do with what Ms. Dougan reported.

> **SOF 352** states: Mr. Sullivan noted that Mr. Seidler had decided he wanted to take over the adult portfolio, which influenced their decision. He indicated that none of the candidates knew Tableau, between Ms. Allen and Plaintiff. He noted that he was impressed with Ms. Allen and that she was going to be presenting on research she did with Alex Holsinger.

Plaintiff does not controvert the fact that Mr. Sullivan reported these things to HR, but she fills more than a page with completely unrelated information. First, she makes a hearsay objection.

The statement to HR is not offered to prove the matter asserted, but even if it were, the reasons Mr. Sullivan believed Ms. Allen was the best candidate to take over the juvenile portfolio are not hearsay.

After making that objection, Plaintiff discusses the interview Ms. Dougan gave to HR (to which she previously lodged hearsay objections). She then discusses the fact that Ms. Allen did not have experience with Tableau. *No one has ever said she did.* Plaintiff then repeats her misrepresentations regarding the discussion of Ms. Allen's juvenile experience during her interview (which has been discussed above). Finally, she repeats her allegation that Ms. Allen had less juvenile experience than Plaintiff. Again, that is not supported by the record.

The *long* and the short of it is that this Fact is not controverted – neither the rationale for Mr. Sullivan's decision nor the fact that he reported it to HR. Yet Plaintiff's response to it is more than a page long and filled with statements that have nothing to do with the Fact, including unsupported statements and misrepresentations. Plaintiff's obstructionist tactics should not be sanctioned.

Plaintiff's responses to **SOF 357** has the same issues. Her objection is unfounded, and she spends significant space making statements that have nothing to do with the Fact. It is true the panel could have asked for more recent examples. It is also true that Plaintiff knew she was competing for a position, and the panel was surprised Plaintiff could not (or at least did not) provide examples of the difference she had made in her current leadership position in recent years.

> **SOF 356** states: Earl Taylor gave similar feedback about Plaintiff when Ms. Bloomberg and Ms. Veronda interviewed him about the Deputy Director of ARC position. He stated that Plaintiff does not always seem engaged.

In response, Plaintiff makes the same unfounded hearsay objection. She then notes that Mr. Taylor provided a specific example of when he had seen Plaintiff have "fire." The notes actually say:

Shannon? I haven't always been impressed that she is always plugged in and engaged. You never see her at the advisory board. There are sometimes you can see where that fire is lit, like when we started PREA, but I don't always see the desire or fire. I think she would struggle with the environment out here, over 100 staff, things going on 24/7, I think it would be challenging for her.

Ex. O at JoCo 489.[11]

> **SOF 358** states: Mr. Sullivan indicated he and Ms. Dougan wanted to hire Ms. Allen. Mr. Seidler was more ambivalent. He really wanted the external candidate from Topeka (Casey Johnson), but Mr. Sullivan did not believe Mr. Johnson would be a good fit. He stated he did not think Mr. Seidler was excited about either Plaintiff or Ms. Allen.

In response, Plaintiff again lodges an unfounded hearsay objection. She then takes issue with the underlying facts, but in the process, misrepresents the record. Specifically, Plaintiff states, "Mr. Seidler brought up Plaintiff for discussion and that was shot down. [citation omitted] This caused Mr. Seidler to be indifferent as he knew he was going to be outvoted; 'Got two against one, I guess.'" Pltf's Resp., p. 187.

Plaintiff cites Mr. Seidler's deposition at 94:8-95:6 to support these statements, but neither that cite nor any other supports the statements. Mr. Seidler testified that Casey Johnson was his top candidate, and Plaintiff and Ms. Allen were in his top three. He does not remember whether he ranked Plaintiff or Ms. Allen higher. Ex. 28, Seidler depo. 72:21-73:6, 82:21-83:1.

Mr. Seidler also testified that *after the panel decided against Mr. Johnson,* he was indifferent about the choice. *Id*. at 85:21-86:6. In the portion of the deposition cited by Plaintiff, Mr. Seidler simply says he felt he could voice his opinion. It's just that his opinion was different from the other two panel members. Mr. Seidler *did not* testify (as Plaintiff represents) that he was indifferent after raising Plaintiff as a possibility.

---

[11] Notably, it is obvious from the notes that Mr. Taylor did not know why HR was interviewing him. He simply provided feedback on each of the candidates for the Deputy Director of ARC position.

Plaintiff has similar problems with the other Facts listed at the beginning of this section. She admits the Fact but then goes on to take issue with underlying facts, which do not change the admission.

### E.      Facts Plaintiff Claims to Controvert but Fails to Point to Any Evidence Controverting the Fact.

Plaintiff claims to controvert the following Facts but does not point to anything in the record that actually controverts them: 49, 52, 56, 64, 65, 67, 70, 81, 83, 85, 95, 105, 106, 117, 118, 126, 142, 143, 145, 148, 151, 153, 157, 163, 170, 171, 177, 182, 194, 197, 201, 209, 212, 239, 240, 247, 248, 250, 264, 265, 267, 269-271, 281-283, 289, 292, 294, 296, 298, 299, 301, 303, 307, 309, 310, 313, 317, 319, 323, 339, 362, 366, 388, and 424.

> **SOF 49** states: Mr. Seidler did not view this work [a report Plaintiff took over from him] as data analysis, but Plaintiff inputted information about, for example, the reason an officer revoked someone's probation and likely looked at trends related to that.

This Fact is supported by testimony from Mr. Seidler. It is undisputed that Mr. Seidler actually held a BI Analyst position for year. It is also undisputed that the report about which he was testifying was a report that *he handled*. (SOFs 46, 48 – Both Uncontroverted). Thus, Mr. Seidler has full familiarity with the meaning of data analysis and full familiarity with the report Plaintiff began handling.

> **Plaintiff's response** states:

> Controverted. Plaintiff was entering and analyzing revocation data, which included data analysis. This process was very time consuming for Plaintiff as it required large amounts of data entry, manually looking up and reviewing data, running reports, and cleaning data so it could be analyzed. For the revocation data project, Plaintiff compiled all the recommendations made by Intensive Supervision Officers (ISOs) at revocation hearings (thousands of hearings) and then analyzed how often judges followed the ISO's recommendations. Plaintiff found that 92% of the time, the judge followed the departments recommendations. This was important to know in terms of how ISOs might reduce revocation rates to prison. None of the other supervisors in the department knew how to runt he reports or clean the data for the analysis. Even

> Olivia Allen did not know how to run the reports for this particular revocation data. After doing all of this work on the revocation data, Plaintiff used the data to drive decisions with staff she supervised and ISP as a whole. She reviewed data looking for patterns in revocations and where the Department could better utilize resources to improve revocation rates. She used that data directly with her individual officers and shared it with them and discussed the trends she was seeing. Plaintiff was also reviewing closely the data that Mr. Seidler and Mr. Clark compiled in Tableau Dashboard re: LSIR assessments. Plaintiff used that data in individual coaching sessions with staff and helped them determine what areas to focus on for improvement. No other supervisor in adult services or the department was doing this type of data analysis.

Pltf's Resp., pp. 23-24.

Initially, nothing in this lengthy response contradicts the fact that Mr. Seidler did not view Plaintiff's work on this report as data analysis. In fact, the response emphasizes the point. Plaintiff inputted information and then counted the number of times judges followed a recommendation versus the number of times they did not. This may well be helpful information to have, but the fact that Plaintiff considers this data analysis is telling.

**SOF 52** discusses Nanette Rosas's complaint about Plaintiff screaming and cursing at a fellow SCM. Plaintiff claims to controvert the fact and denies the underlying conduct. Even assuming Ms. Rosas fabricated the incident, it does not change the fact that she made the report to one of the members of the DFS hiring panel.

**SOFs 64-67** establish that when Betsy Gillespie became the Director of JDOC in 2007, she wanted all employees in the department to dress professionally. As a result, Ms. Brown spoke to her employees (including Plaintiff) about this. **SOF 65** establishes that Ms. Gillespie never told or implied to Ms. Brown that she wanted Plaintiff to dress in a more feminine way. **SOF 67** establishes that Plaintiff believed Ms. Brown's request was based on Ms. Gillespie's discriminatory intent, but neither Ms. Brown nor Ms. Gillespie ever indicated that was the case.

Plaintiff claims SOFs 64, 65, and 67 are controverted and in support of this claim cuts and pastes the same response. The responses, however, actually underscore the Facts. When Ms.

Brown told Plaintiff that Ms. Gillespie did not like the way Plaintiff dressed, Plaintiff assumed it

was due to the fact that she wore male clothing, but Ms. Brown had conversations about dressing

differently with numerous people. It had nothing to do with Plaintiff's masculine wardrobe.

> **SOF 83** states: At times, hiring managers within Johnson County ask people
> outside the organization to sit on interview panels for high level positions in
> order to obtain an outside perspective. Other governmental organizations also
> do this.

**Plaintiff's response** states:

> Controverted. In the Department of Corrections within Johnson County, it was
> not a typical practice to ask people outside of the organization to sit on the
> interview panels, and the only hiring manager who did this was Robert Sullivan
> for three of the positions that Plaintiff applied for. (Footnote) Exhibit G [sic]
> Keith Clark Deposition at 138:21-139:10 (Mr. Clark could not remember any
> other positions than the DFS and DDARC with Robert where outsiders were
> brought in); Exhibit I, Sharon Brown Deposition at 48:10-49:19 (Ms. Brown
> stated this was not customary in her experience in the Department of
> Corrections); Exhibit N, Samantha Veronda Deposition at 95:24-96:6 (Ms.
> Veronda testified that this was not common in the Mental Health Department).
> Robert Sullivan chose the people outside of the organization to sit in on these
> interview panels. Exhibit G, Robert Sullivan Deposition at 90:12-19. He is not
> aware of anyone else selecting people outside the organization for interviews for
> Department of Corrections positions and he is no longer doing this. Exhibit G,
> Robert Sullivan Deposition at 89:23-90:22. He only did it for the DFS and
> DDARC positions and he has not done this since. Exhibit G, Robert Sullivan
> Deposition 89:23-90:22.

Pltf's Resp., pp. 36-37. The footnote in this response states:

> Robert Sullivan asked another ARC Director from outside the County to sit in
> on the interviews for the DDARC position, even though Earl Taylor was the
> hiring manager for that position. Exhibit G, Sullivan Deposition at 90:12-19.

*Id.* at p. 36.

First, Plaintiff's response does not controvert the Fact. More importantly, Plaintiff's

response is full of misrepresentations. In the testimony cited by Plaintiff, Mr. Sullivan testified

that *Earl Taylor* (not Mr. Sullivan) asked the Deputy Director of another jurisdiction to be on the

panel for the Deputy Director of the ARC (DDARC) position. Ex. G, Sullivan depo. 90:12-19

("**Earl asked** -- for the deputy director ARC position, **he asked** another director from – well, it would have been a deputy director in another jurisdiction to assist.") (emphasis added).

Thus, Plaintiff's statement that "the only hiring manager who did this was Robert Sullivan for the three positions that Plaintiff applied for" is not accurate. Mr. Sullivan did not do it for the DDARC position (for which Plaintiff applied), and he did not do it for the BI Analyst position (for which Plaintiff applied).

