**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|  |  |  |
|---|---|---|
| SHANNON KING, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 21-2049-KHV |
| | ) | |
| BOARD OF COUNTY COMMISSIONERS | ) | |
| OF JOHNSON COUNTY, KANSAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Shannon King filed suit against the Board of County Commissioners of Johnson County
Kansas, alleging that it denied her various promotions (1) because of her gender in violation of
Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., (2) because of
her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 et
seq. and (3) in retaliation for asserting rights under the Family and Medical Leave Act ("FMLA"),
29 U.S.C. § 2601 et seq. This matter is before the Court on Defendant's Motion For Summary
Judgment (Doc. #63) filed February 11, 2022. For reasons stated below, the Court overrules
defendant's motion for summary judgment.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits, if any, show no genuine issue as to any material
fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c);
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735,
740 (10th Cir. 2007). A factual dispute is "material" only if it "might affect the outcome of the
suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute

requires more than a mere scintilla of evidence in support of a party's position.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).  Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).  To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence.  Nahno-Lopez, 625 F.3d at 1283.

In applying these standards, the Court views the factual record in the light most favorable to the party opposing the motion for summary judgment.  Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1306 (10th Cir. 2018).  The Court may grant summary judgment if the nonmoving party's evidence is merely colorable or not significantly probative.  Liberty Lobby, 477 U.S. at 250–51. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

## Factual Background

Initially, the Court addresses the sufficiency of the parties' presentation of facts and compliance with D. Kan. Rule 56.1:

First, both parties have submitted unnecessarily lengthy memoranda—a total of more than 400 pages of facts and argument—in this relatively routine employment discrimination matter. Under D. Kan. Rule 7.1(e), absent a court order, the arguments and authorities section of briefs or

memoranda must not exceed 30 pages.  D. Kan. Rule 7.1(e).  By its terms, the rule applies only to the argument and authorities section of briefs and memoranda and therefore not to statements of fact.  Even so, counsel should give pause before submitting a statement of facts that grossly exceeds 30 pages.  <u>See</u> D. Kan. Rule 56.1(a) (factual section in supporting memorandum must include "concise" statement of material facts); (b)(2) (additional facts in opposition memorandum also shall comply with subsection (a)).  Also, counsel might query whether an employment case of this nature is really so one-sided as to warrant summary judgment if it requires 400 pages of fact and argument.

Second, in response to defendant's statement of facts, plaintiff's memorandum includes many facts that are also included in her own statement of additional facts.  Moreover, plaintiff repeats lengthy renditions of facts, apparently concerned that the Court may miss a fact if it is stated only once.  <u>See, e.g.</u>, <u>Plaintiff's Suggestions In Opposition To Defendant's Motion For Summary Judgment</u> (Doc. #79) filed April 1, 2022, response to defendant's fact ¶ 122 (response includes four sentences and corresponding citations which are repeated nearly verbatim some 20 times throughout fact section).  Unless a factual statement directly controverts defendant's statement of fact or a portion of it, plaintiff should include the factual assertion only once in the statement of additional facts.

Third, plaintiff has set forth 91 additional statements of fact even though many of those same facts, or at least defendant's version, are included in defendant's statement of facts.  A non-moving party's additional facts should address only "facts not contained in movant's memorandum."  D. Kan. Rule 56.1(b)(2).

Finally, plaintiff attempts to controvert many of defendant's facts by stating that the fact is uncontroverted but "irrelevant and controverted to the extent that Defendant attempts to imply . . ."

See, e.g., Plaintiff's Suggestions In Opposition (Doc. #79), responses to defendant's facts ¶¶ 2, 4, 51, 122–25, 127–28, 133, 135, 298.  Such responses are insufficient to controvert the alleged facts and do not comply with Rule 56(c), Fed. R. Civ. P., or D. Kan. Rule 56.1(b) and (e).  See Mondaine v. Am. Drug Stores, Inc., 408 F. Supp.2d 1169, 1176 (D. Kan. 2006).

The Court has no desire to make "technical minefields" of summary judgment proceedings, but neither can it permit laxness in the proper and timely presentation of proof.  Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993).  Despite the deficiencies in how the parties presented the facts in their memoranda, the following is a brief summary of the material facts that are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to plaintiff, the non-movant.

## I.     Johnson County Department of Corrections And Its Hiring Practices

From April of 2007 until September 29, 2017, Betsy Gillespie was Director of Corrections for the Johnson County Department of Corrections ("JDOC").  In October of 2017, Robert Sullivan, who is 49 years old, became interim Director of Corrections.  In 2018, Sullivan formally became Director of Corrections.[1]  Since that time, Susan Dougan, who is 59 years old, has been the Assistant Director of Corrections.