In addition, Plaintiff's statement that  Mr. Sullivan "is not aware of anyone else selecting people outside the organization for interviews for the Department of Corrections positions and he is no longer doing this" has two false statements. In the cited testimony, Mr. Sullivan specifically testified that he was aware that Earl Taylor had done this, and he did not say he is "no longer doing this." He said he had (at that point) only hired one other executive-level position, and he did not do it for that particular one. Ex. G, Sullivan depo. 90:12-91:3.

Plaintiff's representation that Ms. Brown testified that it is not customary to have panel members from outside the department is, at best, misleading. The testimony Plaintiff cites reads as follows:

> Q.    Is it customary for you to have people from outside of Johnson County be involved in the interview panels?
>
> A.    For me personally I never used anybody from outside. I could see why he did that because we had candidates who were state level. And oftentimes if you bring in people who have done state level work, for those that, you know, we don't know, they can give us a sense of working relationships with them. I mean, I can see the value in it. I've not personally done it, if that makes sense.
>
> Q.    Well, so in your experience, it wouldn't have been customary. Is that fair to say?
>
> A.    Right. In my experience, I've not done that before. I've brought people in from outside of my department who may have worked for the County. I've brought them in to help with interviews before. I just –
>
> Q.    But not from outside Johnson County; is that correct?

> A.      I've got to think about that. I  don't think I've – I have for any of the roles that I've interviewed for. I can't speak for other people within our department, though, honestly.
>
> Q.      Okay. Did you ever sit on any interview panels where there were people from outside the County involved besides this particular one?
>
> A.      I've got to think about that. I don't think so. I've been on panels were there have been court services staff, but I don't recall from outside of the County.

Ex. I, Brown depo. 48:10-49:19.

Moreover, Ms. Brown was the Director of Field Services. As such, she would not have been hiring for any executive level positions.

Plaintiff's reference to Ms. Veronda's testimony is also misleading. Ms. Veronda testified as follows:

> Q.      Is it normal for somebody outside of the department to be included on interview panels?
>
> A.      I can't answer for corrections. It's not normal in mental health. It is normal in the county manager's office, another department I support. So I don't know if that's normal for corrections or not. But countywide, it's normal from time to time.

Ex. N, Veronda depo. 95:24-96:6.

Thus, Ms. Veronda's testimony directly supports **SOF 83**.

The idea that Mr. Sullivan orchestrated the make-up of the panel in order to discriminate against Plaintiff, is absurd, particularly given that he chose to interview Plaintiff knowing full-well that she is a masculine-presenting female. Yet in an apparent effort to convince this Court that Mr. Sullivan did that, Plaintiff has suggested that Mr. Sullivan deviated from normal practice. In so doing, Plaintiff has repeatedly misrepresented the record and attempted to conceal the truth.

Plaintiff does this again in response to **SOF 85**. Moreover, Ms. Williams is not a Director in Sedgwick County (as stated in Plaintiff's Response, p. 38), and Mr. Sullivan asked Ms. Williams to be on the panel before Mr. Clark submitted his application. *See* Ex. T and Ex. 40.

31

Thus, he could not have known Mr. Clark had included Ms. Williams as a reference at the time he asked her.

> **SOF 95** states: From 2003 until 2016, Mr. Clark was the Director of Community Corrections for the Fourth Judicial District, meaning he held a Director position similar to the position held by Mr. Sullivan but in a much smaller District.

**In response, Plaintiff states**:

> Controverted. Mr. Clark shared that the role he held as the Director of Community Corrections for the Fourth Judicial District was actually more similar to the Project Manager position (later BI Analyst) he took with Johnson County in 2016. Exhibit G [sic] Clark Deposition at 29:13-30:25. In fact, he testified that it was not a promotion, and he would describe it as a lateral move.

Pltf's Resp., pp. 41-42.

Mr. Clark did testify that *some* of the duties he had as a Community Corrections Director were also duties he had as a Project Manager. Specifically, Mr. Clark testified that, in both roles, he wrote the adult comprehensive plan, wrote the behavioral health plan, worked on those budgets, submitted quarterly reports for the Kansas Department of Corrections, and worked with data and outcomes. Ex. 21, Clark depo. 30:5-20.

Mr. Clark *did not* testify that this Director position was "more similar" to the Project Manager position. Rather, he testified that it was similar to the Director position Mr. Sullivan had but in a much smaller District. Ex. 43, Clark Decl. ¶ 4. In addition, in Exhibit 40 (also cited by Defendant in support of this Fact), Mr. Clark outlined his Director duties as a whole (and not limited to those he also held as a Project Manager) as follows:

> In this [Director] role I served as the department head that was directly responsible for community-based supervision in a four-county area. These services included Adult Intensive Supervision, Juvenile Intensive Supervision, Community Case Management, behavioral health services and various programming to meet the needs of the populations being served.

Ex. 40, p. 1.

Plaintiff's representation that Mr. Clark testified that his Director role in the Fourth Judicial District was "more similar" to the Project Manager role is blatantly false.

**SOF 117** states: The interview panelists generally recall that Keith Clark, Rachel Mestad, and Megan Milner were the top three candidates.

In support of this Fact, Defendant cites to the following:

- Mr. Sullivan's deposition, identifying Mr. Clark, Ms. Mestad, and Ms. Milner as the top candidates. Ex. 18, Sullivan depo. 216:4-22.

- Ms. Dougan's deposition, identifying Mr. Clark as a top candidate and noting Plaintiff was not one of her top candidates for the DFS position (although she was for the BI Analyst position). Ex. 20, Dougan depo. 53:17-55:11, 74:6-16, 77:19-22.

- Ms. Bloomberg's deposition, identifying Ms. Clark, Ms. Mestad, and Ms. Milner as top candidates and noting that neither Plaintiff nor Ms. Markos was a top candidate. Ex. 17, Bloomberg depo. 129:11-131:10, 137:5-138:5, 180:4-25, 182:16-25.

- Ms. Brown's deposition, identifying Ms. Milner and Mr. Clark as top candidates and noting Plaintiff was not a top candidate for her because "it was about who had the most administrative experience, you know, who knew how to do this work not only on a local level but on the state level and it came down for me to those two people [Mr. Clark and Ms. Milner]." Ex. 25, Brown depo. 22:24-25:2, 40:10-22.

Plaintiff claims to controvert the Fact and includes more than a page full of statements, none of which controvert the Fact, and some of which are not supported by the record (as previously explained).

Plaintiff desperately wants the record to say otherwise, but she cannot escape the fact that none of the panelists deposed had Plaintiff in their top three, and none of them remember her being in anyone else's top three, with the possible exception of Shelly Williams.

**SOF 118** states: The only panel member who may have had Plaintiff in her top three is Shelly Williams.

In response, Plaintiff points out that the record does not contain an indication of who Tedd Jester had in his top three. The record *does* indicate that, however, none of the panel members who

were deposed recall Plaintiff being in the top three of any panel member with the possible exception of Shelly Williams. And there certainly is no evidence that Plaintiff *was* in Mr. Jester's top three.

> **SOF 142** states: Going into the interviews, Mr. Sullivan believed Mr. Clark would be the best candidate, and Mr. Clark's interview solidified that for him.

This Fact is remarkably similar to PSOF 457, yet Plaintiff claims to controvert this Fact by alleging that Ms. Brown told Plaintiff, it was a "done deal." As discussed above, Plaintiff misrepresents the testimony on that topic. Moreover, Ms. Brown specifically testified that she did not know who Mr. Sullivan was going to select until sometime after she sent her March 23, 2019 email (which was more than a week after the interviews). Ex. 25, Brown depo. 30:24-31:3; Ex. 45. Plaintiff has the same problems with **SOFs 143, 145,** and **148**, where she literally cut and pasted the exact same response. Plaintiff has not controverted any of these Facts.

**SOF 151** establishes Plaintiff believes the DFS hiring decision was discriminatory based on direction she says she was given regarding the way she dressed by four people who did not even work for the County at the time of the decision, most of whom had been gone for decades. This Fact is supported by Plaintiff's own testimony.

In response, Plaintiff claims to controvert the Fact but sets forth only her own speculation about what "the County" wants and does not want. Plaintiff is required to point to evidence in the record that contradicts facts. She may not rest on speculation and conjecture. *See Conaway v. Smith*, 8563 F.2d 789, 794 (10th Cir. 1988) ("in response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.")

**SOF 157** indicates that Plaintiff applied for the BI Analyst position, which would have been a lateral move. Defendant cited *Plaintiff's Contentions* in the Pretrial Order for this

proposition. In addition, in her own Additional Facts (PSOF 479), Plaintiff asserts that the move

to the BI Analyst position "would have been a lateral move for Plaintiff." Pltf's Resp., p. 216.

Despite this, Plaintiff somehow found it appropriate to "controvert" this Fact.

> **SOF 163** states: Susan Dougan was the hiring manager for the position, but Ms.
> Dougan relied heavily on Mr. Sullivan in making this decision because Mr.
> Sullivan worked much more closely with the BIAs.

Plaintiff claims to controvert the Fact but then cites to the exact testimony supporting it.

Plaintiff also mischaracterizes the email discussed in **SOF 164**. Perhaps most interesting, Plaintiff

goes to great lengths to argue, in response to Defendant's Statement of Facts, that Mr. Sullivan

made the BIA hiring decision, but in her legal argument, she argues he did *not* make the decision.

> **SOF 171** states: The juvenile portfolio has some fairly specific nuances that are
> different from the adult portfolio such that having juvenile experience would be
> beneficial to the person taking on the juvenile portfolio.

This Fact is supported by the following testimony from Brian Seidler:

> Q. Do you think it was harder to learn juvenile than it was adult?
>
> A. Juvenile has some fairly specific nuances to it that are different from adult.
> I don't know that it's any harder per se. It's just the – having the experience and
> knowing that – that particular section of corrections.
>
> Q. Do you think it was necessary for the person that was hired for the role of BI
> Analyst to have previous juvenile experience?
>
> A. I think it would be beneficial. I don't know that it would be necessary, but it
> would certainly be beneficial to have somebody that had that knowledge and
> experience.

Ex. 28, Seidler depo. 38:16-39:6.

Plaintiff "controverts" the Fact, stating that Mr. Seidler testified that juvenile experience

was not necessary. That's true, but that's not what the Fact says. Plaintiff also repeats the same

misrepresentations about what was discussed the interview process and about the differences

between handling the two portfolios. Both of these misrepresentations are discussed at length, above.

Regardless, nothing Plaintiff says controverts the Fact.

**SOF 182** establishes that having end user experience with Tableau is helpful in a limited way. An end user can see the way the dashboard looks but that does not help much on the creation side.

Plaintiff claims to controvert this Fact by pointing to Brian Seidler's testimony. Mr. Seidler testified that being an end user would help you know what is simple and easy to follow, but that would not help in a "functional 'help me create that board and build it' kind of way." Ex. 28, Seidler depo. 128:23-129:7. As noted previously, Mr. Seidler compared the benefit that being a Tableau end user would have in creating Tableau dashboards to the benefit a person might receive by using the Chipotle website in creating the website. *Id.* at 127:23-128:12. Chipotle website users might know what they want to see, but it certainly doesn't qualify you to build the website. Plaintiff has not controverted the Fact.

> **SOF 212** states: Dr. Holsinger, a data scientist, had previously held the Criminal Justice Coordinator role at Johnson County, and his recommendation was significant to the interview panel.  Ex. 17, Bloomberg depo. 156:5-12; Ex. 18, Sullivan depo. 241:25-242:16; Ex. 28, Seidler depo. 75:15-20, 89:16-90:6.