County policy states that the County "prefers to promote from within and may first consider current employees with the necessary qualifications and skills to fill vacancies, unless outside recruitment is considered to be in the County's best interest."  Each department within the County handles the recruitment process differently.

---

[1]     JDOC has four division directors, all of whom report to the Director of Corrections. Those include the Administrative Division, the Director of Juvenile Services, the Director of Field Services and the Director of the Adult Residential Center.  In addition, the Director of Corrections and Assistant Director of Corrections oversee financial functions, administrative functions and project management functions.

Since February of 2017, Shala Bloomberg, a Human Resource Partner for the County, has provided support to the JDOC, including posting open positions and screening applicants for minimum qualifications.  After Bloomberg screens applicants, the hiring manager for that position decides, sometimes after direction or input from superiors, who to interview.

To fill positions, JDOC generally conducts panel interviews to fill positions and the hiring manager determines who will be on the interview panel.  Historically, each panel member has used a rubric scoring process to evaluate each candidate on answers to interview questions. Occasionally, the candidate with the highest score has not been the individual whom the hiring manager wanted to hire.  For this reason, the County recommended against using scoring matrices and after Sullivan became Director, he stopped using them in the interview process.

## II.    Plaintiff And Her Employment With JDOC

In 1991, plaintiff graduated with a bachelor's degree in criminal justice from the University of Central Florida where she also studied computer science, statistics and advanced math.  In 1994, plaintiff received a master's degree in administration from the University of Missouri at Kansas City ("UMKC").  In that program, she took several statistical classes in quantitative and qualitative data analysis.

Since 1992, plaintiff has held various positions with JDOC including House Arrest Officer for four years, Adult Intensive Supervision Officer ("ISO") (a probation officer) for several years and then Senior Case Manager ("SCM") for 20 years.  As SCM, plaintiff oversaw ISOs on the adult side of the criminal justice system.  As SCM, plaintiff typically supervised a team of eight or nine ISOs, a secretary, two probation intake officers, a resource developer and pretrial staff.

Plaintiff is 52 years old and is a masculine-presenting, homosexual female.  Plaintiff dressed similarly to men in her positions: khaki pants, collared long-sleeve button-down shirts and

casual shoes.

In 2007, Sharon Brown became Director of Field Services ("DFS") and plaintiff reported to her until Brown retired in March of 2019.  Brown testified that plaintiff understood JDOC's mission and vision, is very smart, took a lot of pride in her work, was able to interact with clients and staff, showed maturity and did a very good job as an SCM.  During her tenure, Brown gave plaintiff positive performance reviews, which rated her very highly and included many favorable comments.  In at least two performance appraisals, Brown specifically recognized plaintiff's innovation.[2]  She also noted that plaintiff "recommends solutions to problem situations and provides proactive solutions."

During much of her tenure as an SCM in adult supervision, plaintiff handled side projects related to data.  For example, plaintiff took over the duties for a report that Brian Seidler, a Business Intelligence Analyst ("BIA"), had previously handled.  The report required plaintiff to engage in detailed data collection each month to ascertain patterns why clients had their probations revoked.  In sum, plaintiff had over five years of experience in data analysis, including collection, cleaning data sets and developing reports and dashboards to communicate findings.

Since 2018, plaintiff has taken intermittent FMLA leave and continues to take such leave. On January 7, January 28, February 11 and March 25, 2019, plaintiff used FMLA leave.

On one occasion, Brown told plaintiff that a co-worker of plaintiff did not like the way that she dressed.  Brown later apologized to plaintiff, stating that she "shouldn't have done that." Plaintiff believed that at the time, Brown was insinuating that she should dress more femininely.

---

[2]     On the appraisal for 2015–16, Brown noted that plaintiff "encourages innovation with regard to client supervision."  On the appraisal for 2013–14, Brown noted that plaintiff was open to staff who present "innovative" ways to get the job done and has "challenged her supervisory peers to be more open to this same concept."

Plaintiff believes that Sullivan has a bias against masculine-presenting females because (1) he has not promoted masculine-presenting females and (2) he referred to various male candidates for positions as sharp or polished.  Plaintiff does not know of other masculine-presenting females who have applied for positions where Sullivan was on the hiring panel. Plaintiff believes that Dougan has a bias against masculine-presenting females because Dougan and Gillespie, who retired in 2017, gave a PowerPoint presentation on the dress code, and all of the women's clothing which it showed was feminine-presenting.