Plaintiff makes a hearsay objection, but the County is not offering statements from Dr. Holsinger but rather pointing out that, given his stature, the *fact* that he recommended Ms. Allen was significant. Plaintiff's statement that the citations do not support the Fact is simply inaccurate. Mr. Sullivan testified that one of the things that set Ms. Allen apart was that she had come highly recommended by Dr. Holsinger. Ex. 18, Sullivan depo. 241:25-242:16. Mr. Seidler testified that

Ms. Allen came highly recommended by Dr. Holsinger, and he knows Mr. Sullivan put a lot of weight on that. Ex. 28, Seidler depo. 75:2-20.[12]

> **SOF 240** states: Ms. Allen remembers discussing her experience with the juvenile side of corrections [in her interview]. She remembers talking about her thesis, which was specifically on teens, and she talked about the evaluation study she did for the Center for Conflict Resolution, which was a youth-in-schools program.

In response, and without citation, Plaintiff "controverts" that Ms. Allen "was asked questions about her juvenile experience or that she discussed anything other than her graduate work." Pltf's Resp. 109. The Fact says nothing about what Ms. Allen was asked, and Plaintiff has cited to nothing to support the second clause of the statement.

Plaintiff then claims to controvert the Fact "to the extent that Defendant attempts to imply that Ms. Allen was performing data analysis in this position or needed to know any 'juvenile-specific policy.'" *Id.* The Fact says nothing about data analysis or about any position.

Plaintiff then cites to evidence that Ms. Dougan could not find in her notes where the panel asked about juvenile experience. Again, the Fact says nothing about that.

Plaintiff then repeats the representation that Mr. Seidler testified that juvenile experience was not discussed during the interview process. As discussed above, that assertion is not supported by Mr. Seidler's testimony (or any other part of the record). In fact, the interview notes and Ms. Allen's testimony illustrate the opposite.

Again, nothing about any of the statements Plaintiff makes controverts the Fact.

> **SOF 248** states: As noted above, Ms. Allen wrote the literature and conclusion portions of [the Byrne] grant and present the portions she wrote.

Plaintiff claims the Fact is "controverted" and cites to testimony that Ms. Allen did not complete any grants on her own. That is true, but that is not what the Fact says. Plaintiff repeatedly

---

[12] Defendant agrees that its cite should have started on line 2 of the page, rather than line 15.

adds statements to the record that have nothing to do with the Fact in an apparent attempt to create the illusion of fact questions.

> **SOF 265** states: Mr. Sullivan does not recall if they asked Plaintiff for a more recent example but noted that this is the time for the candidates to impress them, so he would have thought Plaintiff would have chosen a different and more recent example.

Plaintiff's response to this Fact is nearly two pages long, but none of the many statements she includes controvert SOF 265.

> **SOF 269** states: When asked to describe a time where she came up with and implemented a solution "that was bold – perhaps even risky, creative, maybe even unconventional," (Question 7) Plaintiff responded by saying she is not real risky. Her solutions tend to be more grounded. She thinks grounded solutions will help transition staff and not scare them off.

This Fact is supported by Plaintiff's testimony, confirming that this was her answer to the question.

Plaintiff first makes a hearsay objection. Of course, the County is not offering this to prove that Plaintiff is not risky or that her solutions tend to be grounded. The County is offering this to prove that this is what Plaintiff (admittedly) told the hiring panel in connection with a position where Mr. Sullivan (long before Plaintiff even applied) indicated a desire to find someone who is innovative. Plaintiff then, without citation, denies saying she was "not real risky," but apparently admits saying she was not risky.

In any event, nothing about this Fact – supported by Plaintiff's own testimony – is controverted.

> **SOF 270** states: Plaintiff's answer to [Question 7] caused Mr. Sullivan to question whether Plaintiff would be innovative enough to successfully handle the ever-changing juvenile portfolio.

Plaintiff claims the Fact is controverted and states Mr. Sullivan did not use those words. Plaintiff is correct that Defendant summarized the testimony. The relevant testimony reads as follows:

> A.    In my opinion, they were both going to be new to that juvenile portfolio, so I had to make a decision. And I felt, in my opinion, that I needed to tell Susan Olivia was my best choice if, in fact, Brian was going to move from the juvenile portfolio to the adult portfolio. So …
>
> Q.    So if this was going to be new for anyone who was taking on the juvenile portfolio, why would – why would that – why would it be less disruptive for Olivia to take it over Shannon taking it?
>
> A.    There was a question earlier in the interview process that kind of worried me a bit with Shannon.
>
> * * *
>
> A.    So on Question No. 7 – "Describe for me a time, work or otherwise, where you came up with and implemented a solution that was bold, perhaps even risky, creative, maybe even unconventional." And my notes say, "Tend to propose solutions that are really grounded." That didn't answer the question. That was an opportunity to really wow me with your ability to do what is going to be asked of this position. And for somebody that had been here 28 years, I guess I was expecting more.
>
> Q.    Did you expect less of somebody who was young and starting out?
>
> A.    I would expect the enthusiasm and the – the energy and excitement that Oliva brought would be the kind of person that would need to take on a portfolio that would involve programs that have yet to exist that we still needed to create and processes that didn't exist that we still needed to create, and to be able to take those challenges on.

Ex. 18, Sullivan depo. 189:14-192:2.

Plaintiff is correct that Mr. Sullivan did not use the exact words included in SOF 270, but SOF 270 is an accurate summary of his testimony, and Plaintiff's full-page response where she pulls out incomplete pieces of Mr. Sullivan's testimony does not change that.

**SOF 283** states: In Ms. Dougan's view, Ms. Allen knocked it out of the park. Ms. Dougan was in awe of Ms. Allen's speaking knowledge, her presentation skills, and her confidence. Something about Ms. Allen's presentation skills stood

39

out, not just compared to Plaintiff, but in comparison to all of the candidates they interviewed.

This Fact is supported by Ms. Dougan's testimony about her recollection of the interviews. Plaintiff claims to controvert the Fact by stating that Ms. Dougan does not remember speaking to HR about the hiring decisions. Defendant is at a loss as to how Plaintiff could believe that statement controverts SOF 283.

> **SOF 289** states: Mr. Sullivan also recalls Ms. Allen discussing a social networking study and recalls she was excited to work on a project that would track massive amounts of GPS data to analyze where clients spent their time and with whom and leveraging that information.

In response, Plaintiff claims to controvert the fact and states: "Mr. Sullivan testified that he was excited about working on the social networking study and that he doesn't know how it came out in the interview process. Further, Ms. Allen did not remember this coming out." Exhibit G, Robert Sullivan Deposition at 171:25-172:25." Pltf's Resp., p. 137.

Defendant has no idea what the first sentence means. Mr. Sullivan testified about the social networking study and stated, "I remember that came out somehow during the interview, and she referenced social networking study and how exciting it would be to work on a project like that." Ex. G, Sullivan depo. 172:21-25. Mr. Sullivan was reviewing his notes of Ms. Allen's interview at the time of this testimony, which also reference discussion of the social network analysis Ms. Allen had done. Ex. 55 at JoCo 1300 (Question 9).

In addition, Ms. Allen testified, "So during the interview, I believe his ears perked up when I started discussing that kind of network analysis … ." Ex. 52, Allen depo. 139:24-140:10.

Plaintiff's statement that "Ms. Allen did not remember this coming out" is completely false.

**SOFs 309** and **310** discuss the fact that Mr. Seidler did not have strong feelings about who to hire for the BI Analyst position once Mr. Sullivan and Ms. Dougan rejected his favorite

candidate, Casey Johnson. Plaintiff claims to controvert those facts, but makes the same misrepresentations she made in response to SOF 358, discussed above.

Mr. Seidler testified that *after the panel decided against Mr. Johnson,* he was indifferent about the choice. *Id*. at 85:21-86:6. He *did not* testify (as Plaintiff represents) that he was indifferent after raising Plaintiff as a possibility.

> **SOF 323** states: In other words, [Ms. Allen] used Excel as a platform for getting the data ready for analysis in Tableau, which is something she knew how to do before she was a BIA.

> **In response, Plaintiff states:**

> Controverted. Ms. Allen stated during the interview process that she "hasn't used Excel formulas [sic] does not know."

Pltf's Resp., p. 159.

Defendant does not dispute that Ms. Allen indicated in her interview that she was not proficient at Excel formulas, but that has nothing to do with SOF 323. It's as if Plaintiff believes that writing "controverted" and adding unrelated information will benefit her in some way, but the tactic actually illustrates her desire to avoid the undisputed facts.

In the interest of (relative) brevity, Defendant will not go through each and every Fact in detail, but a review of the record illustrates that Plaintiff also did not controvert the remaining Facts identified in the beginning of this Section.

### F.   The Few Facts Plaintiff Controverted Are Not Material to this Motion.

Plaintiff arguably controverts all or a portion of the following Facts, but none of them is material to the determination of Defendant's Motion: 21, 30, 45, 71, 79, 91, 134, 150, 181, 259, 340, 359, 372, 380, and 433.

**SOF 21** states that the hiring manager decides who to interview.

In response, Plaintiff correctly points out that others sometimes have input on the decision of who to interview. Plaintiff was interviewed for all of the positions at issue in this case, so this Fact is not material.

> **SOF 30** states: Members of the interview panel provide input, but the decision is ultimately made by the hiring manager for the position.

In response, Plaintiff states that "while Susan Dougan was listed as the hiring manager for the BI Analyst, Robert Sullivan was the ultimate decisionmaker for the position." Pltf's Resp., pp. 16-17.

Although Defendant believes reasonable minds could disagree on who made the ultimate decision for that position, for purposes of this Motion, Defendant will assume it was Robert Sullivan (although Defendant notes Plaintiff takes the opposite position in her legal argument). Regardless, the identity of the final decisionmaker for this position does not impact the determination of the Motion.

> **SOF 45** states: Ms. Brown viewed Plaintiff's areas for improvement as learning to fight appropriate battles and to be sure to gather all the information before jumping to conclusions. Ms. Brown also coached Plaintiff to be open to different ideas and ways of approaching situations. Ms. Brown did not necessarily believe Plaintiff could not be innovative, but observed that sometimes if she did not agree with something, it became a point of contention.

In response, Plaintiff states that Ms. Brown did not coach Plaintiff on the issues outlined in SOF 45. Pltf's Resp. pp. 21-22. She then cuts and pastes her statements made elsewhere in her brief about how Ms. Brown really was not her supervisor, but a peer.

In any event, Defendant agrees that Plaintiff has controverted the second sentence of SOF 45, but whether Ms. Brown coached Plaintiff on the areas of improvement she saw or not, does not affect Defendant's Motion.

> **SOF 71** states: After Sharon Brown retired Plaintiff applied to fill her position as the Director of Field Services.

In response, Plaintiff points out that Ms. Brown had not actually retired at the time Plaintiff applied for the position. This is correct. The SOF should say that Plaintiff applied after Ms. Brown announced her plan to retire. Obviously, this distinction is immaterial.

> **SOF 79** states: Mr. Sullivan determined who to interview, and he selected eight candidates, including Plaintiff, for interviews.

In response, Plaintiff states that Ms. Bloomberg played a role in that since she screened candidates for minimum qualifications. That is really not the point of the Fact, but Defendant agrees Ms. Bloomberg did that, which has no impact on Defendant's Motion, as Ms. Bloomberg did not screen Plaintiff out, and Mr. Sullivan selected Plaintiff for an interview.

> **SOF 91** states: The writing sample Plaintiff submitted was a letter she had written to a judge in 2008.