### III.    Selection Of New Director Of Field Services

In March of 2019, after Brown announced her retirement as DFS, some 44 people—including plaintiff—applied for the position.  The DFS oversees Adult and Juvenile Intensive Supervision (supervised probation), Adult and Juvenile House Arrest, Juvenile Case Management, Juvenile Programming, Probation Intake and Bond Assessment.[3]  Bloomberg was the recruiter for the position and screened applicants for basic qualifications.  Sullivan, who was the hiring manager, decided to interview eight candidates, including plaintiff.  Twelve other candidates met minimum qualifications for the position but did not receive interviews.  The DFS interview panel

---

[3]        The job description stated as follows:

The Director of Field Services maintains strong familiarity with department policies, as well as Kansas Department of Corrections (KDOC) adult and juvenile offender contact standards. The Director maintains a working knowledge of current trends and actions with both Adult and Juvenile Field Services.  This Director maintains continued awareness of the status of the Department's budget and adjusts operations accordingly.  This Director authorizes purchases according to budget status and need, and oversees compliance with state and local statutes.  This Director participates in the development of the agency's comprehensive plan, serves as the Administrative Contact to the KDOC Juvenile Services, and ensures the district complies with KDOC juvenile policies and regulations.  This Director must also develop positive working relationships with the KDOC, the Adult and Juvenile Community Corrections Advisory Boards, and serves on the Statewide Community Advisory Committee.

included Sullivan, Brown, Dougan, Bloomberg, Ted Jester (Director of Juvenile Services) and Shelly Williams (Director of Community Corrections for Riley County, Kansas).[4]

In plaintiff's application for the DFS position, she listed Brown (who was on the interview panel) as a reference. Plaintiff had one year of work experience with juveniles, which occurred from 1992 to 1993. Plaintiff had limited experience with budgets. She understood and read budgets, but had never created them. Plaintiff's experience with writing grants was limited. Even so, the DFS job description did not require experience with creating budgets or grant writing.

Keith Clark, who is 53 years old, also applied for the DFS position. Clark listed Williams (who was on the interview panel) as one of his references. Since 1994, he had worked in corrections. From 2003 until 2016, Clark was Director of Community Corrections for the Fourth Judicial District, a much smaller District than Johnson County.[5] Clark supervised ten to 12 employees in that role. He also wrote the adult comprehensive plan (annual report) and behavioral health plan, and submitted quarterly reports to the Kansas Department of Corrections ("KDOC") related to outcomes in the comprehensive plan.

On March 15, 2019, after interviewing the eight candidates, the hiring panel met. Initially, Sullivan had each hiring panel member rank the top three candidates. If no member ranked a

---

[4]     Sullivan testified that he asked Williams to be on the panel because as a brand new director, he did not feel confident. Sullivan testified that it was not uncommon for a director to ask a director outside the county to help interview candidates. Brown testified that she personally did not ask others from outside JDOC to sit on hiring panels, but that she understood why Sullivan did so for this position because some applicants had state experience outside of Johnson County.

[5]     In his cover letter, Clark stated that as Director of Community Corrections, he was directly responsible for community-based supervision in a four-county area. This included Adult Intensive Supervision, Juvenile Intensive Supervision, Community Case Management, Behavior Health Services and various programming. Clark also represented that he developed and monitored six budgets totaling $1.1 million and he wrote and executed multiple grant applications that supported the continuation of evidence-based practices in community supervision.

candidate as a top choice, the panel did not further consider that individual.

No panel member ranked plaintiff as the top choice so the panel did not further consider her for the DFS position.[6]  Sullivan's top pick was Clark and in his opinion, none of the other candidates came close.[7]  Bloomberg remembers Clark standing out as a top candidate because he had great experience and good interview answers.  Sullivan and Bloomberg recall that Clark, Megan Mestad and Megan Milner were the top three candidates.  Dougan recalls that Clark and Mestad were the top two candidates.  Brown, who had held the DFS position for 12 years and was plaintiff's former supervisor, believed that Clark and Milner had the most relevant experience and were clearly the top two candidates.  Defendant eventually hired Clark.[8]

Sullivan testified that before going into the interview process, he did not have his mind made up but he unequivocally thought that Clark was the top candidate.  Later, during an internal investigation of plaintiff's complaint, Sullivan told Bloomberg that hiring Clark was an easy decision and that he did not have an internal candidate better than him.  Sullivan admitted that the "optics look[ed] very bad," however, because he had selected Williams as a panelist and she also was one of Clark's references.

Later, plaintiff asked Brown how she had interviewed.  Brown told her that she did

---

[6]     Sullivan, Dougan, Bloomberg and Brown do not recall that any panel member other than Williams ranked plaintiff in the top three.  Neither party presented evidence how Jester ranked the candidates.