In response, Plaintiff states that it was a "hypothetical letter to a real situation Plaintiff was a part of during that time period in 2008." Defendant assumes the truth of Plaintiff's statement, but that distinction is not material.

> **SOF 134** states: Ms. Dougan remembers that Mr. Clark had significant experience and gave many good examples. She recalls a consensus to hire Mr. Clark.

Plaintiff takes issue with the second sentence. To the extent this Fact is taken to mean that all panelists had Mr. Clark as their top choice, Defendant agrees the record does not support that. However, as discussed in connection with SOF 117, above, the record plainly supports the fact that Mr. Clark, Ms. Milner, and Ms. Mestad were the top three candidates. And in any event, whether there was a consensus or not does not alter the analysis required for Defendant's Motion.

> **SOF 150** states: Plaintiff also believes she was more qualified than all the other candidates but admits she does not know all of them and is not familiar with their qualifications.

In response, Plaintiff agrees that she believes she was more qualified than the all the other candidates but says she is familiar with the qualifications of Ms. Milner, Ms. Mestad, and Ms.

Markos. To the extent SOF 150 implies otherwise, Defendant agrees that portion of the Fact is controverted, but that does not change the fact that Plaintiff believes she was more qualified than the other three candidates despite having no knowledge of their qualifications. The distinction Plaintiff has made is not material.

> **SOF 181** states: In order to create dashboards through Tableau, a creator license is required.

In response, Plaintiff notes a public version is available. That is true, and Defendant specifically stated that in SOF 183. Thus, this obviously does not change the analysis. Moreover, Plaintiff admits that she did not have a license and did not obtain the free version of Tableau until February 2021 (more than a year after the BIA position was filled). SOF 184 – Uncontroverted; Pltf's Response to SOF 280.

> **SOF 259** states: Mr. Sullivan really liked Plaintiff's answer to Question No. 1 because she had 28 years of corrections experience, a strong educational background, and had dabbled in computer science for two years.

In response, Plaintiff takes issue with the word "dabbled," noting she had majored in computer science for two years. For purposes of this Motion, Defendant assumes that means that Plaintiff did more than dabble in computer science, but that does not change the calculus of the Motion (so to speak).

> **SOF 340** states: Ms. Bloomberg understood from her interviews with Mr. Sullivan and Ms. Dougan, and from her review of the panel's notes of their interview with Plaintiff, that Plaintiff had end user experience with Tableau, but not creator experience with Tableau.

Plaintiff first states that Ms. Bloomberg formed this opinion about Tableau after reviewing the panel's notes of their interview with Plaintiff a week prior to Ms. Bloomberg's deposition. That statement is not supported by Plaintiff's cite (or anything else in the record). The testimony Plaintiff cites references Ms. Bloomberg's recollection of *Ms. Allen's* Tableau experience.

Plaintiff next states that Ms. Bloomberg could not recall for certain whether she reviewed the notes of Plaintiff's interview during her investigation. That accurately states Ms. Bloomberg's testimony. Thus, it is possible Ms. Bloomberg reached the (correct) conclusion that Plaintiff had end user, but not creator, experience with Tableau based on her interviews alone, rather than the interviews in conjunction with the notes.

This is completely immaterial for two reasons. First, the manner in which Ms. Bloomberg reached the conclusion has no relevancy. Second, Plaintiff *admits* she had no creator experience with Tableau when she was interviewing for the BIA position. SOFs 181, 183, 184 (All Uncontroverted); Pltf's Response to SOF 280.

The same issue arises in regards to **SOF 359**. There is a question about whether Ms. Bloomberg reviewed the interview notes at the time of the investigation. Regardless, it is undisputed that Ms. Bloomberg and Ms. Veronda determined that the department hired the most qualified candidate in each recruitment. Thus, the distinction is immaterial.

Plaintiff also takes issue with whether Mental Health clients are typically in the criminal justice system (**SOF 372**). As Plaintiff has dismissed her claims based on her applications to Mental Health, that fact is obviously immaterial.

**G.    Plaintiff's Additional Facts Are Either Unsupported or Immaterial.**

1. <u>Facts Defendant Agrees are Admissible and Supported.</u>

Defendant agrees that the following Facts are admissible and not controverted. Indeed, many of them are restatements of the Facts set forth by Defendant: PSOF 440-449, 451-455, 457-462, 465-468, 470, 471, 477-484, 487, 488, 489, 493-496, 498-508, 513-515, 517, 519-521, and 526. None of these Facts changes the analysis of Defendant's Motion, and the following are noteworthy.

**PSOF 457** states: Mr. Clark admitted that he "had a favorite before going into the interview process."

Defendant assumes Plaintiff intended to say that Mr. Sullivan had a favorite. That fact is not disputed and not unusual. Presumably, most hiring managers review credentials in advance of interviews and know which candidate or candidates appear best suited for the position. In this instance, Mr. Sullivan had personal knowledge about Mr. Clark's prior, extensive experience with nearly all of the job duties for the position.

**PSOF 458** states: Mr. Sullivan hand-selected Shelly Williams from an outside department (Riley County) to sit on the interview panel for the DFS position; Mr. Clark listed Ms. Williams as a reference.

Defendant is not sure what "hand-selected" means, but it is undisputed that Mr. Sullivan asked Ms. Williams to be on the panel and that Mr. Clark listed Ms. Williams as a reference. Indeed, those Facts are included in Defendant's Statement of Facts, so Defendant is not sure why Plaintiff is repeating them.

In any event, Mr. Sullivan asked Ms. Williams to be on the panel *before* Mr. Clark submitted his application (*see* Ex. T, email sent on February 12, 2019 and Ex. 42, application submitted on February 21, 2019). Thus, although Mr. Clark included Ms. Williams as a reference, Mr. Sullivan could not have known that at the time he asked Ms. Williams to be on the panel.

**PSOF 459** states: Mr. Sullivan denied knowing Mr. Clark listed her as a reference because he did not look at Mr. Clark's references.

This is not disputed, but Defendant notes that Mr. Sullivan *could not have* looked at Mr. Clark's references before he asked Ms. Williams to be on the panel because Mr. Clark had not yet submitted his application.

**PSOF 479** states: This [the BIA position] would have been a lateral move for Plaintiff.

Defendant does not dispute this but notes that when Defendant included that in its Statement of Facts (SOF 157), Plaintiff claimed it was controverted. Again, Plaintiff appears to be playing games.

    **PSOF 480** states: Mr. Sullivan was not the hiring manager for this position, yet he made the final hiring decision.

For purpose of this Motion, Defendant assumes the truth of this fact. At the very least, it is clear that Ms. Dougan relied heavily on Mr. Sullivan because he worked much more closely with the position. SOF 163. In any event, Plaintiff asserts here that Mr. Sullivan made the decision, but then in her brief argues he did not.

    **PSOF 483** quotes a portion of an email Mr. Sullivan sent that includes a list of traits he thought a great candidate for the BIA position would have. Defendant does not dispute that Mr. Sullivan sent the email. Indeed, the same email is included in Defendant's SOF 164, so Defendant is unsure why Plaintiff has repeated it. In any event, it is notable that Mr. Sullivan sent the email before either Plaintiff or Ms. Allen applied. SOFs 189 and 192 (Both Uncontroverted). The list includes "is innovative," and does not put a premium on domain expertise. Rather, it says, "Has people skills and is willing to shadow operations to gain domain expertise." Ex. U. The email also says nothing about Tableau. *Id.*

    **PSOF 500** states: Plaintiff believes that "they don't want me to present at a BOCC meeting [because] they don't know if I'm male or female."

Defendant has no reason to dispute that Plaintiff believes that, but Plaintiff's beliefs do not make it so. She cites to nothing for this proposition other than notes of an interview with herself.

    **PSOF 513** and **514** state that significant changes were occurring in the juvenile justice system based on recent legislative changes. Defendant agrees with these statements but notes that Plaintiff *controverted* some of the same statements in response to Defendant's Statement of Facts. *See e.g.* Pltf's Response to SOF 172.

2. <u>The Remaining "facts" asserted by Plaintiff are inadmissible or unsupported.</u>

The remaining Facts Plaintiff has included are either inadmissible or unsupported or both. Specifically:

In regards to **PSOF 450,** Defendant agrees that in Plaintiff's review for 2015-2016, Ms. Brown stated that Plaintiff encouraged her ISOs to be innovative. Similarly, Defendant agrees that Plaintiff's evaluation for the years 2013-2014 has a comment stating that Plaintiff "has taken the approach to say 'yes' as much as she can when staff present with innovative ways to get their jobs done." Ex. Z at 618. In other words, Ms. Brown recognized that Plaintiff encouraged and allowed her staff to be innovative. Otherwise, PSOF 450 is not supported.

> **PSOF 456** states: Sharon Brown told Plaintiff that hiring Mr. Clark for the Director of Field Services position was a "done deal before the interviews were conducted."

In support of this statement, Plaintiff cites to three lines from her own deposition. Initially, Plaintiff's deposition reads, in relevant part, as follows:

Q:    Did she provide you any more information other than you did excellent?

A.    The only other thing she said was, look, it was a done deal.

Q.    Did you ask her what that meant?

A.    No.

Q.    What did you understand it to mean?

A.    That Robert had already made up his mind that Keith was who he wanted for that position.

Q.    Well, I mean, he had made up his mind at that point, right? I mean, the decision had already been made?

A.    Yes. But previous to that, that he had made up his mind.

Q.    And why did you take it that way?

A.    Because Sharon, that was her statement to me, was it a done deal before the interviews were even conducted.

Q.    Oh, she specifically said that?

A.    Well, I don't remember specifically what she said, no. But she did say it was a done deal, that his mind had already been made up that it was going to be Keith.

Q.    What I'm trying to figure out is did she say that his mind was made up before the interviews? Or did she just say –

A.    I don't recall what she said.

Ex. 1, Pltf's depo. 189:9-190:10.

Defendant does not dispute that Ms. Brown made a comment to Plaintiff that she was upset she missed a retirement party when a decision had already been made, but Ms. Brown admits she did not know what decision Mr. Sullivan had made until after she sent her March 23, 2019 (more than a week after the interviews). SOF 144, 148.

> **PSOF 463** states: Ms. Brown and Samantha Veronda testified that the practice of bringing in [sic] outside the department to interview was not customary in the Department of Corrections or the Mental Health Department.

This statement is not supported by the record. As discussed above, Ms. Veronda specifically stated she *did not know* whether that was common in the Department of Corrections. Ex. N, Veronda depo. 95:24-96:6. She also said it *was* common in the County Manager's office. *Id.* Ms. Brown (who would not have been hiring at the executive level) simply testified it was not something *she* had done, but that she understood why that made sense when hiring for the Director of Field Services position. Ex. I, Brown depo. 48:10-49:19. Ms. Brown also testified she sometimes brought people from outside the Department of Corrections, but not from outside the County. *Id*. Notably, as the Director of Field Services, Ms. Brown would not have been hiring for any executive level positions.

In **PSOF 464**, Plaintiff states that Mr. Sullivan pre-selected "another male candidate" for a different BIA position years later. In support of this statement, Plaintiff cites to Olivia Allen's

deposition. Ms. Allen has no foundation for her statement. She simply stated her opinion. Moreover, Defendant does not know what Plaintiff means by "another male candidate." It is undisputed that Mr. Sullivan hired a *female* candidate over several male candidates for the position for which Plaintiff applied.