[7]     Sullivan knew that Clark had been a director in multiple jurisdictions, had years of experience as a community corrections director, was well aware of Kansas law and KDOC policies, had years of experience writing strategic comprehensive plans for KDOC, fully understood the allocation method under KDOC policy, was used to working with diverse funding and understood financial guidelines.

[8]     Brown wanted to hire Milner (who was an external candidate) and was disappointed that she did not get the position.  Even so, because he had the most experience and was an internal candidate, Brown understood why defendant hired Clark for the position.

excellent.  Brown also said that she was upset that she missed a retirement party to participate in the interviews because it was already a done deal.  Sullivan had made up his mind before the interviews and the decision to hire Clark was a "done deal."

Plaintiff believes the County did not hire her for the DFS position because of the way that she dressed.  Gillespie, Bev Marshbank, Doug Gertsema and Bill Keith conveyed the message to plaintiff multiple times that the County did not want a masculine-presenting female in a "front facing, public facing position."  Plaintiff concedes that none of them told her this directly or said words to that effect.  Gillespie, Marshbank, Gertsema and Keith were not involved in the hiring process for the DFS position and did not even work for the County in 2019.

## IV.    Selection Of New Business Intelligence Analyst

In May of 2019, JDOC had two BIAs: Clark and Brian Seidler.  Clark handled the adult portfolio and Brian Seidler handled the juvenile portfolio, but they performed substantially the same job duties and worked together within each other's portfolio, as needed.  After the County hired Clark for the DFS position, Seidler decided that he wanted to take over the adult portfolio so the open BIA position was for the juvenile portfolio.  Some 25 people—including plaintiff— applied for the position.  After consulting with Sullivan, Dougan decided to interview 11 individuals, including plaintiff and Allen.[9]

---

[9]      BIAs give presentations on a regular basis.  They present data and explain it to people in the judicial system, such as judges and district attorneys, as well as advisory boards and others who do not have a correctional or judicial background.  The BIA position required a bachelor's degree in Computer Science, Information Technology, Economics, Information Systems, Statistics, Applied Math, Business Administration, or a department specific degree.  The job listing stated that the County preferred one year of corrections experience.  The job listing described the job in part as follows: (1) acts as domain expert understanding existing systems as well as culture and business objectives; (2) cleans, reviews, manipulates and conducts high level data analysis; (3) designs and develops higher data solutions, reviewing and analyzing data from multiple internal and external sources; (4) through high level data analysis, identifies areas or ways
(continued. . .)

The interview panel included Dougan, Sullivan and Seidler.  Dougan was the hiring manager, but Sullivan heavily influenced her decisions.  On May 24, 2019, Sullivan sent Dougan and Seidler an outline of the characteristics of a great candidate for the BIA position: (1) loves working with data; (2) is innovative; (3) has people skills and is willing to shadow operations to gain domain experience; (4) has ability to present information; and (5) is humble (bonus points for humor).

By May of 2019, the County had switched from Excel and begun using a data visualization tool called Tableau.  Tableau allows a user to take a data source and manipulate data to create charts and graphs so that the information is easy to understand.  Seidler thought that Clark's replacement needed experience with Excel to clean data to connect it to Tableau.  Even so, Seidler did not think that experience with Excel formulas was as important as knowledge of Tableau.

Olivia Allen (now Parks), who was 26 years old in May of 2019 and a feminine-presenting female, also applied for the BIA position.  Allen has a bachelor's and master's degree in Criminal Justice and Criminology from UMKC.

From 2014 through 2016, Allen worked as a research clerk at the Jackson County Family court, where she entered data, scrubbed it and provided it to a director on the juvenile side of family court.  In January of 2016, Allen began working for Johnson County as a pretrial officer in court services.  In that role, she supervised a caseload of more than 100 adults who were on bond in Johnson County.  During the time she was a pretrial officer, Allen also helped Dr. Alex Holsinger, a professor at UMKC, who is known nationally for research and experience in criminal justice.

---

[9](. . . continued)

to increase success of JDOC, tracks performance, optimizes operations, predicts success of new programs, identifies trends and business issues, and compares data with other entities; (5) creates advanced data visualization for presentations; and (6) writes and submits grant applications.

Allen had experience cleaning her own data, including arrest data for her thesis and data for a social network analysis.  Allen used Excel to get data ready for software analysis.  She did not use formulas in Excel because she did all her analysis in SPSS (Statistical Package for the Social Sciences).  At the time of the interviews, Allen had not used any data analytics software besides Excel and SPSS.