> **PSOF 469** states: Even though Ms. Kelley was ranked #2 in the initial round of interviews, and she had a much more impressive presentation, Mr. Sullivan wanted to hire Ms. Schneweis because he had worked with him prior.

In support of this statement, Plaintiff cites to Ms. Allen's deposition at 24:7-9. That testimony reads: "He said he agreed with Robert that on paper he was more – you know, it looked better; he was more qualified – but he stated that as well." Clearly, this does not support Plaintiff's assertion. Moreover, this hiring process (which occurred more than two years after Plaintiff applied for a BIA position) is not a subject of this lawsuit. As a result, the reasons for the hiring decision have not been a part of discovery and have no relevance to Plaintiff's claims.

The same is true for **PSOF 472** and **473** [13]. Ms. Allen's "beliefs" about Mr. Sullivan's state of mind are inadmissible. They lack foundation and have no relevance to Plaintiff's claims.

> **PSOF 474** states: Ms. Allen had expressed her concerns to Mr. Sullivan about how Mr. Schneweis was having affairs with women in the Mental Health department and that he was known to be a womanizer.

In support of this statement, Plaintiff cites to Ms. Allen's deposition at 15:10-20. Neither that testimony nor anything else in the record supports Plaintiff's assertion. On page 15 of her deposition, Ms. Allen states, "As for Chris, you know, the only other things – I just – I would hear that he'd – you know, he was having affairs with people involved in Johnson County Mental Health. He just – from what I understood, he was known as attempt to womanize at [sic] time to time as well." In other words, Ms. Allen testified about gossip she had heard about Mr. Schneweis

---

[13] **PSOF 530** is an exact replica of PSOF 473 and inadmissible for the same reasons.

(who has nothing to do with Plaintiff's claims). She says nothing about reporting this gossip to Mr. Sullivan.

> **PSOF 475** states: Ms. Allen informed Mr. Sullivan, Ms. Dougan, and Mr. Clark about Mr. Schneweis's behavior and that a former employee had levied a harassment complaint against him.

Initially, Defendant has no idea what any of this has to do with Plaintiff's claims. In any event, Plaintiff has completely misrepresented and contorted the record about this. The first part of Ms. Allen's deposition cited in support of this statement simply states that another employee had filed a harassment complaint against Mr. Schneweis.[14] The second cite indicates that Ms. Allen informed Mr. Sullivan, Ms. Dougan, and Mr. Clark about the issue *she* experienced with Mr. Schneweis. Plaintiff has misstated the record, yet again.

> **PSOF 476** states: Mr. Sullivan dismissed her concerns and told her that she "needed to be tougher" twice.

Given that PSOF 476 follows PSOF 475, Plaintiff apparently wants the Court to believe that Ms. Allen informed Mr. Sullivan that Mr. Schneweis had harassed other employees and that Mr. Sullivan dismissed her concerns. That is blatantly false and not supported by Plaintiff's cite or anything else in the record. Ms. Allen testified that Mr. Seidler had not supported her when she was in the BI Analyst role, that she was concerned Mr. Schneweis also would not support her, and that she was afraid she would not be supported by her supervisors if that happened. Again, none of this has anything to do with Plaintiff, but Plaintiff has misrepresented the record regardless.

> **PSOF 485** states: It was widely known that Mr. Sullivan enjoyed heavy influence over the hiring manager, Sharon [sic] Dougan.

Defendant assumes Plaintiff means Susan Dougan. In any event, it is not disputed that Mr. Sullivan had influence over the hiring decision for the BIA position since he worked more closely

---

[14] No harassment claim has been filed with the EEOC, state agency, or any court.

with that position than Ms. Dougan. The record does not support Plaintiff's assertion that it was "widely known" that Mr. Sullivan had "heavy influence" over Ms. Dougan, in general.

> **PSOF 486** states: Plaintiff was one of the two finalists for the BI Analyst position because Ms. Dougan decided whom to interview.

Plaintiff is patently playing games. It is undisputed that Plaintiff was one of the two finalists for the BI Analyst position, but neither Plaintiff's cite nor anything else in the record supports the assertion that this was "because Ms. Dougan decided whom to interview." In fact, Plaintiff goes to great lengths to portray Ms. Dougan as having no input at all.

Plaintiff's games continue with **PSOF 490-493**. As discussed above, at the time of the interviews, Plaintiff's only experience with Tableau was as an end user. Plaintiff admits she did not have a license. SOF 180 (Uncontroverted); Pltf's Resp. to SOF 280. She also admits she did not have access to the public version of Tableau until February 2021. SOF 184 (Uncontroverted). As discussed above, although being an end user of Tableau would have provided a modest benefit (similar to using a website), it does not help in creating dashboards in Tableau. SOF 182 (Not Controverted); Ex. 28, Seidler depo. 127:23-129:7. Thus, the panel members for the BI Analyst position were focused on whether the candidates had creator experience. The only candidate who had creator experience was Casey Johnson (a male), whom Mr. Sullivan did not believe was a good fit for the position. SOF 358 (Uncontroverted).

Plaintiff knows all of this, but she attempts to create confusion around the topic in order to take the Court's eye off the relevant, undisputed facts. Some of the quotes Plaintiff plucks out and includes in **PSOFs 490-493** are in the record but not in the way Plaintiff portrays.

**PSOF 492** (stating that Mr. Sullivan misrepresented Plaintiff's experience in his justification to HR) is completely unsupported.

> Similarly, **PSOF 491** states: Plaintiff had extensive experience using Tableau, and this was noted in Mr. Sullivan's interview notes for the DFS position.

The sum total of referenced notes state: "Utilizing Tableau has been very helpful." This supports neither the notion that Plaintiff had extensive experience with Tableau nor that this alleged extensive experience was contained in Mr. Sullivan's notes.

Plaintiff's decision to exaggerate and assert unsupported facts is telling.

> **PSOF 497** states: Ultimately, Mr. Sullivan hired Ms. Allen over Plaintiff allegedly because she exhibit enthusiasm and Plaintiff seems "tired."

It is undisputed that Ms. Allen exhibited enthusiasm for the position. It is also undisputed that (based on many factors described in Defendant's Statement of Facts), Plaintiff seemed tired. But Plaintiff's suggestion that these are the only two factors that went into the decision is not supported and disingenuous. Defendant described the reasons in its Statement of Facts and will not repeat all of them here.

In **PSOF 509**, Plaintiff once again repeats the unsupported assertion that juvenile experience was not discussed during the interview process. As discussed, at length, above, Ms. Allen specifically testified to her recollection of discussing her juvenile experience, and the interview notes also illustrate these discussions. The same is true for **PSOF 512**. Ms. Allen's experience with the juvenile justice system is discussed in SOFs 196-198, 202, and 206. Plaintiff's assertion is patently unsupported.

In **PSOFs 510** and **511**, Plaintiff repeats the unsupported assertion that the BI Analyst positions were interchangeable. As discussed in detail above, that misrepresents the testimony of both Mr. Clark and Mr. Seidler.

Plaintiff's assertion, in **PSOF 516**, that she "already knew" Tableau is another blatant misrepresentation. Plaintiff knew how to look at Tableau dashboards. She admits she had not *created* Tableau dashboards. Indeed, as discussed above, she did not have the ability to do that until more than a year after the interviews.

In **PSOF 518**, Plaintiff notes that Mr. Sullivan had a concern that Plaintiff was not innovative enough to successfully handle the juvenile portfolio. That is true, but there is no support for the notion that Mr. Sullivan based this solely on Plaintiff's answer to one question.

**PSOF 522** states: Ms. Allen felt like it "just became like pulling teeth to have ideas."

Defendant has no idea what Plaintiff means by this. Ms. Allen did use those words in her deposition, but they were describing her relationship with Brian Seidler. Ms. Allen's working relationship with Brian Seidler has nothing whatsoever to do with the hiring decisions at issue in this case. The same is true with **PSOFs 523** and **524**. Ms. Allen did not like Mr. Seidler, but that has nothing to do with Plaintiff's claims.

> **PSOF 525** states: Ms. Bloomberg and Mr. Seidler recognized that remarking that Plaintiff was "tired" could be seen as a comment on someone's age. Ex. L, Bloomberg Depo. 258:08-10; Ex. F, Seidler Depo. 81:07-14.

Ms. Bloomberg indicated she understood there may be a context where that was true, but that was not the context in which Mr. Sullivan used it. Mr. Seidler testified as follows:

Q.      Have you ever heard "tired" used as a synonym for "old"?

A.      I mean, I guess it could be. It's not one that I would use.

Q.      Did you – do you recall from Ms. King's interview whether she appeared tired?

A.      I – I don't recall. That's not a word I would use to describe her.

Ex. F, Seidler depo. 81:7-14.

> **PSOF 527** states: In a meeting with Ms. Allen, Mr. Sullivan made comments about the fact that the criminal justice coordinator, Allie Dickinson, was taking FMLA leave, and she was "no [sic] doing what she needed to be doing." Mr. Sullivan expressed that he was irritated that he was having to do things for Ms. Dickinson's role while she was out on leave.[15]

---

[15] Ms. Dickinson did not work in the Corrections Department. Ex. O, Allen depo. 43:12-16.

Initially, none of this is relevant, particularly because it is undisputed that Mr. Sullivan did not even know Plaintiff had intermittent FMLA. Beyond that, the assertions are completely unsupported. Ms. Allen testified that Mr. Sullivan expressed frustration because he was doing things that were in Ms. Dickinson's job description. She did not testify that he connected this to Ms. Dickinson's leave. She specifically testified that she does not know if he said anything about her leave. Rather, Ms. Allen knew independently that Ms. Dickinson was on leave. Ex. O, Allen depo. 147:12-148:9. ("Q. Did he seem upset by the fact that she was out on leave? A. He seemed irritated with her and the situation. It didn't seem, maybe, per se, that she was on leave – but the situation in general.")

> **PSOF 529** is an exact replica of PSOF 527 and unsupported for the same reasons.

> **PSOF 528** states: Ms. Allen did not believe it was necessary for someone coming into her position as a BI Analyst for the juvenile portfolio to have juvenile experience. Exhibit O, Olivia Allen Deposition at 97:18-98:3.

The testimony Plaintiff cites for this proposition says nothing of the sort. Ms. Allen was testifying about the person filling the position for the adult portfolio (two years later).

**LEGAL ARGUMENT**

**I.      The Remaining Claims.**

Since the time Defendant filed its Motion for Summary Judgment, Plaintiff has dismissed her claims related to the positions in Mental Health. She has also dismissed the claims she previously asserted under the Americans with Disabilities Act. That leaves the following: (1) claims of sex, sexual orientation, and gender presentation discrimination, and FMLA retaliation related to the Director of Field Services position; and (2) claims of age, sexual orientation, and gender presentation discrimination, and FMLA retaliation related to the BI Analyst position.

As discussed below, Plaintiff cannot establish the elements of any of these claims, nor can she establish pretext.