On May 31, 2019, Dougan, Sullivan and Seidler interviewed the 11 candidates.  In her interview, plaintiff outlined her experience with data processing/analysis software including Google Sheets, Google Data Studios (which is similar to Tableau), SPSS and Excel.  She explained that she had learned data visualization tools through online classes and had created dashboards.  When specifically asked about experience with Tableau or other data visualization software, plaintiff explained that she had both end-user and creator experience with Tableau and Google Data Studios.  Because plaintiff did not have a license for Tableau, the panel understood her to mean that she had end-user experience with Tableau and creator experience with Google Data Studios.  Plaintiff also had experience cleaning data and developing reports and dashboards to convey data.

Seidler created a three-part exercise for candidates to complete during the interviews.  One of the parts had an Excel formula.  Seidler created the exercise to test the candidates' experience, knowledge and ability to interpret data and statistics, and to use Excel.  Plaintiff did well on Seidler's exercise.  Allen did not try to complete the part of the exercise on Excel because she had not used Excel formulas.  Seidler was concerned and worried about hiring Allen because he assumed that with her education and experience, she would have had some familiarity with Excel and would have performed better on that part of the exercise.

When the interview panel asked plaintiff about an example of identifying a complex

problem, evaluating the options and implementing a solution, plaintiff referred to a sexual misconduct issue that had occurred some 15 years earlier.  Sullivan and Dougan both thought that plaintiff's example was dated, but they did not ask her for a more recent example.

Dougan knew that plaintiff took FMLA leave on March 25, 2019.  Dougan testified that plaintiff did a very good job in her interview for the BIA position, but she was disappointed that plaintiff used examples from years earlier.

As with the DFS position, Sullivan had each panelist rank the top three candidates.  Both Dougan and Sullivan had Allen and plaintiff as their top two candidates.  Seidler's top choice was an external candidate named Casey Johnson.  Seidler had plaintiff and Allen in his top three, but he does not recall in which order.

Ultimately, the County hired Allen for the BIA position.  Sullivan thought that Allen would bring energy and excitement to the position.  Sullivan remarked that plaintiff seemed "very tired" and he liked Allen's enthusiasm.  Sullivan could picture Allen doing the job; i.e. he could picture her presenting to individuals and groups.  Sullivan stated that none of the candidates knew Tableau, but plaintiff was familiar with the system and had explained her experience in the interview.

Sullivan testified that if the BIA position was for the adult portfolio, plaintiff would have been his top choice because of her extensive experience with adult services.  Sullivan explained that Allen was his top choice because the open BIA position involved overseeing the juvenile portfolio.  Even so, the duties for the two BIA positions were essentially the same.  The two BIAs worked together and within each other's portfolios as needed.  The main difference was the analyst's ability to interpret the source data.  Even though the open BIA position was for the juvenile portfolio, Seidler did not think juvenile experience was necessary.  Indeed, the hiring panel did not discuss the distinction between the adult and juvenile experience of the various

candidates.  After the fact, Allen herself stated that she did not believe that juvenile experience was necessary for the BIA position overseeing the juvenile portfolio.

## V.  Selection Of Another Business Intelligence Analyst And Sullivan's Comments

For a BIA position to which plaintiff did not apply, Sullivan pre-selected a male candidate over a female candidate before the panel held interviews.  Allen, who was on the interview panel, concluded that before the second round of interviews, Sullivan had made up his mind to hire a male, Chris Schneweis, over a female that Allen had ranked higher.

Allen believed that Sullivan had problems with women stating their concerns and that he treated men better than women.[10]  At some point, Allen informed Sullivan, Dougan and Clark that she did not enjoy being near Schneweis because he "just seemed inappropriate, not very professional."  Sullivan dismissed Allen's concerns and twice told her that she "needs to be tougher."

In a meeting with Allen, Sullivan made comments about Allie Dickinson—especially when she was out on FMLA leave—that she was "not doing what she needed to be doing."  Sullivan expressed that he was irritated with the situation generally because he was having to do things to cover Dickinson's job while she was out on leave.

## VI.  Procedural History

On January 29, 2021, plaintiff filed suit under Title VII, the ADEA and the FMLA. Plaintiff alleges that in March of 2019, defendant did not hire her for the DFS position because of her sex (including gender stereotyping, gender presentation and sexual orientation) and in

---

[10]  Other than the fact that a former employee had filed a harassment complaint against Schneweis, plaintiff has not provided admissible evidence to support Allen's belief.  Plaintiff cites no evidence to show the basis or the outcome of the harassment complaint.

retaliation for her use of FMLA leave.  Plaintiff also alleges that in June of 2019, defendant did not hire her for the BIA position because of her sex, age and in retaliation for her use of FMLA leave.[11]  Defendant asserts that it is entitled to summary judgment on each of plaintiff's claims.