**II.      The Director of Field Services Position.**

      A.      Plaintiff Has Not Established a *prima facie* Case of Gender Discrimination.

The parties agree that, in order to establish her *prima facie* case, Plaintiff must point to something that gives rise to an inference of discrimination. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). In her effort to do this, Plaintiff argues that Robert Sullivan "pre-selected" Keith Clark for the position and then stacked the panel in his favor. Initially, Plaintiff completely misrepresents the record on this topic. It is undisputed that Sharon Brown did not know who Mr. Sullivan selected for the position for more than a week after the interviews. SOF 148 (Not Controverted). Ms. Brown apparently made a comment to Plaintiff to the effect that she wished she had not missed a retirement party when the decision was a "done deal," but the comment was admittedly not based on any knowledge that Mr. Sullivan had made a decision before the interviews. Ex. 25, Brown depo. 31:31-32:4 (stating she made a flippant comment about knowing who he was going to select "which was inappropriate because I have no way of knowing, you know, who he wanted for that job until after he selected that person"). Indeed, in an email she

sent eight days after the interviews, Ms. Brown asked Mr. Sullivan if he had decided who he would offer the position to. SOF 144 (Uncontroverted).

In addition, at the time Mr. Sullivan asked Ms. Williams to be on the panel, Mr. Clark had not even submitted his application. Ex. T (Feb. 12, 2019 email asking Ms. Williams to be on the panel); Ex. 40 (Mr. Clark's Feb. 21, 2019 application). Mr. Sullivan does not recall looking at Mr. Clark's references at all, but he certainly could not have looked at them at the time he asked Ms. Williams to serve on the panel.

There is absolutely no evidence that Mr. Sullivan made his decision before the interviews. There is, on the other hand, evidence that Mr. Sullivan believed Mr. Clark would be the most qualified candidate. At the time of this hiring process, Mr. Sullivan knew that Mr. Clark had held a Director of Community Corrections position for 13 years where he was directly responsible for the entirety of Corrections in four jurisdictions. Mr. Clark was directly responsible for Adult and Juvenile Intensive Supervision, as well as Community Case Management and Behavior Health Services. SOF 96 (Uncontroverted). He had developed and monitored budgets totaling more than $1 million. SOF 97 (Uncontroverted). He had executed multiple grant applications and wrote adult comprehensive plans and behavioral health plans. SOF 97 (Uncontroverted). He had also submitted quarterly reports for the Kansas Department of Corrections (KDOC). SOF 98 (Uncontroverted). Indeed, Mr. Clark's experience aligned directly to nearly every aspect of the job description. Ex. 46. Given Mr. Sullivan's knowledge of Mr. Clark's experience, it is not surprising Mr. Sullivan viewed him as the strongest candidate going into the interviews.

Plaintiff (and many of the other candidates) also had significant experience in corrections, but the breadth of Plaintiff's experience was undisputedly much more limited. She had worked for four years as a House Arrest Officer in the 1990s and then spent the next 20 years in Adult Intensive

Supervision. SOFs 38, 40 (Both Uncontroverted). Plaintiff had not developed or monitored budgets. She had not executed grant applications. She had not written comprehensive plans or behavioral health plans.

Moreover, Mr. Sullivan was not alone in his conclusion that Plaintiff was not the most qualified candidate. Indeed, only one panel member even had Plaintiff the top three candidates. SOF 118 (Not Controverted). Perhaps most telling, the person who had supervised Plaintiff for 12 years and had *held* the DFS position for 12 years testified that Keith Clark and Megan Milner were clearly the two best qualified candidates. SOFs 119-122 (All Uncontroverted).

Plaintiff has asserted her opinion that "the County" does not want a masculine presenting female in that position, but she simply has no evidence of that. The only evidence that *anyone* at the County even potentially had that kind of bias surrounds individuals who left the County decades before this hiring decision made and indisputably had nothing to do with this decision. Indeed, Plaintiff has affirmatively stated that she has never experienced anything like that with Mr. Sullivan. SOF 331 (Uncontroverted).

In short, the circumstances surrounding this decision do not even hint at sex discrimination (in any of its forms).

B.     Plaintiff Has Not Established a *Prima Facie* Case of FMLA Retaliation.

Again, the parties agree that, in order to establish a *prima facie* case of FMLA retaliation, Plaintiff must establish a causal connection between her FMLA leave and the decision not to hire her for the position. *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012). Plaintiff argues that the fact that she took FMLA leave on January 7, January 28, and February 11 satisfies the causation requirement.

Initially, it is undisputed that, at the time of the decision, Mr. Sullivan did not know Plaintiff ever took FMLA leave (SOF 434, Uncontroverted), let alone that she took it on a few days in early 2019. Second, Plaintiff goes to great pains to argue that Mr. Sullivan is the only one who had anything to do with the hiring process, yet for this purpose asks the Court to consider the fact that other panel members were aware she took FMLA leave. In any event, although it is true that Ms. Bloomberg and Ms. Dougan[16] were generally aware that Plaintiff had been approved to take FMLA leave, there is no evidence to suggest they were aware she took it in January or February, let alone any evidence connecting that leave to the decision to hire Mr. Clark.

The record is completely devoid of any evidence connecting this hiring decision to Plaintiff's intermittent FMLA leave. *See also Didier v. Abbott Laboratories*, 21 F.Supp. 3d 1152, 1175 (D. Kan. 2014) (finding no reasonable jury could conclude the plaintiff's FMLA leave was causally connected where most of the decision makers were unaware of it).

    C.    <u>Plaintiff Has Not Established Pretext.</u>

In an effort to establish pretext, Plaintiff misrepresents both the facts and the law. In the case cited by Plaintiff, *Sasser v. Salt Lake City Corp.*, 772 Fed. Appx. 651, 669 (10th Cir. 2019), the Tenth Circuit discussed a plaintiff's burden to prove pretext in the hiring context at length. The case includes a discussion about both of Plaintiff's arguments here – subjectivity and Plaintiff's claim that she was more qualified than Mr. Clark. Like the evidence in *Sasser*, the evidence in this case fails to establish a triable issue of fact on the question of pretext.

The plaintiff in *Sasser* applied for an Assistant Golf Pro position, having worked in the golf industry for many years and having the experience required for the position. Sasser was one of 28 people who applied for the position. The hiring manager assembled a four-person hiring

---

[16] Ms. Dougan does not recall being aware that Plaintiff had been approved for intermittent FMLA, but Defendant assumes she had this general awareness for purposes of this Motion.

panel and asked them to review the applications and rank their top ten candidates based on their skills and experiences as compared to the job description. The hiring manager indicated they would interview the top eight candidates based on the ranking. Only one of the panelists included Sasser in their top ten. As a result, he was not interviewed.

The district court granted the employer summary judgment, and the plaintiff appealed. Among the arguments the plaintiff asserted on appeal was that he established pretext because the panelists' rankings were subjective. In analyzing the issue, the Tenth Circuit acknowledged that subjective evaluation methods can evince pretext in some circumstances, but "'the existence of subjective criteria alone is not considered evidence of pretext.'" *Id*. at 669 (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007)). "Indeed, '*some* subjectivity is to be expected in every hiring decision' because employers must have discretion to choose between qualified candidates." *Id*. (quoting *Conroy v. Vilsack,* 707 F.3d 1163, 1177 (10th Cir. 2013)) (emphasis in original).

Thus, the Tenth Circuit held that pretext can typically be inferred "'only when the criteria on which the employers ultimately rely are *entirely* subjective in nature' and when the hiring process is especially opaque." *Id*. (quoting *Conroy*, 707 F.3d at 1178) (emphasis in original).

In *Sasser*, the panelists evaluated the candidates' qualifications against a job description which specified the minimum qualifications and the job duties. The job description was public, allowing the candidates to tailor their applications accordingly. And the court held that the fact that different panelists attached a different weight to the criteria did not indicate pretext.

The same is true here. The job description for the Director of Field Services was posted and known to all the candidates and panelists. The panelists undoubtedly used their own judgment to decide who the best qualified candidates were, but that "is to be expected in every hiring

decision." *Sasser*, 772 Fed. Appx at 669. Plaintiff's suggestion that the fact that the panel did not assign scores to each interview questions somehow suggests pretext falls flat for at least two reasons. First, scoring each interview question would also require subjective determinations. Second, when making hiring decisions, supervisors are "certainly justified" in factoring in what they know about the candidates whether or not that comes from the interview process. *Id* at 662.[17]

As with *Sasser*, the circumstances in this case are unlike those in *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002) where the supervisors were given *no* guidance and simply asked to rank employees. Here, the panelists knew the requirements and job duties for the position and used their judgment to identify the best qualified candidates. Using that criteria, only one panelist even had Plaintiff in the top three candidates. SOF 118 (Not Controverted). The panelist who knew Plaintiff the best and also had been performing the job for 12 years (Sharon Brown) found that two other candidates (Keith Clark and Megan Milner) were clearly the top two. SOF 119-122 (All Uncontroverted). Based on what he knew about the candidates, Mr. Sullivan did not even think it was a close call. SOF 130 (Uncontroverted). Mr. Clark's experience with nearly every aspect of the DFS position was unmatched by any of the other candidates.

Plaintiff also argues that her qualifications were better than Mr. Clark's. Initially, that is objectively unsupported. At the time of the interviews, Plaintiff had been a supervisor in Adult Intensive Supervision for 20 years. SOF 40 (Uncontroverted). She had extensive experience in that arena, but virtually no experience in any of the other areas the DFS oversees. The small amount of experience she had outside of Adult Intensive Supervision was more than 20 years earlier. As the *Sasser* court noted, "[t]he temporal proximity of job experience to an open position obviously

---

[17] There was no "scoring" in the *Sasser* case either.

bears on the relevance of that experience, especially where, as here, multiple applicants have similar experience." *Id*. at 671.

Moreover, the Tenth Circuit has held unequivocally that to demonstrate pretext on the theory that the plaintiff had superior qualifications to the prevailing candidate, "'a plaintiff must come forward with facts showing an overwhelming disparity in qualifications.'" *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005)). Plaintiff cannot establish that her qualifications were even equal to Mr. Clark's (or Ms. Milner's), let alone an overwhelming disparity in qualifications.

In a last ditch effort to save her claim, Plaintiff points to another employee's "beliefs" about Mr. Sullivan. Ms. Allen's beliefs are irrelevant, particularly when it is undisputed that Mr. Sullivan chose Ms. Allen (a female) over numerous males in connection with the other hiring process at issue. *See* Ex. 51. Beyond that, page 232 of Plaintiff's brief is full of misrepresentations. As discussed in the Fact section, Ms. Allen *did not* express her concerns to Mr. Sullivan "about how Mr. Schneweis was having affairs with women in the Mental Health department and that he was known to be a womanizer." *See* Pltf's Resp., p. 232. Ms. Allen testified that she had heard that, not that she had reported it to Mr. Sullivan. Similarly, Ms. Allen *did not* testify that she had informed Mr. Sullivan, Ms. Dougan, and Mr. Clark that "a former employee had levied a harassment complaint against [Mr. Schneweis]." *See* Defendant's Response to PSOF 474 and 475. Ms. Allen testified that Mr. Sullivan dismissed *her* concerns about Mr. Schneweis and Mr. Seidler – which has nothing to do with Plaintiff's claims in this case.

Plaintiff's misrepresentations continue in the next paragraph. Ms. Allen specifically testified that she *did not* remember if Mr. Sullivan connected Ms. Dickinson's leave to his frustration. Ex. O, Allen depo. 147:12-148:9. ("Q. Did he seem upset by the fact that she was out

on leave? A. He seemed irritated with her and the situation. It didn't seem, maybe, per se, that she was on leave – but the situation in general."); *see also* Defendant's Response to PSOF 527.