## Analysis

Under Title VII, the ADEA and the FMLA, plaintiff may establish that defendant acted with discriminatory or retaliatory intent either directly, through direct or circumstantial evidence, or indirectly, through the inferential burden-shifting scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804 (1973).  See Dewitt v. Sw. Bell Tel. Co., 845 F.3d 1299, 1318 (10th Cir. 2017) (FMLA retaliation); Jones v. Okla. City Pub. Schs., 617 F.3d 1273, 1278–79 (10th Cir. 2010) (Title VII and ADEA).  Here, plaintiff relies on the indirect method of proving discrimination and retaliation.  Under the McDonnell Douglas burden-shifting framework, plaintiff has the initial burden of establishing a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802; Sanders v. Sw. Bell Tel., L.P., 544 F.3d 1101, 1105 (10th Cir. 2008).  If plaintiff satisfies her burden, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's employment.  McDonnell Douglas, 411 U.S. at 802–03.  If defendant does so, the burden shifts back to plaintiff to show a genuine issue of material fact whether defendant's stated reason is pretextual, i.e. unworthy of belief.  Sanders, 544 F.3d at 1105.

Defendant argues that for both the DFS and BIA positions, plaintiff cannot (1) establish a prima facie case of discrimination or retaliation, or (2) show that defendant's stated reasons for not choosing her for the positions were a pretext for discrimination or retaliation.

---

[11]     In the complaint, plaintiff asserted various other claims, but later agreed to dismiss them.

## I.     Director Of Field Services Position

Plaintiff alleges that defendant did not choose her for the DFS position because of her gender and because she exercised her rights under the FMLA.  Defendant argues that (1) plaintiff cannot establish a prima facie case of discrimination or retaliation and (2) plaintiff has not presented sufficient evidence to create a genuine issue of material fact whether defendant's stated reasons for not selecting her for the DFS position were a pretext for discrimination.

### A.     Prima Facie Case Of Gender Discrimination

Title VII makes it unlawful to discriminate against any individual with respect to terms, conditions or privileges of employment based on the employee's sex.  See 42 U.S.C. § 2000e–2(a)(1).  A plaintiff can also show discrimination based on sex if such differential treatment is motivated by her failure to conform to stereotypical gender norms.  Throupe v. Univ. of Denver, 988 F.3d 1243, 1251–52 (10th Cir. 2021) (citing McBride v. Peak Wellness Ctr., Inc., 688 F.3d 698, 711 (10th Cir. 2012)).  To establish a prima facie case of disparate treatment under Title VII, plaintiff must show that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination.  Luster v. Vilsack, 667 F.3d 1089, 1095 (10th Cir. 2011).  Plaintiff's burden to establish a prima facie case is not onerous.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see also Bird v. W. Valley City, 832 F.3d 1188, 1200–01 (10th Cir. 2016) (burden is light).

Defendant argues that plaintiff cannot establish that its decision not to hire her for the DFS position occurred under circumstances giving rise to an inference of discrimination.  Plaintiff has presented evidence that she was qualified for the position and that defendant hired Clark, a male applicant.  The fact that defendant hired someone outside the protected class is sufficient to

establish circumstances giving rise to an inference of discrimination.  Hamilton v. Okla. City Univ., 563 F. App'x 597, 601 n.3 (10th Cir. 2014) (proof that employer hired or promoted someone outside protected class sufficient to show adverse employment action occurred under circumstances which give rise to inference of unlawful discrimination) (citing Sorbo v. United Parcel Serv., 432 F.3d 1169, 1173 (10th Cir. 2005)).  The Court therefore overrules defendant's motion for summary judgment on this ground.

      B.     Prima Facie Case Of FMLA Retaliation

Under the FMLA, an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]."  Dewitt, 845 F.3d at 1318 (citing 29 U.S.C. § 2615(a)(2)).  The Tenth Circuit has "construed this provision of the FMLA as creating a retaliation theory of recovery."  Id. (citations omitted).  Under the FMLA, an employer cannot retaliate against an employee for taking FMLA leave.  Smothers v. Solvay Chems., Inc., 740 F.3d at 539–40 (10th Cir. 2014).  To establish a prima facie case of retaliation under the FMLA, plaintiff must show that (1) she engaged in protected activity, (2) defendant took an action that a reasonable employee would have found materially adverse and (3) a causal connection exists between the protected activity and the adverse action.  Dewitt, 845 F.3d at 1318.