Plaintiff also misrepresents Mr. Clark's testimony regarding his 13 years of experience as a Director of Community Corrections. Mr. Clark *did not* testify that his Director position was "more similar" to the Project Manager position. *See* Pltf's Resp., p. 233. Mr. Clark testified that some of his Director duties were also duties he had as a Project Manager. Specifically, Mr. Clark testified that, in both roles, he wrote the adult comprehensive plan, wrote the behavioral health plan, worked on those budgets, submitted quarterly reports for the Kansas Department of Corrections, and worked with data and outcomes. Ex. 21, Clark depo. 30:5-20. (As an aside, Plaintiff had not done any of those things.)

Mr. Clark *did not* testify that this Director position was "more similar" to the Project Manager position. Rather, he testified that it was similar to the Director position Mr. Sullivan had but in a much smaller District. Ex. 43, Clark Decl. ¶ 4. In addition, in his cover letter for the DFS position, Mr. Clark outlined his Director duties as a whole (and not limited to those he also held as a Project Manager) as follows:

> In this [Director] role I served as the department head that was directly responsible for community-based supervision in a four-county area. These services included Adult Intensive Supervision, Juvenile Intensive Supervision, Community Case Management, behavioral health services and various programming to meet the needs of the populations being served.

Ex. 40, p. 1.

Plaintiff's representation that Mr. Clark testified that his Director role in the Fourth Judicial District was "more similar" to the Project Manager role is blatantly false.

In sum, in order to establish pretext, Plaintiff must demonstrate "that the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination."

*Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006). Plaintiff cannot even come close to meeting that burden. Indeed, the undisputed facts not only fail to suggest that the County's reasons for hiring Mr. Clark were weak, they establish that the decision was completely logical. And they certainly do not raise any question of discrimination or retaliation.

## III.    The BI Analyst Position.

### A.    Plaintiff Has Not Established a *Prima Facie* Case of Age Discrimination.

Plaintiff's misrepresentations of the record continue in this section of her brief. Specifically, Plaintiff states that she "was one of the two finalists for the BI Analyst position because [Ms. Dougan] selected her to interview." Pltf's Resp., p. 235. As discussed in response to PSOF 486, there is absolutely no support in the record for that statement. Mr. Sullivan clearly testified that, in his view, Plaintiff and Ms. Allen were the top two candidates. If they were filling the position for the adult portfolio, he would have seen Plaintiff as the top choice due to her extensive experience in Adult Supervision. SOF 302 (Uncontroverted). Since they were filling the position for the juvenile portfolio, Plaintiff's experience was less relevant, and Mr. Sullivan had a concern about Plaintiff's desire/ability to handle the dynamic juvenile portfolio as compared to Ms. Allen's enthusiasm about making changes. SOF 298-301 (All Not Controverted or Uncontroverted). None of this had anything to do with Ms. Dougan selecting Plaintiff for an interview. It is undisputed that, at the time Mr. Sullivan made suggestions about who to interview, Plaintiff had not yet applied. SOFs 188 and 189 (Both Uncontroverted).[18]

Plaintiff makes much of the fact that both Mr. Sullivan and Ms. Dougan were concerned that the examples Plaintiff gave in her interview were dated. The reality is her examples *were*

---

[18] It is also undisputed that Ms. Allen also had not yet applied, so Mr. Sullivan did not select her either. SOF 192 (Uncontroverted). Moreover, Ms. Dougan did not elect to interview all of the applicants Mr. Sullivan suggested. SOF 194 (Not Controverted).

dated. If Plaintiff had examples of innovative changes she had made or substantive impacts she had in the department in recent years, she should have identified them. Her decision to focus on events that occurred more than ten years earlier made it seem as though she had not engaged in innovative, impactful activity for a long time. This led to the impression that Plaintiff was tired.

Plaintiff's suggestion that Mr. Sullivan's desire for enthusiasm and excitement somehow evidence an age bias only illustrates her own age bias. People in their 50s are fully capable of being enthusiastic and excited. Ms. Allen expressed excitement about using her past experiences to make changes in the criminal justice system. SOF 312 (Uncontroverted). On the other hand, when asked to give an example of something risky, bold or creative she had done, Plaintiff responded by saying she does not like to take risks. SOF 269 (Not Controverted).[19]

It is true that Ms. Allen was young, but Plaintiff must come forward with something besides that fact, alone, to create an inference of unlawful discrimination. *See e.g. Lewis v. Twenty-First Century Bean Processing*, 2015 WL 4774052, at *4 (D. Kan. Aug. 13, 2015) (finding that the broadest formulation of the elements in an ADEA claim is a requirement to prove that the adverse decision occurred under circumstances giving rise to an inference of discrimination); *Griddine v. GP1 KS-SB, Inc.*, 2019 WL 1002049 (D. Kan. Feb. 28, 2019) (same). Here, the evidence establishes that, just two months earlier, Mr. Sullivan chose Keith Clark, who is exactly the same age as Plaintiff, for the DFS position. SOF 93 (Uncontroverted). Nothing in the record suggests that Plaintiff's age had anything to do with the decision to hire Ms. Allen for this position.

---

[19] Notably, in the reviews Plaintiff cites, Ms. Brown remarked that Plaintiff encouraged or allowed *others* to be innovative. They do not indicate that Ms. Brown saw Plaintiff, herself, as innovative. *See* PSOF 450 and Defendant's response thereto.

B.     Plaintiff Has Not Established a *Prima Facie* Case of Sex Discrimination.

In this section of her brief, Plaintiff continues her practice of setting forth unsupported and misleading "facts." There is no dispute that the panel was looking for a candidate with experience in data analytics, preferably with domain experience. Ex. 46. There is also no dispute that the interview questions contained a question about the candidates' experience with data visualization software like Tableau. SOF 274 (Uncontroverted). That question, however, specifically asked the candidates to differentiate between end user experience and creator experience. *Id.* Finally, it is undisputed that Plaintiff did not have any Tableau creator experience at the time of the interviews. SOF 180 (Uncontroverted), SOFs 181 and 183 (Uncontroverted when taken together), SOF 184 (Uncontroverted).

Plaintiff's Tableau "experience" was as an end user, which the panelists (including Brian Seidler, who held a BI Analyst position), viewed as only modestly beneficial. Ex. 28, Seidler depo. 127:23-129:7. Moreover, neither the job description nor anything in Mr. Sullivan's email outlining the traits he believed would make a great candidate for this position mentions Tableau. Finally, it is undisputed that the panel passed on a candidate who had significant experience with Tableau. SOF 317 (Not Controverted). For all of these reasons, Plaintiff's focus on Tableau is a red herring.

The only evidence of bias Plaintiff has set forth (aside from her own subjective belief) comes from supervisors who had left the County long before this decision was made and undisputedly had nothing to do with the hiring decision. These circumstances simply do not give rise to any inference that the decision was based on Plaintiff's sexual orientation or gender identity. *See E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007) (outlining the *prima facie* requirements). This is simply not sufficient to establish a *prima facie* case.

C.      Plaintiff Has Not Established a *Prima Facie* Case of FMLA Retaliation.

In this section of her brief, Plaintiff unabashedly contradicts the position she takes in every other part of her brief. She spends pages and pages of space in both the fact and argument sections of her brief arguing that Mr. Sullivan was the sole decisionmaker for this position. For example, in response to SOF 163, Plaintiff states that "Mr. Sullivan was actually the person making the decision for this position." Pltf's Resp., p. 82. Similarly, in PSOF 480, Plaintiff states, "Mr. Sullivan was not the hiring manager for this position, yet he made the final hiring decision." *Id*. at 216.

Plaintiff realizes, however, that taking that position eliminates any chance she has at prevailing on her FMLA retaliation claim because it is undisputed that Mr. Sullivan did not know Plaintiff was taking FMLA at all. SOF 434 (Uncontroverted). As a result, in *this* section of her brief, Plaintiff contradicts herself and states, "Mr. Sullivan and Ms. Dougan worked closely together on filling the BI Analyst position." *Id*. at 240. This tactic epitomizes Plaintiff's entire approach to the case. She is not interested in conveying the truth. She is interested in asserting whatever she believes will make her claim.

Plaintiff has asserted that Ms. Dougan was aware Plaintiff was approved for intermittent FMLA because she approved Plaintiff's days off when Ms. Brown was absent. Although Ms. Dougan does not recall that, Defendant assumes that is true for purposes of this Motion. Nonetheless, there is no indication Ms. Dougan was even aware Plaintiff took FMLA in 2019, and Plaintiff asserts Ms. Dougan did not make this decision in any event. Finally, even assuming (contrary to Plaintiff's assertions) that Ms. Dougan's input influenced Mr. Sullivan's decision, the record is completely devoid of any indication that Plaintiff's sporadic intermittent FMLA leave had anything at all to do with Ms. Dougan's recommendations.

67

Because Plaintiff has not pointed to a shred of evidence linking her intermittent FMLA to this hiring decision, she has not established a *prima facie* case of FMLA retaliation.

     D.     <u>Plaintiff Has Not Established Pretext.</u>

Even assuming Plaintiff could establish a *prima facie* case for any of her three claims, she has not established that Defendant's legitimate, non-discriminatory, non-retaliatory reasons for choosing Ms. Allen were somehow a pretext for discrimination or retaliation.

In this regard, Plaintiff again focuses on the subjectivity involved in making the decision.[20] Again, the requirements for and duties of this position were outlined by a published job description. SOF 160-162 (Uncontroverted). In addition, Mr. Sullivan sent an email outlining the traits he thought would make a great candidate. SOF 164 (Uncontroverted). The panelists undoubtedly used subjective judgment in determining which candidate was the best one for this position, but the Tenth Circuit has repeatedly acknowledged that "*some* subjectivity is to be expected in every hiring decision." *Conroy,* 707 F.3d at 1177 (emphasis in original); *Sasser,* 772 Fed. Appx. at 669.

In order to establish pretext based on this argument, Plaintiff would have to show that the criteria on the County relied was "*entirely* subjective in nature" *and* that the hiring process was especially opaque. *Sasser*, 772 Fed. Appx. at 669 (quoting *Conroy*, 707 F.3d at 1178) (emphasis in original). Neither is true here. As in *Sasser*, the hiring panel here had specific, listed criteria by which they were to make their decisions/recommendations. This circumstances in this case are unlike those in *Garrett*, *supra*, where the supervisor instructed his team to rank employees and gave them no indication about how to do so. Although Plaintiff does not like the additional criteria Mr. Sullivan added, she cannot argue that he did not add them, nor does she dispute the fact that the job description was posted and available.

---

[20] Plaintiff discusses this in the section on the *prima facie* elements, but the cases analyze this concept in connection with pretext.

Similarly, and as with the DFS position discussed above, in order to establish pretext based on an argument that she was more qualified than Ms. Allen, Plaintiff would have to show "'an overwhelming disparity in qualifications.'" *Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (quoting *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005)); *see also Sasser*, 772 Fed. Appx. at 673. The record simply does not support that conclusion.

As discussed more thoroughly in Defendant's original brief (in both the fact and argument sections), before coming to Johnson County, Ms. Allen had worked with a UMKC professor on two grants, where she cleaned all of the data, wrote the literature review and conclusion for one of the grants, and presented the portions of the grant she wrote. SOF 200 (Uncontroverted), 201 (Not Controverted). She had completed a social network analysis, mapping human relationships and interactions to analyze relationships with gang members. SOF 202 (Uncontroverted). She had spent approximately two years scrubbing data on huge Excel spreadsheets on the juvenile side of family court in Jackson County, Missouri. SOF 204 (Uncontroverted).