Here, defendant asserts that plaintiff has not established a causal connection between her FMLA leave and defendant's decision not to select her for the DFS position.  Sullivan testified that at the time of the decision he did not know that plaintiff had ever taken FMLA leave.  Even so, plaintiff has presented evidence that two members of the hiring panel (Bloomberg and Dougan) knew that plaintiff had been approved for FMLA leave and that plaintiff took leave six weeks before she interviewed for the DFS position.  Plaintiff may rely on temporal proximity alone if the adverse action "is very closely connected in time to the protected activity."  Metzler v. Fed. Home

Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting Anderson v. Coors Brewing, Co., 181 F.3d 1171, 1179 (10th Cir. 1999)).   For purposes of establishing a prima facie case through temporal proximity, plaintiff has presented evidence of a causal connection between defendant's decision not to hire her for the DFS position and her use of FMLA leave some six weeks earlier.   See id. at 1172 (six weeks between protected activity and adverse action sufficiently close in time to establish third element of prima facie case).   The Court therefore overrules defendant's motion for summary judgment on this ground.

      C.     Evidence That Stated Reasons Are Pretext For Discrimination Or Retaliation

Defendant argues that it did not hire plaintiff for the DFS position for legitimate, non-discriminatory reasons, i.e. Clark was more qualified than plaintiff because he had better experiences and superior skills.   Memorandum In Support Of Motion For Summary Judgment (Doc. #64) filed February 11, 2022 at 77.   Because defendant has met its burden of offering non-discriminatory reasons for not hiring plaintiff for the DFS position, the presumption of discrimination and retaliation drops from the case and plaintiff must establish by a preponderance of the evidence that the proffered reasons were not the true reasons for the employment decision. Aramburu v. Boeing Co., 112 F.3d 1398, 1403 (10th Cir. 1997).   Plaintiff may show pretext by establishing that a discriminatory or retaliatory reason more likely motivated defendant or that its stated reasons are unworthy of credence.   Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994).

Plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Jaramillo v. Colo.

Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005). While "[t]his burden is not onerous . . . it is also not empty or perfunctory." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323–24 (10th Cir. 1997) (quotation marks and citation omitted). Plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action is false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). More specifically, evidence of pretext may include the following: "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." Simms v. Okla. ex rel. Dept. of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999). In sum, plaintiff must produce evidence which shows that the employer did more than just "get it wrong" and that it did not honestly believe its proffered reasons. Johnson v. Weld Cty., Colo., 594 F.3d 1202, 1211 (10th Cir. 2010).

As noted above, defendant states that it did not hire plaintiff for the DFS position because Clark was more qualified, and had better experiences and superior skills. Plaintiff asserts that defendant's stated reasons for not hiring her are pretext for sex discrimination and FMLA retaliation. Specifically, plaintiff has presented evidence that (1) JDOC prefers to fill vacancies with internal candidates, (2) Sullivan, the hiring manager for the DFS position, stated that he chose Clark in part because he was an internal candidate yet he did not apply this same preference for internal candidates to plaintiff when ranking his three candidates for further consideration; (3) Williams, the only hiring panel member from outside the County, ranked plaintiff as one of the

top three candidates; (4) the hiring panel did not directly compare the qualifications of plaintiff and Clark, but shortly after interviews, eliminated plaintiff from consideration in favor of Clark, Mestad and Milner who was an external candidate; and (5) plaintiff was more qualified than Clark, Mestad and Milner.  Collectively, this evidence creates a genuine issue of material fact about the truth of defendant's stated reasons for not hiring plaintiff.  The Court therefore overrules defendant's motion for summary judgment on plaintiff's claims of age discrimination and FMLA retaliation as to the DFS position.

## II.     Business Intelligence Analyst Position

Plaintiff alleges that defendant did not choose her for the BIA position because of age, her gender and because she exercised her rights under the FMLA.  Defendant argues that (1) plaintiff cannot establish a prima facie case of discrimination or retaliation and (2) plaintiff has not presented sufficient evidence to create a genuine issue of material fact whether defendant's stated reasons for not selecting her for the BIA position were a pretext for discrimination.

### A.     Prima Facie Case Of Age Discrimination

To establish a prima facie claim of age discrimination, plaintiff must show that (1) she was a member of the protected age group, over age 40; (2) she was qualified for the BIA position; and (3) defendant hired a younger person for the position or hired another person under circumstances giving rise to an inference of discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Medlock v. United Parcel Serv., Inc., 608 F.3d 1185, 1191 n.5 (10th Cir. 2010); Rivera v. City & Cty. of Denver, 365 F.3d 912, 920 (10th Cir. 2004).  As with plaintiff's gender discrimination claim discussed above, the fact that defendant hired someone outside the protected class is sufficient to establish circumstances giving rise to an inference of discrimination. See Hamilton, 563 F. App'x at 601 n.3 (proof that employer hired or promoted someone outside

protected class sufficient to show adverse employment action occurred under circumstances which give rise to inference of unlawful discrimination) (citing <u>Sorbo</u>, 432 F.3d at 1173). The Court therefore overrules defendant's motion on this ground.