As a pretrial officer at Johnson County, while carrying a caseload of approximately 100 offenders, Ms. Allen also worked with Dr. Alex Holsinger on a project analyzing how community assessments affected adults in the system. SOF 210, 213, 214 (All Uncontroverted). She also worked with Johnson County's Director of Justice Information Management System (JIMS) to analyze pretrial data and later began working on validating the pretrial assessment and creating a report for that. SOF 215-218 (All Uncontroverted).

Relatedly, Mr. Sullivan had received positive feedback from both Mr. Mulcahy about Ms. Allen's work in the data analytics space, and Ms. Allen came highly recommended by Dr. Holsinger, who is a respected data scientist and known nationally in criminal justice circles. SOF 211 (Uncontroverted), 230, and 311 (Not Controverted). In addition, Ms. Allen attended meetings

where Mr. Sullivan presented pretrial data because her supervisor asked her to support him with that based on her statistical background. SOF 228 (Uncontroverted). And she did all of this on her own; it was not part of her job as a pretrial officer. SOF 219 (Uncontroverted).

Plaintiff had also worked with data in her SCM position and volunteered to help with reports analyzing revocation data. SOF 46-48, 234 (All Uncontroverted). In addition, Plaintiff had become familiar with Google Data Studios, a data visualization software package. SOF 185 (Uncontroverted). Plaintiff also had experience cleaning data and had shown an interest in data during her time as a SCM. SOF 186 (Uncontroverted).

Plaintiff also interviewed well for the position. SOF 291 (Uncontroverted). Indeed, Mr. Sullivan testified that if they had been hiring for the Adult portfolio, he would have selected Plaintiff. SOF 302 (Uncontroverted). Unfortunately, in her interview, Plaintiff gave little indication she was interested in taking innovative or bold approaches, which Mr. Sullivan saw as problematic given the dynamic nature of the Juvenile portfolio. SOF 269-270 (Not Controverted).

By contrast, in her interview, Ms. Allen was enthusiastic and excited about the position and her ability to contribute to making the criminal justice system better. SOF 316 (Uncontroverted). Ms. Dougan was in awe of Ms. Allen's presentation skills and confidence. SOF 283 (Not Controverted).

In an effort to escape the clear conclusion that she cannot establish pretext, Plaintiff carries the misrepresentations she made in the fact section into her legal argument. Specifically, Plaintiff states that juvenile experience "was not discuss[ed] in the interviews." Pltf's Resp., p. 242. That statement is simply not supported. Ms. Allen testified as follows:

> Q.  Did your experience on the juvenile side ever come up during your interview for the position?
>
> A.  I believe so, because I know I talked a lot about my, you know, research experience with UMKC, my thesis was specifically on teens. You know, I also

– I know I spoke about I did an evaluation on the Center for Conflict Resolution, which was, specifically, a youth-in-schools program. So I observed, you know, youth in schools and how they were using conflict for center resolution. So it was – I just had done numerous projects, and I can't remember exactly how I brought everything up. But I believe that was the interview where I was able to share what I had done in school.

Ex. O, Allen depo. 63:24-65:15.

Moreover, the interview notes of all three panelists illustrate that this topic came up more than once. Ex. 55. They also illustrate that she discussed the "Teens in Transition" project, which is the project she did with Dr. Fox. Ex. O, Allen depo. 71:10-23. Finally, both Ms. Allen and Mr. Sullivan testified about their discussion around Ms. Allen's social network analysis related to youth connections to gangs. Ex. G, Sullivan depo. 172:21-25; Ex. O, Allen depo. 139:24-140:10. Indeed, Mr. Seidler's notes state that Ms. Allen discussed her social network analysis project "in depth." Ex. 55 at JoCo 1302.[21]

Plaintiff then states that "[t]he duties for the BI Analysts were the same for each portfolio, except that the source data and the developing visualizations around that data would have looked a little different depending on the portfolio." Pltf's Resp., pp. 242-243. Again, that statement contorts the record.

Mr. Clark testified as follows:

Q.    Did you all have the same duties as project managers, or were they different?

A.    **They – they were different**. He was – he had the juvenile portfolio, and I had the adult portfolio. But then we would work together our – or within each other's portfolios as needed.

Q.    And can you explain what the difference is between the two portfolios – if there is a difference besides just the fact that one deals with juvenile data and one deals with adult data?

---

[21] Plaintiff also states that the only juvenile experience Ms. Allen had was a 10-hour-a-week summer intern position. Pltf's Resp., p. 243. As discussed at length in the fact section, that is not accurate.

A.   Yeah. That – that's true. They – but there's – I mean, there's just a there's a juvenile side to our operations and a [sic] adult. And so your primary is serving those divisions to meet their needs. And so the – some of the duties are similar. You have a – you have a – comp plan and budgets and those kinds of things, but then you have things that are different between the two sides that – you know you have needs related to juvenile detention, but you don't have that kind of thing on the (inaudible). There's just some differences.

Q.   But as far as – as – besides the differences in the – the data sets and what might be needed by the departments, were there any substantial differences in actual work duties – like, job duties?

A.   The – the two positions are similar.

Q.   Okay. Do you feel like you could have just jumped over to the juvenile side if you had needed to?

A.   In some areas, I could have jumped over to the juvenile side. In other areas, there would have been a learning curve.

Ex. M, Clark depo. 48:11-49:20 (emphasis added). Mr. Seidler testified as follows:

Q.   Is there a stark difference in what's going on in your job duties based upon whether you're working a juvenile portfolio or a [sic] adult portfolio?

A.   I would just say that the – it's more the difference in your knowledge and experience in the – the portfolio more so than the actual duties. You know, if you're – if you're calculating averages or percentages and something that – those duties are the same, whether it's adult data or juvenile data, **but the ability to interpret or, you know, understand what, you know, the impact of that is – is the difference**.

Q.   Did you feel like you were more qualified to be interpreting juvenile data?

A.   More qualified?

Q.   Well, than adult data?

A.   Oh, okay. Yeah, probably. My – most of my experience was in  -- in juvenile at the time, and I was – I guess I just – I was more familiar with that, and so I don't know if "more qualified" is the right – is the way I would say it, but my familiarity with that section of corrections was – I certainly had more experience in juvenile.

Ex. F, Seidler depo. 35:1-36:1 (emphasis added).

Plaintiff points out that Mr. Sullivan was not impressed with Ms. Allen's answer to the question about innovation either. That is true, but unlike Plaintiff, Ms. Allen did not indicate she was opposed to taking risks. Moreover, the rest of Ms. Allen's interview illustrated she was excited to use her past experiences to make changes in the juvenile justice system. *See e.g.* SOF 312 (Uncontroverted).

Plaintiff also argues that the only data analysis experience Ms. Allen had was during her master's program and cleaning data at the family court. Pltf's Resp., p. 242. As discussed above, that is simply not an accurate description of the record.

Plaintiff then represents that Ms. Allen struggled in the BIA position due to her learning curve. First, that is not relevant to the analysis. But more importantly, Plaintiff again misrepresents the record about this. She states that Ms. Allen had to learn how to use Tableau "which Plaintiff already knew." Plft's Resp., pp. 243-244. She also states that Ms. Allen had a learning curve was "a curve Plaintiff would not have had." *Id*. at 244. Again, this is not supported by the record. Plaintiff knew how to *look at* Tableau dashboards. She had no experience *creating* Tableau dashboards. Plaintiff's statements about this are misleading and disingenuous.[22]

Plaintiff next states that, "during the deliberation process after the interviews, Mr. Sullivan brought up that Plaintiff had been in her position for a 'long time,' a direct comment related to Plaintiff's age in consideration for this position. (SOF 307)." Pltf's Resp., p. 245. In actuality, the Fact says that Mr. Sullivan said, "Plaintiff had been in a position for a long time where she could have been innovative and made changes, and she had largely not done that." SOF 307. Plaintiff's length of service with the department was an *advantage* for her. Unfortunately, Plaintiff did not

---

[22] Plaintiff's statements that Ms. Allen's job was lonely, and it became "like pulling teeth to have ideas" are baffling. Ms. Allen's complaints were about working with Mr. Seidler. That has nothing to do with the hiring process for the position.

provide the panel with information (either in the interview process or in her day-to-day work) illustrating she had been innovative or made changes. In short, Plaintiff set forth only a portion of the Fact, took it out of context, and argued it had something to do with Plaintiff's age. The actual record demonstrates otherwise.

Plaintiff "believes" the County does not want a masculine-presenting female presenting to the BOCC or other boards, but it is axiomatic that "mere conjecture that the [ ] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Sasser,* 772 Fed. Appx. at 658 (quoting *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988)). Indeed, Plaintiff *admits* no one at the County had malicious intent. SOF 330 (Uncontroverted). Indeed, it is uncontroverted that Mr. Sullivan would have had Plaintiff as his top choice if they had been filing the Adult portfolio. SOF 302 (Uncontroverted).

## IV.    Conclusion

The Tenth Circuit has repeatedly advised against courts acting as a "super personnel department that second guesses employers' business judgments." *See e.g. Conroy*, 707 F.3d at 1178. This is particularly true in failure-to-hire cases, where employers are in a unique position to understand the needs of the position and the importance of particular objective and subjective considerations. *See Salemi v. Colo. Pub. Employees' Retirement Assoc.*, 747 Fed. Appx. 675, 690 (10th Cir. 2018) ("We have long respected employers' wide latitude in setting job standards and requirements and in deciding whether applicants meet those standards."); *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[O]ur role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."); *Tran v. Sonic Industries Services, Inc.*, 490 Fed. Appx. 115, 119 (10th Cir. 2012) (employer made good faith business decision in hiring even where it

relied on some subjective considerations); *Sasser*, 772 Fed. Appx. at 669 ("employers must have the discretion to choose between qualified candidates").

As discussed above and in Defendant's original brief, the undisputed facts illustrated that Plaintiff and others were qualified for both of the positions at issue. The County evaluated the qualifications and determined that Plaintiff was not the *most* qualified for either position. Plaintiff may genuinely disagree, but even giving Plaintiff every benefit of the doubt – based on information actually in the record – she cannot claim that the decisions were discriminatory or retaliatory. Accordingly, Defendant respectfully requests that the Court grant its Motion for Summary judgment and dismiss Plaintiff's remaining claims with prejudice.

Respectfully submitted,

/s/ *Jeannie M. DeVeney*

Jeannie M. DeVeney, #17445
Direct: 816.627.4405
E-Fax: 816.817.1453
jdeveney@littler.com
Bonnie G. Birdsell, #78895
Direct: 816.627.4412
E-Fax: 816.817.1957
bbirdsell@littler.com
LITTLER MENDELSON, P.C.
1201 Walnut Street, Suite 1450
Kansas City, MO 64106

**ATTORNEYS FOR DEFENDANT**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of April, 2022, a true and correct copy of the foregoing was electronically submitted via the Court's e-filing system, which generated notice of same to the following counsel of record:

Rik N. Siro
Erik W. Smith
Athena M. Dickson
Raymond A. Dake
Ryan P. McEnaney
SIRO SMITH DICKSON PC
1621 Baltimore Avenue
Kansas City, MO 64108
rsiro@sirosmithdickson.com
esmith@sirosmithdickson.com
adickson@sirosmithdickson.com
rdake@sirosmithdickson.com
rmcenaney@sirosmithdickson.com

**ATTORNEYS FOR PLAINTIFF**

*/s/ Jeannie M. DeVeney*
**ATTORNEY FOR DEFENDANT**