      B.    <u>Prima Facie Case Of Gender Discrimination</u>

To establish a prima facie case of disparate treatment under Title VII, plaintiff must show that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination. <u>Luster</u>, 667 F.3d at 1095. Plaintiff's burden to establish a prima facie case is not onerous. <u>Burdine</u>, 450 U.S. at 253; <u>see also</u> <u>Bird</u>, 832 F.3d at 1200–01 (burden is light).

Defendant argues that plaintiff cannot establish that its decision not to hire her for the DFS position occurred under circumstances giving rise to an inference of discrimination. "[S]ex-plus-age claims" are cognizable under Title VII. <u>Frappied v. Affinity Gaming Black Hawk, LLC</u>, 966 F.3d 1038, 1048 (10th Cir. 2020). Again, the fact that defendant hired someone outside the protected class (a much younger, feminine-presenting female) is sufficient to establish circumstances giving rise to an inference of discrimination. <u>See Hamilton</u>, 563 F. App'x at 601 n.3 (proof that employer hired or promoted someone outside protected class sufficient to show adverse employment action occurred under circumstances which give rise to inference of unlawful discrimination) (citing <u>Sorbo</u>, 432 F.3d at 1173). The Court therefore overrules defendant's motion on this ground.

      C.    <u>Prima Facie Case Of FMLA Retaliation</u>

To establish a prima facie case of retaliation under the FMLA, plaintiff must show that (1) she engaged in protected activity, (2) defendant took an action that a reasonable employee would have found materially adverse and (3) a causal connection exists between the protected

activity and the adverse action.  Dewitt, 845 F.3d at 1318.

Here, defendant asserts that plaintiff has not established a causal connection between her FMLA leave and defendant's decision not to select her for the BIA position.  Plaintiff has presented evidence that at least one member of the hiring panel (Dougan) knew that plaintiff took leave some eight weeks before she interviewed for the BIA position and that she was approved for ongoing FMLA leave.  As explained above, a plaintiff may rely on temporal proximity alone if the adverse action "is very closely connected in time to the protected activity."  Metzler, 464 F.3d at 1171 (quoting Anderson, 181 F.3d at 1179).  For purposes of establishing a prima facie case through temporal proximity, plaintiff has presented evidence of a causal connection between defendant's decision not to hire her for the BIA position and her use of FMLA leave some eight weeks earlier. See id. at 1172 (six weeks between protected activity and adverse action sufficiently close in time to establish third element of prima facie case); Anderson, 181 F.3d at 1179 (assuming nine-week period sufficient to show causation); cf. Meiners v. Univ. of Kan., 359 F.3d 1222, 1231 (10th Cir. 2004) (three months and one week too long to establish causation by temporal proximity alone). The Court therefore overrules defendant's motion for summary judgment on this ground.

D.     Evidence That Stated Reasons Are Pretext For Discrimination Or Retaliation

Defendant argues that it did not hire plaintiff for the BIA Analyst position for legitimate, nondiscriminatory reasons, i.e. Allen was more qualified than plaintiff.  Memorandum In Support Of Motion For Summary Judgment (Doc. #64) at 85–86.  Specifically, defendant asserts that Allen had more experience involving juveniles than plaintiff and plaintiff did not indicate a willingness to step outside the box.  Id. at 86.

Plaintiff asserts that defendant's stated reasons for not hiring her are pretext for sex discrimination, age discrimination and FMLA retaliation.  Specifically, plaintiff has presented

evidence that (1) she had significantly more corrections experience than Allen (some 28 years compared to some three to five years), (2) she knew how to use Tableau but Allen did not; (3) she outperformed Allen on Seidler's interview exercises to use Excel and to demonstrate experience, knowledge and ability to interpret data and statistics, (4) Sullivan and Dougan referred to her examples as "dated" and that she looked "tired," and (5) Sullivan admitted that plaintiff would have been the top pick for the BIA position covering the adult portfolio even though the duties between the two BIA positions were substantially the same.  From this evidence, a reasonable jury could find that defendant's stated reasons for not hiring plaintiff for the BIA position are unworthy of belief.  In other words, construed in the light most favorable to plaintiff, the record creates a genuine issue of material fact about the truth of defendant's stated reasons for not hiring plaintiff for the BIA position.  The Court therefore overrules defendant's motion for summary judgment on plaintiff's claims of age discrimination, sex discrimination and FMLA retaliation as to the BIA position.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #63) filed February 11, 2022 is **OVERRULED**.

Dated this 12th day of May, 2022 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge